


USPS CERTIFIED MAIL

9236 0901 7301 4153 2300 0009 88

P.O. BOX 505
MARION, AL, 36756


RECEIVED
JUL 2 4 2023
Kim Rigoroso

53-CV-2023-900035.00

**Restricted Delivery**

To:   INDIAN HARBOR INSURANCE COMPANY C/O SARAH MIMS
      505 EAGLEVIEW BLVD
      SUITE 100
      EXTON, PA 19341

# NOTICE OF ELECTRONIC FILING

### IN THE CIRCUIT COURT OF PERRY COUNTY, ALABAMA

### JUDSON COLLEGE ET AL V. INDIAN HARBOR INSURANCE COMPANY C/O SARAH MIMS
### 53-CV-2023-900035.00

The following complaint was FILED on 7/17/2023 12:12:46 PM

Notice Date:      7/17/2023 12:12:46 PM

**MIA JACOBS-TURNER**
**CIRCUIT COURT CLERK**
PERRY COUNTY, ALABAMA
P.O. BOX 505
MARION, AL 36756

334-683-6106
mia.turner@alacourt.gov

| State of Alabama<br>Unified Judicial System<br>Form C-34  Rev. 4/2017 | **SUMMONS**<br>**- CIVIL -** | **Court Case Number**<br>53-CV-2023-900035.00 |
|---|---|---|

### IN THE CIRCUIT COURT OF PERRY COUNTY, ALABAMA
### JUDSON COLLEGE ET AL V. INDIAN HARBOR INSURANCE COMPANY C/O SARAH MIMS

**NOTICE TO:** INDIAN HARBOR INSURANCE COMPANY C/O SARAH MIMS, 505 EAGLEVIEW BLVD SUITE 100, EXTON, PA 19341

*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S), WILLIAM IVEY GILMORE JR.

*(Name(s) of Attorney(s))*

WHOSE ADDRESS(ES) IS/ARE: 1905 7th Street, TUSCALOOSA, AL 35401

*(Address(es) of Plaintiff(s) or Attorney(s))*

THE ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

### TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☑ Service by certified mail of this Summons is initiated upon the written request of JUDSON COLLEGE
pursuant to the Alabama Rules of the Civil Procedure.

*(Name(s))*

| 07/17/2023 | /s/ MIA JACOBS-TURNER | By:  |
|---|---|---|
| *(Date)* | *(Signature of Clerk)* | *(Name)* |

☑ Certified Mail is hereby requested.

/s/ WILLIAM IVEY GILMORE JR.

*(Plaintiff's/Attorney's Signature)*

### RETURN ON SERVICE

☐ Return receipt of certified mail received in this office on _____

*(Date)*

☐ I certify that I personally delivered a copy of this Summons and Complaint or other document to _____

_____ in _____ County,

*(Name of Person Served)* *(Name of County)*

Alabama on _____

*(Date)*

| _____ | _____ | _____ |
|---|---|---|
| *(Type of Process Server)* | *(Server's Signature)* | *(Address of Server)* |
| | _____ | _____ |
| | *(Server's Printed Name)* | *(Phone Number of Server)* |

### 53-CV-2023-900035.00
**JUDSON COLLEGE ET AL V. INDIAN HARBOR INSURANCE COMPANY C/O SARAH MIMS**

| C001 - JUDSON COLLEGE | v. | D001 - INDIAN HARBOR INSURANCE COMPANY C/O SARAH MIMS |
|---|---|---|
| *(Plaintiff)* | | *(Defendant)* |

**SERVICE RETURN COPY**

DOCUMENT 9

| State of Alabama<br>Unified Judicial System<br>Form C-34  Rev. 4/2017 | **SUMMONS**<br>**- CIVIL -** | **Court Case Number**<br>53-CV-2023-900035.00 |
|---|---|---|

### IN THE CIRCUIT COURT OF PERRY COUNTY, ALABAMA
### JUDSON COLLEGE ET AL V. INDIAN HARBOR INSURANCE COMPANY C/O SARAH MIMS

**NOTICE TO:** INDIAN HARBOR INSURANCE COMPANY C/O SARAH MIMS, 505 EAGLEVIEW BLVD SUITE 100, EXTON, PA 19341

*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S), WILLIAM IVEY GILMORE JR.

*[Name(s) of Attorney(s)]*

WHOSE ADDRESS(ES) IS/ARE: 1905 7th Street, TUSCALOOSA, AL 35401

*[Address(es) of Plaintiff(s) or Attorney(s)]*

THE ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

### TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☑ Service by certified mail of this Summons is initiated upon the written request of JUDSON COLLEGE pursuant to the Alabama Rules of the Civil Procedure.

*[Name(s)]*

| 07/17/2023 | /s/ MIA JACOBS-TURNER | By: |
|---|---|---|
| *(Date)* | *(Signature of Clerk)* | *(Name)* |

☑ Certified Mail is hereby requested.   /s/ WILLIAM IVEY GILMORE JR.

*(Plaintiff's/Attorney's Signature)*

## RETURN ON SERVICE

☐ Return receipt of certified mail received in this office on _____

*(Date)*

☐ I certify that I personally delivered a copy of this Summons and Complaint or other document to _____

_____ in _____ County,

*(Name of Person Served)*            *(Name of County)*

Alabama on _____.

*(Date)*

_____          _____

*(Type of Process Server)*          *(Address of Server)*

_____          _____

*(Server's Signature)*              

_____          _____

*(Server's Printed Name)*            *(Phone Number of Server)*

DOCUMENT 1

ELECTRONICALLY FILED
7/17/2023 12:12 PM
53-CV-2023-900035.00
CIRCUIT COURT OF
PERRY COUNTY, ALABAMA
MIA JACOBS-TURNER, CLERK

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93  Rev. 9/18 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Ca:<br>53<br><br>Date of Filing:<br>07/17/2023 | Judge Code: |
|---|---|---|---|

## GENERAL INFORMATION

### IN THE CIRCUIT COURT OF PERRY COUNTY, ALABAMA
### JUDSON COLLEGE ET AL v. INDIAN HARBOR INSURANCE COMPANY C/O SARAH MIMS ET AL

**First Plaintiff:** ☑ Business ☐ Individual    **First Defendant:** ☑ Business ☐ Individual
☐ Government ☐ Other           ☐ Government ☐ Other

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**
☐ WDEA - Wrongful Death
☐ TONG - Negligence: General
☐ TOMV - Negligence: Motor Vehicle
☐ TOWA - Wantonness
☐ TOPL - Product Liability/AEMLD
☐ TOMM - Malpractice-Medical
☐ TOLM - Malpractice-Legal
☐ TOOM - Malpractice-Other
☑ TBFM - Fraud/Bad Faith/Misrepresentation
☐ TOXX - Other:

**TORTS: PERSONAL INJURY**
☐ TOPE - Personal Property
☐ TORE - Real Property

**OTHER CIVIL FILINGS**
☐ ABAN - Abandoned Automobile
☐ ACCT - Account & Nonmortgage
☐ APAA - Administrative Agency Appeal
☐ ADPA - Administrative Procedure Act
☐ ANPS - Adults in Need of Protective Service

**OTHER CIVIL FILINGS  (cont'd)**
☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/
     Enforcement of Agency Subpoena/Petition to Preserve
☐ CVRT - Civil Rights
☐ COND - Condemnation/Eminent Domain/Right-of-Way
☐ CTMP - Contempt of Court
☐ CONT - Contract/Ejectment/Writ of Seizure
☐ TOCN - Conversion
☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/
     Injunction Election Contest/Quiet Title/Sale For Division
☐ CVUD - Eviction Appeal/Unlawful Detainer
☐ FORJ - Foreign Judgment
☐ FORF - Fruits of Crime Forfeiture
☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
☐ PFAB - Protection From Abuse
☐ EPFA - Elder Protection From Abuse
☐ QTLB - Quiet Title Land Bank
☐ FELA - Railroad/Seaman (FELA)
☐ RPRO - Real Property
☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
☐ COMP - Workers' Compensation
☐ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN:** F ☑ INITIAL FILING    A ☐ APPEAL FROM      O ☐ OTHER
                        DISTRICT COURT

     R ☐ REMANDED      T ☐ TRANSFERRED FROM
                           OTHER CIRCUIT COURT

**HAS JURY TRIAL BEEN DEMANDED?** ☑ YES ☐ NO    Note: Checking "Yes" does not constitute a demand for a
                                       jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:** ☑ MONETARY AWARD REQUESTED ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**
GIL049

7/17/2023 12:12:40 PM
Date

/s/ WILLIAM IVEY GILMORE JR.
Signature of Attorney/Party filing this form

**MEDIATION REQUESTED:** ☐ YES ☐ NO ☑ UNDECIDED

**Election to Proceed under the Alabama Rules for Expedited Civil Actions:** ☐ YES ☑ NO

ELECTRONICALLY FILED
7/17/2023 12:12 PM
53-CV-2023-900035.00
CIRCUIT COURT OF
PERRY COUNTY, ALABAMA
MIA JACOBS-TURNER, CLERK

## IN THE CIRCUIT COURT OF PERRY COUNTY, ALABAMA

| | |
|---|---|
| JUDSON COLLEGE; JOAN VIGNES NEWMAN; JUDITH KAREN FAVOR; DAPHNE RUDICELL ROBINSON; JOSEPH WILLIAM "BILL" MATHEWS, JR., | ) ) ) ) ) ) |
| **Plaintiffs,** | ) ) |
| v. | ) ) |
| INDIAN HARBOR INSURANCE CO.; KEN GOFORTH; USI INSURANCE SERVICES, | ) ) ) ) |
| **Defendants.** | ) ) |

RECEIVED

JUL 2 4 2023

Kim Rigoroso

CIVIL ACTION NO.: _____

**JURY TRIAL REQUESTED**

### COMPLAINT

COME NOW, Plaintiffs Judson College and its below-named Trustees and a former officer (collectively "Plaintiffs"), and file this Complaint against Defendants Indian Harbor Insurance Company, Ken Goforth, and USI Insurance Services. In support thereof, Plaintiffs state as follows:

### THE PARTIES

1.     Plaintiff, Judson College ("Judson"), is a not-for-profit college located in Marion, Alabama, and organized and existing under the laws of the state of Alabama.

2.     Plaintiff, Judith Karen Favor ("Favor") is a trustee of Judson College and an adult citizen of Alabama residing in Jefferson County, Alabama.

3.     Plaintiff, Joan Vignes Newman ("Newman") is a trustee of Judson College and an adult citizen of Alabama residing in Dale County, Alabama.

4.     Plaintiff, Daphne Rudicell Robinson ("Robinson") is a trustee of Judson College and an adult citizen of Alabama residing in Baldwin County, Alabama.

1

5.      Plaintiff, Joseph William "Bill" Mathews, Jr. ("Mathews") served as former in-house legal counsel for Judson College and is an adult citizen of Alabama residing in Jefferson County, Alabama.

6.      Upon information and belief, Defendant Indian Harbor Insurance Company ("Indian Harbor") is a corporation organized and existing under the laws of the state of New York.

7.      Upon information and belief, Defendant Ken Goforth is a citizen and resident of Perry County, Alabama.

8.      Upon information and belief, Defendant USI Insurance Services is a corporation organized and existing under the laws of the state of Alabama.

9.      Jurisdiction and venue are proper before this Court in as much as the location involved in the lawsuit is in Perry County, Alabama and the insurance policy in questions was sold there by an Alabama corporation and an Alabama agent. Judson College is located in the city of Marion, Alabama in Perry County. Many acts, errors, and omissions leading to Plaintiffs' damages occurred in Perry County. Many of the material witnesses that will provide evidence in this case reside in Perry County and/or are or were employed by Plaintiff Judson College in Perry County.

## FACTUAL ALLLEGATIONS

10.     Judson College was founded in 1831 as a private women's college in Marion, Alabama.

11.     Judson College served generations of Perry County residents as a place of employment, learning, and personal and professional growth.

12.     As a Southern Baptist affiliated institution, Judson College received annual financial support from the Alabama State Baptist Commission and the State Board of Missions of the Alabama State Baptist Commission.

2

13.    Like many small colleges throughout the country and the state of Alabama, Judson College began to experience acute financial difficulties in the twenty-first century.

14.    Amidst a sustained period of lower enrollment and financial difficulties, and in an effort to achieve financial stability, Judson College attempted to raise funds by issuing bonds in the amount of $11.23 million in October 2010.

15.    However, despite the capital raised from the sale of bonds and the support of state Baptist entities and other benefactors, Judson College continued to experience financial difficulties.

16.    Ultimately, in 2021, Judson College was forced to close its doors, ending nearly two centuries of service to the young women of this state and the surrounding community of Marion, Alabama.

17.    Since 2021, Judson College's employees lost their jobs and many of their former students and faculty have left Perry County in search of opportunities elsewhere.

18.    Following the closure of Judson College, Frank C. Mann, a bondholder of Judson College, initiated a lawsuit against Judson College and certain members of its board of trustees, including the above-referenced Plaintiffs, in a case styled *Frank C. Mann v. Charles F. Dunkin et al.*, Civil Action Number: 01-CV-2022-902060, currently pending in the Circuit Court of Jefferson County (the "Underlying Suit"). A true and correct copy of the original Complaint of the Underlying Suit is attached as **Exhibit A**.

19.    Judson College timely notified its insurer, Defendant Indian Harbor Insurance Company, of the Underlying Suit and requested defense and indemnity under its policy of insurance, on behalf of the individual named Defendant Trustees and officer of the College.

20.     Judson College had a policy of insurance with Indian Harbor, policy number ELL0951876-03, that provided insurance coverage for "educators' legal liability and employment practices liability". A true and correct copy of the Indian Harbor policy of the Underlying Suit is attached as **Exhibit B**.

21.     This policy of insurance also provides coverage to Judson's trustees and officers as additional insureds.

22.     Defendant Ken Goforth is an insurance agent and vice president of USI Insurance Services.

23.     Ken Goforth, acting in his capacity as an insurance agent and employee of USI Insurance Services, procured this policy of insurance with Indian Harbor on behalf of Judson College.

24.     Judson College relied on Ken Goforth's purported expertise and experience as an insurance agent to identify and procure policies of insurance for Judson College which would provide coverage, defense, and indemnity to Judson College in the event of a covered loss or litigation.

25.     After Judson College notified Indian Harbor of the Underlying Suit and Amended Complaints, it had every expectation that Indian Harbor would provide a defense to Judson College, as the Named Insured, and a defense to those certain trustees and officer, named as individual Defendants in the Mann litigation as Additional Insureds, pursuant to the clear and unambiguous language of the policy.

26.     Instead, Indian Harbor denied Judson College's request and refused to provide a defense to its insured, including *a denial issued within 38 minutes* of receiving Judson College's

4

request for defense and indemnity. A copy of the denial letter is attached to this Complaint as **Exhibit C**.

27.     As a result of Indian Harbor's refusal to provide defense and indemnity to Plaintiffs in the Underlying Suit, Plaintiffs have incurred significant legal expenses in their defense and experience mental anguish.

### COUNT ONE-BREACH OF CONTRACT AGAINST ALL DEFENDANTS

28.     Plaintiffs hereby reallege and adopt all of the foregoing paragraphs of the complaint as if more fully set out herein.

29.     Defendant Indian Harbor has breached its contract of insurance by refusing to provide defense to Plaintiffs pursuant to the terms of said contract.

30.     Indian Harbor's refusal to provide defense to Plaintiffs constitutes a clear breach of a written contract of insurance between Indian Harbor and Judson College. The proximate result of this breach is thousands of dollars in incurred legal expenses for Plaintiffs, extreme mental anguish suffered by the individual Plaintiffs in this suit.

31.     Defendants Ken Goforth and Defendant USI Insurance Services also breached their contract and obligation to Plaintiffs by not properly insuring Judson College, after committing to and agreeing to do so, thereby causing Plaintiffs to incur aforesaid legal expenses and unjustly exposing them to personal liability in the Underlying Suit.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demand judgment against all Defendants for breach of contract, separately and severally, and for compensatory damages as provided by law. Plaintiffs claim such other and further relief as to the Court and jury seems proper and just.

## COUNT TWO- BAD FAITH FAILURE TO DEFEND AND INDEMNIFY AGAINST

## DEFENDANT INDIAN HARBOR

32.    Plaintiffs hereby reallege and adopt all of the foregoing paragraphs of the complaint as if more fully set out herein.

33.    Plaintiffs allege that Indian Harbor has committed various acts of bad faith. Specifically, Indian Harbor denied Plaintiffs' request for defense and indemnity in the Underlying Suit without an arguable or reasonable basis to do so, and/or without conducting a reasonable investigation into Plaintiffs' request for defense and indemnity.

34.    Under the circumstances, Indian Harbor's intentional refusal to provide defense and indemnity to its insureds, according to the written contract of insurance which was in full force and effect at the time of Judson's request, has amounted to bad faith, not only because of Indian Harbor's intentional conduct, but also because of the anticipated results to Plaintiffs.

35.    Plaintiffs allege that Indian Harbor failed to reasonably investigate Judson's request for defense and indemnity with a pre-determined motive, intentionally breached its duty to properly evaluate Plaintiffs' request, and committed the tort of bad faith and intentional tortious conduct against Plaintiffs.

36.    Pursuant to the choice of law provision in the policy, New York law applies to the policy of insurance issued by Indian Harbor to Judson College. See **Exhibit B**, page 22.

37.    Under New York law, insurers must expressly state all relevant exclusions in its denial letter. Any exclusions not expressly stated in an insurer's denial letter are waived under New York law. *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 2013 NY Slip Op 3264, ¶ 5, 21 N.Y.3d 139, 146, 969 N.Y.S.2d 808, 813, 991 N.E.2d 666,

6

671 ("Failure to raise a ground for disclaimer as soon as is reasonably possible precludes an insurer from later asserting it as a defense.")

38.     In the denial letter in response to Plaintiffs' request for defense and indemnity regarding the claims raised in the <u>Mann</u> litigation, which Indian Harbor sent to Plaintiff within 40 minutes of Plaintiffs' request, Indian Harbor only identified Exclusion #11-Contracts, as the basis for its denial of coverage. See **Exhibit C**.

39.     Accordingly, under New York law, which governs the Indian Harbor policy, Indian Harbor's sole basis for its denial of coverage is Exclusion #11-Contracts.

40.     The Underlying Suit did not arise from any contractual dispute as defined in Exclusion #11. Indeed, the sole exclusion cited by Indian Harbor for its denial of defense to Plaintiffs' request for a defense to the claims raised in the <u>Mann</u> litigation, Exclusion #11, is both factually and legally inapposite to the issues raised in the Underlying Suit and does not provide an adequate basis for denial of coverage.

41.     Therefore, Indian Harbor's refusal provide a defense or indemnity its insured, Judson College, and its trustees and officers, lacks any arguable or reasonable basis. Indian Harbor's conduct was intentional and in bad faith.

42.     Indian Harbor, intentionally and in bad faith, refused to reasonably and properly investigate Plaintiffs' covered claims under the insurance policy in question.

43.     Indian Harbor, intentionally and in bad faith, refused to properly evaluate and honor Plaintiffs' covered claims under the insurance policy in question.

44.     Indian Harbor, intentionally and in bad faith, failed to communicated with its agents, adjusters and associates and failed to investigate in an effort to breach a contract of insurance with Plaintiff Judson College.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demand judgment against Defendant Indian Harbor for bad faith and for all damages provided by law. Plaintiffs claim such other and further relief as to the Court and jury seems proper and just.

## COUNT THREE-NEGLIGENT PROCUREMENT AGAINST DEFENDANTS KEN GOFORTH AND USI INSURANCE SERVICES

**45.** Plaintiffs hereby reallege and adopt all of the foregoing paragraphs of the complaint as if more fully set out herein.

**46.** Should the Court determine that Indian Harbor owes no duty to Plaintiffs to defend or indemnify Plaintiffs under the terms of the policy, Plaintiffs assert, in the alternative, negligence against Defendants Ken Goforth and Defendant USI Insurance Services.

**47.** Specifically, Plaintiffs allege that Defendants negligently procured a policy of insurance for Judson College that did not provide proper and adequate insurance coverage for Plaintiffs for claims that should have been foreseeable against Plaintiffs.

**48.** Said Defendants' conduct is a proximate cause of Plaintiffs' losses. Specifically, these Defendants failed to procure adequate insurance coverage for Plaintiffs.

**49.** At the time that these Defendants procured insurance policies for Plaintiff Judson College, these Defendants had full knowledge of Judson College's operation as a private women's college and institution of higher learning. Defendants were specifically knowledgeable about the need to properly insure Judson College.

**50.** Defendants' knowledge was sufficient to obtain proper and adequate insurance coverage for Plaintiffs, and these Defendants never represented anything to the contrary to Plaintiffs.

**51.** Defendant USI Insurance Services advertises itself as an insurance agency and Defendant Ken Goforth holds himself out as an experienced and competent insurance agent.

8

Defendants represented to Judson College that they would procure proper and adequate insurance for Judson College.

52.    Consequently, Plaintiffs relied on these Defendants' representations that they would procure proper and adequate insurance policies and coverage to insure Judson College in the event of covered loss or litigation.

53.    These Defendants undertook to provide all appropriate insurance coverage to Plaintiffs. Said Defendants undertook to advise Plaintiff and to do all things necessary to adequately and completely insure Judson College. However, Defendants failed to do so.

54.    As a result of these Defendants' negligent failure to provide proper and adequate insurance coverage for Plaintiff Judson College, Plaintiffs, including individual Judson College trustees and a Judson officer, have incurred significant legal expenses defending themselves in the Underlying Suit and suffered mental anguish due to the potential liability exposure arising from that action.

55.    These trustees include retirees with long histories of civic service. Had Defendants obtained proper insurance coverage for Judson College, these trustees would have been covered as additional insureds under Judson College's insurance policies. However, as a result of Defendants' negligent procurement of inadequate insurance policies, these trustees, and other Plaintiffs, have incurred significant legal expenses, and face personal liability exposure, and potential financial devastation, for the claims in the Underlying Suit.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demand judgment against Defendants Ken Goforth and USI Insurance Services for negligent procurement, separately and severally, and for all damages provided by law. Plaintiffs claim such other and further relief as to the Court and jury seems proper and just.

9

Respectfully submitted,

*/s/ Richard E. Smith*
Richard E. Smith (SMI105)
Robert Andrew Yarbro (YAR017)
*Attorneys for Plaintiffs*

**OF COUNSEL**:
**CHRISTIAN & SMALL, LLP**
505 20th Street North, Suite 1800
Birmingham, Alabama 35203
Telephone: 205-795-6588
Fax: 205-328-7234
resmith@csattorneys.com
rayarbro@csattorneys.com

*/s/ W. Ivey Gilmore, Jr.*
W. Ivey Gilmore, Jr. (GIL049)
*Attorney for Plaintiffs*

**OF COUNSEL**:
**GILMORE, ROWLEY, CRISSEY & WILSON, ATTORNEYS AT LAW, LLC**
1905 7th St,
Tuscaloosa, AL, 35401
Telephone: 205-752-8338
Fax: 205-686-1516
gilmore@gilmorerowley.com

## JURY DEMAND

Plaintiffs demand a trial by struck jury on all issues.

## PLEASE SERVE DEFENDANTS BY CERTIFIED MAIL WITH THE SUMMONS AND COMPLAINT AND SIMULTANEOUSLY FILED DISCOVERY REQUESTS

**INDIAN HARBOR INSURANCE CO.**
c/o Sarah Mims
505 Eagleview Boulevard, Suite 100
Exton, Pennsylvania 19341-0636

10

**KEN GOFORTH**
3761 Kinross Dr
Birmingham, AL 35242-5805

**USI INSURANCE SERVICES**
2 North Jackson St., Suite 605
Montgomery, AL 36104

3777533.3

DOCUMENT 3

ELECTRONICALLY FILED
7/17/2023 12:12 PM
53-CV-2023-900035.00
CIRCUIT COURT OF
PERRY COUNTY, ALABAMA
MIA JACOBS-TURNER, CLERK

# EXHIBIT A

## Original Complaint
## of the Underlying Action



**AlaFile E-Notice**

01-CV-2022-902060.00

To: JOHN MICHAEL REDIKER
mrediker@rumberger.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

FRANK C. MANN V. CHARLES F. DUNKIN ET AL
01-CV-2022-902060.00

The following complaint was FILED on 7/15/2022 11:41:13 AM

Notice Date:        7/15/2022 11:41:13 AM

JACQUELINE ANDERSON  SMITH
CIRCUIT COURT CLERK
JEFFERSON COUNTY, ALABAMA
JEFFERSON COUNTY, ALABAMA
716 N. RICHARD ARRINGTON BLVD.
BIRMINGHAM, AL, 35203

205-325-5355
jackie.smith@alacourt.gov

ELECTRONICALLY FILED
7/15/2022 11:42 AM
01-CV-2022-902060.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
JACQUELINE ANDERSON SMITH, CLERK

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93   Rev. 9/18 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Ca:<br>01<br><br>Date of Filing:<br>07/15/2022 | Judge Code: |
|---|---|---|---|

## GENERAL INFORMATION

### IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA
### FRANK C. MANN v. CHARLES F. DUNKIN ET AL

**First Plaintiff:** ☐ Business ☑ Individual   **First Defendant:** ☐ Business ☑ Individual
☐ Government ☐ Other                            ☐ Government ☐ Other

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**
- ☐ WDEA - Wrongful Death
- ☐ TONG - Negligence: General
- ☐ TOMV - Negligence: Motor Vehicle
- ☐ TOWA - Wantonness
- ☐ TOPL - Product Liability/AEMLD
- ☐ TOMM - Malpractice-Medical
- ☐ TOLM - Malpractice-Legal
- ☐ TOOM - Malpractice-Other
- ☐ TBFM - Fraud/Bad Faith/Misrepresentation
- ☐ TOXX - Other:_____

**TORTS: PERSONAL INJURY**
- ☐ TOPE - Personal Property
- ☐ TORE - Real Property

**OTHER CIVIL FILINGS**
- ☐ ABAN - Abandoned Automobile
- ☐ ACCT - Account & Nonmortgage
- ☐ APAA - Administrative Agency Appeal
- ☐ ADPA - Administrative Procedure Act
- ☐ ANPS - Adults in Need of Protective Service

**OTHER CIVIL FILINGS (cont'd)**
- ☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/<br>Enforcement of Agency Subpoena/Petition to Preserve
- ☐ CVRT - Civil Rights
- ☐ COND - Condemnation/Eminent Domain/Right-of-Way
- ☐ CTMP - Contempt of Court
- ☐ CONT - Contract/Ejectment/Writ of Seizure
- ☐ TOCN - Conversion
- ☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/<br>Injunction Election Contest/Quiet Title/Sale For Division
- ☐ CVUD - Eviction Appeal/Unlawful Detainer
- ☐ FORJ - Foreign Judgment
- ☐ FORF - Fruits of Crime Forfeiture
- ☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
- ☐ PFAB - Protection From Abuse
- ☐ EPFA - Elder Protection From Abuse
- ☐ QTLB - Quiet Title Land Bank
- ☐ FELA - Railroad/Seaman (FELA)
- ☐ RPRO - Real Property
- ☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
- ☐ COMP - Workers' Compensation
- ☑ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN:** F ☑ **INITIAL FILING**       A ☐ **APPEAL FROM**       O ☐ **OTHER**
                                              **DISTRICT COURT**

         R ☐ **REMANDED**                  T ☐ **TRANSFERRED FROM**
                                              **OTHER CIRCUIT COURT**

**HAS JURY TRIAL BEEN DEMANDED?**  ☑ YES ☐ NO     Note: Checking "Yes" does not constitute a demand for a<br>jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:**   ☑ MONETARY AWARD REQUESTED   ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**
RED004                7/15/2022 11:42:26 AM              /s/ JOHN MICHAEL REDIKER
                      Date                                Signature of Attorney/Party filing this form

**MEDIATION REQUESTED:**   ☐ YES ☑ NO ☐ UNDECIDED

**Election to Proceed under the Alabama Rules for Expedited Civil Actions:**   ☐ YES ☑ NO

ELECTRONICALLY FILED
7/15/2022 11:42 AM
01-CV-2022-902060.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
JACQUELINE ANDERSON SMITH, CLERK

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

| | |
|---|---|
| FRANK C. MANN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **CIVIL ACTION NO.** |
| ) | |
| CHARLES F. DUNKIN, ROY A. BARNETT ) | **CV-2022-_____** ` |
| JR., DAPHNE RUDICELL ROBINSON, ) | |
| BRUCE FULLER, JOSEPH W. MATHEWS, ) | |
| JR., JUDITH KAREN FAVOR, JOAN ) | |
| VIGNES NEWMAN, RICK LANCE, and ) | |
| THE ALABAMA BAPTIST STATE ) | |
| CONVENTION, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiff, by and through undersigned counsel, brings this action against the defendants ("Defendants") named in the caption of this complaint and more particularly identified hereafter, who are and have been Trustees of Judson College ("College" or "Judson") or (in the instance of the defendant Convention hereafter described) the parent of the College, reserving the right to join additional defendants by amendment. Plaintiff alleges the following on information and belief, including information provided in indenture trustee notices to bondholders and information published on public domain web sites, except as to (i) allegations that pertain to Plaintiff (which are alleged on personal knowledge), (ii) allegations based on the Exhibits attached hereto, and (iii) allegations based on other documents identified herein by document type, title and/or heading, where allegations of the type in (ii) and (iii) are made on the basis of the contents of such documents, which are believed to be true copies of genuine records.

## FACTUAL BACKGROUND OF THIS ACTION

1.     The Plaintiff holds One Million Dollars ($1,000,000) principal amount of Educational Building Authority of the City of Marion ("Authority") Revenue Bonds, Judson College Series 2010 (the "Bonds"), which he purchased in the original 2010 Bond offering.

2.     The total amount of the Bonds issued in October 2010 was $11,230,000. At the time of this Complaint (after reflecting certain scheduled principal amount retirements which have taken place), $9,030,000 principal amount of the Bonds remain outstanding. Therefore, Plaintiff owns and holds 11% of the principal amount of outstanding Bonds.

3.     The Bonds were offered and sold by Judson College (the "College") as offeror, an Alabama non-profit corporation under the complete control of Defendant Alabama Baptist State Convention (the "Convention"), in concert and conspiracy with and using the Authority as a financing conduit device, to provide financing for the direct and indirect pecuniary benefit of the College and the Convention and benefitting the Convention's hand-picked representatives serving as the College's Board of Trustees ("Board" or "Trustees"). The ultimate beneficiary of the Bond issuance was the Convention, which was providing annual financial support to its controlled entity, the College.  Each of the individual Defendants herein is or was a Trustee and/or officer of the College during the times and events relevant to this Complaint, and each was installed as College Trustee by the defendant Convention.

4.     The Bonds were issued pursuant to a Lease (the "Lease") dated in October 2010 between the Authority as nominal Bond issuer and the College as the Bond and Lease obligor, Lease tenant and the true party-in-interest-seller of the Bonds.  The Authority and the College, acting together under common control and operating in concert and conspiracy, were the Offerors and also operative Sellers of the Bonds. A true and correct copy of the Lease as entered into by the

2

parties thereto is attached hereto as **Exhibit A** and is incorporated herein by reference. Concurrently with execution and delivery of the Lease, the Authority's rights and College's obligations and covenants under the Lease were assigned in October 2010 to Regions Bank (the "Trustee") as trustee for the benefit of Bondholders, including the Plaintiff, under an Indenture of trust ("Indenture") executed by the Authority as grantor and the Trustee. A true and correct copy of the Indenture as entered into by the parties thereto is attached hereto as **Exhibit B** and is incorporated herein by reference.

5.      In October 2010, the College and Authority as Offerors jointly represented in writing in a securities offering prospectus entitled the Official Statement ("OS" or "Official Statement") provided to Plaintiff and other Bondholders and approved in form and content by the College, the Authority, the Trustees and College Counsel (among others) that the College had a General Endowment (the "General Endowment" or "GE") comprised of cash, bank deposits, stocks, bonds, evidences of indebtedness, income producing property, and other capital assets directly owned by the College and/or of which the College is the beneficiary, totaling in excess of $16 million as of June 30, 2010. A true and correct copy of the Official Statement as approved by the Authority, the Trustees and College Counsel (among others) for making offers of the Bonds is attached hereto as **Exhibit C** and is incorporated herein by reference.

6.      In Lease §8.1, the College covenanted to maintain the level of the market value of its General Endowment at or greater than 125% of the principal amount of Bonds that shall be outstanding from time to time, so that it would be available to pay principal and interest on the Bonds should College revenues become insufficient to make such payments.

7.      As more particularly described hereafter, the Bonds and their repayment were and are secured and backed by, and were sold to Plaintiff and other Bondholders by the College (for

its benefit and the Convention's benefit) pursuant to, a number of pledges, security interests and covenants (both affirmative covenants of performance and negative covenants) contained in the Lease for the benefit and protection of Bondholders, including but not limited to a first priority pledge of Student Fee revenue and an unqualified covenant (the "GE Covenant" or "General Endowment Covenant") by the College under Lease §8.1 that **"[t]o the extent that the Student Fees shall be insufficient [to pay the Bonds] the College will also pay any maturing installment of Basic Rent from those components of the General Endowment that shall be subject to the covenant contained in this Section 8.1, and in no event will the College allow any installment of Basic Rent to remain unpaid."** (Emphasis added.)  The "Basic Rent" under the Lease was and is defined to mean and include the moneys required under the Lease to pay principal, interest and premium on the Bonds and other amounts payable by the College (including but not limited to attorneys' fees and expenses of Regions Bank as Indenture trustee). The Lease did not qualify such unconditional General Endowment Covenant or condition the use of the General Endowment to pay Bonds by reference to any restrictions that might be contained in unknown, unidentified, third-party documents or instruments.

8.   The GE Covenant backing for the Bonds, and the protection and maintenance of the General Endowment for the express benefit of Plaintiff (and other Bondholders), was reinforced and protected against loss, diversion, transfer or diminution by other Lease covenants, including: (i) Lease §8.1 provisions requiring the College semi-annually within 45 days of each April 1 and October 1 to file a report (hereafter, the "GE Coverage Certification") with the Indenture trustee that computed the market value of the General Endowment (e.g., demonstrating continuing compliance with the 125%-market-value maintenance requirement of §8.1); (ii) Lease §8.3, permitting the Indenture trustee and its authorized representatives to access the College

premises to examine and inspect them; (iii) Lease §8.4 in which the College agreed that so long as any Bonds remained outstanding and unpaid, it would maintain its corporate existence and would not dissolve; (iv) Lease §8.4 in which the College agreed that so long as any Bonds remained outstanding and unpaid, it would not sell or otherwise transfer or dispose of all or substantially all its assets (which includes the General Endowment); (v) Lease §8.5, in which the College agreed that, so long as any Bonds remained unpaid, it would levy and collect Student Fees each fiscal year in amounts not less than 250% of Maximum Annual Debt Service Requirement on the Bonds; (vi) Lease §8.6, requiring the College to maintain the first priority of the pledge of Student Fees for the benefit of the Bonds; (vii) Lease §8.9, requiring the College to provide the Indenture Trustee with the College's CPA-audited and certified financial statements each year, within 120 days after close of its fiscal year; (viii) Lease §8.10, requiring the College to provide "annual financial information and operating data of the College . . . to each holder of Series 2010 Bonds who make requests for such information"; (ix) Lease §8.11, where the College covenanted, at its own expense, to "take all actions that, in the judgment of the [Indenture] Trustee, may at the time and from time to time be necessary to perfect, preserve, protect and secure the interests of the ... Trustee . . . in and to the Leased Facilities and the revenues therefrom pledged and assigned in the Indenture"; and (x) Lease §10.2(b), where the College agreed that after any Event of Default shall have happened and be continuing (as is the present situation), the Indenture Trustee shall "have access to, and inspect, examine and make copies of, the books, records and accounts of the College," which any of the Bonds remain outstanding. A true and correct copy of the GE Coverage Certification dated in May 2020, which is representative of the semi-annual GE Coverage Certifications published by the College from 2011 through May 2021 pursuant to Lease §8.1, is incorporated herein by reference and is attached hereto as **Exhibit D;** and a true and correct copy

of the GE Coverage Certification dated in May 2021, which is also representative of the semi-annual GE Coverage Certifications published by the College from 2011 through May 2021 pursuant to Lease §8.1, is incorporated herein by reference and is attached hereto as **Exhibit G**.

9.     The College has each semi-annual fiscal year from 2011 through May 2021 provided the Indenture Trustee and, by means of the so-called "EMMA" internet-based reporting facility ("EMMA" being the acronym for Electronic Municipal Market Access system), has also provided Bondholders and participants in the investment marketplace, with its GE Coverage Certification.   In each such semi-annual certification, the College has represented that it was maintaining its General Endowment components available under the GE Covenant in amounts (at market value) in excess of 125% of principal amount of Bonds outstanding. Using language in the College's May 2021 GE Coverage Certification which is virtually identical to that used in its many preceding certifications, on or about May 8, 2021 the College made the following representations in the following language relevant here (and the key language is italicized for emphasis), *see* Exhibit G hereto (and see also Exhibit D):

<div align="center">

**Judson College**
**Revenue Bonds Series 2010**
***General Endowment Covenant***

</div>

Prepared: 5/8/2021

<div align="right">

<u>As of 3/31/2021</u>

</div>

| | |
|---|---|
| ***Coverage* Calculation:** | |
| Principal Amount of Bonds Outstanding | $9,030,000 |
| Percent Coverage *Requirement* | 125% |
| Amount of General Endowment *Required* | $11,287,500 |
| Market Value of General Endowment | $16,369,903 |
| **Endowment *Coverage* Percentage** | 181% |
| | |
| <u>*Subject to Covenant*</u> * | |
| Endowment and Investments | $8,744,737 |
| Trust Funds | <u>7,625,166</u> |
| Total Components *Subject to Covenant* | *$16,369,903* |

<div align="center">6</div>

Not Subject to Covenant *
Endowment Pledges Receivable, Net      $ --
Temporarily Restricted and Unrestricted
Pledge Receivable, Net      --
Total Components Not Subject to Covenant      ---

$16,369,903

*Covenant refers to Article VIII, Section 8.1
Of the Lease Agreement [sic: between] Judson College and
The Educational Building Authority of the
City of Marion, dated as of October 1, 2010

Prepared by: Glenn E Branum, CPA [with manual & typed signature]
Dated: 5/11/21

10.     Thus, each six months from 2011 through May 2021, the College deliberately

informed the public, including Plaintiff, other Bondholders, the financial advisers to Plaintiff and

other Bondholders, and prospective buyers of the Bonds, that there existed more than $16 million

in General Endowment funds "**subject to [the Lease] Covenant**" available to pay the Bonds, and

as of May 2021 there existed zero "components not subject to Covenant." In other words, all of

the General Endowment was being held, so far as the Bondholder side (and their advisers) knew,

for payment of the Bonds if and when necessary, with no exceptions.

11.     The College is now and for some months has been in default of many of its Lease

obligations, and has not cured such defaults within the allowed time periods after written notices

from the Trustee, including but not limited to: (i) failure to pay $270,000 of mandatory sinking

fund moneys on the Bonds due October 1, 2021; (ii) failure to collect Student Fees and meet the

Student Fee revenue maintenance requirement; (iii) failure to deliver its annual certified audit for

the fiscal year ended May 2021; (iv) admission of the College's inability to pay its debts as they

come due; and (v) failure to deliver its GE Endowment Coverage Certification for the semi-annual

periods as of October 1, 2021 and April 1, 2022. In addition, the College and Defendants, in breach

7

of the Lease and Indenture, have failed and refused to allow either the Indenture Trustee or representatives of the Bondholders, after written requests dating back of October 25, 2021 and subsequent repeated requests, to exercise right of entry and have access to the College premises, books, records and accounts, financial statements or operating data, which represents further events of default under the Lease and the Indenture. The College and Defendants have consistently refused or failed to comply with requests of the Indenture Trustee and plaintiff and other Bondholders for the College to provide full and complete copies (without redaction) of all the instruments and documents comprising the General Endowment, including both (i) the components held under direct College and College trustee control, (ii) the components held under control of the Baptist Foundation (and by extension under control of the defendant Convention), and (iii) the components held in so-called "perpetual trusts" by institutions not under direct College and College Trustee control. The College and Defendants are and have for months been operating in total secrecy. The Defendants have caused the College to shut its doors months ago. The College has refused to account adequately for receipts and disbursements of money or even the preservation (or not) of all of its books, records and accounts. The Defendants have violated their duties to ensure that the debts and obligations of the College of which they were trustees (or in the case of the Convention, the parent) are paid or provided for in terms of full payment.

12.    The Trustee reported to Bondholders after a meeting with the College and representatives of the Defendants on or about August 11, 2021 that the College representatives were then talking about filing a state court declaratory judgment action under the Alabama Uniform Prudent Management of Institutional Funds Act, Alabama Code §19-3C-6 ("UPMIFA") to release any "remaining" restrictions on use and expenditure of General Endowment funds in order to be available to satisfy claims of creditors. Plaintiff is informed and believes that such

8

August 2021 presentation was the first time that the College made public and gave some (but still incomplete) explanation of the issues it now claims prevent compliance with Lease § 8.1 and the GE Covenant; and even then the College (on information and belief) did not provide the public or the Bondholders or the Indenture Trustee with copies of the trust instruments and donation instruments comprising the documentation of the General Endowment. Indeed, initial demands on behalf of Plaintiff and other bondholders sent the College representatives on October 25, 2021, and on behalf of the Indenture Trustee on November 5, 2021, for production and disclosure of such trust instruments, donation instruments and other General Endowment component documents, was completely stonewalled and ignored by the College for months, and the College still has not produced copies of the instruments themselves. Such ongoing concealment of the key documents in 2021 and 2022, even after repeated legal counsel demands were delivered, provides compelling evidence that the College and Authority, at the time they offered the Bonds in 2010, would not back then have produced and disclosed such instruments to persons outside of the College and Convention (and trustees and officers of such two entities).  On occasion, since the above referenced August 2021 meeting, the Defendants and their representatives have instead threatened to (and claimed the power to) shift or divert the General Endowment away from the College, such as to the use and benefit of another college entity of the Defendant Convention or another charitable entity. Any such diversion or transfer of the General Endowment away from the College for less than 100% equivalent consideration deposited with the College would, under the insolvency and default circumstances in which the College now finds itself (which would only be greatly exacerbated by any such diversion), where millions of dollars of debt remain unpaid, constitute a transfer in fraud of creditors, in violation of Alabama Code §8-9A-5, in addition to breaching numerous express Lease covenants and violating representations made by the College

9

and Defendants here in the Official Statement by which the Bonds were offered and sold.

13.     All of the foregoing actions and omissions, and those described in greater detail hereafter under "Additional Factual Allegations," constitute Defendants' and their controlled College's breaches of contract, breaches of trust and fiduciary duty, Bond issue defaults, and a course of fraudulent, wanton and reckless misconduct, including a continuation of and concealment of frauds which Defendants have carried out beginning in 2010 and continuing to the present day.

14.     In amplification of the foregoing, representatives of the College, including Defendant Daphne Robinson, have at times after the May 2021 GE Coverage Certification, and for the first time some eleven years after the Bonds were issued, made statements to the effect that most of the General Endowment moneys and funds are restricted from use and expenditure to satisfy claims of Bondholders or other creditors notwithstanding the General Endowment Covenant and notwithstanding semi-annual representations from 2011 to 2021 of availability of the General Endowment to pay the Bonds. Any reasonable individual in the position of a Bondholder and a financial adviser to a Bondholder would understand from the repeated representations of the College and its accountants, officers and trustees that the General Endowment was and always had been available to pay the Bonds in accordance with the <u>express and unqualified</u> covenants in Lease §8.1. The effect of such recent disclosures is that the College is now disputing its numerous and repeated representations from 2010 to and including May 2021 that it held General Endowment in market value that exceeded 125% of principal amount of Bonds outstanding that was available under the Lease §8.1 GE Covenant to make up for and to pay any insufficiency in Student Fee revenues to meet Bond debt service (Basic Rent) obligations. Thus, **the Defendants and the College are now _admitting_ that their numerous and repeated**

1

**representations and certifications over the past decade, more particularly described herein, were materially false and misleading, and omitted material facts that were necessary to have been disclosed in order to make the certifications, representations and warranties that were made, not misleading.**

15.    A fundamental principle of common law of tort and statutory tort law applicable and invoked here is that where the defendant(s) undertake to speak to a subject, they thereby incur the duty to speak the whole truth, and to not communicate half-truths, and to disclose all the facts necessary to make the statements that were made not misleading. The defendants here, operating in concert and conspiracy with the College and the Authority, violated such principles. Thus, if, as Defendants now contend, the General Endowment is tied up by undisclosed language of undisclosed instruments executed by undisclosed persons from being used to pay Bond obligations, it was the duty of the Defendants to have made or have caused the Authority and the College to have made such disclosures when the Bonds were issued in the clearest manner possible, in capital letters and boldface type in each of the following places where the Bonds and Lease were discussed: (i) on the face of the Official Statement and in the body of the Official Statement's paragraphs describing the Bonds, the Lease, the security for and potential sources of repayment of the Bonds, and the Lease covenant; (ii) in the Lease §8.1 itself; (iii) in the College general counsel's closing opinion referenced *infra*; and (iv) in the closing certifications and representations of College representatives referenced *infra*. Thus the Defendants had the duty (in which they failed) to have made or caused to be made full, unambiguous and clear disclosures to Plaintiff and others, before May 2021, as to language, nature and impacts of the restraining effects which the Defendants (through the College they have controlled) only now say the endowment instruments' language has in preventing the College from applying the General Endowment to payment of the

Bonds as contracted in the General Endowment Covenant. But instead of making or causing to be made such disclosures in and between October 2010 and May 2021, the College and Authority under control and direction of the Defendants and their co-conspirators (i) made the unqualified promises and representations about the General Endowment's availability to pay amounts due on the Bonds, as quoted and detailed hereafter under "Additional Factual Allegations," and (ii) then went forward each six months between 2011 and May 2021 and certified and re-certified that the General Endowment was available to meet the General Endowment Covenant made for the benefit of Bondholders, which constitutes a continuation and repetition (and active concealment), year after year, of the original fraud and deceit upon Plaintiff. All of the foregoing facts constitute part of the special "circumstances" within the meaning of the Alabama Code's fraud provisions.

16.     The Plaintiff and, on information and belief, other Bondholders, and their respective financial advisers, have at all relevant times justifiably relied to their detriment on the statements, representations, warranties, agreements, covenants and certifications of the Defendants and those acting on authority or behalf of the Defendants, as well as justifiably relied on not knowing of the College's concealed position that the General Endowment was not fully available to pay the Bonds as represented to the Plaintiff and others in the Official Statement, the Lease, bond closing documents, and semi-annual GE Coverage Certifications. Further, Plaintiff alleges that Defendants and the College (even though the College itself is not a party hereto) are now equitably estopped to deny use and expenditure of the General Endowment, and estopped to direct the College to deny the use of the General Endowment, to pay the Bond and Lease and Indenture obligations.

## THE PARTIES

17.     Plaintiff Frank C Mann ("Plaintiff" or "Mann") is an adult citizen of Alabama

1

residing in Winston County, Alabama. In October 2010, receiving and acting in reliance upon the within-described Official Statement and bond rating, and upon his not knowing of any impediments to the College's compliance with the General Endowment Covenant, Plaintiff purchased $1 million principal amount of the Bonds offered by the College and Authority, acting in concert and conspiracy, and he still holds all such Bonds. Plaintiff did not discover, and in the exercise of the reasonable care of an ordinarily prudent person could not have discovered, the frauds, deceit and wrongdoing alleged hereafter, until subsequent to the times that (i) the College in May 2021 announced that it was shutting down operations and then (ii) the College subsequently (e.g., in August 2021) made presentations to the bond issue trustee and others concerning alleged General Endowment use restrictions and unavailability.

18.     Defendant Charles F. Dunkin ("Dunkin") is an adult citizen of Alabama residing in Vestavia Hills, Jefferson County, Alabama. During the times relevant hereto, and in addition to knowingly participating in concert and conspiracy with the other Defendants in the acts and omissions alleged herein under "Factual Background of this Action" and under "Additional Factual Allegations," which allegations are incorporated herein by reference:  (i) Dunkin was a Trustee of the College in 2010, was Chairman of the Board of Trustees in October 2010 when the Bond financing and uses of proceeds was approved, is a Trustee today, and has served multiple terms as College Trustee; (ii) Dunkin was a shareholder, with a significant interest in the shares, of Marion Bancshares, the holding company of Marion Bank & Trust Company ("Marion B&T"), the major bank lender to the College which in 2010 directly benefited from issuance of the Bonds, proceeds of which were used to pay down College borrowings from Marion B&T; (iii) Dunkin was a director of Marion Bancshares; (iv) Dunkin was a director of Marion B&T; (v) Dunkin, as College Trustee, participated in the approval of the use of Bond proceeds to repay millions of

1

dollars of loan principal and interest the College has owed his bank, Marion B&T; (vi) Dunkin approved of the College's borrowings in or about 2017 from Marion B&T (while he held conflict of interest positions) where the College granted said bank security interests in the same Student Fees as it had granted in the Lease for the benefit of the Plaintiff, as Bondholders; and (vii) Dunkin along with the other Defendants herein has facilitated and allowed the College to continue in its course of conduct to divert or prevent the General Endowment from being used to pay Lease obligations on the Bonds as required by the General Endowment Covenant. Said Defendant, along with each and all of the other Trustee Defendants herein and the Defendant Convention, while in control of College affairs, has put the College on a course to liquidate and dissolve without making adequate (or even any) provision for payment of the College's Bond obligations.

19.    Defendant Roy A. Barnett Jr. ("Barnett") is an adult citizen of Alabama residing in Perry County, Alabama. During the times relevant hereto, and in addition to knowingly participating in concert and conspiracy with the other Defendants in the acts and omissions alleged herein under "Factual Background of this Action" and under "Additional Factual Allegations," which allegations are incorporated herein by reference: (i) Barnett was a Trustee of the College in 2010, is a Trustee today, and has served multiple terms as College Trustee; (ii) Barnett was, simultaneously with his service as College Trustee, also a director and Chairman of the Authority (which means he effectively sat on both sides of the table when the Lease was approved and entered into); (iii) Barnett was a shareholder, with a significant interest in the shares, of Marion Bancshares, the holding company of Marion Bank & Trust Company ("Marion B&T"), the major bank lender to the College which in 2010 directly benefited from issuance of the Bonds, proceeds of which were used to pay down College borrowings from Marion B&T; (iv) Barnett was a director of Marion Bancshares; (v) Barnett was a director of Marion B&T; (vi) Barnett, as College Trustee,

1

participated in the approval of the use of Bond proceeds to repay millions of dollars of loan principal and interest the College has owed his bank, Marion B&T; (vii) Barnett approved of the College's borrowings in or about 2017 from Marion B&T (while he held conflict of interest positions) where the College granted said bank security interests in the same Student Fees as it had granted in the Lease for the benefit of the Plaintiff, as Bondholders; and (viii) Barnett along with the other Defendants herein has facilitated and allowed the College to continue in its course of conduct to divert or prevent the General Endowment from being used to pay Lease obligations on the Bonds as required by the General Endowment Covenant. Said Defendant, along with each and all of the other Trustee Defendants herein and the Defendant Convention, while in control of College affairs, has put the College on a course to liquidate and dissolve without making adequate (or even any) provision for payment of the College's Bond obligations.

20.    Defendant Bruce Fuller ("Fuller") is an adult citizen of Alabama residing in Dallas County, Alabama. During the times relevant hereto, and in addition to knowingly participating in concert and conspiracy with the other Defendants in the acts and omissions alleged herein under "Factual Background of this Action" and under "Additional Factual Allegations," which allegations are incorporated herein by reference:  (i) Fuller was a Trustee of the College in 2010, when the Bond financing and uses of proceeds was approved, is a Trustee today, and has served multiple terms as College Trustee; (ii) Fuller was a shareholder, with a significant interest in the shares, of Marion Bancshares, the holding company of Marion Bank & Trust Company ("Marion B&T"), the major bank lender to the College which in 2010 directly benefited from issuance of the Bonds, proceeds of which were used to pay down College borrowings from Marion B&T; (iii) Fuller was a director of Marion Bancshares; (iv) Fuller was a director of Marion B&T; (v) Fuller, as College Trustee, participated in the approval of the use of Bond proceeds to repay millions of

1

dollars of loan principal and interest the College has owed his bank, Marion B&T; (vi) Fuller approved of the College's borrowings in or about 2017 from Marion B&T (while he held conflict of interest positions) where the College granted said bank security interests in the same Student Fees as it had granted in the Lease for the benefit of the Plaintiff, as Bondholders; and (vii) Fuller along with the other Defendants herein has facilitated and allowed the College to continue in its course of conduct to divert or prevent the General Endowment from being used to pay Lease obligations on the Bonds as required by the General Endowment Covenant. Said Defendant, along with each and all of the other Trustee Defendants herein and the Defendant Convention, while in control of College affairs, has put the College on a course to liquidate and dissolve without making adequate (or even any) provision for payment of the College's Bond obligations.

21.     From time to time hereafter, Defendants Dunkin, Barnett and Fuller are hereafter referenced together as "Marion Bank Insider-Dealing College Trustees."

22.     Defendant Daphne Rudicell Robinson ("Robinson") is an adult citizen of Alabama residing in Baldwin County, Alabama. During the times relevant hereto, and in addition to knowingly participating in concert and conspiracy with the other Defendants in the acts and omissions alleged herein under "Factual Background of this Action" and under "Additional Factual Allegations," which allegations are incorporated herein by reference: (i) Robinson was a Trustee of the College in 2010, when the Bond financing and uses of proceeds was approved, has served as Vice Chair of the Board of Trustees, has served on the Executive Committee of the Board of Trustees, is a Trustee today, and has served multiple terms as College Trustee since 2000; (ii) Robinson was also Secretary of the College in 2010 and throughout much of the time period in which the College wrongdoings took place thereafter, in position to attest as such officer to documents to carry out the College's acts involved in this complaint; (iii) Robinson is and since

1

1991 has been a licensed Alabama attorney and served during the time period relevant to College

actions (in fact, from 1995 to 2020) as an Assistant Attorney General of Alabama, who should

have known better and did know better, than to participate in and aid and abet the wrongs alleged

herein as she did in fact participate; (iv) Robinson served as head of the College board's Finance

Committee which participated in review and approval of the Bond issue and the bank financings

including the self-dealing / conflict-of-interest loan transactions between Marion B&T, the Marion

Bank Insider-Dealing College Trustees, and the College; (v) Robinson has served and is serving

as President of the College, directing its activities and decisions during the time the College has

not only continued but exacerbated its breaches of contract and violations of obligations owed for

the benefit of Bondholders; and (vi) Robinson along with the other Defendants herein has

facilitated and allowed the College to continue in its course of conduct to divert or prevent the

General Endowment from being used to pay Lease obligations on the Bonds as required by t Said

Defendant, along with each and all of the other Trustee Defendants herein and the Defendant

Convention, while in control of College affairs, has put the College on a course to liquidate and

dissolve without making adequate (or even any) provision for payment of the College's Bond

obligations.

      23.      Defendant Judith Karen Favor ("Favor") is an adult citizen of Alabama residing in

Jefferson County, Alabama. During the times relevant hereto, and in addition to knowingly

participating in concert and conspiracy with the other Defendants in the acts and omissions alleged

herein under "Factual Background of this Action" and under "Additional Factual Allegations,"

which allegations are incorporated herein by reference: (i) Favor was a Trustee of the College in

2010, has also served as Chairman of the Board of Trustees, is a Trustee today, and has served

multiple terms as College Trustee; (ii) Favor approved of the College's use of Bond proceeds to

pay off Marion B&T loans when her fellow board members (Marion Bank Insider Defendants Dunkin, Barnett and Fuller) held conflict of interest positions, and also approved borrowings in or about 2017 from Marion B&T (while certain of her fellow Trustees, e.g., the Marion Bank Insider-Dealing College Trustees, held conflict of interest positions) where the College granted said bank security interests in the same Student Fees as it had granted in the Lease for the benefit of the Plaintiff, as Bondholders; and (iii) Favor along with the other Defendants herein has facilitated and allowed the College to continue in its course of conduct to divert or prevent the General Endowment from being used to pay Lease obligations on the Bonds as required by the General Endowment Covenant. Said Defendant, along with each and all of the other Trustee Defendants herein and the Defendant Convention, while in control of College affairs, has put the College on a course to liquidate and dissolve without making adequate (or even any) provision for payment of the College's Bond obligations.

24.     Defendant Joan Vignes Newman ("Newman") is an adult citizen of Alabama residing in Coffee County or Dale County, Alabama. During the times relevant hereto, and in addition to knowingly participating in concert and conspiracy with the other Defendants in the acts and omissions alleged herein under "Factual Background of this Action" and under "Additional Factual Allegations," which allegations are incorporated herein by reference:  (i) Newman was a Trustee of the College in 2010, has also served as Chairman of the Board of Trustees, is a Trustee and Board Chairman today, and has served multiple terms as College Trustee;  (ii) Newman approved of the College's use of Bond proceeds to pay off Marion B&T loans when her fellow board members (the Marion Bank Insider-Dealing College Trustees) held conflict of interest positions, and also approved borrowings in or about 2017 from Marion B&T (while certain of her fellow Trustees held conflict of interest positions) where the College granted said bank security

1

interests in the same Student Fees as it had granted in the Lease for the benefit of the Plaintiff, as Bondholders; (iii) Newman has been a securities industry professional, trained in disclosure obligations owed to investors in bonds and securities, and a broker of bonds and stocks, throughout the time period relevant hereto including the time of issuance of the Bonds; and (iv) Newman along with the other Defendants herein has facilitated and allowed the College to continue in its course of conduct to divert or prevent the General Endowment from being used to pay Lease obligations on the Bonds as required by the General Endowment Covenant. Said Defendant, along with each and all of the other Trustee Defendants herein and the Defendant Convention, while in control of College affairs, has put the College on a course to liquidate and dissolve without making adequate (or even any) provision for payment of the College's Bond obligations.

25.     Defendant Joseph William "Bill" Mathews, Jr. ("Mathews") is an adult citizen of Alabama residing in Jefferson County, Alabama. During the times relevant hereto, and in addition to knowingly participating in concert and conspiracy with the other Defendants in the acts and omissions alleged herein under "Factual Background of this Action" and under "Additional Factual Allegations," which allegations are incorporated herein by reference: (i) Mathews was Vice President of the College; (ii) Mathews was the College's in-house legal counsel; (iii) Mathews issued his legal opinions, his representations and his certifications which made the issuance of the Bonds to Plaintiff possible to take place, as described hereafter; (iv) Mathews reviewed for the other Defendants and the College the Lease, the Indenture, the Official Statement and the Bond issuance proceedings, and participated in such proceedings, and approved such documents and such proceedings; (v) without Mathews' participation, action and approvals, the Bond issue, as structured, documented and presented to and purchased by Plaintiff could not and would not have taken place as they have taken place; (vi) Mathews, a graduate of Marion Institute,

1

Birmingham Southern College, Vanderbilt Law School and University of Florida's School of Law (with a L.L.M. degree), was highly educated and had decades of legal practice experience, including public finance and legal matters pertaining to institutions of higher education (two of which were affiliated with the Defendant Alabama Baptist State Convention), and was well equipped to understand the implications and effects of the opinions, representations, certifications and approvals that he issued in connection with the Bond issue here. If anyone touching this Bond issue could have stopped this fraud from taking place, it was Mathews, who had the knowledge, training, expertise and role sufficient to have (i) caused proper disclosures regarding the General Endowment (which, if done, would have ensured these Bonds would never have reached the marketplace or been sold), (ii) caused the Lease §8.1 to qualify its covenant to pay the Bonds (which, if done, would have ensured these Bonds would never have reached the marketplace or been sold), and (iii) caused his legal opinion (described *infra*) to be qualified as to its assurances which are quoted hereafter (which, if done, would have ensured these Bonds would never have reached the marketplace or been sold).

26.     As to Defendant Convention and Defendant Lance: Defendant The Alabama State Baptist Convention ("Convention") is and since 1843 has been the entity in ultimate control of the College at all relevant times, including, but not limited to, making the appointment of the Trustees of the College, monitoring and controlling its varied financial and financing activities, and acting in concert and conspiracy with the other Defendants herein. The Convention is organized as an Alabama Domestic Non-Profit Corporation with a principal registered address in Montgomery County, Alabama at 2001 E. South Boulevard, Montgomery, Alabama 36116, and has designated defendant Rick Lance as its Registered Agent. Defendant Rick Lance ("Lance") is an adult resident of Montgomery County, Alabama and since 1998 has been and is the Executive Director of the

2

Alabama Baptist State Board of Missions which under the Convention's bylaws serves as the executive, administrative, fiduciary and promotional agency of the Convention. At the times relevant to the events of this Complaint, Defendant Lance has served as Trustee ex officio of the College, and as the lead representative of the Convention in the activities of the College's Board of Trustees. The Convention's President, Tim Cox, has also participated in the Convention's exercise of supervision and control of the College's affairs, as another ex officio member of the College's Board of Trustees. The Convention, which was having to support the College financially to keep it operating, benefitted financially from the 2010 issuance of the Bonds (as did Marion Bank & Trust). The Convention and Defendant Lance have participated actively in the supervision and control of the College in concert with the other Defendants, in all activities material to this Complaint. Moreover, the Convention through its arm (which it also controls and with which it has acted in concert), the Baptist Foundation, controls and has controlled a large segment of the overall General Endowment of the College. Indeed, the OS, Appendix 1, at page 16, note 9, states, "The College is the income beneficiary of various trust funds administered by The Baptist Foundation of Alabama, totaling $3,038,219 and $2,993,350, as of June 30, 2010 and 2009, respectively. This amount is including in beneficial interest in perpetual trusts on the statement of financial position. Under the terms of the trusts, the College has the right to receive the income generated from these trusts in perpetuity." (That statement of the College's entitlement to income in perpetuity from such trusts is unqualified, and no mention is made of any restriction thereon that would inhibit its use to pay the Bonds under Lease §8.1.) The Convention knowingly lent its name and disclosures about its financial support of the College and about its Baptist Foundation and its endowment holdings in various ways, to the offer and sale of the Bonds and to the promotion of the Bond issue, effectively touting its contribution to the financial underpinnings of

2

the College. The Convention stood to benefit and did benefit, directly and indirectly, from issuance of the Bonds so that its proceeds could be used to (i) pay off existing bank debt of its controlled College and (ii) refinance then outstanding bond debt of its controlled College. Said Defendants, the Convention and Lance, along with each and all of the other Trustee Defendants herein, while in control of College affairs, have put the College on a course to liquidate and dissolve without making adequate (or even any) provision for payment of the College's Bond obligations.

27.      The term "Defendant Trustees" as used herein mean and refer to individual Defendants Dunkin, Barnett, Fuller, Robinson, Favor, Newman and Lance.

28.      Plaintiff reserves the right by amendment to join additional parties Defendant, including persons who have served as Trustees and other controlling persons of the College and affiliates of the Convention who have conspired with any Defendant or have materially participated in or aided and abetted the Defendants' conduct described herein, after discovery in this case.

<div align="center">

**JURISDICTION AND VENUE**

</div>

29.      This Court has subject matter jurisdiction of this action pursuant to Ala. Code §12-11-30(1) and §12-11-31(1). This Court has subject matter jurisdiction over this action for declaratory judgment pursuant to Ala. Code §6-6-220 *et seq.*, including Ala. Code §§ 6-6-222 and 6-6-223. This Court also has subject matter jurisdiction under the Securities Act of Alabama.

30.      Venue is proper in this Court pursuant to Ala. Code §§6-3-2(a)(2), 6-3-2(a)(3), and 6-3-2(b)(3), as key Defendants reside in Jefferson County, Alabama. Additionally, the Indenture Trustee, Regions Bank, is headquartered in Jefferson County, Alabama and material acts and omissions as alleged herein involve both (i) reports made to, (ii) misrepresentations of material facts made to, and (iii) omissions of disclosures made to Regions Bank in Jefferson County as

<div align="center">2</div>

trustee for Plaintiff and other Bondholders and/or to Plaintiff's and other Bondholders' investment advisers in Jefferson County, pursuant to the Lease, by the College acting under the authority of and at the direction of and in concert and conspiracy with the Defendants. In addition, on information and belief, the Defendants made or caused and authorized to be made misstatements of material fact and omissions to disclose material facts in Jefferson County in the course of conduct alleged in Counts One through Six herein.

### ADDITIONAL FACTUAL ALLEGATIONS

31.     The factual allegations set forth above under the caption, "Factual Background of this Action" and under "Jurisdiction and Venue" are incorporated in this section of this Complaint by reference and are realleged as if repeated verbatim here. This "Additional Factual Allegations" section provides documentary language and further details of the actions, omissions and events which form part of the breaches of duty, the frauds, the deceit, and the other wrongdoing of the Defendants.

32.     The Lease Granted an **Unqualified** Covenant for the Benefit of Bondholders to Use and Apply Up To 125% of the Amount of Bonds Outstanding from the College's General Endowment to Pay the Bonds.  Regarding the General Endowment and its use and expenditure, the relevant Lease provisions are as follows, with key language italicized here:

> (a)     The General Endowment is defined in the Lease §1.1 as "all stocks, bonds, evidences of indebtedness and other financial assets (including pledges payable to the College but excluding all buildings and grounds constituting a part of the physical plant or campus of the College) as well as the corpus of all trust funds, the income of which is payable to the College, and all real property owned by or held in trust for the benefit of the College that is not situated on the campus of the College."

(b)  The <u>Student Fees</u> are defined in Lease §1.1 as "all tuition and student fees payable by or on behalf of students enrolled at the College net of scholarships granted, as well as payments by or on behalf of students at the College for housing, meals and books."

(c)  The <u>Basic Rent</u> is defined in Lease §1.1 as "(i) the moneys payable by the College pursuant to the provisions of Section 5.2 of the Lease, (ii) any other moneys payable by the College pursuant to the Lease to provide for the payment of the principal of and the interest and premium (if any) on the Bonds, and (iii) any other moneys payable by the College pursuant to the Lease that are therein referred to as Basic Rent."

(d)  Article VIII of the Lease contains the "PARTICULAR COVENANTS OF THE COLLEGE." Section 8.1 of the Lease sets forth the College covenant "Concerning the General Endowment" (herein referenced as the <u>General Endowment Covenant</u>) that provides, for the protection and benefit of Plaintiff, "The College *will maintain* the market value of the General Endowment at *One Hundred Twenty-Five Percent (125%) of the principal amount of the Bonds that shall be outstanding* from time to time. . . . Within forty five (45) days of April 1, 2011, and within forty five ( 45) days of each April 1 and October 1 thereafter the College *shall* file a report with the Trustee in which it shall compute the market value of the General Endowment, and if such market value shall exceed One Hundred Twenty-Five Percent (125%) of the then outstanding Bonds, *the College shall also designate those components of the General Endowment that shall be subject to the covenant of this Section 8.1.* . . . To the extent that the Student Fees shall be insufficient for that purpose *the College will also pay any maturing installment of Basic Rent from those components of the General Endowment that shall be subject to the covenant contained in this Section 8.1, and in no event will the College allow any installment of Basic Rent to*

2

*remain unpaid.* The College may spend components of the General Endowment without restriction, but if any expenditure of the General Endowment shall cause the market value of the General Endowment to be less than One Hundred Twenty Five Percent (125%) of the principal amount of the then outstanding Bonds, the *College shall replenish the said amount* expended by the next succeeding April 1 or October 1."

(e)       The General Endowment Covenant to use and apply the General Endowment to pay debt service (Basic Rent) on the Bonds is not qualified. Section 8.1 of the Lease does not contain, nor does any other provision or language of the Lease contain, any qualification upon the above-quoted provision that "*the College will also pay any maturing installment of Basic Rent from those components of the General Endowment that shall be subject to the covenant contained in this Section 8.1.*" The Lease General Endowment Covenant does <u>not</u> say, for example, that the College's covenant to "pay any maturing installment of Basic Rent" is also constrained by some internal (and undisclosed) language of a General Endowment component, much less give an explanation <u>understandable to lay persons</u> of how and why such constraint exists. Thus, while Section 8.1 allows the College to "spend components of the General Endowment without restriction" to the extent of market value amounts exceeding 125% of principal amount of Bonds outstanding (to be maintained for purposes other than paying Basic Rent), Section 8.1 does not reference "restrictions" on the use of the mandatory 125% General Endowment maintenance requirement to pay Bonds, and in particular the Lease does not state that any components of the General Endowment would be unavailable to pay Basic Rent due to any so-called "restrictions." <u>The place for statement and disclosure of any such restraint or qualification on the College's ability to meet its Section 8.1 covenant is</u>

2

within said Section 8.1 itself; but there is no such statement within Section 8.1 of any restraint or qualification.  But the Defendants did not cause any such statement and disclosure to be made there. The only "restriction" under Section 8.1 is the 125% mandatory market value maintenance requirement – which is provided for the purpose of benefiting and protecting Bondholders – and not any other undisclosed restriction the Defendants or the College had in their minds. Indeed, the word "restriction" appears only once in the entire Lease, in Section 8.1 in the context above explained.

33.    The Lease Certified That There Was No Internal or External Agreement Or Instrument, or Lack of Power and Authority, Preventing The College From Carrying Out Its General Endowment Lease Covenant And Other Lease Obligations.   Article II of the Lease contains the "REPRESENTATIONS AND WARRANTIES" of the parties to the Lease. Section 2.2 of Article II contains the "Representations and Warranties by the College." Within said Lease §2.2 the College represented, warranted and certified as follows (with key language italicized here):

(a)    [in Lease §2.2(a)] That "[t]he College has the corporate power and authority to own its properties and assets and to carry on its business as now being conducted. The *College has all requisite corporate power* to enter into this Lease Agreement and *to consummate the transactions contemplated hereby*."

(b)    [in Lease §2.2(c)] That "[t]he College has, by all necessary corporate action, *duly authorized* the execution, delivery and *performance of this Lease Agreement*, and when duly executed and delivered by the Authority, *this Lease Agreement will constitute a legal, valid and binding obligation of the College*."

(c)    [in Lease §2.2(d)] That "[n]either the execution and delivery of this Lease

2

Agreement, nor the sale and issuance of any of the Series 2010 Bonds, *nor the consummation of the transactions herein contemplated, nor the fulfillment of or compliance with the terms and provisions hereof conflicts with, or results in a breach of, or constitutes a default under,* or results in or requires the creation of any lien in respect of any properties or assets of the College pursuant to, *or requires any authorization, consent, approval, exemption or other action by, or any notice to, any Person (other than those already obtained, taken or made and which continue in full force and effect) pursuant to the terms, conditions or provisions of any applicable* law, rule, regulation, corporate charter, bylaw, *agreement, instrument,* judgment or order *by which the College is bound or to which the College and any of its properties are subject.*"  If there existed any agreement or instrument which would operate to prevent the use of the General Endowment to meet the Lease §8.1 covenant to pay Bond debt service whenever Student Fee revenues became insufficient to do so, it was incumbent for those executing or approving the Lease (including Defendants) to cause the Lease to so state inside the paragraph containing above representations and covenants, and to qualify the statements made therein.  But the Defendants and other trustees did not cause this to be done.

(d)    Plaintiff, and all market intermediaries involved in the distribution of the Bonds that were sold by and on behalf of the College and the Authority, as well as the Indenture trustee, bond counsel and Standard & Poor's rating agency, were all entitled to rely, and did rely, on the above express written representations and warranties of the College in the Lease itself, which were not only material but were

and are at the core of the protections for the Bondholders. As a causation factor, without the College, the Authority and their authorized representatives having made such representations and warranties (including those quoted hereafter), and without the Defendants having authorized such representations and warranties as alleged herein (see *infra*), the Bonds could never have been offered and sold.

34.    The Defendant Trustees authorized and approved the making of the College's Lease representations and warranties, as well as the Official Statement which also set out the material Lease terms and provisions including the General Endowment Covenant.

(a)    The Lease (i) is dated as of October 1, 2010, (ii) was executed by the College and the Authority on October 27, 2010, (iii) was delivered by both parties on October 28, 2010, (iv) was executed for and in the name of the College, by its President, David E. Potts and attested by its Trustee (a Defendant herein), R. Douglas Halbrooks, (iv) was acknowledged by President David E. Potts before a Notary on October 27, 2010 as being signed in his capacity as an officer of the College acting "with full authority," and (v) is recorded in the Probate Office of Marion County, Alabama as of November 1, 2010 in Deed Book 612, beginning at Page 645.

(b)    The Official Statement is the official, definitive, authorized and certified disclosure document of, and comprehensive set of written representations about, the College, the Authority, the Bonds, the General Endowment and its covenant, and other information relevant here. The Official Statement is dated as of October 1, 2010 and the authorized, finalized, definitive version of the Official Statement is dated October 20, 2010. The OS was manually signed on page number 30, on or

2

about October 27, 2010, by David E. Potts in his official capacity as College President under the following certifying statements on pages 29 and 30: (i) "The College has furnished all information in this Official Statement relating to the College"; (ii) "The College has reviewed the information herein and has approved this Official Statement"; and (iii) "The foregoing Official Statement is approved." Defendant Roy A. Barnett, Jr. (a College Trustee), also manually signed the OS on page 29, in his concurrently-held capacity as Chairman of the Board of Directors of the Authority, under the following OS language: "The execution and delivery of this Official Statement on behalf of the Authority by the Chairman of its Board of Directors have been duly authorized by the Authority." A Preliminary Official Statement ("POS") that preceded the OS was also issued under date of October 7, 2010.

(c)      Defendant Trustees' Authorization of the Lease and Its Terms.      The Defendant Trustees, acting in concert and conspiracy among themselves and with other Trustees, in a meeting of the College Board of Trustees held October 7, 2010, adopted the following resolution (therein denominated as Resolution Section 3) as evidenced by a certified copy of the minutes of such meeting (key language is here italicized): "The Lease shall be in substantially the form presented to the meeting at which this resolution is adopted (which form is hereby adopted in all respects as if set out in full herein), *with such changes, not inconsistent with the provisions hereof, as the President of the College, acting with the advice of counsel to the College, shall determine to be necessary or desirable in order to consummate the transactions authorized by this resolution. The determination of the definitive form*

2

*of the Lease by the President of the College shall be conclusively established by his execution of such document.* The President of the College is hereby *authorized and directed to execute and deliver the Lease* for and in the name and behalf of the College, and the Secretary of the College is hereby authorized and directed to affix the official seal of the College to the Lease and to attest the same."

(d)     <u>Defendant Trustees' Authorization of the Official Statement</u>.  The Defendant Trustees, acting in concert and conspiracy among themselves and with other Trustees, in a meeting of the College Board of Trustees held October 7, 2010, adopted the following resolution (therein denominated as Resolution Section 4) as evidenced by a certified copy of the minutes of such meeting (key language is here italicized): "The Trustees do hereby *authorize* officials of the College designated by the President of the College *to assist the Authority and the Underwriter in the preparation of the Official Statement in order to describe the Series 2010 Bonds to prospective purchasers thereof.* The Official Statement shall be in substantially the form presented to the meeting at which this resolution is adopted (which form is hereby adopted in all respects as if set out in full herein), *with such changes as the President of the College, acting with the advice of counsel to the College, shall determine to be necessary or desirable in order to assist the Underwriter in the sale of the Series 2010 Bonds. The determination of the definitive form of the Official Statement by the President of the College shall be conclusively established by his execution of such document.* The President of the College is hereby authorized and directed to execute and deliver the Official Statement for and in the name and behalf of the College at such time as the

3

definitive terms thereof shall have been determined by the Underwriter."

35.     The Lease Also Certified That The Official Statement And The College's Other
Representations and Warranties Did Not Misstate Any Material Facts and Did Not Omit To
Disclose Any Material Facts Necessary To Make Statements That Were Made Not Misleading;
and There Was No Fact Known or Should Have Been Known By The College That Affects Or
Foreseeably Affects The College's Ability To Perform Its Covenants. Article II of the Lease
contains the "REPRESENTATIONS AND WARRANTIES" of the parties to the Lease. Section
2.2 of Article II contains the "Representations and Warranties by the College." Within said Lease
§2.2, in section 2.2(i), the College represented, warranted and certified as follows (with key
language italicized here), as relevant to the Official Statement as well as representations and
warranties of accuracy of the Official Statement: "Full Disclosure. *Neither any information
furnished by the College to the original purchasers of the Series 2010 Bonds in connection with
the sale and issuance of the Series 2010 Bonds and the other transactions contemplated by this
Lease Agreement, nor the representations and warranties made by the College in this Lease
Agreement or in any document in writing furnished by the College in connection with the
transactions contemplated hereby, contain* (except to the extent, as to any such representation or
warranty not made in this Lease Agreement or in a document required to be furnished pursuant to
this Lease Agreement, corrected in any other written communication subsequently furnished by
the College prior to the execution and delivery of this Lease Agreement) *any untrue statement of
a material fact or omit a material fact necessary to make the statements contained therein or
herein, in light of the circumstances in which they were made, not misleading at the times they
were made.* There is *no fact known to the College or which in the exercise of reasonable diligence
should have been known to the College which the College has not disclosed in writing prior to the*

3

*execution and delivery of this Lease Agreement which materially adversely affects or, so far as the College can now in the exercise of its reasonable business judgment foresee,* the condition (financial or otherwise) of the College or *the ability of the College to perform its obligations hereunder or under any agreement contemplated hereby.*" If there existed any agreement or instrument (such as an Endowment gift instrument or trust) which would operate to prevent the use of the General Endowment to meet the Lease §8.1 covenant to pay Bond debt service whenever Student Fee revenues became insufficient to do so, it was incumbent for those executing or approving the Lease (including Defendants) to cause <u>both</u> the Lease and the Official Statement to so state and disclose inside the above-quoted representations and covenants, and to qualify the statements made therein.  But the Defendants and other trustees did not cause this to be done.  And, on information and belief, <u>the College and the Defendants did not provide, or cause their counsel (e.g., Defendant Mathews) to provide, the bond counsel or the bond underwriters or Standard & Poors with copies of the Endowment instruments themselves, or the language and content of the "restrictions" in the instruments, much less any disclosure of the internally-held position of the College and Defendants that notwithstanding the unqualified language of Lease §8.1, the General Endowment would not be made available to pay the Bonds</u>.  To the contrary, instead of providing such information, the College and Defendants did – and caused others to do – just the opposite: they went through with the Bond issuance without such disclosures and <u>affirmatively certifying to and assuring Bond underwriters, bond counsel, and Bond purchasers</u> that no external agreements or instruments (e.g., an Endowment trust or gift document) would operate to prevent the College from carrying out its payment obligations on the Bonds under Lease §8.1.

36. <u>College Counsel, Authorized by Defendants and College Trustees to Do So, Delivered His Opinion ("College Counsel Closing Opinion Letter") Certifying the Truthfulness of</u>

3

<u>the College's Representations and the Absence of Any Qualifications Upon Or Restraints Upon</u>
<u>The College Fulfilling Its Lease Covenants Including the Maintenance and Use of the General</u>
<u>Endowment to Pay Bond Debt Service</u>.  Defendant Mathews, in his roles as (and on the official letterhead of his roles as) College counsel and College Vice President, on October 28, 2021 represented and certified as follows in said College Counsel Closing Opinion Letter:

a.      [in paragraph (5) thereof:] that the "execution and delivery by the College of the Lease ... and the performance or observance of the terms and conditions thereof will not violate, or result in a breach of, or constitute a default under ... any ... agreement or other instrument to which the College is a party or by which it is bound or to which any of its property is subject."  **[That means the College could perform its obligations under Lease §8.1's unqualified covenant, without restraint from any trust or gift instrument of an Endowment component**.]

b.      [in paragraph (1) thereof:] that the "College ... has all necessary power and authority to  ... perform its obligations under the Lease ..."  **[That means the College could perform its obligations under Lease §8.1's unqualified covenant, without restraint from any trust or gift instrument of an Endowment component**.]

c.      [on page 3 thereof:] "Nothing has come to my attention to suggest that the Official Statement contains any untrue statement of a material fact or fails to state any material fact necessary in order to make statements contained therein not misleading." **[That means the College could perform its obligations under Lease §8.1's unqualified covenant, without restraint from any trust or gift instrument of an Endowment component**.]

A true and correct copy of the College Counsel Closing Opinion Letter as signed and delivered by

3

Defendant Joseph W. Mathews under date of October 28, 2010 is attached hereto as **Exhibit E** and is incorporated herein by reference.  If there existed any agreement or instrument which would operate to prevent the use of the General Endowment to meet the Lease §8.1 covenant to pay Bond debt service whenever Student Fee revenues became insufficient to do so, it was incumbent for Mathews to so state inside the above written certifications in Exhibit E and for him to qualify the statements he did make therein.  But he did not do so.  If Mathews had done so, the Bonds would never have reached the marketplace or been purchased by Plaintiff.

37.    By reason of the express representations of the College quoted above, as well as those of College officers which are quoted *infra*, all of which were authorized by the Defendants and knowingly allowed by the Convention to be made and delivered to and relied upon by Bondholders (and by other financing parties such as the Indenture trustee, market intermediaries and bond counsel), the Defendants including the Convention are now estopped to contend that the General Endowment is not available, to the extent of 125% of principal amount of Bonds outstanding, to pay the Bonds.

38.    By reason of the express representations of the College authorized by the Trustees quoted above, as well as those of College officers which are quoted *infra*, all of which were authorized by the Defendants to be made and delivered to and relied upon by Bondholders (and by other financing parties such as the Indenture trustee, market intermediaries and bond counsel), any and all statements, positions, actions, and failures to act which the College and/or its representatives in 2021 have taken (or omitted to take under circumstances requiring compliance with the Lease) which operate (and/or would operate) to deny, frustrate, diminish, delay, impede or interfere with the ability of the Indenture Trustee and Bondholders now to receive General Endowment moneys as covenanted in Lease §8.1 constitute fraud and deceit upon, and

3

misrepresentations and omissions of material fact imposed upon, and a course of fraudulent conduct against, Plaintiff, as more particularly alleged in Counts One through Six, inclusive, hereof.

39.     Consistently with the express provisions and representations of the Lease as alleged and quoted above, the Official Statement described to Plaintiff, other purchasers of the Bonds, and other persons (such as the Indenture trustee and market intermediaries, as well as bond counsel), that the College had ample General Endowment funds, at market value, to meet the 125%-of-Bonds-outstanding maintenance requirement and that the General Endowment moneys would be available, without any disclosed qualification to such covenant, to pay debt service on the Bonds should Student Fees prove to be insufficient to do so.  Without limiting the generality of the foregoing, the Official Statement, as authorized by Defendants (and other Trustees acting in concert and conspiracy with Defendants) and as certified true and accurate by Defendant Barnett (for the Authority) and by the College President acting with authority, set forth the following affirmative disclosures and representations of material fact which are relevant to this action and to the claims made herein (key language is italicized):

> (a)     At OS page 2, in the continuation of the "Introduction" section which commences on page 1, it is stated: "However, the Series 2010 Bonds will not be secured by a direct pledge of any other funds of the College, although in the Lease *the College has agreed to maintain the market value of all cash, bank deposits, stocks, bonds, evidences of indebtedness, income producing property and other capital assets in the General Endowment (as hereinafter defined) that are directly owned by the College or of which the College is the beneficiary at certain levels as hereinafter described*."

3

(b)     At OS page 2, in the continuation of the "Introduction" section which commences on page 1, it is also stated: "However, as stated above, *in the Lease the College will make certain agreements respecting its General Endowment, including an agreement to maintain the market value of its General Endowment in an amount exceeding the unpaid principal balance of the Series 2010 Bonds.*"

(c)     At OS page 2 under "Security and Source of Payment": "Further, in the Lease the College will agree that in the event that the Student Fees shall be insufficient to make any payment of principal or interest that shall become due with respect to the Series 2010 Bonds, then *the College shall make any such payment from its General Endowment* or from any other funds of the College that will be available for that purpose.."

(d)     At OS page 8 under "THE GENERAL ENDOWMENT": "The General Endowment of the College (the 'General Endowment') consists of all stocks, bonds and other financial assets of the College, including pledges payable to the College as well as the corpus of all trust funds the income of which is payable to the College."

(e)     At OS page 9, also under "THE GENERAL ENDOWMENT," the June 30, 2010 total of the General Endowment was listed as being $16,039,941.

(f)     At OS page 22, under "SUMMARY OF THE LEASE AGREEMENT," it is stated:

**Maintenance of General Endowment**.

In the Lease the College will agree to maintain the market value of the General Endowment at a level that shall be not less than One Hundred Twenty-Five Percent (125%) of the unpaid principal of the Series 2010 Bonds that shall be outstanding from time to time under the Indenture. *Further, in the event that the Student Fees*

3

> *shall be insufficient to pay any installment of the principal of or the interest on any of the Series 2010 Bonds that shall be outstanding under the Indenture, the College shall pay any such installment from its General Endowment.*

40.    The Official Statement contains no disclosed qualifications or exceptions to the several covenants and factual representations quoted in subparagraphs (a) through (f) of the preceding paragraph that (or relating to the covenant that) "*in the event that the Student Fees shall be insufficient to pay any installment of the principal of or the interest on any of the Series 2010 Bonds that shall be outstanding under the Indenture, the College shall pay any such installment from its General Endowment.*" If there existed any agreement or instrument which would operate to prevent the use of the General Endowment to meet the Lease §8.1 covenant to pay Bond debt service whenever Student Fee revenues became insufficient to do so, it was incumbent for those executing or approving the Official Statement (including Defendants) to cause the Official Statement to so state in capital letters and boldface type, inside of, and right at the place of, the above representations and covenants, and to qualify the statements made therein, *see also* allegations in paragraph 15, *supra*. But the Defendants and other trustees did not cause this to be done.

41.    <u>College Officer Certification of Truth of the Lease's Representations and the Official Statement's Accuracy and Truthful Disclosures.</u>

(a)    In the previously-alleged October 7, 2010 resolutions adopted and approved by the Defendants, the Defendants in resolution section 5 authorized as follows: "The President and the Secretary of the College are hereby *authorized and directed to execute, deliver, seal and attest such other ancillary documents and certificates* as may be necessary to carry out fully the leasing, issuance and other transactions hereinabove authorized." (Italics added.)

3

(b)     Pursuant to such authority granted by the Defendants, on October 28, 2010, College officers David E. Potts (President) and Dennis W. Frodsham (Vice President-Business Affairs) executed and delivered their "Officers' Certificate" which in paragraph (2) certified as follows in the part here relevant (key language is italicized): "The College has corporate *power to enter into, execute, deliver and perform the agreements, representations and covenants on its part contained in* (a) that certain Ground Lease Agreement dated as of October 1, 2010 (herein called the "Ground Lease"), between the College and the Educational Building Authority of the City of Marion (the "Authority") and (b) *that certain Lease Agreement* dated as of October l, 2010 between the College and the Authority (herein called the "Financing Lease")."

(c)     Pursuant to such authority granted by the Defendants, on October 28, 2010, College officers David E. Potts (President) and Dennis W. Frodsham (Vice President-Business Affairs) executed and delivered their "Officers' Certificate" which in paragraph (3) certified as follows in the part here relevant (key language is italicized): "Neither the execution or delivery of the Basic Agreements by the College nor the performance and observance by it of any of the agreements and covenants on its part contained in any thereof . . . will result in a breach of, or constitute or will constitute a violation of or default under any contract, agreement or other instrument to which the College is a party or by which it is bound . . ."

(d)     Pursuant to such authority granted by the Defendants, on October 28, 2010, College officers David E. Potts (President) and Dennis W. Frodsham (Vice President-Business Affairs) executed and delivered their "Officers' Certificate"

3

which in paragraph (3) certified as follows in the part here relevant (key language is italicized): "As of the date hereof, the representations and warranties of the College contained in the Financing Lease are true, accurate and complete in all material respects."

(e)      Pursuant to such authority granted by the Defendants, on October 28, 2010, College officers David E. Potts (President) and Dennis W. Frodsham (Vice President-Business Affairs) executed and delivered their "Officers' Certificate" which in paragraph (11) certified as follows in the part here relevant (key language is italicized): "*We have examined the Official Statement* of the Authority, dated October 20, 2010, pertaining to the Series 2010 Bonds (herein called the "Official Statement") and the Appendices thereto and, in our opinion, *no event affecting the College has occurred since October 1, 2010, that should be disclosed in the Official Statement for the purpose for which it is to be used or that is necessary to disclose therein in order to make the statements therein not misleading in any material respect* as of the date hereof."

(f)      Pursuant to such authority granted by the Defendants, on October 28, 2010, College officers David E. Potts (President) and Dennis W. Frodsham (Vice President-Business Affairs) executed and delivered their "Officers' Certificate" which in paragraph (13) certified as follows in the part here relevant (key language is italicized): "To the best of our knowledge *after reasonable investigation, the Official Statement, insofar as it relates to the College, does not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements made therein, in light of the circumstances under which they were made,*

3

*not misleading*."

If there existed any agreement or instrument which would operate to prevent the use of the General Endowment to meet the Lease §8.1 covenant to pay Bond debt service whenever Student Fee revenues became insufficient to do so, it was incumbent for such College Officers to so disclose and state, and to cause the Lease to so state, inside or in connection with the above representations and covenants, and at that same time, and to qualify the statements made therein at said place and time. But said Officers, acting with authorization by Defendants and other trustees, did not cause this to be done.

42.     The Official Statement describes the relationship of the College to its ultimate controlling entity (the Defendant Convention) as follows, on the cover page thereof: "JUDSON COLLEGE, an entity of The Alabama Baptist State Convention." The OS at page 2 again references "The Alabama Baptist State Convention, of which the College is an entity." The OS at page 12 states of the College, "[i]t became an entity of The Alabama Baptist State Convention in 1843." The OS at page 13 elaborates on the relationship as follows:

Relationship to The Alabama Baptist State Convention

Judson College is one of the three incorporated entities of The Alabama Baptist State Convention which offer Christian Higher Education. The Committee on Boards and Commissions of the Convention is responsible for nominating persons for election by the Convention to serve on the Boards of Trustees. The State Board of Missions is the administrative and promotional agency of the Convention and recommends proposed goals and objectives for raising funds and a proposed distribution. Education and other benevolent causes receive funds according to the annual budget adopted by the Convention. In the 2009-2010 academic year Judson College received $1,030,462 from The Alabama Baptist State Convention, which accounts for approximately 11% of the College's annual budget.

The OS at page 18 discloses: "The [College's] Board of Trustees consists of 38 members, each of whom is appointed by The Alabama Baptist State Convention."

4

43.     Thus, the Defendant Convention, through its "State Board of Missions" and its appointments of the College Trustees, and its installation of the Convention's executive director (defendant Lance) as an ex officio standing member of the College's Board of Trustees, controlled or played a material role in controlling the decisions about funding of the College (including issuance of the Bonds involved here), and decisions about directing funds to the College from various sources, including the Convention's affiliated and controlled Baptist Foundation, which held some of the General Endowment funds in so-called "perpetual trusts" which were part of the Endowment moneys that are the subject of Lease §8.1.

44.     The provisions of the Lease, including College duties and obligations, and rights and remedies provided therein, were expressly made for the benefit of the Plaintiff, who are entitled to enforce them. Without limiting the generality of the foregoing, the Lease provides in relevant part as follows:

a.     Lease §5.3 pledges the Student Fees "for the equal and pro rata protection and benefit of the [Bond] Holders, present and future."

b.     Lease §8.1 states, "To the extent that the Student Fees shall be insufficient for that purpose the College will also pay any maturing installment of Basic Rent from those components of the General Endowment that shall be subject to the covenant contained in this Section 8.1, and in no event will the College allow any installment of Basic Rent to remain unpaid."

c.     Lease §8.10 states the College's acknowledgement that its information-providing obligations are "intended to be for the benefit of the holders of the Series 2010 Bonds."

d.     Lease §9.2 states that "the Trustee and the Holders of the Bonds shall be

4

deemed to be third party beneficiaries of the covenants and agreements on the part of the College contained in the Lease and shall, to the extent provided in the Indenture, be entitled to enforce performance and observance of the agreements and covenants on the part of the College contained in the Lease to the same extent as if they were parties hereto."

    e.    Lease §12.9 states that "the Bondholders … shall be deemed to be third party beneficiaries" of the Lease and the Indenture.

45.    The provisions of the Indenture, including College and Authority duties and obligations, and contractual rights and contractual and equitable remedies provided therein, were expressly made for the benefit of the Plaintiff, who are entitled to enforce them or to cause the Indenture Trustee to enforce them (provided, however, that the tort causes of action alleged herein are owned by the Plaintiff and the Indenture Trustee does not have standing to bring the tort causes of action alleged herein). Without limiting the generality of the foregoing, the Indenture provides in relevant part as follows:

    a.    The Indenture on page 1 states that "it is hereby agreed between the parties signatory hereto and the holders of all bonds issued hereunder (the holders of said bonds evidencing their consent hereto by their acceptance of said bonds and the parties signatory hereto evidencing their consent hereto by their execution hereof), each with each of the others, as follows . . ."

    b.    Indenture §2.1 states, "In order to secure to the Holders thereof payment of the principal of and the interest and premium (if any) on the Bonds and the performance and observance of the covenants herein and therein contained, and in consideration of their purchase and acceptance of the Bonds and of the acceptance

4

by the Trustee of the trusts herein provided, the Authority does hereby grant, bargain, sell and convey, assign, transfer and pledge to any with the Trustee the following described properties of the Authority, whether the same are now owned by it or may be hereafter acquired: ... All right, title and interest of the Authority in and to the Lease . . . [etc.] ... TO HAVE AND TO HOLD the same unto the Trustee . . . IN TRUST NEVERTHELESS, upon the terms and trusts herein set forth, for the equal and pro rata protection and benefit of the Holders, present and future, of the Bonds equally and ratably..."

c.      Indenture §10.6: "Subject to the provisions of Section 8.3 of the Lease, the Authority ... will permit the Trustee of any Bond to inspect at any reasonable time, the books and records of the Authority pertaining to the Leased Facilities."

d.      Indenture §11.4: "All remedies hereunder are vested exclusively in the Trustee for the equal and pro rata benefit of all the Holders of the Bonds, unless the Trustee refuses or neglects to act within a reasonable time after written request so to act addressed to the Trustee by the Holders of twenty-five percent (25%) in principal amount of any series of the outstanding Bonds, accompanied by indemnity satisfactory to the Trustee, in which event the Holder of any of the Bonds may thereupon so act in the name and on behalf of the Trustee or may so act in his own name in lieu of action by or in the name and behalf of the Trustee."

e.      Indenture §11.6: "No delay or omission by the Trustee or by any Bondholder to exercise any available right, power or remedy hereunder shall impair or be construed a waiver thereof or an acquiescence in the circumstances giving rise thereto; every right, power or remedy given herein to the Trustee or to the

4

Bondholders may be exercised from time to time and as often as deemed expedient."

f.      Indenture §12.1(g): "Whenever [the Trustee] has a choice of remedies under said [Indenture] Section 11.2 or a discretion as to details in the exercise of its powers thereunder, it must follow any directions given by the Holders of a majority in principal amount of the Bonds at the time outstanding, anything therein or herein to the contrary notwithstanding, ..."

g.      Indenture §15.5: "Nothing herein or in the Bonds shall confer any right on anyone other than ... the Holders of the Bonds." (Emphasis added.)

46.      In further support of the materiality and extent of the deception regarding the College's concealed position that the perpetual trusts (such as those held by the Baptist Foundation) and other General Endowment funds were not in a position to be used as Lease §8.1 stated, i.e., were not in a position to be used to pay the Basic Rent, principal of and interest on the Bonds, Plaintiff alleges that Defendants, operating in concert and conspiracy with each other and other College trustees and representatives, as well as the Authority, misled, or acted to cause and assist the College and the Authority to mislead, the national securities rating agency, Standard & Poor's Rating Services, by concealing the College's concealed position above stated with respect to unqualified availability of the General Endowment to pay Bond related obligations under Lease §8.1. As a result, Standard & Poor's, before the Bond closing, was misled into assigning an investment grade (BBB) rating to the Bonds, which in turn was made part of the Bond closing and was published as such investment grade rating to the Bond underwriter, to Bond purchasers, to the Bond marketplace, to dealers and brokers of securities including the Bonds, and others, on the cover of the Official Statement. A true and correct copy of Standard & Poor's Rating Services'

4

("S&P's") September 20, 2010 Bond rating letter to the College assigning the investment grade rating of BBB- to the Bonds, together with the 6-page S&P's ratings rationale report dated as of September 27, 2010 supporting (and referenced in) such rating and such rating letter is attached hereto as **Exhibit F** and is incorporated herein by reference. The Bonds could not have been sold to the public, including Plaintiff, at the prices the Bonds were sold, or at all, if such investment grade rating of the Bonds by Standard & Poor's had not been obtained and published. By misleading Standard & Poor's, the College, the Authority and the Defendants (and Marion Bank and Marion Bancshares as well) benefited from the issuance of the Bonds going forward as it did.

47. The College, acting in concert and conspiracy with the Authority, was the true offeror, the true seller and the true party-in-interest-seller of the Bonds within the meaning of the Securities Act of Alabama and otherwise. For example, in Lease §8.2, the College recognizes its role as offeror and seller of the Bonds, stating "[t]he College acknowledges that *it* may, at some time after the issuance of the Series 2010 Bonds initially issued, *furnish to prospective purchasers of the Series 2010 Bonds* (other than the College and any Affiliate thereof) certain information concerning the business and financial condition of the College, and the College further acknowledges that *it may seek the assistance and cooperation of the Authority in connection with the offering and sale of the Series 2010 Bonds to any prospective purchaser thereof* (other than the College or an Affiliate thereof). *In connection with the offering and sale of any of the Series 2010 Bonds to any prospective purchaser thereof*, the College will indemnify, hold harmless and defend the Authority and the Trustee (and each director, officer and employee thereof) against (a) any claim or liability whatsoever arising out of or based upon any untrue or misleading statement or alleged untrue or misleading statement of any material fact contained in any *information furnished, or caused to be furnished, by or on behalf of the College or any Affiliate thereof to any prospective*

4

*purchaser* of the Series 2010 Bonds, or the omission or alleged omission to state in any such information any material fact necessary to make the statements contained therein not misleading in the light of the circumstances under which such statements were made." (Italics added.)

48.     In addition, the Authority was also a conduit offeror and seller of the Bonds acting for and in concert and conspiracy with the College. By reason of the positions of common control of the Authority and the College (including without limitation the role exercised by Defendant Roy A. Barnett Jr. as director and chairman of the Authority at the same time as he was a Trustee of the College), as well as by reason of the joint participation of the Authority and the College under the control of the Convention in providing Official Statement information for use in offers and sales of the Bonds and the certifications each provided regarding the accuracy of the Official Statement, the Authority and College <u>acting as a team and in concert and conspiracy, as one group,</u> acted as offeror and seller of the Bonds. The proceeds of selling the Bonds to Bondholders, net of issuance costs, inured to the pecuniary benefit of the College and of the Convention itself (rather than the Authority itself) in several ways, including but not limited to (i) the retirement of $2.4 million of College debt owed to banks, including Marion Bank & Trust Company with which some Defendants here, i.e., Defendants Charles F. Dunkin, Roy A. Barnett and Bruce Fuller, were both affiliated (as bank directors, significant shareholders, and directors of that bank's holding company, Marion Bancshares) at the same time as they were Trustees of the College and Barnett was also director and Chairman of the Authority; and (ii) and the refunding of more than $9.2 million of outstanding prior bond indebtedness of the College; all to improve the College's financial picture. Those actions inured to the benefit of the College's parent organization, the Convention.

49.     The College, with the active participation of the Authority, and under the control

4

of the Convention (which benefited from issuance of the Bonds as did Marion Bank & Trust Co. under control of Defendants Dunkin, Barnett and Fuller), operating in concert and in conspiracy with the Convention, under common control and with a common and unified purpose, was the real party interest that was offering and selling its Lease commitments and its covenants to the Bondholders, packaged as Bond instruments. Such package included the College's promises to pay Basic Rent in the amount of Bond debt service and to provide resources (Student Fees and the General Endowment) in stated percentages of Bonds outstanding to make such payments. This type of transaction is widely known in the marketplace as a "conduit" financing (using what amounts to a pass-through entity, the Authority, with no material assets or revenues or personal financial commitments of its own), where there is a Borrower/Obligor-Seller entity (here, the College) and a Lender/Obligee side (here, the Bondholders).  As such, any market intermediaries in the Bond sales process (Frazer Lanier and any bond brokers) were functioning as agents of the College and of the Authority, relying, like Bondholders, on the representations and certifications of the College and its teammate, the Authority.

50.    Although the Convention and its controlled entity, the College, stated in the Official Statement that the Convention was not liable for payment of the Bonds, that statement applies only to contractual assumption of the Lease and Indenture obligations, and does not apply to, and does not exonerate the Convention for liability for, fraud and intentional misconduct committed against Plaintiff and other bondholders.

### COUNT ONE: FRAUD UNDER ALABAMA CODE §6-5-100

51.    The factual, jurisdictional and venue allegations set forth in paragraphs 1-50 of this Complaint are incorporated in this Count by reference and are realleged as if repeated verbatim here.

4

52.     The Defendants, acting in concert and conspiracy, committed common law fraud and statutory fraud (under Code of Alabama §6-5-100) against Plaintiff and other Bondholders, which proximately damaged Plaintiff. The content and legal ramifications of the terms of the components forming the General Endowment, buried from view and never disclosed to Plaintiff (and on information and belief other Bondholders), were known to and held by the College (under control of the Defendants) and the Convention and the Baptist Foundation, with respect to the General Endowment component donation and trust instruments.

53.     Such fraud was carried out by and under the direction and control of Defendants in a uniform manner that was common to Plaintiff and other Bondholders, using the same documents (Lease, Official Statement, Mathews closing legal opinion, and certifications alleged herein) for Plaintiff as for the other Bondholders.  Thereafter, such fraud was not only concealed by Defendants in a uniform manner common to Plaintiff and other Bondholders from 2010 to 2021, it was also fostered and perpetuated by the semi-annual misleading General Endowment Coverage Certificates issued from 2011 to May 2021, as previously alleged herein, published to the world. The Plaintiff, and on information and belief other Bondholders, acted upon such misrepresentations by their acts of purchasing the Bonds, to their injury and damage. The Plaintiff could not have discovered the violations of the Alabama Code and common law alleged herein, by the exercise of reasonable care, sooner than two years before the filing of this action.

## COUNT TWO: FRAUD UNDER ALABAMA CODE §6-5-101

54.     The factual, jurisdictional and venue allegations set forth in paragraphs 1-50 of this Complaint are incorporated in this Count by reference and are realleged as if repeated verbatim here.

55.     At all times relevant hereto, the Defendants, acting in concert and conspiracy, made

4

or caused to be made misrepresentations of material facts to be conveyed to, and which were conveyed to, Plaintiff and other Bondholders. The content and legal ramifications of the terms of the components forming the General Endowment, buried from view and never disclosed to Plaintiff (and on information and belief other Bondholders), were known to and held by the College (under control of the Defendants) and the Convention and the Baptist Foundation, with respect to the General Endowment component donation and trust instruments. Such misrepresentations were made willfully to deceive, or else recklessly without knowledge, or else (and alternatively) by mistake and innocently. Such misrepresentations included half-truths along with outright misstatements. The Plaintiff, and on information and belief  other Bondholders, acted upon such misrepresentations by their acts of purchasing the Bonds, to their injury and damage.  Such conduct of Defendants, which constitutes common law fraud and statutory fraud (under Code of Alabama §6-5-101) has proximately damaged Plaintiff.

56.     Such fraud was carried out by and under the direction of Defendants in a uniform manner that was common to Plaintiff and other Bondholders, using the same documents (Lease, Official Statement, Mathews closing legal opinion, and certifications alleged herein) for Plaintiff as for the other Bondholders. Thereafter, such fraud was not only concealed by Defendants in a uniform manner common to Plaintiff and other Bondholders from 2010 to 2021, it was also fostered and perpetuated by the semi-annual misleading General Endowment Coverage Certificates issued from 2011 to May 2021, as previously alleged herein, published to the world. The Plaintiff could not have discovered the violations of the Alabama Code and common law alleged herein, by the exercise of reasonable care, sooner than two years before the filing of this action.

## COUNT THREE: FRAUD UNDER ALABAMA CODE §6-5-102

57.     The factual, jurisdictional and venue allegations set forth in paragraphs 1-50 of this Complaint are incorporated in this Count by reference and are realleged as if repeated verbatim here.

58.     At all times relevant hereto, the Defendants were in control of the Authority, the College and the disclosure of material information about the College, the General Endowment and other matters relevant here, such that Defendants were under an obligation to communicate and to cause the College and Authority to communicate the material facts which, as alleged in this Complaint, were suppressed and not communicated or otherwise disclosed to Plaintiff and other Bondholders. The content and legal ramifications of the terms of the components forming the General Endowment, buried from view and never disclosed to Plaintiff (and on information and belief other Bondholders), were known to and held by the College (under control of the Defendants) and the Convention and the Baptist Foundation, with respect to the General Endowment component donation and trust instruments. The Defendants, having undertaken to cause, to facilitate and to approve the College to use the Defendants' names and to speak in the Official Statement to the terms of and security for the Bonds and other relevant facts, thereby incurred a duty to speak, and to cause the College to speak, fully and to tell (or cause to be told) the whole truth on all aspects of such subject matters, and to refrain from concealing other facts necessary for a reasonable investor to appreciate the truth. The Defendants failed in such duties, and did so knowingly and recklessly, in disregard of the likely harm to the Plaintiff and other bondholders. The Plaintiff, and on information and belief other Bondholders, relied and acted upon such material fact suppressions by their acts of purchasing the Bonds. Such conduct of Defendants, which constitutes common law fraud and statutory fraud (under Code of Alabama §6-5-102) has

5

proximately damaged Plaintiff.

59.     Such fraud was carried out by and under the direction of Defendants in a uniform

manner that was common to Plaintiff and other Bondholders, using the same documents (Lease,

Official Statement, Mathews closing legal opinion, and certifications alleged herein) for Plaintiff

as for the other Bondholders. Thereafter, such fraud was not only concealed by Defendants in a

uniform manner common to Plaintiff and other Bondholders from 2010 to 2021, it was also

fostered and perpetuated by the semi-annual misleading General Endowment Coverage

Certificates issued from 2011 to May 2021, as previously alleged herein, published to the world.

The Plaintiff could not have discovered the violations of the Alabama Code and common law

alleged herein, by the exercise of reasonable care, sooner than two years before the filing of this

action.

<u>**COUNT FOUR: DECEIT UNDER ALABAMA CODE §6-5-103**</u>

60.     The factual, jurisdictional and venue allegations set forth in paragraphs 1-50 of this

Complaint are incorporated in this Count by reference and are realleged as if repeated verbatim

here.

61.     At all times relevant hereto, the Defendants, acting in concert and conspiracy,

willfully, fraudulently and/or recklessly made or caused to be made misrepresentations of material

facts portrayed as true (and statements of half-truths instead of full truths) to be conveyed to, and

which were conveyed to, Plaintiff and other Bondholders, to induce Plaintiff and other

Bondholders to purchase the Bonds, and the Plaintiff and other Bondholders were deceived and

did purchase the Bonds, which has damaged the Plaintiff in the amount he paid for the Bonds, as

well as any accrued and unpaid interest, and out of pocket and legal costs. The content and legal

ramifications of the terms of the components forming the General Endowment, buried from view

and never disclosed to Plaintiff (and on information and belief other Bondholders), were known to and held by the College (under control of the Defendants) and the Convention and the Baptist Foundation, with respect to the General Endowment component donation and trust instruments. Such deceit was conducted in such a manner as to deceive and mislead Plaintiff and others similarly situated, as well as market intermediaries and, indeed, the rating agency, Standard & Poor's.

62.     The Plaintiff, and on information and belief the other Bondholders, acted upon such misrepresentations by their respective acts of purchasing the Bonds, to their injury and damage. Such conduct of Defendants, which constitutes common law fraud and statutory deceit (under Code of Alabama §6-5-103) has proximately damaged Plaintiff.

63.     Such fraud and deceit was carried out by and under the direction of Defendants in a uniform manner that was common to Plaintiff and other Bondholders, using the same documents (Lease, Official Statement. Mathews closing legal opinion, and certifications alleged herein) for Plaintiff as for the other Bondholders. Thereafter, such fraud was not only concealed by Defendants in a uniform manner common to Plaintiff and other Bondholders from 2010 to 2021, it was also fostered and perpetuated by the semi-annual misleading General Endowment Coverage Certificates issued from 2011 to May 2021, as previously alleged herein, published to the world. The Plaintiff could not have discovered the violations of the Alabama Code and common law alleged herein, by the exercise of reasonable care, sooner than two years before the filing of this action.

### COUNT FIVE: FRAUDULENT DECEIT, ALABAMA CODE §6-5-104

64.     The factual, jurisdictional and venue allegations set forth in paragraphs 1-50 of this Complaint are incorporated in this Count by reference and are realleged as if repeated verbatim

here.

65.     At all times relevant hereto, the Defendants, acting in concert and conspiracy, willfully, fraudulently and/or recklessly deceived Plaintiff and other Bondholders, and caused and aided and abetted the College and Authority to deceive them, with intent for Plaintiff and other Bondholders to alter their positions by purchasing the Bonds, and the Plaintiff and other Bondholders were deceived and did purchase the Bonds, which has damaged Plaintiff.

66.     The Defendants carried out such deceit by (among other means) representing as a true fact the availability of the General Endowment to pay College lease obligations to pay Basic Rent and other amounts supporting the Bonds, when the Defendants either did not believe such fact representation to be true or alternatively asserted or caused to be asserted such fact as true (when it was not true) at times when the Defendants had no reasonable grounds for believing such representations were true. The content and legal ramifications of the terms of the components forming the General Endowment, buried from view and never disclosed to Plaintiff (and on information and belief other Bondholders), were known to and held by the College (under control of the Defendants) and the Convention and the Baptist Foundation, with respect to the General Endowment component donation and trust instruments.

67.     Alternatively, the Defendants, acting in concert and conspiracy, suppressed material facts regarding the availability of the General Endowment to pay College lease obligations to pay Basic Rent and other amounts supporting the Bonds, that Defendants were duty bound and bound by circumstances to disclose, and gave information to Plaintiff and other Bondholders about the General Endowment which was likely to mislead for want of communication by Defendants of material facts.

68.     Alternatively, the Defendants, acting in concert and conspiracy, covenanted and

promised in Lease §8.1, in the Official Statement, and in the several certifications alleged herein, to use and apply the General Endowment to pay College lease obligations to pay Basic Rent and other amounts supporting the Bonds, without any intention of performing such covenant and promise.

69.     The Plaintiff, and on information and belief other Bondholders, acted upon such misrepresentations, suppressions, promises and covenants, by their acts of purchasing the Bonds, to their injury and damage. Such conduct of Defendants alleged in this Count, which constitutes common law fraud and statutory fraudulent deceit (under Code of Alabama §6-5-104) has proximately damaged Plaintiff.

70.     Such fraudulent deceit was carried out by and under the direction of Defendants in a uniform manner that was common to Plaintiff and other Bondholders, using the same documents (Lease, Official Statement, Mathews closing legal opinion, and certifications alleged herein) for the other Bondholders as for the Plaintiff. Thereafter, such fraud was not only concealed by Defendants in a uniform manner common to Plaintiff and other Bondholders from 2010 to 2021, it was also fostered and perpetuated by the semi-annual misleading General Endowment Coverage Certificates issued from 2011 to May 2021, as previously alleged herein, published to the world. The Plaintiff could not have discovered the violations of the Alabama Code and common law alleged herein, by the exercise of reasonable care, sooner than two years before the filing of this action.

## COUNT SIX: SECURITIES ACT OF ALABAMA VIOLATIONS

71.     The factual, jurisdictional and venue allegations set forth in paragraphs 1-50 of this Complaint are incorporated in this Count by reference and are realleged as if repeated verbatim here.

72.     This is not a case for elevating "form over substance." The substance of this College activity, driven and controlled by the Defendants was this: at all times relevant hereto, the College, acting in concert and conspiracy with the Authority (acting as a financing team with the College while controlled by its chair who was also a College trustee) and the College's parent (the Convention) in a conduit financing, was the offeror and the seller to Bondholders of the College's contractual obligations, covenants (including the General Endowment Covenant), representations and warranties set forth in the Lease, as detailed previously in the factual allegations of this Complaint, which were packaged as a loan from Bondholders (taking the form of Bonds), who were lenders to the College as the borrower (and, with the Authority, as sellers of the instruments evidencing such debt) and were all offered and sold by the College and Authority using information it and the Defendants provided and/or caused to be provided (and omissions to provide information that Defendants and the College determined would not be provided) to Bondholders through the Official Statement, the Lease, various certifications alleged herein, and other means. The $11.2 million loan package was divided into $5,000 debt denominations to facilitate the College's sale of its obligations to multiple purchasers, and the market and legal effects of dividing the Lease obligations and debt into so many small pieces to be offered and sold in the securities marketplace was to create a "security" of the College, as the offeror and seller, which was subject to the provisions of the Securities Act of Alabama (the "Act"), among other applicable laws.

73.     The College's activities described in the Official Statement, the Lease, the Indenture, and the various certifications, representations and warranties alleged in this Complaint, constituted both "offers" and "sales" by the College, in combination, concert and conspiracy with the Authority, of the College's Lease obligations packaged into debt instruments, acting under the control and direction of the Defendants, within the meaning of Sections 8-6-2, 8-6-17 and 8-6-19

of the Act, Alabama Code §§ 8-6-2, 8-6-17 and 8-6-19, respectively.  Alternatively, to the extent

that the Authority is regarded as offeror and as a seller of the securities package here (even though

the Authority was a mere device, a conduit, akin to a straw man), the Authority was effectively

acting under the control and direction of the Defendants and for the benefit of the Defendants,

within the meaning of Sections 8-6-2, 8-6-17 and 8-6-19 of the Act, Alabama Code §§ 8-6-2, 8-6-

17 and 8-6-19, respectively.  Thus, the College was an "offeror" of the Bonds within the meaning

of Sections 8-6-2, 8-6-17 and 8-6-19 of the Act, Alabama Code §§ 8-6-2, 8-6-17 and 8-6-19,

respectively; and, as well, the Authority was an "offeror" of the Bonds within the meaning of

Sections 8-6-2, 8-6-17 and 8-6-19 of the Act, Alabama Code §§ 8-6-2, 8-6-17 and 8-6-19,

respectively; which constituted the College and the Authority as controlled persons for purposes

of § 8-6-19(a)(1) and (c), as well as for purposes of § 8-6-19(a)(2) and (c).

74.     Each of the Defendants was a person in control of the College, and a member of

the control group of the College, with respect to all transactions falling within the scope of the Act

and alleged herein, at all times relevant to the events pleaded herein, within the meaning of

Alabama Code Sections 8-6-2 and 8-6-19, particularly § 8-6-19(c). Moreover, Defendant Barnett,

acting in concert and conspiracy with the other Defendants, was in actual control of, and the

principal control person of, the Authority.  Additionally, the Defendants acted in concert and

conspiracy and consciously aided and abetted each other, and the Authority and the College, in the

violations of the Act set forth herein.

75.     The Defendants, as the aforesaid control persons and as persons acting in concert

and conspiracy, and as aiders and abettors, in connection with the offer, sale or purchase of the

College's Lease obligations packaged by the College with the aid of the Authority (both controlled

directly or indirectly by Defendants) as securities and as Bonds, directly and indirectly employed

5

devices, schemes, and artifices to defraud the Bondholders, in violation of Alabama Code Section 8-6-17(a)(1).

76.     The Defendants, as the aforesaid control persons and as persons acting in concert and conspiracy, and as aiders and abettors, in connection with the offer, sale or purchase of the College's Lease obligations packaged by the College with the aid of the Authority (both controlled directly or indirectly by Defendants) as securities and as Bonds, directly and indirectly made untrue statements of material fact and caused the omission of, or omitted to state, material facts necessary in order to make the statements made to Bondholders, in the light of the circumstances under which they are made, not misleading, in violation of Alabama Code Section 8-6-17(a)(2).

77.     The Defendants, as the aforesaid control persons and as persons acting in concert and conspiracy, and as aiders and abettors, in connection with the offer, sale or purchase of the College's Lease obligations packaged by the College with the aid of the Authority (both controlled directly or indirectly by Defendants) as securities and as Bonds, directly and indirectly engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon each of the Bondholders, in violation of Alabama Code Section 8-6-17(a)(3).

78.     The Defendants, as the aforesaid control persons and as persons acting in concert and conspiracy, and as aiders and abettors, in connection with the offer, sale or purchase of the College's Lease obligations packaged by the College with the aid of the Authority (both controlled directly or indirectly by Defendants) as securities and as Bonds, caused persons they controlled (the Authority and the College) to sell or offer to sell a security to Bondholders in violation of each of the subdivisions of Alabama Code Section 8-6-17, in violation of Alabama Code Section 8-6-19(a)(1). The Plaintiff's funds went to the College as a result of his purchase of the Bonds and the College was the entity which, through a conduit and market intermediaries (as planned by the

5

College), received the Plaintiff's Bond purchase funds at the Bond closing and was the true offeror and seller to Plaintiff.

79.     The Defendants, as the aforesaid control persons and as persons acting in concert and conspiracy, and as aiders and abettors, in connection with the offer, sale or purchase of the College's Lease obligations packaged by the College with the aid of the Authority (both controlled directly or indirectly by Defendants) as securities and as Bonds, caused persons they controlled (the Authority and the College) to sell or offer to sell a security to Bondholders by means of untrue statements of material facts and by omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, the Bondholders not knowing of the untruth or omission of such material facts, all in violation of Alabama Code Section 8-6-19(a)(2).

80.     It is not a precondition to or jurisdictional requirement of Plaintiff's suit against such Defendant control persons that the controlled persons (i.e., the College and/or the Authority) also be made a party to the suit.

81.     The Plaintiff is entitled under the Act to rescission and alternatively a rescission measure of damages from the Defendants, and each of them, jointly and severally, and is prepared to tender the Plaintiff's securities to perfect such rescission or rescission measure of damages (less any credit for income already received), and is entitled to recovery of court costs and reasonable attorneys' fees and prejudgment interest as provided in the Act.

82.     By statute (Alabama Code §8-6-19(e)), the claims brought in this count survive the death of any Plaintiff or any Defendant or any other potential defendant.

83.     The Plaintiff were uniformly kept in the dark by Defendants and the College and Authority as to the existence of the misstatements of material fact and as to the omission of material

5

facts from the statements made to the Plaintiff, reinforced by the repeated publications of semi-annual GE Covenant Coverage Certificates, until May 2021 or thereafter, when the College and Defendants made and caused to be made some disclosures about the closure of the College and thereafter about the College's new position that the General Endowment would not be available to pay its Lease obligations and the Bonds. The Plaintiff could not have discovered the violations of the Act alleged herein, by the exercise of reasonable care, sooner than two years before the filing of this action.

**COUNT SEVEN: DECLARATORY RELIEF**

84.     The factual, jurisdictional and venue allegations set forth in paragraphs 1-50 of this Complaint are incorporated in this Count by reference and are realleged as if repeated verbatim here.

85.     As previously alleged, Marion Bank Insider-Dealing College Trustee Defendants Dunkin, Barnett and Fuller held multiple conflict of interest positions during the times they breached their duties and wronged the Plaintiff, they engaged intentionally in self-preferment and self-dealing arrangements and transactions, and they committed willful fraud and deceit upon Plaintiff for pecuniary motives and the enrichment of Marion B&T in which they held and hold substantial stakes. Under the facts of this case, any and all statutory, bylaw, charter, contractual and other indemnity and contribution provisions, which in the absence of such facts would operate to cover or reimburse their legal fees and liability for damages to Plaintiff and Bondholders, are unenforceable, as it would violate public policy (if not also the terms of any such indemnity provisions) to protect such Defendants against the consequences of their deliberate wrongdoing. Similarly, as to Defendants Robinson (who had and has extensive legal expertise, training and experience and served as Finance Committee chair), Newman (who has extensive securities and

5

financial expertise and experience), Matthews (who had extensive legal and securities law expertise and experience), and Lance, they knowingly approved the Bond- related transactions and Marion B&T related transactions which have benefited Marion Bank Insider-Dealing College Trustee Defendants Dunkin, Barnett and Fuller and have correspondingly operated to the detriment of Plaintiff, and they acted willfully, intentionally and recklessly (and in concert and conspiracy with Marion Bank Insider-Dealing College Trustees Dunkin, Barnett and Fuller) in so doing and in the wrongs alleged in this Complaint.

86.    Public policy does not permit indemnification of wrongdoers who have acted willfully, intentionally and recklessly, as the Defendants acted here, and it makes no difference whether indemnity is sought by reason of contract, bylaw, charter provision, statute or insurance.

87.    In addition to said public policy bar against indemnification, Alabama Code §10A-3-2.43 bars an Alabama non-profit such as the College and the Convention from having the power to indemnify any person who shall have served as a director or officer (or at its request served as director or officer of another entity) where such person shall be shown to be liable for negligence or misconduct in the performance of duties. In this case, Defendants Dunkin, Barnett, Fuller, Robinson, Newman, Matthews and Lance have not been merely negligent; they are guilty of fraud, deceit and reckless misconduct in the performance of their offices and the use of their positions.

88.    Consistently with the principles invoked in the two preceding paragraphs of this Complaint, Lease §8.2 bars the College from indemnifying Barnett "against any claim, liability or loss resulting from the willful misconduct or gross negligence" of Barnett as a would-be indemnifiable party.

89.    The Lease in §12.7 provides, among other things, that "Nothing in this section, however, shall relieve any trustee ... or employee of the College from performing all duties of

6

their respective offices that may be necessary to enable the College to perform the covenants and agreements on its part herein contained." In the circumstances presented here, the individual Defendants as trustees have failed to perform all duties necessary to enable the College to perform its General Endowment Covenant.

90.     Consistently with the foregoing, Plaintiff alleges that public policy does not permit the enforcement by Defendants Dunkin, Barnett, Fuller, Robinson, Newman, Matthews and Lance of any indemnification provisions (including any assumptions of the defense of such Defendants by the College or the Convention, which in any event would involve unresolvable conflicts of interest due to the intentional misconduct involved and potential claims of such entities themselves against such individuals) contained in the charter or bylaws of the College and the Convention.

91.     Plaintiff are entitled to, and pray for, a declaration of the court (and a corresponding judgment) which determines the rights of indemnity and the applicability of bars to indemnity of Defendants Dunkin, Barnett, Fuller, Robinson, Newman, Matthews and Lance. Plaintiff believes such Defendants are already using or relying upon, or are seeking to rely upon, indemnity provisions in this matter. Clearly, those Defendants are and will be in disagreement with Plaintiff with regard to such issues of indemnity (and contribution among joint tortfeasors) and bars against indemnification, which necessitates judicial resolution of the issues.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows, as applicable for each particular cause of action asserted herein:

    A. An Order and Judgment awarding Plaintiff such actual, compensatory, statutory, rescission, punitive and/or exemplary damages as are established by the evidence and any jury award.

6

B. An Order and Judgment awarding Plaintiff specific performance, disgorgement relief, declaratory judgment relief, and preliminary and permanent injunctive relief, including, without limitation, the relief sought in Count Seven.

C. An Order and Judgment awarding Plaintiff his attorneys' fees and expenses, expert witness fees, and costs, together with prejudgment and post-judgment interest.

D. An Order and Judgment awarding such other and further relief as may be just and proper, premises considered.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues which are triable to a jury.

*J. Michael Rediker*

J. Michael Rediker (RED004)
R. Scott Williams (WIL167)
E. Berton Spence (SPE 027)
Counsel for Plaintiff

Of Counsel:
Rumberger Kirk & Caldwell, P.C.
Renasant Place, Suite 1300
2001 Park Place North
Birmingham, Alabama  35203-2700
Telephone:  (205) 327-5550
Facsimile:  (205) 326-6786
E-mail: mrediker@rumberger.com
E-mail: swilliams@rumberger.com
E-mail: bspence@rumberger.com

## INDEX OF EXHIBITS TO THIS COMPLAINT

(Note: these exhibits have been bates numbered for convenient reference to pages within them.)

**Exhibit A -** Lease executed in October 2010 between the Educational Building Authority of the City of Marion ("Authority") as nominal issuer and Judson College ("College") as the obligor, tenant and the true party-in-interest-seller of the Educational Building Authority of the City of Marion Revenue Bonds, Judson College Series 2010 (the "Bonds"). Bates Numbers JBH-000001 to JBH-000054.

6

**Exhibit B** - Trust Indenture executed in October 2010 between the Authority as nominal Bond issuer and Regions Bank as Indenture Trustee (to which rights were contemporaneously assigned under the Lease), securing the Bonds. Bates Numbers JBH-000055 to JBH-000122.

**Exhibit C** - Official Statement dated as of October 20, 2010 as approved by the Authority, the Trustees and College Counsel (among others). Bates Numbers JBH-000123 to JBH-000189.

**Exhibit D** - GE Coverage Certification dated in May 2020, which is representative of the semi-annual GE Coverage Certifications published by the College from 2011 through May 2021 pursuant to Lease section 8.1. Bates Numbers JBH-000190 to JBH-000193.

**Exhibit E** - College Counsel Closing Opinion Letter as signed and delivered by Defendant Joseph W. Mathews under date of October 28, 2010. Bates Numbers JBH-000194 to JBH-000197.

**Exhibit F** - Standard & Poor's Ratings Services' ("S&P's") September 20, 2010 Bond rating letter to the College assigning the investment grade rating of BBB- to the Bonds, together with the 6-page S&P's ratings rationale report dated as of September 27, 2010 supporting (and referenced in) such rating and such rating letter. Bates Numbers JBH-000198 to JBH-000206.

**Exhibit G** - GE Coverage Certification dated in May 2021, which is representative of the semi-annual GE Coverage Certifications published by the College from 2011 through May 2021 pursuant to Lease section 8.1. Bates Numbers JBH-000207 to JBH-000210.

**Please serve the Defendants by Certified Mail at the following address:**

Charles F. Dunkin
1453 Panorama Drive
Vestavia Hills, AL 35216-3014

Roy Alexander Barnett, Jr.
202 E. Early St
Marion, AL 36756-2514

Daphne Rudicell Robinson
403 Dryer Ave.
Daphne, AL 36526-8610

Roger Bruce Fuller
11623 Highway 219
Selma, AL 36701

Joseph W. Mathews, Jr.
404 Poinciana Drive
Homewood, AL 35209-4130

Judith Karen Favor
105 Crestview Drive
Birmingham, AL 35213-3106

Joan Vignes Newman
307 Lakeshore Drive
Enterprise, AL 36330-7805

Rick Lance
9445 Winfield Place
Montgomery, AL 36117

The Alabama Baptist State Convention
Attn: Rick Lance, Executive Director
2001 E. South Boulevard
Montgomery, AL 36116

6

# EXHIBIT A

JBH-000001

DEED    612    645
Recorded In Above Book and Page
11/01/2010 12:59:12 PM
Eldora B. Anderson
Judge of Probate
Perry

Recording Fee        170.00
TOTAL                170.00

## LEASE AGREEMENT

between

### EDUCATIONAL BUILDING AUTHORITY OF THE CITY OF MARION

and

### JUDSON COLLEGE

dated as of October 1, 2010

Relating to

$11,230,000

### EDUCATIONAL BUILDING AUTHORITY OF THE CITY OF MARION

Revenue Bonds
Judson College
Series 2010
dated October 1, 2010

JBH-000002

TABLE OF CONTENTS*                    DEED   612   646

to
**LEASE AGREEMENT**
between
**EDUCATIONAL BUILDING AUTHORITY**
**OF THE CITY OF MARION**
and
**JUDSON COLLEGE**

Page

Parties......................................................................................................................................1
Recitals....................................................................................................................................1

## ARTICLE I

### DEFINITIONS AND USE OF PHRASES

Section 1.1    Definitions............................................................................................ 1
Section 1.2    Definitions Contained in the Indenture.............................................. 5
Section 1.3    Use of Phrases...................................................................................... 5

## ARTICLE II

### REPRESENTATIONS AND WARRANTIES

Section 2.1    Representations and Warranties by the Authority. ............................... 5
Section 2.2    Representations and Warranties by the College. ................................... 7

## ARTICLE III

### DEMISING CLAUSES

Section 3.1    Demising Clauses................................................................................ 10
Section 3.2    Concerning the Lease of the Leased Facilities. ................................. 10

*This Table of Contents appears here for reference only and should not be considered a part of this Lease Agreement.

i

JBH-000003

## ARTICLE IV

DEED   612   647

### ISSUANCE OF THE SERIES 2010 BONDS

Section 4.1     Agreement to Issue the Series 2010 Bonds............................................................. 10

## ARTICLE V

### DURATION OF TERM AND
### RENTAL PROVISIONS

Section 5.1     Duration of Term. ........................................................................................ 11
Section 5.2     Basic Rent. .................................................................................................. 11
Section 5.3     Pledge of the Student Fees. ......................................................................... 12
Section 5.4     Additional Rent – Trustee's Fees and Expenses. ................................................. 13
Section 5.5     Additional Rent – Expenses of the Authority.................................................... 13
Section 5.6     Optional Prepayment of Basic Rent............................................................... 14
Section 5.7     Obligations of the College Unconditional. ........................................................ 14

## ARTICLE VI

### PROVISIONS CONCERNING MAINTENANCE
### AND ADDITIONS, TAXES AND INSURANCE

Section 6.1     Maintenance, Additions and Modifications........................................................ 15
Section 6.2     Payment of Claims, Judgments, Taxes and Other Governmental
                Charges. ...................................................................................................... 16
Section 6.3     Insurance With Respect to the Leased Facilities. ................................................ 16

## ARTICLE VII

### PROVISIONS RESPECTING DAMAGE,
### DESTRUCTION AND CONDEMNATION

Section 7.1     Damage and Destruction Provisions.................................................................. 17
Section 7.2     Condemnation Provisions. ............................................................................ 18
Section 7.3     Condemnation of Right to Use of the Leased Facilities for Limited
                Period. ........................................................................................................ 22
Section 7.4     Condemnation of College-Owned Property........................................................ 22
Section 7.5     Cooperation of the Authority in the Conduct of Condemnation
                Proceedings. ................................................................................................ 23
Section 7.6     Cooperation of the Authority with Respect to Restoration of the
                Leased Facilities in the Event of Casualty or Condemnation. .......................... 23

ii

JBH-000004

## ARTICLE VIII

### PARTICULAR COVENANTS OF THE COLLEGE

DEED    612    648

Section 8.1    Concerning the General Endowment. .................................................... 23
Section 8.2    Release and Indemnification Covenants. ............................................. 24
Section 8.3    Inspection of the Leased Facilities. ...................................................... 26
Section 8.4    Agreements Respecting Corporate Existence and Transfer of Assets. ................ 26
Section 8.5    Agreements Respecting Maintenance of Student Fees. ......................... 27
Section 8.6    Agreement To Respect Priority of Pledge of Student Fees. .................. 27
Section 8.7    Covenants With Respect to Exemption of Interest on Series 2010
               Bonds from Federal Income Taxation. ................................................. 28
Section 8.8    No-Arbitrage Covenants.  Investment of Proceeds. ............................ 29
Section 8.9    Annual Audits. ..................................................................................... 29
Section 8.10   Continuing Disclosure. ........................................................................ 30
Section 8.11   Further Assurances. ............................................................................. 31

## ARTICLE IX

### CERTAIN PROVISIONS RELATING TO
### ASSIGNMENT AND SUBLEASING
### AND TO THE BONDS

Section 9.1    Assignment and Subleasing by the College. ........................................ 31
Section 9.2    Assignment of the Lease by the Authority. .......................................... 32
Section 9.3    References to Bonds Ineffective after Indenture Indebtedness Paid. .................. 33
Section 9.4    Concerning Issuance of Additional Parity Bonds. ............................... 33
Section 9.5    Disposition of Trust Fund Moneys after Full Payment of Indenture
               Indebtedness. ....................................................................................... 33

## ARTICLE X

### EVENTS OF DEFAULT AND REMEDIES

Section 10.1   Events of Default Defined. ................................................................. 34
Section 10.2   Remedies on Default. .......................................................................... 35
Section 10.3   No Remedy Exclusive. ........................................................................ 36
Section 10.4   Agreement to Pay Attorneys' Fees. ..................................................... 36
Section 10.5   No Additional Waiver Implied by One Waiver. ................................... 36

JBH-000005

DOCUMENT 3

## ARTICLE XI

### OPTIONS

Section 11.1 Options to Terminate the Ground Lease and the Lease During Lease Term. ................................................................................................ 37
Section 11.2 Option to Terminate – Casualties. ................................................. 38
Section 11.3 Option to Terminate After Payment of Indenture Indebtedness. ........................... 40
Section 11.4 Option to Release Parts of Sites from Ground Lease. ......................................... 40
Section 11.5 Options – In General. ................................................................. 40

## ARTICLE XII

### MISCELLANEOUS

Section 12.1 Covenant of Quiet Enjoyment. Surrender. ........................................ 41
Section 12.2 Retention of Title to the Leased Facilities by the Authority. Granting of Easements. .............................................. 41
Section 12.3 Exemption from Taxation. ........................................................... 41
Section 12.4 This Lease a Net Lease. ............................................................. 41
Section 12.5 Notices. ................................................................................ 41
Section 12.6 Limited Liability of the Authority. ................................................. 42
Section 12.7 Limited Liability of Trustees, Directors, Officers, Employees or Agents of the College. ........................................ 43
Section 12.8 Disclaimer of Liability on Behalf of the Alabama Baptist State Convention. ................................................. 43
Section 12.9 Binding Effect. ........................................................................ 43
Section 12.10 Severability. ........................................................................... 43
Section 12.11 Article and Section Captions. ..................................................... 44
Section 12.12 Governing Law. ....................................................................... 44

Testimonium ............................................................................................. 45
Signatures ................................................................................................ 45
Acknowledgments ..................................................................................... 46

Exhibit A

iv

JBH-000006

DOCUMENT 2

DEED   612   650

**LEASE AGREEMENT** between **EDUCATIONAL BUILDING AUTHORITY OF THE CITY OF MARION**, a public corporation organized and existing under the laws of the State of Alabama, party of the first part (herein called the "Authority"), and **JUDSON COLLEGE**, a non-profit corporation organized and existing under the laws of the State of Alabama, party of the second part (herein called the "College");

## RECITALS

Pursuant to this Lease Agreement the Authority is undertaking to lease the Leased Facilities hereinafter defined to the College to enable the Authority to refund and retire the Series 2000 Bonds and the Series 2003 Bonds of the Authority that are hereinafter defined and to provide certain funds to the College to enable the College to retire the Outstanding Notes that are also hereinafter defined, and the College is undertaking to lease said Leased Facilities from the Authority. The Authority, in order to finance the refunding of the said Series 2000 Bonds and the said Series 2003 Bonds and providing funds to the College to enable the College to repay the said Outstanding Notes, will issue its $11,230,000 principal amount of its Revenue Bonds Judson College Series 2010, under a Trust Indenture dated as of October 1, 2010, between the Authority and Regions Bank, Birmingham, Alabama, as Trustee.

## NOW, THEREFORE, THIS LEASE AGREEMENT

## WITNESSETH:

That in consideration of the premises and the respective representations, warranties and agreements herein contained, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS AND USE OF PHRASES

Section 1.1    **Definitions.**

Unless the context clearly indicates a different meaning, the following words and phrases, as used herein, shall have the following respective meanings:

**"Act"** means the statutes codified as Code of Alabama 1975, Title 16, Chapter 17, as amended and supplemented and at the time in force and effect.

**"Additional Bonds"** means bonds of the Authority authorized in Article VIII of the Indenture to be issued thereunder and secured thereby on a parity with the Series 2010 Bonds.

**"Authority"** means the party of the first part hereto and, subject to the provisions of Section 10.4 of the Indenture, includes its successors and assigns and any public corporation resulting from or surviving any consolidation or merger to which it or its successors may be a party.

1

JBH-000007

DEED 612 651

**"Basic Rent"** means (i) the moneys payable by the College pursuant to the provisions of Section 5.2 of the Lease, (ii) any other moneys payable by the College pursuant to the Lease to provide for the payment of the principal of and the interest and premium (if any) on the Bonds, and (iii) any other moneys payable by the College pursuant to the Lease that are therein referred to as Basic Rent.

**"Bond Fund"** means the Judson College Series 2010 Bond Principal and Interest Fund created in Section 9.1 of the Indenture.

**"Bond Payment Date"** means any April 1 or October 1 (or, with respect to any series of Additional Bonds, such other date or dates as may be specified in the Supplemental Indenture providing for the issuance of such Additional Bonds) on which any principal or interest with respect to the Bonds shall mature and be due and payable or on which any principal amount of the Bonds shall be required by the Indenture to be redeemed prior to the stated maturity thereof.

**"Bondholder"** means the Holder of any Bond.

**"Bonds"** means all bonds of the Authority issued under the Indenture, viz, the Series 2010 Bonds and all Additional Bonds.

**"City"** means the City of Marion, Alabama, or any municipal corporation resulting from or surviving any consolidation or merger to which it or its successors may be a party.

**"Code"** means the Internal Revenue Code of 1986, as amended and at the time in force and effect.

**"College"** means the party of the second part hereto and, subject to the provisions of Section 8.4 hereof, includes its successors and assigns and any corporation resulting from or surviving any consolidation or merger to which it or its successors may be a party.

**"Counsel"** means any attorney duly admitted to practice before the highest court of any state of the United States of America or the District of Columbia (including any officer or full-time employee of the Authority, the College or an Affiliate of either thereof who is so admitted to practice), it being understood that "Counsel" may also mean a firm of attorneys all of whose members are so admitted to practice.

**"Event of Default"** means an "Event of Default" as specified in Section 10.1 hereof.

**"fully paid," "payment in full,"** or any similar expression with respect to the Indenture Indebtedness, means that the entire Indenture Indebtedness has been paid in full or duly provided for pursuant to Section 14.1 of the Indenture and that the Indenture has been cancelled, satisfied and discharged in accordance with the provisions of said Section 15.1 thereof.

**"General Endowment"** means all stocks, bonds, evidences of indebtedness and other financial assets (including pledges payable to the College but excluding all buildings and grounds constituting a part of the physical plant or campus of the College) as well as the corpus

2

JBH-000008

DOCUMENT 2

DEED  612  652

of all trust funds, the income of which is payable to the College, and all real property owned by or held in trust for the benefit of the College that is not situated on the campus of the College.

"Ground Lease" means that certain Ground Lease Agreement dated as of October 1, 2010, between the College and the Authority pursuant to which the College has leased the Leased Facilities to the Authority, as said Ground Lease Agreement now exists or may hereafter be amended or supplemented.

"Holder," when used in conjunction with a Bond, means the Person in whose name such Bond is registered on the registry books of the Trustee pertaining to the Bonds.

"Indenture" means that certain Trust Indenture between the Authority and Regions Bank, Birmingham, Alabama, dated as of October 1, 2010, under which (i) the Series 2010 Bonds are authorized to be issued, and (ii) the Authority's interest in and to the Lease is to be assigned as security for payment of the principal of and the interest and premium (if any) on the Series 2010 Bonds, as said Trust Indenture now exists and as it may hereafter be supplemented and amended.

"Indenture Indebtedness" means all indebtedness of the Authority at the time secured by the Indenture, including, without limitation, (i) all principal of and interest and premium (if any) on the Bonds and (ii) all reasonable and proper fees, charges and disbursements of the Trustee for services performed under the Indenture.

"Lease" or "this Lease Agreement" means this Lease Agreement as it now exists and as it may from time to time be amended or supplemented in accordance with the provisions of Article XIII of the Indenture.

"Lease Term" means the period beginning on the date of the delivery of this Lease Agreement and continuing until 11:59 o'clock, P.M., on October 1, 2040.

"Leased Facilities" means Jewitt Hall, the Science Center and the Women's Missionary Union Residence Hall on the campus of the College, as well as the Sites upon which they are situated.

"Maximum Annual Debt Service Requirement" means the maximum amount of principal and interest payable or required to be redeemed during the then current fiscal year of the College with respect to (a) all Bonds then outstanding and (b) all securities or other indebtedness issued or incurred by, on behalf of or for the benefit of the College which are secured by a pledge of the Student Fees on a parity with the pledge thereof made in the Lease for the benefit of the Series 2010 Bonds. For purposes of determining maximum interest payable, any Additional Bonds or other securities or indebtedness which bear interest at a fluctuating rate shall be assumed to bear interest for the remainder of the term thereof at the rate in effect on the date when such determination is made.

"Net Condemnation Award" means the total amount received as compensation for any part of the Leased Facilities taken under the exercise of the power of eminent domain plus

3

JBH-000009

DOCUMENT 3

DEED   612   653

damages to any part of the Leased Facilities not taken (including any compensation referable to the interest of the College in the part of the Leased Facilities taken and as damages to the interest of the College in any part thereof not taken), which compensation shall consist of (i) all awards received pursuant to administrative or judicial proceedings conducted in connection with the exercise of the power of eminent domain, plus (ii) all amounts received as the result of any settlement of compensation claims (whether in whole or in part) negotiated with the condemning authority, less (iii) all attorneys' fees and other expenses incurred in connection with the receipt of such compensation, including attorneys' fees and expenses relating to such administrative or judicial proceedings and to such settlement negotiations (other than any that may be paid directly by the College).

"**Net Insurance Proceeds**" means the total insurance proceeds recovered by the Authority, the College and the Trustee on account of any damage to or destruction of the Leased Facilities or any part thereof, less all expenses (including attorneys' fees and any extraordinary expenses of the Trustee) incurred in the collection of such proceeds.

"**outstanding**," when used with reference to any of the Bonds, means, at any date as of which the amount of such Bonds outstanding is to be determined, all such Bonds which have been theretofore authenticated and delivered by the Trustee under the Indenture, except (i) those of such Bonds purchased for retirement which have been delivered to and cancelled by the Trustee, (ii) those of such Bonds cancelled by the Trustee because of payment at or after their respective maturities or redemption prior to their respective maturities, (iii) those of such Bonds for the payment or redemption of which provisions shall have been made with the Trustee as provided in Section 15.1 of the Indenture, and (iv) those of such Bonds in exchange for which, or in lieu of which, other Bonds have been authenticated and delivered under the Indenture.

"**Outstanding Notes**" means the following Promissory Notes of the College, which represent borrowings of the College for the purpose of paying certain of the costs of constructing capital improvements that are situated upon the Sites or elsewhere on the campus of the College:

Payable to:

First Cahawba Bank
Selma, Alabama

Marion Bank and Trust Company
Marion, Alabama

West Alabama Bank and Trust
Reform, Alabama

"**Person**" means any natural person, corporation, joint venture, partnership, trust, government or governmental body, political subdivision, or other legal entity as in the context may be possible or appropriate.

4

JBH-000010

DOCUMENT 2

DEED   612   654

"**Series 2000 Bonds**" means the Tuition Revenue Bonds Judson College Series 2000, dated December 1, 2000 of the Authority, originally issued and now outstanding in the aggregate principal amount of $2,500,000.

"**Series 2003 Bonds**" means the Variable Rate Tuition Revenue Bonds Judson College Series 2003, dated March 28, 2003 of the Authority, originally issued in the aggregate principal amount of $6,715,000 and now outstanding in the aggregate principal amount of $5,725,000.

"**Series 2010 Bonds**" means the Revenue Bonds Judson College Series 2010, authorized to be issued under the Indenture in an aggregate principal amount of $11,230,000.

"**Sites**" means those parcels of land described on Exhibit A attached hereto and made a part hereof, upon which the said Jewitt Hall, the Science Center and the Women's Missionary Union Residence Hall of the College are situated.

"**Student Fees**" means all tuition and student fees payable by or on behalf of students enrolled at the College net of scholarships granted, as well as payments by or on behalf of students at the College for housing, meals and books.

"**Trustee**" means the Regions Bank, Birmingham, Alabama, or any successor trustee thereto at the time serving as such under the Indenture.

Section 1.2   **Definitions Contained in the Indenture.**

Unless the context clearly indicates a different meaning, any words, terms or phrases that are used in the Lease as defined terms without being herein defined and that are defined in the Indenture shall have the meanings respectively given them in the Indenture.

Section 1.3   **Use of Phrases.**

"Herein," "hereby," "hereunder," "hereof," "hereinbefore," "hereinafter" and other equivalent words refer to the Lease as an entirety and not solely to the particular portion in which any such word is used. The definitions set forth in Section 1.1 hereof include both singular and plural. Whenever used herein, any pronoun shall be deemed to include both singular and plural and to cover all genders.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

Section 2.1   **Representations and Warranties by the Authority.**

The Authority makes the following representations and warranties as the basis for the undertakings on its part herein contained:

5

JBH-000011

(a)   Organization.   The Authority is a public corporation duly organized and validly existing under the provisions of the Act, as now existing, by reason of its Certificate of Incorporation duly filed for record in the office of the Judge of Probate of Perry County, Alabama. The said Certificate of Incorporation has not been amended or revoked and is in full force and effect.

(b)   Litigation. There are no actions, suits or proceedings pending (nor, to the knowledge of the Authority, are any actions, suits or proceedings threatened or is there any basis therefor) against or affecting the Authority or any property of the Authority in any court, or before an arbitrator of any kind, or before or by any governmental body, which involve the possibility of materially and adversely affecting the transactions contemplated by this Lease Agreement or which in any way might adversely affect the validity or enforceability of any other agreement or instrument to which the Authority is or is to be a party relating to the transactions contemplated by this Lease Agreement.

(c)   Sale and Other Transactions are Legal and Authorized. The sale and issuance of the Series 2010 Bonds, the execution and delivery of the Ground Lease, this Lease Agreement and the Indenture, and the compliance with all the provisions of each thereof and of the Series 2010 Bonds by the Authority (i) are within the power and authority of the Authority, (ii) will not conflict with or result in a breach of any of the provisions of, or constitute a default under, or result in or require the creation of any lien or encumbrance (other than Permitted Encumbrances) upon any property of the Authority under, the Act, the certificate of incorporation or the bylaws of the Authority, any agreement or other instrument to which the Authority is a party or by which it may be bound, or any license, judgment, decree, order, law, statute, ordinance or governmental regulation applicable to the Authority, and (iii) have been duly authorized by all necessary corporate action on the part of the Authority.

(d)   Consents and Approvals. All consents, approvals, authorizations and orders of governmental or regulatory authorities, if any, which are required for the execution and delivery of the Series 2010 Bonds, this Lease Agreement and the Indenture and for the consummation of the transactions contemplated by each of the aforesaid documents have been obtained by or on behalf of the Authority and are in full force and effect. The issuance of the Series 2010 Bonds has been approved by the City, said approval having been made by the applicable elected representative of the City after public hearing following reasonably public notice, all in accordance with the provisions of Section 147(f) of the Code.

(e)   No Default. No event has occurred and no condition exists which would constitute an "Event of Default" under the Indenture, as "Event of Default" is therein defined, or which would become such an "Event of Default" with the passage of time or the giving of notice or both. The Authority is not in default under the Act, its Certificate of Incorporation, its bylaws, or any agreement or instrument to which it is a party or by which it is bound, or any judgment, order,

6

DOCUMENT 3

rule or regulation of any court or other governmental body applicable to it, to the extent in any such case that the default in question would adversely affect the existence of the Authority, its corporate power to carry out the transactions contemplated by this Lease Agreement or the validity of any of the Series 2010 Bonds or the security therefor.

(f)   The Series 2010 Bonds.  The Series 2010 Bonds, when issued and paid for in accordance with the provisions of this Lease Agreement and the Indenture and when duly authenticated by the Trustee, will constitute legal, valid and binding special obligations of the Authority payable solely from the sources provided in the Indenture.

(g)   Nature and Location of the Leased Facilities.   The Leased Facilities will constitute "ancillary improvements" within the meaning of the Act, as now existing. The Sites are located wholly within the now existing corporate limits of the City.

(h)   Leasehold Interest.  Pursuant to the Ground Lease, the Authority has acquired a leasehold interest in the Leased Facilities.

(i)   Fulfillment of Purposes of Act.  The Authority has determined that the issuance of the Series 2010 Bonds, the payment and refunding of the Series 2000 Bonds and the Series 2003 Bonds, the payment of the Outstanding Notes and the leasing of the Leased Facilities to the College will fulfill the purposes of the Act.

Section 2.2   **Representations and Warranties by the College.**

The College makes the following representations and warranties as the basis for the undertakings on its part herein contained:

(a)   Organization and Qualification of the College.  The College is a non-profit corporation duly organized and validly existing under the laws of the State of Alabama.  The College has the corporate power and authority to own its properties and assets and to carry on its business as now being conducted.  The College has all requisite corporate power to enter into this Lease Agreement and to consummate the transactions contemplated hereby.

(b)   Nature of the College.  The College (i) is an organization described in Section 501(c)(3) of the Code, (ii) has received a ruling from the Internal Revenue Service to that effect, which ruling has not been modified, limited or revoked, (iii) is in compliance with all the terms, conditions and limitations (if any) contained in such ruling, it being specifically represented by the College hereby that the facts and circumstances which form the basis of such ruling (as represented to the Internal Revenue Service) continue to exist, and (iv) is therefore exempt from Federal income taxes under Section 501(a) of the Code.

7

(c)  <u>Authorization and Validity of this Lease Agreement</u>.  The College has, by all necessary corporate action, duly authorized the execution, delivery and performance of this Lease Agreement, and when duly executed and delivered by the Authority, this Lease Agreement will constitute a legal, valid and binding obligation of the College.

(d)  <u>Conflicting Agreements and Charter Provisions</u>.  Neither the execution and delivery of this Lease Agreement, nor the sale and issuance of any of the Series 2010 Bonds, nor the consummation of the transactions herein contemplated, nor the fulfillment of or compliance with the terms and provisions hereof conflicts with, or results in a breach of, or constitutes a default under, or results in or requires the creation of any lien in respect of any properties or assets of the College pursuant to, or requires any authorization, consent, approval, exemption or other action by, or any notice to, any Person (other than those already obtained, taken or made and which continue in full force and effect) pursuant to the terms, conditions or provisions of any applicable law, rule, regulation, corporate charter, bylaw, agreement, instrument, judgment or order by which the College is bound or to which the College and any of its properties are subject.

(e)  <u>Governmental Consents</u>.  Neither the nature of the College, its business or property, nor any relationship between the College and any other Person nor any circumstance in connection with the offering, sale, issuance or delivery of any of the Series 2010 Bonds is such as to require any consent, approval, permit, exemption, action, order or authorization of, or filing, registration or qualification with, or with respect to, any court, regulatory agency or other governmental body in connection with the execution and delivery of this Lease Agreement or the sale and issuance of any of the Series 2010 Bonds other than those already obtained, taken or made and which continue in full force and effect.

(f)  <u>Nature and Location of the Leased Facilities</u>.  The Leased Facilities will constitute "ancillary improvements" within the meaning of the Act, as now existing. The Sites are located wholly within the now existing corporate limits of the City.

(g)  <u>Litigation</u>.  There is no action, suit, inquiry, investigation or proceeding pending or overtly threatened against or affecting the College at law or in equity or before or by any court or governmental body (nor, to the best knowledge and belief of the College, is there any basis therefor) which might result in any material adverse change in the business, operations, properties or assets or in the condition (financial or otherwise) of the College, or which might materially and adversely affect the transactions contemplated by this Lease Agreement, or which might impair the ability of the College to comply with its obligations hereunder.

8

JBH-000014

DOCUMENT 2

DEED   612   658

(h)   No Defaults.   No event has occurred and no condition exists which, upon the issuance of any of the Series 2010 Bonds, would constitute an Event of Default or which would become such an Event of Default with the passage of time or with the giving of notice or both. To the best of the knowledge of the College, no event has occurred and no condition exists which would constitute an "Event of Default" under the Indenture, as "Event of Default" is therein defined, or which would become such an "Event of Default" with the passage of time or with the giving of notice or both. The College is not in default in any respect under any charter instrument or bylaw or, to the best of the knowledge of the College, any agreement or other instrument to which it is a party or by which it is bound, or any judgment, order, rule or regulation of any court or other governmental body applicable to it, to the extent in any such case that the default in question would materially and adversely affect the transactions contemplated by this Lease Agreement or would impair the ability of the College to comply with its obligations hereunder. The College is not in default under the payment of the principal of or the interest on any of its indebtedness and is not in default under any instrument or agreement under and subject to which any indebtedness of the College has been incurred, and no event has occurred or is continuing under the provisions of any such instrument or agreement which constitutes or will constitute an event of default thereunder.

(i)   Full Disclosure.   Neither any information furnished by the College to the original purchasers of the Series 2010 Bonds in connection with the sale and issuance of the Series 2010 Bonds and the other transactions contemplated by this Lease Agreement, nor the representations and warranties made by the College in this Lease Agreement or in any document in writing furnished by the College in connection with the transactions contemplated hereby, contain (except to the extent, as to any such representation or warranty not made in this Lease Agreement or in a document required to be furnished pursuant to this Lease Agreement, corrected in any other written communication subsequently furnished by the College prior to the execution and delivery of this Lease Agreement) any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein, in light of the circumstances in which they were made, not misleading at the times they were made. There is no fact known to the College or which in the exercise of reasonable diligence should have been known to the College which the College has not disclosed in writing prior to the execution and delivery of this Lease Agreement which materially adversely affects or, so far as the College can now in the exercise of its reasonable business judgment foresee, the condition (financial or otherwise) of the College or the ability of the College to perform its obligations hereunder or under any agreement contemplated hereby.

9

JBH-000015

DOCUMENT 3

## ARTICLE III

### DEMISING CLAUSES

Section 3.1    **Demising Clauses.**

For and during the Lease Term, the Authority hereby demises and leases to the College and the College hereby rents from the Authority to the full extent of the Authority's interest therein pursuant to the Ground Lease, the Sites, the Leased Facilities and all personal property and fixtures installed in or around the Leased Facilities.

Section 3.2    **Concerning the Lease of the Leased Facilities.**

In order to give the Authority a requisite property interest in the Leased Facilities pursuant to the provisions of the Act, the College has leased the Leased Facilities to the Authority pursuant to the Ground Lease. It is agreed and understood that the lease of the Leased Facilities from the Authority by the College pursuant to this Lease Agreement will not (i) impair or destroy the leasehold interest created by the Ground Lease as a separate property right belonging to the Authority or (ii) extinguish the leasehold interest created by the Ground Lease through merger thereof with the College's fee simple interest in the Leased Facilities. It is understood by the parties hereto that the leasehold interest of the Authority in the Leased Facilities not be assigned to the Trustee under the Indenture and that no mortgage, security interest or other security device will be undertaken with respect to the Leased Facilities as security for the payment of the principal of or the interest on the Series 2010 Bonds.

## ARTICLE IV

### ISSUANCE OF THE SERIES 2010 BONDS

Section 4.1    **Agreement to Issue the Series 2010 Bonds.**

In order to provide for the refunding of the principal indebtedness evidenced by the Series 2000 Bonds and the Series 2003 Bonds and to enable the College to pay and retire the Outstanding Notes, the Authority will, simultaneously with the delivery hereof, sell and issue the Series 2010 Bonds and will execute and deliver the Indenture. All the terms and conditions of the Indenture (including, without limitation, those relating to the use of the proceeds of the Series 2010 Bonds and the amount, maturity, interest rate and redemption provisions of the Series 2010 Bonds) are hereby approved by the College, and to the extent that any provision of the Indenture is relevant to the calculation of any amount which the College is hereunder obligated to pay or to the determination of any other obligation of the College hereunder, the College agrees that such provision of the Indenture shall be deemed a part hereof as fully and completely as if set out herein.

10

JBH-000016

DOCUMENT 3

DEED   612   660

## ARTICLE V

## DURATION OF TERM AND
## RENTAL PROVISIONS

Section 5.1    **Duration of Term.**

The Lease Term shall begin on the date of the delivery of this Lease Agreement and, subject to the provisions hereof, shall continue until 11:59 o'clock, P.M., on October 1, 2040. The Authority will deliver to the College sole and exclusive possession of the Leased Facilities (or such portion or portions thereof as are then in existence) on the commencement date of the Lease Term, and the College will accept possession thereof at such time as shall be necessary for it to accomplish the undertakings on its part contained in Section 4.1 hereof; provided, that the Authority will be permitted such access to the Leased Facilities as shall be necessary and convenient for it to make any repairs, restorations, additions or improvements required or permitted to be made by the Authority pursuant to the provisions of the Lease.

Section 5.2    **Basic Rent.**

For the use and occupancy of the Leased Facilities during the Lease Term, the College will, not later than 10:00 o'clock, A.M., on the business day next preceding each Bond Payment Date, beginning with April 1, 2011, and continuing until and including October 1, 2040, pay to the Trustee at its principal office, for the account of the Authority, installments of Basic Rent. Each such installment of Basic Rent shall be paid in immediately available funds and shall be in an amount equal to the sum of

     (a)    the interest maturing with respect to the then outstanding Series 2010 Bonds on the Bond Payment Date on which each such installment of Basic Rent becomes due and payable, plus

     (b)    the principal (if any) maturing, or required by the terms of the Indenture to be redeemed, with respect to the then outstanding Series 2010 Bonds on said Bond Payment Date.

Any installment of Basic Rent due hereunder that is not paid on or before the Bond Payment Date next succeeding the original due date thereof shall bear interest from such Bond Payment Date until paid at the per annum rate or rates applicable to the Series 2010 Bonds.

Anything to the contrary contained in the Lease notwithstanding, there shall be credited against any installment of Basic Rent due hereunder (including components of principal and interest) any amount then held in the Bond Fund to the extent that such amount has not theretofore been credited on a previously due installment of Basic Rent; provided however, that moneys in the Bond Fund shall not be credited against any such installment if such moneys (i) are held therein for payment of matured but unpaid Bonds, Bonds called for redemption but not yet redeemed and matured but unpaid interest on the Bonds, (ii) are held therein for the future redemption or purchase of Bonds in accordance with the provisions of the Indenture, or (iii) are held therein for the payment of unmatured Bonds if such Bonds are considered fully paid

11

JBH-000017

DOCUMENT 3

pursuant to the provisions of Section 14.1 of the Indenture by reason of the fact that such moneys are so held in the Bond Fund.

Anything to the contrary contained in the Lease notwithstanding, if for any reason, after the payment by the College of such installments of Basic Rent as are required to be paid by it pursuant to any provisions of the Lease, the moneys then held by and available to the Trustee for payment or redemption of the principal of and the interest and premium (if any) on the Bonds are not sufficient to pay, on the due or required redemption date thereof, the principal maturing or required to be redeemed with respect to the Bonds plus the interest and premium (if any) due with respect to the Bonds, the College will promptly pay to the Trustee (for the account of the Authority) such additional Basic Rent as, when added to the aforesaid moneys held by and available to the Trustee, will equal an amount sufficient to pay such principal, interest and premium (if any).

So long as any of the Bonds are outstanding, all payments of Basic Rent (including all mandatory or optional prepayments thereof) shall be made directly to the Trustee for the account of the Authority. Nothing herein contained shall be construed as imposing on the Authority or on the Trustee any duty or responsibility of giving any notice to the College of the amount on deposit in the Bond Fund, or of the amount of any credits against Basic Rent available to the College, as of any rent payment date, but the Authority will cause the Trustee to respond to any reasonable requests that the College may make for such information. Neither the Authority nor the Trustee shall be obligated to give any prior notice to the College of the due date or amount of any installment of Basic Rent, and failure to receive any such prior notice, even if customarily given by the Authority or the Trustee, shall not relieve the College of its obligation to pay such installment of Basic Rent when it is due and payable.

The Authority will, promptly following the designation of any successor or interim successor Trustee under the Indenture, give written notice to the College of the name and location of the principal corporate trust office of such successor or interim successor Trustee, or it will cause such notice to be promptly given. In the event the due date of any installment of Basic Rent payable hereunder is a Saturday, Sunday or legal holiday in the state in which the principal corporate office of the Trustee is located or a day on which the bank that is then acting as Trustee is legally authorized to close, such installment shall be due in immediately available funds no later than the opening of business by the Trustee on the first business day next succeeding such due date.

Section 5.3    **Pledge of the Student Fees.**

In order to secure the prompt payment of the Basic Rent herein reserved to the Authority and the payment of the principal of and the interest on the Series 2010 Bonds, the College hereby pledges and assigns to the Authority and to the Trustee, grants to the Authority and the Trustee a security interest in, and agrees and acknowledges that the Authority and the Trustee shall continue to have a security interest in the Student Fees until payment in full of all Indenture Indebtedness and cancellation, satisfaction and discharge of the Indenture in accordance with the provisions of Section 14.1 thereof. The pledge of the Student Fees made herein shall be for the equal and pro rata protection and benefit of the Holders, present and future, of the Series 2010 Bonds and of all Additional Bonds and the holders of any other securities or indebtedness

JBH-000018

incurred or issued by or on behalf of or for the benefit of the College which are secured by a pledge of the Student Fees on a parity with the pledge made herein for the benefit of the Series 2010 Bonds. The pledge made herein will be for the benefit of the Series 2010 Bonds only unless in the proceedings under which any series of Additional Bonds is issued the College specifically pledges the Student Fees for the benefit of such Additional Bonds. The College represents and warrants that the pledge of the Student Fees made herein constitutes the only outstanding pledge with respect to the Student Fees.

The College will be permitted to pledge the Student Fees, on a parity with the pledge made herein for the benefit of the Series 2010 Bonds, as security for any Additional Bonds or as security for any other securities or indebtedness incurred or issued by, on behalf of or for the benefit of the College provided that the College furnishes the Trustee with a certificate signed by the President of the College certifying that the amount of the Student Fees received by the College in each of the two fiscal years of the College next preceding the fiscal year in which such Additional Bonds or other securities or indebtedness are proposed to be issued or incurred was not less than 250% of the Maximum Annual Debt Service Requirement during the then current or any subsequent bond year, being the period beginning on October 2 of one calendar year and ending on October 1 of the next calendar year. No such certificate will be required for any pledge of the Student Fees which is inferior or subordinate to the pledge made herein for the benefit of the Series 2010 Bonds.

### Section 5.4    Additional Rent – Trustee's Fees and Expenses.

In addition to the Basic Rent and all other rental payments due from the College hereunder, the College will also pay, as additional rent, (i) the annual fee of the Trustee for the ordinary services of the Trustee rendered and its ordinary expenses incurred under the Indenture, (ii) the reasonable fees and charges of the Trustee as registrar, transfer agent and paying agent with respect to the Bonds, as well as the fees and charges of any other paying agent with respect to the Bonds who shall act as such agent in accordance with the provisions of the Indenture, (iii) the reasonable fees and expenses of the Trustee in connection with the issuance of a new Bond upon the partial redemption of any Bond, and (iv) the reasonable fees, charges and expenses of the Trustee for necessary extraordinary services rendered by it and necessary extraordinary expenses incurred by it under the Indenture. All such fees, charges and expenses shall be paid directly to the Trustee upon presentation of its statements therefor, but the College may, without creating a default hereunder, contest in good faith the necessity for any extraordinary services performed by the Trustee or the reasonableness of the compensation or expenses of the Trustee in connection therewith.

### Section 5.5    Additional Rent – Expenses of the Authority.

In addition to the Basic Rent and all other rental payments due from the College hereunder, the College will also pay the reasonable and necessary expenses, not otherwise provided for, which may be incurred by the Authority, or for which the Authority may in any way become liable, as a result of issuing any of the Bonds or being a party to the Lease or the Indenture; provided however, that so long as no Event of Default shall have occurred and be continuing, the College's liability under this section shall not include expenses voluntarily incurred by the Authority without prior request or approval by the College, unless such expenses

13

JBH-000019

DOCUMENT 3

DEED   612   663

are necessary to enable the Authority to perform its obligations under the Lease and the Indenture.

### Section 5.6    Optional Prepayment of Basic Rent.

The College may, at its option at any time and from time to time, prepay directly to the Trustee, for the account of the Authority, such amount of Basic Rent as shall be sufficient to enable the Authority to redeem and retire, in advance of maturity, any or all of the Bonds in accordance with their terms and the terms of the Indenture. In the event of such prepayment, the Authority will cause the amount of Basic Rent so prepaid to be applied to redemption and retirement of Bonds, in accordance with the provisions of the Indenture, on the earliest practicable date after receipt of such prepaid Basic Rent on which, under their terms and the terms of the Indenture, such Bonds may be redeemed, and will (upon being notified by the College in writing of the College's intention in this respect and without the necessity of the moneys therefor being deposited with the Trustee) take all action necessary under the provisions of the Indenture to effect such redemption. Optional prepayments of Basic Rent referable to the Series 2010 Bonds shall be applied to the redemption of Series 2010 Bonds at the redemption prices and in accordance with the other terms and conditions set forth in Section 7.2 of the Indenture. The prepayment of Basic Rent will result in a total or partial abatement of the Basic Rent that would thereafter have come due had it not been for such prepayment. After the prepayment of Basic Rent sufficient to pay, redeem and retire all the outstanding Bonds, the College shall be entitled to the use and possession of the Leased Facilities without the payment of any further Basic Rent but otherwise on all the same terms and conditions of the Lease.

### Section 5.7    Obligations of the College Unconditional.

The obligation of the College to pay the Basic Rent, to make all other payments provided for herein and to perform and observe the other agreements and covenants on its part herein contained shall be absolute and unconditional, irrespective of any rights of set-off, recoupment or counterclaim it might otherwise have against the Authority. The College will not suspend, discontinue, reduce or defer any such payment or fail to perform and observe any of its other agreements and covenants contained herein or (except as expressly authorized herein) terminate the Lease for any cause, including, without limiting the generality of the foregoing, any acts or circumstances that may deprive the College of the use and enjoyment of the Leased Facilities, or any damage to or destruction of the Leased Facilities or any part thereof, or the taking by eminent domain of title to or the right to temporary use of all or any part of the Leased Facilities, or any change in the tax or other laws of the United States of America, the State of Alabama or any political or taxing subdivision of either thereof, or any failure of the Authority to perform and observe any agreement or covenant, whether express or implied, or any duty, liability or obligation arising out of or connected with the Lease.

The provisions of the first paragraph of this section shall remain in effect only so long as any of the Indenture Indebtedness remains outstanding and unpaid. Nothing contained in this section shall be construed to prevent the College, at its own cost and expense and in its own name or in the name of the Authority, from prosecuting or defending any action or proceeding or taking any other action involving third persons which the College deems reasonably necessary in order to secure or protect its rights hereunder, and in such event the Authority will cooperate

JBH-000020

DOCUMENT 3

DEED   612   664

fully with the College in any such action or proceeding.  Further, nothing contained in this section shall be construed to release the Authority from the performance of any of the agreements on its part herein contained or to preclude the College from instituting such action against the Authority as the College may deem necessary to compel such performance, it being understood and agreed, however, that no such action on the part of the College shall in any way affect the agreements on the part of the College contained in the first paragraph of this section or in any way relieve the College from performing any such agreements.

## ARTICLE VI

### PROVISIONS CONCERNING MAINTENANCE AND ADDITIONS, TAXES AND INSURANCE

Section 6.1   **Maintenance, Additions and Modifications.**

The College will, at its own expense, maintain the Leased Facilities in such state of repair and operating condition as that in which it customarily maintains facilities of similar character owned and operated by it, making from time to time all appropriate repairs thereto; provided however, that the College shall have no obligation hereunder to repair or maintain the Leased Facilities after full payment of the Indenture Indebtedness.

The College may, at its own cost and expense, make, or cause to be made, any additions, alterations, improvements or modifications to the Leased Facilities that it may deem desirable, provided that such additions, alterations, improvements or modifications do not change the character of the Leased Facilities to such extent that they no longer constitute "ancillary improvements" within the meaning of the Act.  At any time and from time to time the College may remove from the Leased Facilities any equipment, fixtures or personal property and may dispose of such items without any accountability to the Authority or the Trustee therefor.  Upon request by the College, the Authority will convey to the College or to such Person as the College may direct title to any item of such property so removed.

In the event that the College determines to make, or to cause to be made, any additions, alterations, improvements or modifications to the Leased Facilities, the Authority will, if requested by the College, execute and deliver, or cause to be executed and delivered, all contracts, orders, requisitions, instructions and other written instruments and do, or cause to be done, all other acts that may be necessary or proper in making such additions, alterations, improvements or modifications.  In no event, however, will the Authority hereafter enter into any contract with respect to any such additions, alterations, improvements or modifications unless there is endorsed thereon a legend indicating that the College has approved both the form and substance of such contract and such legend is signed on behalf of the College by an authorized representative thereof.  Any obligation for the payment of money incurred or assumed by the Authority in connection with such additions, alterations, improvements or modifications shall be payable solely out of the proceeds derived by the Authority from the sale of Additional Bonds or from any moneys made available to the Authority by the College for such purpose.

JBH-000021

DEED   612   665

Section 6.2   **Payment of Claims, Judgments, Taxes and Other Governmental Charges.**

The College will not create, or knowingly suffer to exist, any liens, charges or encumbrances on the Leased Facilities and it will duly pay and discharge, or cause to be paid and discharged (a) all claims or judgments which, if not paid or discharged, would give rise to a lien on the Leased Facilities, or a charge on the revenues of the Authority from the Leased Facilities prior to, or on a parity with, the pledge and assignment of such revenues made in the Indenture, (b) all taxes and governmental charges of any kind whatsoever that may lawfully be assessed or levied against or with respect to the Leased Facilities, including, without limitation, any taxes levied upon or with respect to any revenues of the Authority from the Leased Facilities, which, if not paid, would become a lien on the Leased Facilities or a charge on such revenues prior to, or on a parity with, the pledge and assignment thereof made in the Indenture, and (c) all assessments and charges lawfully made by any governmental body for public improvements that may be secured by a lien on the Leased Facilities, provided that with respect to special assessments or other governmental charges that may lawfully be paid in installments over a period of years, the College shall be obligated to pay only such installments as are required to be paid during any period while the Lease shall be in effect.  The Authority will promptly forward to the College any bills, statements, assessments, notices or other instruments asserting or otherwise relating to any such claims, judgments, taxes, assessments or charges.

The College may, at its own expense and in its own name and behalf or in the name and behalf of the Authority, in good faith contest any such claims, judgments, taxes, assessments and other charges and, in the event of any such contest, may, if it so notifies the Authority and the Trustee, permit such claims, judgments, taxes, assessments or other charges so contested to remain unpaid during the period of such contest and any appeal therefrom.  The Authority will cooperate fully with the College in any such contest.

Section 6.3   **Insurance With Respect to the Leased Facilities.**

So long as the Lease shall remain in effect, the College will obtain and continuously maintain in effect such insurance with respect to the Leased Facilities, paying all premiums with respect thereto, as businesses of like size and type customarily maintain in effect with respect to properties similar in nature to the Leased Facilities, including, but not necessarily limited to, public liability insurance and insurance against destruction of or damage to property by fire or other casualties.  Such insurance may be provided by blanket policies covering risks in addition to those relating to the Leased Facilities. To the extent consistent with the customary insurance practices of the College as applied to its other facilities, the College may insure all risks relating to the Leased Facilities through policies having such deductible amounts and co-insurance provisions as it deems desirable, or the College may be completely self-insured with respect to such risks.  The College shall have no obligation to furnish the Authority or the Trustee any policies, certificates or other evidence of insurance with respect to the Leased Facilities.  All policies of insurance covering losses to the Leased Facilities may name the College as the sole party insured thereunder, and all recoveries under such policies shall be paid to the College and applied in accordance with the provisions of Section 7.1 hereof.

JBH-000022

**ARTICLE VII**

DEED  612  666

**PROVISIONS RESPECTING DAMAGE,
DESTRUCTION AND CONDEMNATION**

Section 7.1    **Damage and Destruction Provisions.**

If, prior to full payment of the Indenture Indebtedness, any of the Leased Facilities is destroyed, in whole or in part, or is damaged by fire or other casualty, all obligations of the College and the Authority under the Lease which are still capable of performance (including, without limitation, the obligation of the College to pay the Basic Rent and all other amounts payable hereunder) shall continue in full force and effect. The College shall be entitled to collect, hold and apply all Net Insurance Proceeds referable to any destruction of or damage to the Leased Facilities, regardless of the amount of the loss resulting therefrom, and any such proceeds initially recovered by the Authority or the Trustee shall be paid over to the College or applied as the College may direct in accordance with the provisions hereof.  The College will promptly notify the Authority and the Trustee of any destruction or damage resulting in losses greater than $50,000.  The Net Insurance Proceeds referable to any destruction or damage to the Leased Facilities shall be applied by the College, or at its direction, for one or both of the following purposes, with the amount, if any, to be applied to each such purpose to be determined by the College in the exercise of its sole judgment:

(a)    payment of the costs of repairing, replacing or restoring the property damaged or destroyed, with such changes, alterations or modifications as shall be directed by the College and as shall not change the character of the Leased Facilities to such extent that they will not constitute "ancillary improvements" within the meaning of the Act; or

(b)    the redemption of Bonds prior to maturity in accordance with the terms of the Indenture and on the earliest practicable date permitted thereby, or the purchase of Bonds for retirement, in which case such portion of the Net Insurance Proceeds to be used for such redemption or purchase shall be paid by the College to the Trustee and deposited in the Bond Fund.

In the event that the College determines to apply the Net Insurance Proceeds (or any specified portion thereof) for payment of the costs of repairing, replacing or restoring the property damaged or destroyed, the Authority, at the request of the College, will undertake in its own name the work of repairing, replacing or restoring the property damaged or destroyed, and in such case the College shall pay such proceeds (or specified portion thereof) to the Trustee for the account of the Authority.  The Trustee shall establish a construction fund with the Trustee to apply such Net Insurance Proceeds (or specified portion thereof) for the payment of the costs of repairing, replacing or restoring the property damaged or destroyed, and such proceeds (or specified portion thereof) shall be deposited in such fund and held therein, invested to the extent not immediately required for the payment of such costs, and disbursed pursuant to requisitions submitted by the College, all on the same terms and conditions (with the necessary changes in detail) as provided in the Indenture with respect to the proceeds of the Series 2010 Bonds deposited in such fund.  Any balance of the Net Insurance Proceeds (or any balance of the

17

JBH-000023

DEED    612    667

portion thereof specified for the payment of such costs) remaining after the payment of all such costs, whether at the time held by the College or the Trustee, shall be paid to the College.  In the event that the Net Insurance Proceeds (or the portion thereof specified for the payment of such costs) are not sufficient to pay in full the costs of such repair, replacement or restoration, the College (i) will nonetheless complete the work thereof and will pay that portion of the costs thereof in excess of the Net Insurance Proceeds (or specified portion thereof) available for the payment of such costs, or (ii) will pay to the Trustee, for the account of the Authority, the moneys necessary to complete such work, in which case the Authority will cause such work to be so completed, and the Authority and the Trustee will, upon completion of such work and payment in full of the costs thereof, return to the College any portion of such payment that is not needed therefor.  The College shall not, by reason of the payment of such excess costs (whether by direct payment thereof or payment to the Trustee therefor), be entitled to any reimbursement from the Authority or to any reduction or abatement of the rentals or other payments due from the College hereunder.

If the College duly exercises the option to terminate the Ground Lease and this Lease Agreement and to acquire unencumbered title to the Leased Facilities granted in Section 11.2 hereof in accordance with the applicable provisions of said section, then neither the College nor the Authority shall have any obligation to repair, replace or restore the property damaged or destroyed, in which case so much (which may be all) of any Net Insurance Proceeds then held by the Trustee as shall be necessary to provide for full retirement of the Bonds (as specified in Section 11.2 hereof) shall be paid or credited by the Trustee into the Bond Fund and so much of the excess thereafter remaining (if any) as shall be necessary for the payment of any other Indenture Indebtedness shall be applied by the Trustee to the payment of such other Indenture Indebtedness. Any portion of such Net Insurance Proceeds remaining after payment in full of the entire Indenture Indebtedness shall be paid to the College after or simultaneously with the exercise by the College of such option.

If any of the Leased Facilities is destroyed, in whole or in part, or is damaged after the Indenture Indebtedness has been paid in full, neither the College nor the Authority shall be obligated to repair, replace or restore the property damaged or destroyed, and any Net Insurance Proceeds referable to such damage or destruction shall belong and be paid to the College; provided however, that the Authority will, to the extent and in the manner provided in Section 7.6 hereof, cooperate fully with the College in carrying out such repair, replacement and restoration as the College may, in the exercise of its sole judgment, decide to undertake.

All property acquired in connection with the repair, replacement or restoration of any part of the Leased Facilities pursuant to the provisions of this section shall be and become part of the Leased Facilities subject to the demise hereof and shall be held by the College on the same terms and conditions as the property originally constituting the Leased Facilities.

Section 7.2    **Condemnation Provisions.**

If title to the Leased Facilities or any part thereof is taken under the exercise of the power of eminent domain, the entire condemnation award in respect of such taking [including, without limitation, (i) all amounts received as the result of any settlement of compensation claims negotiated with the condemning authority, and (ii) any amount awarded as compensation for the

18

JBH-000024

DEED   612   668

interest of the College in the part of the Leased Facilities taken and as damages to the interest of the College in any part thereof not taken, but not including any condemnation award belonging to the College pursuant to the provisions of Section 7.4 hereof] shall be applied, and certain related actions shall be taken, in accordance with the succeeding provisions of this section:

    (a)   Taking of All or Substantially All the Leased Facilities Prior to Full Payment of the Indenture Indebtedness.  If all or substantially all the Leased Facilities is so taken by such exercise of the power of eminent domain, prior to full payment of the Indenture Indebtedness, the entire condemnation award in respect of such taking shall be paid to the Trustee and the Lease shall terminate (except as to the provisions of this subsection and any other provisions hereof which are expressly stated herein to survive the termination of the Lease) as of the forty-fifth (45th) day after the receipt by the Trustee of the final installment of the entire condemnation award in respect of such taking, unless the College has theretofore exercised the option to terminate the Ground Lease and the Lease and to acquire unencumbered title to the Leased Facilities granted in Section 11.2 hereof or has otherwise terminated the Lease in accordance with the provisions hereof.  As promptly as practicable following such receipt by the Trustee of such final installment of the entire condemnation award, the College shall be notified in writing by the Trustee of the date on which such final installment was so received by the Trustee and the amount of the Net Condemnation Award in respect of such taking then held by the Trustee.  On or before the date on which the Lease shall terminate pursuant to this subsection, the College will pay to the Trustee, for the account of the Authority, such additional Basic Rent as, when added to the total of the amounts then held in the Bond Fund (exclusive of any amount held therein for payment of matured but unpaid Bonds, Bonds called for redemption but not yet redeemed, and matured but unpaid interest) plus the full amount of the Net Condemnation Award then held by the Trustee, will be sufficient to pay, redeem and retire all the then outstanding Bonds on the aforesaid date on which the Ground Lease and the Lease shall terminate, including, without limitation, principal, premium (if any), interest to maturity or earliest practicable redemption date, as the case may be, expenses of redemption and all other Indenture Indebtedness.  The payment of any additional Basic Rent required by this subsection shall be made by the College in funds that will be immediately available to the Trustee as of the opening of business on the date on which the Ground Lease and the Lease shall terminate.  Any portion of the Net Condemnation Award not needed for payment of the Indenture Indebtedness shall be paid to the College simultaneously with or promptly after the termination of the Lease.

    (b)   Taking of Less than Substantially All the Leased Facilities Prior to Full Payment of the Indenture Indebtedness.  If less than substantially all the Leased Facilities is taken by such exercise of the power of eminent domain, prior to full payment of the Indenture Indebtedness, all obligations of the College under the Lease which are still capable of performance (including, without limitation, the obligation of the College to pay the Basic Rent and all other amounts payable

19

DOCUMENT 3

DEED   612   669

hereunder) shall continue in full force and effect. The College shall be entitled to collect, hold and apply all of the Net Condemnation Award in respect of any such taking, regardless of the amount thereof, and any part of such award initially paid to the Authority or the Trustee shall be paid over to the College or applied as the College may direct in accordance with the provisions hereof. The Net Condemnation Award in respect of any such taking shall be applied by the College, or at its direction, for one or more of the following purposes, with the amount, if any, to be applied to each such purpose to be determined by the College in the exercise of its sole judgment:

(1)    payment of the costs of repairing, restoring, modifying, relocating or rearranging any portions of the Leased Facilities not taken but damaged or adversely affected by such taking, all under such circumstances and upon such terms as shall be specified by the College and as shall not change the character of the Leased Facilities to such extent that they will not constitute "ancillary improvements" within the meaning of the Act;

(2)    payment of the costs of purchasing such additional land and of acquiring (by construction, purchase or otherwise) such additional facilities and equipment as the College may direct, which land, facilities and equipment (i) shall be of such nature as to constitute "ancillary improvements" within the meaning of the Act, (ii) shall be leased or otherwise acquired by the Authority and made subject to the demise of the Lease, and (iii) shall be deemed a part of the Leased Facilities and made available for use by the College, without the payment of additional rent hereunder, to the same extent as if such land, facilities and equipment had originally constituted part of the Leased Facilities and had been specifically demised hereby;

(3)    the redemption of Bonds prior to maturity in accordance with the terms of the Indenture and on the earliest practicable date permitted thereby, or the purchase of Bonds for retirement, in which case such portion of the Net Condemnation Award to be used for such redemption or purchase shall be paid by the College to the Trustee and deposited in the Bond Fund.

In the event that the College determines to apply the Net Condemnation Award (or any specified portion thereof), pursuant to the provisions of subparagraphs (1) or (2) of this subsection, for payment of the costs of repairing, restoring, modifying, relocating or rearranging any part of the Leased Facilities or for payment of the costs of acquiring additional property to become part of the Leased Facilities, as the case may be, the Authority, at the request of the College, will undertake in its own name such repair, restoration, modification, relocation or rearrangement or such acquisition of additional property, and in such case the College shall pay such award (or specified portion thereof) to the Trustee for the

JBH-000026

DOCUMENT 3

DEED   612   670

account of the Authority. The Trustee shall use the aforesaid construction fund to apply the Net Condemnation Award (or specified portion thereof) for the payment of the costs of repairing, restoring, modifying, relocating or rearranging any part of the Leased Facilities or for payment of the costs of acquiring additional property, as the case may be, and such award (or specified portion thereof) shall be deposited in such fund and held therein, invested to the extent not immediately required for the payment of such costs, and disbursed pursuant to requisitions submitted by the College, all on the same terms and conditions (with the necessary changes in detail) as provided in the Indenture with respect to the proceeds of the Series 2010 Bonds deposited in such fund.

Any balance of the Net Condemnation Award (or any balance of the portion thereof specified for the payment of such costs) remaining after payment of all such costs, whether at the time held by the College or the Trustee, shall be paid to the College. In the event that the Net Condemnation Award (or the portion thereof specified for the payment of such costs) is not sufficient to pay in full the costs of such repair, restoration, modification, relocation or rearrangement, or the costs of acquiring such additional property, as the case may be, the College (i) will nonetheless complete such repair, restoration, modification, relocation or rearrangement or the acquisition of such additional property, as the case may be, and will pay that portion of the costs thereof in excess of the amount of the Net Condemnation Award (or specified portion thereof) available for the payment of such costs, or (ii) will pay to the Trustee, for the account of the Authority, the moneys necessary to complete such repair, restoration, modification, relocation or rearrangement or the acquisition of such additional property, as the case may be, in which case the Authority will cause such undertakings to be so completed, and the Trustee will, upon completion of such undertakings and payment in full of the costs thereof, return to the College any portion of such payment by the College that is not needed therefor. The College shall not, by reason of the payment of such excess costs (whether by direct payment thereof or payments to Trustee therefor), be entitled to any reimbursement from the Authority or to any reduction or abatement of the rentals and other payments due from the College hereunder.

(c)    Taking of All or Substantially All the Leased Facilities After Full Payment of the Indenture Indebtedness. If, after full payment of the Indenture Indebtedness, title to all or substantially all the Leased Facilities is taken by such exercise of the power of eminent domain, the Net Condemnation Award referable to such taking shall belong and be paid to the College. The Ground Lease and the Lease shall terminate as of the date on which the final condemnation award is received by the College, and the Authority and the College shall have no further rights or obligations hereunder except those which may theretofore have vested.

(d)    Taking of Less Than Substantially All the Leased Facilities After Full Payment of Indenture Indebtedness. If, after full payment of the Indenture Indebtedness, title to less than substantially all the Leased Facilities is taken by

21

JBH-000027

DOCUMENT 5

DEED    612    671

such exercise of the power of eminent domain, the Ground Lease and the Lease shall continue in full force and effect, but neither the College nor the Authority shall be obligated to correct or ameliorate in any way the condition of the Leased Facilities caused by such taking, and the Net Condemnation Award referable to such taking shall be paid to the College; provided however, that the Authority will, to the extent and in the manner provided in Section 7.6 hereof, cooperate fully with the College in carrying out such work of repairing, restoring, modifying, relocating or rearranging the Leased Facilities or in acquiring such additional property to form part of the Leased Facilities as the College may, in its sole discretion, deem necessary or desirable.

If the College duly exercises the option to terminate the Ground Lease and the Lease and to acquire unencumbered title to the Leased Facilities granted in Section 11.2 hereof in accordance with the applicable provisions of said section, then neither the College nor the Authority shall be obligated to correct or ameliorate in any way the condition of the Leased Facilities caused by such taking, in which case so much (which may be all) of any part of the Net Condemnation Award then held by the Trustee as shall be necessary to provide for full retirement of the Bonds (as specified in Section 11.2 hereof) shall be paid or credited by the Trustee into the Bond Fund and so much of the excess thereafter remaining (if any) as shall be necessary for the payment of any other Indenture Indebtedness shall be applied by the Trustee to the payment of such other Indenture Indebtedness. Any portion of such Net Condemnation Award remaining after payment in full of the entire Indenture Indebtedness shall be paid to the College after or simultaneously with the exercise by the College of such option.

Section 7.3    **Condemnation of Right to Use of the Leased Facilities for Limited Period.**

If the use, for a limited period, of all or part of the Leased Facilities is taken under the exercise of the power of eminent domain, the Lease (including, without limitation, the provisions hereof relating to the payment of Basic Rent and all other amounts payable by the College hereunder) shall continue in full force and effect, but with the consequences specified in the succeeding provisions of this section. If the period of such taking expires on or before the expiration of the Lease Term, the College shall be entitled to receive the entire condemnation award made therefor, whether by way of damages, rent or otherwise. If such taking occurs during the Lease Term but the period of such taking expires after the expiration of the Lease Term, the College shall be entitled to receive that portion of the award allocable to the period from the date of such taking to the end of the Lease Term, and the Authority shall be entitled to the remainder thereof; provided that if College exercises either of the options to purchase the Leased Facilities granted in Section 11.2 and 11.3 hereof, the College (rather than the Authority) shall be entitled to receive the remainder of such award (if any).

Section 7.4    **Condemnation of College-Owned Property.**

The College shall be entitled to any condemnation award or portion thereof made for damages to or the taking of its own property not included in the Leased Facilities, but any condemnation award resulting from damages to or the taking of all or any part of the leasehold estate or other interest of the College in the Leased Facilities created by the Lease shall be

22

JBH-000028

DEED   612   672

applied in accordance with the provisions of Section 7.2 or 7.3 hereof, whichever may be applicable. In the event of any taking which involves both the Leased Facilities and property of the College, the College shall be responsible for all attorney's fees and other expenses properly allocable to the taking of its own property.

Section 7.5    **Cooperation of the Authority in the Conduct of Condemnation Proceedings.**

The Authority will cooperate fully with the College in the handling and conduct of any prospective or pending condemnation proceeding with respect to the Leased Facilities or any part thereof and will follow all reasonable directions given to it by the College in connection with any such proceeding. In no event will the Authority settle, or consent to the settlement of, any prospective or pending condemnation proceeding with respect to the Leased Facilities or any part thereof without the prior written consent of the College.

Section 7.6    **Cooperation of the Authority with Respect to Restoration of the Leased Facilities in the Event of Casualty or Condemnation.**

If, as a result of the taking of title to less than substantially all the Leased Facilities or the taking of the temporary use of all or any part of the Leased Facilities through the exercise of the power of eminent domain, or if, as a result of any event causing destruction or damage to the Leased Facilities or any part thereof, the College determines, in accordance with any applicable provision of this Article VII, to acquire (by purchase, construction or otherwise) any additional property to replace any part of Leased Facilities so taken, or to have the Leased Facilities repaired, replaced, restored, modified, relocated or rearranged in order to correct or ameliorate any condition caused by such taking, damage or destruction, as the case may be, then the Authority will, if requested by the College, execute and deliver, or cause to be executed and delivered, all contracts, orders, requisitions, instructions and other written instruments and do, or cause to be done, all other acts that may be necessary or proper in carrying out all such undertakings with respect to the Leased Facilities. In no event, however, will the Authority hereafter enter into any contract with respect to any part of such undertakings unless there is endorsed thereon a legend indicating that the College has approved both the form and substance of such contract and such legend is signed on behalf of the College by an authorized representative of the College. Any obligation for the payment of money incurred or assumed by the Authority in connection with such undertakings shall be payable solely out of any Net Condemnation Award or Net Insurance Proceeds held by the Trustee or from any other moneys made available to the Authority by the College under the provisions of the Lease.

# ARTICLE VIII

## PARTICULAR COVENANTS OF THE COLLEGE

Section 8.1    **Concerning the General Endowment.**

The College will maintain the market value of the General Endowment at One Hundred Twenty-Five Percent (125%) of the principal amount of the Bonds that shall be outstanding from

JBH-000029

DOCUMENT 3

time to time. If at any time the market value of the General Endowment shall exceed the One Hundred Twenty-Five Percent (125%) of the then outstanding Bonds, then the College shall designate those stocks, bonds or other components of the General Endowment that shall be subject to the covenant herein contained and which shall have a market value of not less than One Hundred Twenty-Five Percent (125%) of the principal amount of the then outstanding Bonds; and the remaining stocks, bonds or other components of the General Endowment shall not be subject to the covenant contained in this Section 8.1 for purposes of Section 148 of the Code. Within forty five (45) days of April 1, 2011, and within forty five (45) days of each April 1 and October 1 thereafter the College shall file a report with the Trustee in which it shall compute the market value of the General Endowment, and if such market value shall exceed One Hundred Twenty-Five Percent (125%) of the then outstanding Bonds, the College shall also designate those components of the General Endowment that shall be subject to the covenant of this Section 8.1. Any remaining components of the General Endowment shall not be subject to the said covenant for purposes of Section 148 of the Code.

To the extent that the Student Fees shall be insufficient for that purpose the College will also pay any maturing installment of Basic Rent from those components of the General Endowment that shall be subject to the covenant contained in this Section 8.1, and in no event will the College allow any installment of Basic Rent to remain unpaid. The College may spend components of the General Endowment without restriction, but if any expenditure of the General Endowment shall cause the market value of the General Endowment to be less than One Hundred Twenty Five Percent (125%) of the principal amount of the then outstanding Bonds, the College shall replenish the said amount expended by the next succeeding April 1 or October 1.

Section 8.2    **Release and Indemnification Covenants.**

The College releases the Authority (and each director, officer and employee thereof) and the Trustee from, and will indemnify and hold the Authority (and each director, officer and employee thereof) and the Trustee harmless against, any and all claims and liabilities of any character or nature whatsoever, regardless of by whom asserted or imposed, and losses of every conceivable kind, character and nature, arising out of, resulting from, or in any way connected with the Leased Facilities, including, without limiting the generality of the foregoing, (i) any actions relating to the acquisition and construction of the Leased Facilities and (ii) the leasing of the Leased Facilities to the College and the condition, use, possession or management of the Leased Facilities during the Lease Term; provided however, that the College shall not be obligated (1) to indemnify the Authority (or any director, officer or employee thereof) or the Trustee against any claim, liability or loss resulting from willful misconduct or gross negligence on the part of any such indemnifiable party or (2) to indemnify any director, officer or employee of the Authority against any claim, liability or loss in any way connected with the Leased Facilities unless such claim, liability or loss arises out of or results from official action taken in the name and behalf of the Authority by such director, officer or employee.

The College acknowledges that it may, at some time after the issuance of the Series 2010 Bonds initially issued, furnish to prospective purchasers of the Series 2010 Bonds (other than the College and any Affiliate thereof) certain information concerning the business and financial condition of the College, and the College further acknowledges that it may seek the assistance and cooperation of the Authority in connection with the offering and sale of the Series 2010

24

JBH-000030

DOCUMENT 3

DEED   612   674

Bonds to any prospective purchaser thereof (other than the College or an Affiliate thereof). In connection with the offering and sale of any of the Series 2010 Bonds to any prospective purchaser thereof, the College will indemnify, hold harmless and defend the Authority and the Trustee (and each director, officer and employee thereof) against

(a)     any claim or liability whatsoever arising out of or based upon any untrue or misleading statement or alleged untrue or misleading statement of any material fact contained in any information furnished, or caused to be furnished, by or on behalf of the College or any Affiliate thereof to any prospective purchaser of the Series 2010 Bonds, or the omission or alleged omission to state in any such information any material fact necessary to make the statements contained therein not misleading in the light of the circumstances under which such statements were made, and

(b)     any claim or liability arising out of any action taken by the Authority at the request of the College in connection with any offering and sale of the Series 2010 Bonds.

The College will pay or reimburse all legal or other expenses reasonably incurred by the Authority (and each director, officer and employee thereof), or the Trustee, as the case may be, in connection with the investigation or defense of any action or proceeding, whether or not resulting in liability, with respect to any claim, liability or loss in respect of which indemnity may be sought against the College under the provisions of this section.

In the event that any action or proceeding is brought against any indemnifiable party (whether the Authority, or any of the Authority's directors, officers or employees, or the Trustee) in respect of which indemnity may be sought against the College under the provisions of this section, such indemnifiable party shall, as a condition of the College's liability under the provisions of this section, be obligated to notify promptly the College in writing of the commencement of such action or proceeding and shall thereafter forward to the College a copy of every summons, complaint, pleading, motion or other process received with respect to such action or proceeding. The College may (and if so requested by such indemnifiable party, shall) at any time assume the defense of such indemnifiable party in connection with any such action or proceeding, and in such case the College shall pay all expenses of such defense and shall have full and complete control of the conduct on the part of such party of any such action or proceeding, including, without limitation, the right to settle or compromise any claim giving rise to such action or proceeding upon such terms and conditions as the College, in its sole discretion, shall determine. In the event that any claim is asserted against the Authority which would not be payable solely out of the proceeds of any of the Bonds or other funds advanced to the Authority by the College or out of the proceeds of the sale or leasing of the Leased Facilities (viz., a general, not a limited, claim), the College shall at the request of the Authority provide an indemnity bond with sureties satisfactory to the Authority. Any other provision of this section to the contrary notwithstanding, the College shall not be obligated to indemnify any such indemnifiable party for any liability resulting from the settlement of any action or proceeding, or for any legal or other expenses incurred in connection with the investigation or defense of any action or proceeding, if such settlement was made without the College's consent, irrespective of

25

JBH-000031

DOCUMENT 3

DEED   612   675

whether the College had, prior to such settlement, exercised its right to assume the defense of such indemnifiable party in connection with such action or proceeding.

Anything to the contrary herein contained notwithstanding, the covenants of the College contained in this section shall, with respect to any claim, liability or loss for which the College is obligated to provide indemnity, remain in full force and effect after the termination or expiration of the Lease until (i) any cause of action brought in respect of such claim, liability or loss shall be barred by the applicable statute of limitation or (ii) the payment in full or the satisfaction of such claim, liability or loss, including all reasonable expenses incurred by the indemnifiable party or parties in defending against such claim, liability or loss; provided however, that in the event any action or proceeding arguably barred by the applicable statute of limitation is brought against any indemnifiable party hereunder, the College shall be obligated to defend such indemnifiable party with respect to such action or proceeding, all to the end that the bar of the statute of limitation may be asserted by the College against the party bringing such action or proceeding but may not be asserted by the College against the indemnifiable party in order to avoid performing any of its obligations under this section.

Section 8.3    **Inspection of the Leased Facilities.**

So long as any of the Indenture Indebtedness is outstanding, the College will permit the Authority and the Trustee and their duly authorized representatives during normal business hours to examine and inspect the Leased Facilities or any part thereof.

Section 8.4    **Agreements Respecting Corporate Existence and Transfer of Assets.**

So long as any of the Indenture Indebtedness shall be outstanding and unpaid, the College will maintain its corporate existence, will not dissolve or sell, lease, transfer or otherwise dispose of all or substantially all its assets (either in a single transaction or in a series of related transactions), and will not consolidate with or merge into another corporation or permit one or more other corporations to consolidate with or merge into it; provided that it may, without violating the agreements contained in this section, consolidate with or merge into another corporation, permit one or more other corporations to consolidate with or merge into it, or sell, lease, transfer or otherwise dispose of all or substantially all its assets to another corporation, but if and only if the following conditions are met:

(a)    the said merger or consolidation will not subject the Leased Facilities to "private use" or the Bonds to "private payment," as those terms are defined in Section 141 of the Code;

(b)    the corporation surviving or resulting from such consolidation or merger (if it be one other than the College) or the corporation to which such sale, lease, transfer or other disposition shall be made, as the case may be (the "Successor Corporation"), (i) expressly assumes in writing all the obligations of the College contained in the Lease, with the same effect as if the Successor Corporation had been named herein as a party hereto in lieu of the College, (ii) furnishes to the Authority and the Trustee, promptly following such consolidation or merger or such sale, lease, transfer or other disposition, appropriately certified

JBH-000032

DOCUMENT 3

DEED   612   676

or fully executed copies of the writing by which the Successor Corporation so assumes such obligations and (iii) furnishes to the Trustee the opinions of one or more Counsel (who, although selected by the College, shall be satisfactory to the Trustee) which, taken together, state in substance that the Successor Corporation has by such writing duly and validly assumed, and is bound by, all the obligations of the College contained in the Lease;

(c)   at the time of such consolidation or merger or such sale, lease, transfer or other disposition and immediately upon giving effect thereto, the Successor Corporation shall be a solvent corporation;

(d)   immediately after and giving effect to such merger, consolidation or such sale, lease, transfer or other disposition, no event which constitutes an Event of Default under the Lease or the Indenture, or which would become such an Event of Default with the passage of time or the giving of notice or both, shall have occurred and be continuing; and

(e)   there shall have been delivered to the Authority and to the Trustee a certificate signed by the President or any Vice President of the College or the Successor Corporation, as the case may be, and stating that such merger, consolidation, sale, lease, transfer or other disposition complies with the provisions of this section and that all conditions precedent herein provided for relating to such transaction have been complied with.

Upon any merger, consolidation or any sale, lease, transfer or other disposition complying with the provisions of this section, the Successor Corporation shall succeed to, and be substituted for, the College for all purposes under the Lease, with the same effect as if the Successor Corporation had been named as the College herein.  If, after a sale or transfer by the College of all or substantially all its assets to another corporation under the circumstances described in the preceding provisions of this section, the College does not thereafter dissolve, it shall not have any further rights or obligations hereunder.

Section 8.5   **Agreements Respecting Maintenance of Student Fees.**

The College agrees that, so long as the principal of or the interest on any of the Bonds remains unpaid or until payment thereof shall have been provided for, the College will levy and collect the fees and charges of the College that are the sources of the Student Fees in such amounts as will produce Student Fees during each fiscal year of the College in an amount not less than 250% of the Maximum Annual Debt Service Requirement.

Section 8.6   **Agreement To Respect Priority of Pledge of Student Fees.**

The pledge of the Student Fees herein made shall be prior and superior to any pledge thereof hereafter made for the benefit of any securities or other indebtedness hereafter incurred or issued by, on behalf of or for the benefit of the College, other than Additional Bonds, and other securities and indebtedness which are secured by a pledge of the Student Fees on a parity with the pledge made herein as permitted by Section 5.3 hereof.  The College agrees that in the

27

JBH-000033

event any securities or other indebtedness should be issued by it or on its behalf or for its benefit, other than such Additional Bonds and such other securities and indebtedness which are secured by a parity pledge of the Student Fees, the College will recognize in the proceedings under which any such securities or other indebtedness are hereafter authorized the priority of the pledge of the Student Fees herein made for the benefit of the Bonds and such other securities and indebtedness.

Section 8.7   **Covenants With Respect to Exemption of Interest on Series 2010 Bonds from Federal Income Taxation.**

(a)     The Series 2010 Bonds are being issued by the Authority in compliance with the conditions necessary for the interest income on the Bonds to be excludable from gross income for purposes of federal income taxation pursuant to the provisions of Section 145(a) of the Code relating to "qualified 501(c)(3) bonds." The Authority and the College covenant with each other and with the Trustee for the benefit of the Holders of any Series 2010 Bonds, present and future, that neither of them will cause or permit the proceeds of the Series 2010 Bonds to be used in a manner which would cause the interest on the Series 2010 Bonds to lose the exclusion from federal income taxation conferred by Section 145(a) of the Code and the applicable regulations thereunder.

(b)     The College will file, or cause to be filed, with appropriate governmental authorities (whether state, federal or local) all statements and reports required to be filed as a condition of qualification of the Series 2010 Bonds as an issue the interest on which is excludable from gross income for purposes of federal income taxation, and the Authority will cooperate with the College in connection with such filings to the extent reasonably requested by the College.

(c)     The College will not cause or permit more than 2% of the face amount of the Series 2010 Bonds to be used for the payment of the costs and expenses of issuing the Series 2010 Bonds.

(d)     The College will cause at least 95% of the proceeds of the Series 2010 Bonds plus the income earned from the investment of such proceeds (less the amount, if any, deposited in a reasonably required reserve fund) to be used to provide property owned by a 501(c)(3) organization within the meaning of Section 145(a) of the Code.

(e)     The College will not cause the "average maturity" of the Series 2010 Bonds to exceed 120% of the average reasonably expected economic life of the facilities being financed with the proceeds of the Series 2010 Bonds, all within the meaning of Section 147(b) of the Code.

(f)     The College will not cause or permit the use of any portion of the proceeds of the Series 2010 Bonds to be used to provide a facility (with the exception of a "health club facility") described in Section 147(e) of the Code.

(g)     The College does not have any plans and is not a party to any arrangement which, if consummated, would result in the aggregate authorized face amounts of the Bonds allocated to

JBH-000034

a Test Period Beneficiary as defined in Section 147(c) of the Code (when increased by the outstanding tax-exempt nonhospital bonds of such Test Period Beneficiary) exceeding $150,000,000, all within the meaning of Section 145(b) of the Code. The College will not take any action after the date of the issuance of the Series 2010 Bonds which would cause the College or the Series 2010 Bonds to exceed the limitation described in Section 145(b) of the Code.

### Section 8.8    No-Arbitrage Covenants. Investment of Proceeds.

Neither the Authority nor the College will take any action, or omit to take any action, with respect to the investment of any of the proceeds from the sale of the Series 2010 Bonds, or any revenues from the Leased Facilities accumulated by the Authority, if, as a result of such action by the Authority or the College, or the omission of the Authority or the College to take such action, as the case may be, such proceeds or revenues would be invested in a manner causing the Series 2010 Bonds to be "arbitrage bonds" within the meaning of Section 148 of the Code and the applicable regulations thereunder. The College shall be solely responsible for (i) determining that any such investment complies with the arbitrage limitations imposed by Section 148 of the Code, including without limitation the provisions of Section 148 of the Code relating to investment of "gross proceeds" of bonds, and (ii) calculating the amount of, and making payment of, any rebatable arbitrage due to the United States under Section 148(f) of the Code and the regulations thereunder.

The College will not cause or permit any proceeds of the Series 2010 Bonds to be invested in a manner contrary to the provisions of Section 148(f) of the Code and the applicable regulations thereunder and will assure compliance with such requirements on behalf of the Authority. The College will keep or cause to be kept records, will periodically make or cause to be made computations of rebatable arbitrage, and will make or cause to be made installment payments of rebatable arbitrage to the United States of America in accordance with all requirements of Section 148 of the Code and the regulations thereunder in order for the interest on the Series 2010 Bonds to be and remain excludable from gross income for federal income tax purposes. As and to the extent so requested, (i) not later than sixty (60) days after the end of each fifth "Bond Year," as such term is used in said Section 148(f) and the regulations thereunder and after the last Series 2010 Bond is fully paid, the College will furnish to the Authority and the Trustee a report showing the amounts that will be required to be paid to the United States of America pursuant to the provisions of said Section 148(f) as of the end of such Bond Year and (ii) the College will timely pay to the United States of America, for the account of the Authority, all amounts required to be so paid in accordance with said Section 148(f) and will maintain, on behalf of the Authority, all records required to be maintained pursuant to said Section 148(f). The College agrees to furnish to the Authority and the Trustee such reports, certificates and documentation (including, without limitation, certificates of accountants and opinions of counsel) as they may reasonably request to evidence compliance with the provisions of this section.

### Section 8.9    Annual Audits.

The College will maintain proper books of record and account in which it will make full and correct entries of all its activities and operations in accordance with generally accepted

JBH-000035

DOCUMENT 3

DEED   612   679

accounting principles. Within one hundred twenty (120) days following the close of each of its fiscal years, it will furnish to the Trustee

      (a)   a balance sheet and statements of revenues and expenditures, changes in fund balances and changes in financial condition, showing the financial condition of the College at the close of such fiscal year,

      (b)   such supporting notes as, in the opinion of the accountant or accounting firm certifying such balance sheet and statement, are necessary for a reasonably complete understanding of such balance sheet and statements, and

      (c)   a certificate of the President or the Chief Financial Officer of the College, stating that no Event of Default, or event that would with the passage of time constitute an Event of Default, has occurred or is continuing.

Each of such balance sheets and statements shall be accompanied by a certificate or opinion of an independent certified public accountant (or firm thereof), in a standard form approved by the American Institute of Certified Public Accountants or successor body thereto (if any).

      Section 8.10  **Continuing Disclosure.**

      In accordance with the requirements of Rule 15c2-12 (the "Rule") promulgated by the Securities and Exchange Commission, the College will provide

      (a)   to the Municipal Securities Rulemaking Board ("MSRB"), certain annual financial information and operating data of the College; such information is expected to be available on or before November 1 of each year for the fiscal year ending on the preceding June 30 and will be made available, in addition to the Trustee and to each holder of Series 2010 Bonds who make requests for such information;

      (b)   in a timely manner, to the MSRB, notice of the occurrence of any of the following events with respect to the Series 2010 Bonds, if, in the judgment of the Trustee, such event is material:

            (i)    principal and interest payment delinquencies;
            (ii)   non-payment related defaults;
            (iii)  unscheduled draws on debt service reserves reflecting financial difficulties;
            (iv)  unscheduled draws on credit enhancements reflecting financial difficulties;
            (v)   substitution of credit or liquidity providers, or their failure to perform;
            (vi)  adverse tax opinions or events affecting the tax-exempt status of the Series 2010 Bonds;
            (vii) modifications to rights of holders of the Series 2010 Bonds;

JBH-000036

DOCUMENT 3

(viii)  bond calls;

(ix)  defeasances;

(x)  release, substitution, or sale of property securing repayment of the securities;

(xi)  rating changes.

DEED  612  680

The College will from time to time choose to provide notice of the occurrence of certain other events, in addition to those listed above, if, in the judgment of the College, such other event is material with respect to the Series 2010 Bonds, but the College does not undertake to commit to provide any such notice of the occurrence of any material event except those events listed above.

The College reserves the right to modify from time to time the specific types of information provided or the format of the presentation of such information, to the extent necessary or appropriate in the judgment of the College; provided that, the College agrees that any such modification will be done in a manner consistent with the Rule. The College reserves the right to terminate its obligations to provide annual financial information and notices of material events, as set forth above, if and when the College no longer remains an obligated person with respect to the Series 2010 Bonds within the meaning of the Rule. The College acknowledges that its undertakings pursuant to the Rule described under this heading is intended to be for the benefit of the holders of the Series 2010 Bonds and shall be enforceable by the Trustee on behalf of such holders; provided that, the Trustee's right to enforce the provisions of this undertaking shall be limited to a right to obtain specific enforcement of the obligations of the College hereunder.

Section 8.11   **Further Assurances.**

The College will, at its own expense, take all actions that, in the judgment of the Trustee, may at the time and from time to time be necessary to perfect, preserve, protect and secure the interests of the Authority and the Trustee, or either, in and to Leased Facilities and the revenues therefrom pledged and assigned in the Indenture.

## ARTICLE IX

## CERTAIN PROVISIONS RELATING TO
## ASSIGNMENT AND SUBLEASING
## AND TO THE BONDS

Section 9.1   **Assignment and Subleasing by the College.**

The College may assign the Lease and the leasehold interest created thereby, and may sublease the Leased Facilities or any part thereof, without the necessity of obtaining the consent of the Authority or the Trustee; provided however, that no such assignment or subleasing shall be made which will cause the Leased Facilities to be subject to "private use" as that term is defined in Section 141 of the Code, and provided further, that no assignee or sublessee or anyone claiming by, through or under any such assignment or sublease shall by virtue thereof acquire

JBH-000037

DEED   612   681

any greater rights in the Leased Facilities or any part thereof than the College then has under the Lease, nor shall any such assignment (except an assignment resulting from or incident to a consolidation, merger or transfer under the conditions specified in and meeting the requirements of Section 8.4 hereof) or subleasing or any dealings or transactions between the Authority or the Trustee or any sublessee or assignee in any way relieve the College from primary liability for any of its obligations hereunder. Thus, in the event of any such assignment or subleasing, the College shall, unless such assignment results from or is incident to a consolidation, merger or transfer under the conditions specified in and meeting the requirements of Section 8.4, remain primarily liable for payment of the rentals herein provided to be paid by it and for performance and observance of the other agreements and covenants on its part herein provided to be performed and observed by it. Promptly following any assignment of the Lease or any subleasing of the Leased Facilities, the College will notify the Authority and the Trustee in writing of the occurrence of any such transaction, and if any assignment of the Lease is of a kind that relieves the College from liability thereunder, the notice provided for in this section need not be given in addition to the notice required by Section 8.4 hereof in such case.

Section 9.2    **Assignment of the Lease by the Authority.**

It is understood and agreed that the Authority will assign its interest (other than its right to require the College to pay certain expenses as provided in Sections 5.4 and 10.4 hereof and the indemnification rights contained in Section 8.2 hereof) in the Lease, and pledge any moneys receivable hereunder, to the Trustee as security for payment of the principal of and the interest and premium (if any) on the Bonds. It is further understood and agreed that in the Indenture the Authority will obligate itself to follow the instructions of the Trustee or the Holders of the Bonds or a certain percentage of the latter in the election or pursuit of any remedies herein vested in it. Upon the assignment and pledge to the Trustee of the Authority's interest in the Lease, the Trustee shall have all rights and remedies herein accorded the Authority (other than the aforesaid expense payment and indemnification rights), and any reference herein to the Authority shall be deemed, with the necessary changes in detail, to include the Trustee; and the Trustee and the Holders of the Bonds shall be deemed to be third party beneficiaries of the covenants and agreements on the part of the College contained in the Lease and shall, to the extent provided in the Indenture, be entitled to enforce performance and observance of the agreements and covenants on the part of the College contained in the Lease to the same extent as if they were parties hereto. Subsequent to the issuance of any of the Bonds and prior to the payment of the Indenture Indebtedness in full, the Authority and the College shall have no power to modify, alter, amend or (except as specifically authorized herein) terminate the Lease without the prior written consent of the Trustee and then only as provided in the Indenture. So long as an Event of Default shall not have occurred and be continuing, the Authority will not amend the Indenture or any indenture supplemental thereto without the prior written consent of the College.

Without the prior written request or consent of the College, the Authority will not, so long as an Event of Default shall not have occurred and be continuing, hereafter issue any Bonds or other securities (including refunding securities), other than the Series 2010 Bonds, that are payable out of or secured by a pledge of the revenues and receipts derived by the Authority from the Leased Facilities, nor, without such consent, will the Authority, so long as an Event of Default shall not have occurred and be continuing, hereafter place any mortgage or other

JBH-000038

DEED   612   682

encumbrance (other than the Indenture and supplemental indentures contemplated thereby) on the Leased Facilities or the revenues derived by the Authority therefrom.

Section 9.3    **References to Bonds Ineffective after Indenture Indebtedness Paid.**

Upon full payment of the Indenture Indebtedness and cancellation, satisfaction and discharge of the Indenture in accordance with the provisions of Section 14.1 thereof, all references in the Lease to the Bonds and the Trustee shall be ineffective and neither the Trustee, nor the Holders of any of the Bonds shall thereafter have any rights hereunder, saving and excepting any that shall have theretofore vested.

If the Indenture Indebtedness is fully paid prior to the end of the Lease Term, the College shall be entitled to use of the Leased Facilities for the remainder of the Lease Term without the payment of any further Basic Rent but otherwise on all the same terms and conditions hereof.

Section 9.4    **Concerning Issuance of Additional Parity Bonds.**

The Authority and the College recognize that the Authority is authorized to issue under the Indenture, upon compliance with the conditions precedent specified therein, one or more series of Additional Bonds for any one or more of the purposes specified in the Indenture. If no Event of Default shall have occurred and be continuing, the Authority will, on the written request of the College and upon compliance with the applicable conditions contained in Article VIII of the Indenture, take such actions as are necessary to authorize the issuance and sale of Additional Bonds in such principal amount and for such purpose or purposes as are specified in such request and will use its best efforts to effect the sale thereof. To the extent consistent with all applicable provisions of the Indenture and the Lease, all terms and conditions of such Additional Bonds (including, without limitation, those relating to the maturity dates of the principal of such Additional Bonds, the interest rate or rates thereof and the provisions for redemption thereof prior to their respective maturities) and the purchase price to be paid therefor shall be subject to the approval of the College.

Section 9.5    **Disposition of Trust Fund Moneys after Full Payment of Indenture Indebtedness.**

The Authority hereby assigns to the College all surplus moneys (if any) that may remain in the Bond Fund or that may otherwise be held by the Trustee after the Indenture Indebtedness has been fully paid, such assignment to be subject to the condition that the Lease shall not have been terminated prior to full payment of the Indenture Indebtedness as a result of the occurrence of an Event of Default. The Authority will provide in the Indenture for such surplus moneys to be paid to the College in accordance with such assignment. It is understood and agreed that surplus moneys remaining in the Bond Fund or otherwise held by the Trustee shall not include (i) any amounts so held for payment of matured but unpaid Bonds, Bonds called for redemption but not yet redeemed, and matured but unpaid interest and (ii) any amounts held therein which are referable to unmatured Bonds if such Bonds are considered fully paid pursuant to the provisions of Section 14.1 of the Indenture by reason of the fact that such amounts are so held by the Trustee. The provisions of this section shall survive the expiration or termination of the Lease.

33

JBH-000039

DEED   612   683

## ARTICLE X

## EVENTS OF DEFAULT AND REMEDIES

Section 10.1   **Events of Default Defined.**

The following shall be "Events of Default" under the Lease, and the term "Event of Default" shall mean, whenever it is used in the Lease, any one or more of the following events:

(a)      failure by the College to pay any installment of Basic Rent on or before the date that such installment shall become due and payable by the terms of the Lease and the continuation of such failure for a period of ten (10) days after written notice shall be given to the College by the Trustee that such installment is due and payable;

(b)      failure by the College to pay any amount due the Trustee for its reasonable fees, charges and disbursements within sixty (60) days after written demand for such payment by the Trustee, which demand shall not be made earlier than the date on which such amount is due and payable;

(c)      failure by the College to perform or observe any agreement, covenant or condition required by the Lease to be performed or observed by it [other than the agreements and covenants referred to in the preceding clause (a) of this section], including the covenant of the College to maintain the market value of the General Endowment contained in Section 8.1 hereof, which failure shall have continued for a period of thirty (30) days after written notice specifying, in reasonable detail, the nature of such failure and requiring the College to perform or observe the agreement, covenant or condition with respect to which it is delinquent shall have been given to the College by the Authority or the Trustee, unless (i) the Authority and the Trustee shall agree in writing to an extension of such period prior to its expiration, or (ii) during such thirty-day period or any extension thereof, the College has commenced and is diligently pursuing appropriate corrective action, or (iii) the College is by reason of *force majeure* at the time prevented from performing or observing the agreement, covenant or condition with respect to which it is delinquent;

(d)      institution by the College of proceedings to be adjudicated a bankrupt or insolvent, or consent by the College to the filing of a bankruptcy or insolvency proceeding against it, or the filing by the College of a petition or answer or consent seeking relief under Title 11 of the United States Code, as now constituted or as amended, or any other applicable federal or state bankruptcy or other similar law, or consent by the College to the institution of proceedings thereunder or to the filing of any such petition, or consent by the College to the appointment of, or the taking of possession of any of its property by, a receiver, liquidator, trustee, custodian or assignee in bankruptcy or insolvency for the College or for all or a major part of its property, or an assignment by the College

JBH-000040

DOCUMENT 3

DEED    612    684

for the benefit of its creditors, or a written admission by the College of its inability to pay its debts generally as they become due, or the failure by the College generally to pay its debts as such debts become due, or the taking of any corporate action by the College in furtherance of any of the foregoing events or actions; or

(e)    the entry of a decree or order by a court of competent jurisdiction for relief in respect of the College or adjudging the College to be a bankrupt or insolvent or approving as properly filed a petition seeking reorganization of the College or the arrangement, adjustment or composition of its obligations under Title 11 of the United States Code, as now constituted or as amended, or any other applicable federal or state bankruptcy or other similar law, which decree or order shall have continued undischarged or unstayed for a period of sixty (60) days; or the entry of a decree or order of a court of competent jurisdiction for the appointment of a receiver, liquidator, trustee, custodian or assignee in bankruptcy or insolvency for the College or for all or a major part of its property, or for the winding up or liquidation of its affairs, which decree or order shall have remained in force undischarged or unstayed for a period of ninety (90) days.

The term "*force majeure*" as used herein means acts of God or the public enemy, strikes, lockouts, work slowdowns or stoppages or other labor disputes, insurrections, riots or other civil disturbances, orders of the government of the United States of America or of any state of the United States of America or of any of the departments, agencies, political subdivisions or officials of the United States of America or of any state thereof, or orders of any other civil or military authority, or partial or entire failure of public utilities, or any other condition or event beyond the reasonable control of the College. The College will, to the extent that it may lawfully do so, use its best efforts to remedy, alleviate or circumvent any cause or causes preventing it from performing its agreements and covenants hereunder; provided however, that the settlement of strikes, lockouts and other labor disputes shall be entirely within the discretion of the College, and the College shall not be required to settle strikes, lockouts and other labor disputes by acceding to the demands of the opposing party or parties when such course is in its judgment against its best interests.

Section 10.2    **Remedies on Default.**

Whenever any Event of Default shall have happened and be continuing, the Authority and the Trustee, or the Trustee on behalf of the Authority, may take any one or more of the following remedial actions:

(a)    declare immediately due and payable Basic Rent in an amount equal to the principal amount of all outstanding Bonds plus interest accrued on such Bonds to the date of such declaration, whereupon such Basic Rent shall become immediately due and payable, but only if, concurrently with such declaration, the principal of and accrued interest on the Bonds are also declared due and payable pursuant to subsection (a) of Section 11.2 of the Indenture;

35

JBH-000041

(b)   have access to, and inspect, examine and make copies of, the books, records and accounts of the College, but if and only if any of the Bonds are then outstanding; and

(c)   take whatever legal proceedings may appear necessary or desirable to collect the rent then due, whether by declaration or otherwise, or to enforce any obligation, covenant or agreement of the College under the Lease or any obligation of the College imposed by any applicable law.

If, however, the College makes good that default and every other default hereunder (except for those installments of principal and interest declared due and payable that would, absent such declaration, not be due and payable), with interest on all overdue payments of principal and interest, and makes reimbursement of all the reasonable expenses of the Trustee, then the Trustee may (and, if requested in writing by Holders of a majority in principal amount of the then outstanding Bonds, shall), by written notice to the College, waive such default and its consequences, but no such waiver shall affect any subsequent default or right relative thereto.

Section 10.3   **No Remedy Exclusive.**

No remedy herein conferred upon or reserved to the Authority or the Trustee is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under the Lease.  No delay or omission to exercise any right or power accruing upon any Event of Default shall impair any such right or power or shall be construed to be a waiver thereof but any such right or power may be exercised from time to time and as often as may be deemed expedient.  In order to entitle the Authority or the Trustee to exercise any remedy reserved to it in this article, it shall not be necessary to give any notice, other than such notice as is herein expressly required.

Section 10.4   **Agreement to Pay Attorneys' Fees.**

If, as a result of an Event of Default or a threatened Event of Default by the College, the Authority or the Trustee should employ attorneys at law or incur other expenses in or about the collection of rent or the enforcement of any other obligation, covenant, agreement, term or condition of the Lease, the College will, if the Authority or the Trustee is successful in such efforts or if a final judgment for either is rendered by a court of competent jurisdiction, pay the reasonable attorneys' fees and other reasonable expenses so incurred by the Authority and the Trustee.

Section 10.5   **No Additional Waiver Implied by One Waiver.**

In the event any agreement contained in the Lease should be breached by either party and thereafter waived by the other party, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder. Further, neither the receipt nor the acceptance of any rent hereunder by the Authority, or by the Trustee on its behalf, shall be deemed to be a waiver of any breach of any covenant, condition or obligation herein contained or a waiver of any Event of Default even though at the time of such receipt or acceptance there has been a breach of one or more covenants, conditions or obligations on the

36

JBH-000042

DOCUMENT 3

part of the College herein contained or an Event of Default (or both) and the Authority or the Trustee (or both) have knowledge thereof.

DEED 612   686

## ARTICLE XI

## OPTIONS

Section 11.1   **Options to Terminate the Ground Lease and the Lease During Lease Term.**

The College shall have the right, exercisable at its option, to cancel or terminate the Lease and the Ground Lease during the Lease Term and thereby to acquire fee simple to the Leased Facilities upon compliance with the conditions specified in the succeeding provisions of this section:

(a)   At any time prior to full payment of the entire Indenture Indebtedness, the College may cancel or terminate the Lease and the Ground Lease by (i) giving the Authority and the Trustee written notice of such termination and specifying in such notice the date on which such termination is to be effective and (ii) paying to the Trustee for the account of the Authority, on or before the effective date of such termination, an amount which, when added to the total of the amounts then held in the Bond Fund (exclusive of any amount held therein for payment of matured but unpaid Bonds, Bonds called for redemption but not yet redeemed, and matured but unpaid interest), will be sufficient to pay, redeem and retire all the outstanding Bonds on the earliest practicable date next succeeding the effective date of such termination on which under their terms and the terms of the Indenture they may be paid or redeemed, including, without limitation, principal, premium (if any), all interest to mature until and on such payment or redemption date, the expenses of redemption and all other Indenture Indebtedness then owing and that will accrue until the payment, redemption and retirement of all the outstanding Bonds. Upon being notified by the College in writing of the College's intentions in this respect and without the necessity of the moneys therefor being deposited with the Trustee, the Authority will take, or cause the Trustee to take, all preliminary action necessary under the provisions of the Indenture to effect the payment, redemption and retirement of all the outstanding Bonds.

(b)   At any time after the entire Indenture Indebtedness has been fully paid, the College may cancel or terminate the Lease by giving the Authority written notice of such termination not less than ten (10) days prior to the date on which such termination is to be effective.

Any cancellation or termination of this Lease Agreement as aforesaid notwithstanding, any obligations or liabilities of the College hereunder, actual or contingent, which have arisen on or before the effective date of such cancellation or termination shall remain in full force and effect until paid or otherwise discharged.

JBH-000043

DOCUMENT 3

DEED   612   687

Section 11.2   **Option to Terminate – Casualties.**

While any of the Indenture Indebtedness is outstanding and unpaid, the College shall have the right and option, hereby granted by the Authority, to terminate the Lease and the Ground Lease and thereby to acquire fee simple title to the Leased Facilities if

(a)      any part of the Leased Facilities is damaged or destroyed, by fire or other casualty, to such extent that, in the opinion of the College in good faith expressed in a written statement filed with the Authority and the Trustee, (a) the normal operations of the College are substantially impaired and (b) the restoration or repair of the property damaged or destroyed to the condition thereof immediately preceding such damage or destruction would not be economically practicable or desirable or such restoration or repair cannot be accomplished within a period of four (4) consecutive months or the College is thereby prevented from carrying on its normal operations in the Leased Facilities or any part thereof for a period of not less than four (4) consecutive months, or

(b)      under the exercise of the power of eminent domain, (i) title to all or substantially all the Leased Facilities is taken, or (ii) the temporary use of all or part of the Leased Facilities, or title to part of the Leased Facilities, is taken to such extent that, in the opinion of the College in good faith expressed in a written statement filed with the Authority and the Trustee, (a) the normal operations of the College are substantially impaired and (b) the College will thereby be prevented, or is likely to be thereby prevented, from making normal use of the Leased Facilities or any part thereof for a period of not less than four (4) consecutive months, or

(c)      as a result of (i) any changes in the Constitution of the State of Alabama or the Constitution of the United States of America, (ii) any legislative or administrative action (whether local, state or federal) or (iii) any final decree, judgment or order of any court or administrative body (whether local, state or federal) entered after the contest thereof by the College in good faith, the Lease becomes void or unenforceable or impossible of performance in accordance with the intent and purposes of the parties as expressed herein or unreasonable burdens or excessive liabilities are imposed on the Authority or the College, or

(d)      the use and occupancy of the Leased Facilities by the College is legally curtailed for any reason other than circumstances or conditions described in the preceding clauses (b) and (c).

To exercise such option, the College

(1)      shall, within ninety (90) days following the event authorizing the exercise of such option, give to the Authority and the Trustee written notice, signed by the College, which shall contain a description of such event and shall state the reason why it authorizes the exercise of such option,

38

JBH-000044

(2)     shall specify in such notice the date of termination of the Lease and the Ground Lease, which (subject to the provisions of the last paragraph of this Section 11.2) shall be not less than forty-five (45) nor more than ninety (90) days after the date such notice is mailed or otherwise delivered,

(3)     shall direct the Trustee in such notice to call for redemption all the outstanding Bonds on the business day next succeeding the date of purchase specified by the College in such notice, and

(4)     shall on the date of termination pay to the Trustee (for the account of the Authority), as and for the consideration for the Leased Facilities, an amount which, when added to the total of the amounts then held in the Bond Fund (exclusive of any amount held therein for payment of matured but unpaid Bonds, Bonds called for redemption but not yet redeemed and matured but unpaid interest), plus the amount of any Net Insurance Proceeds or Net Condemnation Award then held by the Trustee and referable to any damage, destruction or condemnation authorizing the exercise of such option, will be sufficient to pay, redeem and retire all the outstanding Bonds on the business day next succeeding the date of purchase, including, without limitation, principal, premium (if any), all interest to mature until and on such payment or redemption date, expenses of redemption and all other Indenture Indebtedness; provided, however, that if on the date of purchase the entire Indenture Indebtedness has been paid in full, the College shall not be required to pay any such amount in order to entitle it to exercise such option, in which event (any provision herein to the contrary notwithstanding) any Net Insurance Proceeds or Net Condemnation Award referable to any damage, destruction or condemnation authorizing the exercise of such option shall be paid to the College simultaneously with or promptly after the exercise of such option.

Upon receipt of the amount required by this section to be paid by the College as the consideration for the Leased Facilities (if payment of any such amount is required), and if at such time the College is not in default in payment of the rent or any other amounts due hereunder, the Authority will, by deed or other appropriate instrument complying with the provisions of Section 11.5 hereof, transfer and convey the Leased Facilities (or such portion thereof – which may be none – as is then in existence and is owned by the Authority) in its then condition, whatever that may be, to the College.

In the event that the option granted by this section is exercised by the College as a result of the taking of all or substantially all the Leased Facilities under the exercise of the power of eminent domain, the date of purchase of the Leased Facilities pursuant to such option shall not, irrespective of the date specified therefor pursuant to clause (2) of the first paragraph of this section, be later than the date on which the Lease terminates in accordance with the provisions of Section 7.2(a) hereof, which date of termination is the forty-fifth (45th) day after the receipt by the Trustee of the final installment of the entire condemnation award in respect of such taking.

JBH-000045

DOCUMENT 1

Section 11.3   **Option to Terminate After Payment of Indenture Indebtedness.**   DEED   612   689

If the College pays all rent and other amounts due hereunder, it shall have the right and option, hereby granted by the Authority, to acquire fee simple title to the Leased Facilities from the Authority at any time during the Lease Term by termination of the Ground Lease and the Lease after payment in full of the Indenture Indebtedness, at and for a price of $100.  To exercise any such option, the College shall notify the Authority in writing not less than ten (10) days prior to the date on which it proposes to effect such purchase and, on the date of such termination, shall pay the aforesaid price to the Authority, whereupon the Authority will, by an appropriate instrument complying with the provisions of Section 11.5 hereof, transfer and convey fee simple title to the Leased Facilities (in their then condition, whatever that may be) to the College.  At the end of the Lease Term the College shall be deemed to have exercised such option unless it notifies the Authority in writing to the contrary before the end of the Lease Term, and, in the event of such automatic exercise by the College of its option to acquire fee simple title to the Leased Facilities, the date of purchase shall be the last day of the Lease Term or such other date within one hundred eighty (180) days thereafter as shall be designated by the College.  Nothing herein contained shall be construed to give the College any right to any rebate to or refund of any rent paid by it hereunder prior to the exercise by it of the option hereinabove granted, even though such rent may have been wholly or partially prepaid.

Section 11.4   **Option to Release Parts of Sites from Ground Lease.**

The Authority and the College recognize that the College has the option to release from the provisions of the Ground Lease any part of the Sites upon compliance with certain conditions set forth in the Ground Lease.  The Authority and the College agree (a) the said option shall be prior and superior to the provisions of this Lease, and (b) from and after any release effected pursuant to the Ground Lease, any reference herein to the Sites shall be deemed to refer to the real property that immediately prior thereto constituted the Sites, less and except that part so release by the College under the Ground Lease.

Section 11.5   **Options – In General.**

Each of the options herein granted to the College may be exercised by it even though an Event of Default shall have occurred and be continuing, it being understood and agreed, however, that all other applicable conditions specified herein to the exercise of such option (including payment of any amounts of money herein required to be paid by the College) must be satisfied.

In the event of the exercise by the College of any of the options to acquire fee simple title to the Leased Facilities or any part thereof granted in Sections 11.2 and 11.3 hereof, the Authority will convey to the College, after compliance by the College with the conditions to acquire fee simple title specified in the respectively applicable sections hereof, the property with respect to which such option was exercised by statutory warranty deed, bill of sale (in the case of personal property) or other appropriate instrument, subject only to such liens, encumbrances and exceptions to which title to such property was subject when this Lease Agreement was delivered or such property was acquired by the Authority (whichever occurred last), those to the creation

40

JBH-000046

DOCUMENT 3

DEED    612    690

or suffering of which the College consented and those resulting from the failure of the College to perform or observe any of the agreements or covenants on its part herein contained.

## ARTICLE XII

## MISCELLANEOUS

### Section 12.1    Covenant of Quiet Enjoyment. Surrender.

So long as the College performs and observes all the covenants and agreements on its part herein contained, it shall peaceably and quietly have, hold and enjoy the Leased Facilities during the Lease Term, subject to all the terms and provisions hereof. At the end of the Lease Term or upon any prior termination of the Lease, the College will surrender to the Authority possession of all property then subject to the demise of the Lease (unless it is simultaneously acquiring such property from the Authority) in its then condition, whatever that may be.

### Section 12.2    Retention of Title to the Leased Facilities by the Authority. Granting of Easements.

Without the prior written consent of the College, the Authority will not itself (i) sell, convey or otherwise dispose of all or any part of the Leased Facilities (except as provided in Section 10.4 of the Indenture or to the College as provided in Article XI hereof), (ii) mortgage or otherwise encumber the Leased Facilities or any part thereof, or (iii) dissolve or do anything that will result in the termination of its corporate existence (except as provided in Section 10.4 of the Indenture). The Authority will grant such utility, access and other similar easements, permits and rights-of-way over, across or under the Sites as shall be requested by the College.

### Section 12.3    Exemption from Taxation.

As provided in the Act, as now existing, the Authority warrants and covenants that the Bonds and the income therefrom and any revenues derived by the Authority from the leasing of the Leased Facilities shall be exempt from all taxation in the State of Alabama.

### Section 12.4    This Lease a Net Lease.

The College recognizes and understands that it is the intention hereof that the lease herein made shall be a net lease and that until the Bonds are fully paid all Basic Rent shall be available for payment of the principal and the interest on the Bonds. The Lease shall be construed to effectuate such intent.

### Section 12.5    Notices.

All notices, demands, requests and other communications hereunder shall be deemed sufficient and properly given if in writing and delivered in person to the following addresses or received by certified or registered mail, postage prepaid with return receipt requested, at such addresses:

41

JBH-000047

DEED   612   691

(a)     If to the Authority:

        Educational Building Authority
          of the City of Marion
        Post Office Box 955
        Marion, Alabama 36756
           Attention: Chairman of the Board of Directors

(b)     If to the College:

        Judson College
        302 Bibb Street
        Marion, Alabama 36756
           Attention: President

(c)     If to the Trustee:

        Regions Bank
        1901 Sixth Avenue North, 28th Floor
        Birmingham, Alabama 35203
           Attention: Corporate Trust Department

Notices or other communications to Bondholders shall be mailed or otherwise delivered to their respective addresses as shown on the registry books of the Trustee pertaining to the Bonds.

Any of the above mentioned parties may, by like notice, designate any further or different addresses to which subsequent notices shall be sent. A copy of any notice given to any of the above named parties pursuant to the provisions of the Lease shall also be given to those of such parties to whom notice is not herein required to be given, but the failure to give a copy of such notice to any party claiming the right to receive it pursuant to this sentence shall not invalidate such notice or render it ineffective unless notice to such party is otherwise herein expressly required. Any notice hereunder signed on behalf of the notifying party by a duly authorized attorney at law shall be valid and effective to the same extent as if signed on behalf of such party by a duly authorized officer or employee.

Section 12.6   **Limited Liability of the Authority.**

The Authority is entering into this Lease Agreement pursuant to the authority conferred upon it by the Act. No provision hereof shall be construed to impose a charge against the general credit of the Authority or any personal or pecuniary liability upon the Authority except with respect to the proper application of the proceeds to be derived from the sale of the Bonds, moneys made available by the College to the Authority pursuant to the provisions hereof, and the revenues and receipts to be derived by the Authority from the Leased Facilities, including insurance proceeds and condemnation awards. Further, none of the directors, officers, employees or agents (other than the College as agent of the Authority in connection with any acquisition, construction and installation of the Leased Facilities) of the Authority shall have any

JBH-000048

DOCUMENT 1

DEED   612   692

pecuniary liability whatever hereunder or any liability for the breach by the Authority of any of the agreements on its part herein contained. Nothing contained in this section, however, shall relieve the Authority from the observance and performance of the several covenants and agreements on its part herein contained or relieve any director, officer, employee or agent of the Authority from performing all duties of their respective offices that may be necessary to enable the Authority to perform the covenants and agreements on its part herein contained.

Section 12.7  **Limited Liability of Trustees, Directors, Officers, Employees or Agents of the College.**

None of the trustees, directors, officers, employees or agents of the College shall have any personal or pecuniary liability whatever hereunder or any liability for the breach of the College of any of the agreements on its part herein contained. Nothing contained in this section, however, shall relieve any trustee, director, officer or employee of the College from performing all duties of their respective offices that may be necessary to enable the College to perform the covenants and agreements on its part herein contained.

Section 12.8  **Disclaimer of Liability on Behalf of the Alabama Baptist State Convention.**

The agreements and covenants on the part of the College herein contained are agreements and covenants on the part of the College only, and nothing herein contained shall be construed to impose any liability whatever upon the Alabama Baptist State Convention, or any subdivision, agency or congregation of either thereof other than the College, nor shall the Alabama Baptist State Convention or any subdivision, agency or congregation thereof other than the College, be bound in any way by any of the agreements or covenants on the part of the College contained herein.

Section 12.9  **Binding Effect.**

The Lease shall inure to the benefit of, and shall be binding upon, the Authority, the College and their respective successors and assigns. To the extent provided herein and in the Indenture, the Trustee, the Bondholders, and certain indemnifiable parties specified in Section 8.2 hereof shall be deemed to be third party beneficiaries hereof, but nothing herein contained shall be deemed to create any right in, or to be for the benefit of, any other Person who is not a party hereto.

Section 12.10  **Severability.**

In the event any provision of the Lease shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof. Without in any way limiting the generality of the foregoing, the College specifically acknowledges and agrees that the several purchase options granted it herein are fully severable from and independent of the other provisions hereof and that neither the invalidity or unenforceability of any of such purchase options shall invalidate or render unenforceable any other provision hereof nor excuse the College from fully performing and observing any of the agreements and covenants on its part herein contained.

43

JBH-000049

DEED   612   693

Section 12.11  **Article and Section Captions.**

The article and section headings and captions contained herein are included for convenience only and shall not be considered a part hereof or affect in any manner the construction or interpretation hereof.

Section 12.12  **Governing Law.**

The Lease and the rights and obligations of the parties hereto (including third party beneficiaries) shall be governed, construed and interpreted according to the laws of the State of Alabama. The Lease shall not be governed in any respect by the rules of the Discipline of the Alabama Baptist State Convention or any church or internal law of the Alabama Baptist State Convention.

JBH-000050

DOCUMENT 3

DEED   612   694

IN WITNESS WHEREOF, the Authority and the College have caused this Lease Agreement to be executed in their respective corporate names, have caused their respective corporate seals to be hereunto affixed and have caused this Lease Agreement to be attested, all by their duly authorized officers, in six (6) counterparts, each of which shall be deemed an original, and the parties have caused this Lease Agreement to be dated as of October 1, 2010, although executed by the Authority on October 27, 2010, and by the College on October 27, 2010, and delivered by both said parties on October 28, 2010.

EDUCATIONAL BUILDING
AUTHORITY OF THE CITY OF MARION

By _____
Chairman of its Board of Directors

ATTEST:

_____
Its Secretary

[ S E A L ]

JUDSON COLLEGE

By _____
Its President

ATTEST:

_____
Its _____

[ S E A L ]

45

JBH-000051

DOCUMENT 1

STATE OF ALABAMA )
                 :
PERRY COUNTY     )

DEED   612   695

    I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that ROY A. BARNETT, JR., whose name as Chairman of the Board of Directors of EDUCATIONAL BUILDING AUTHORITY OF THE CITY OF MARION, a public corporation and instrumentality under the laws of the State of Alabama, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the said instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said public corporation.

    GIVEN under my hand and seal, this 27th day of October, 2010.

[ NOTARIAL SEAL ]
                                _Mary Ellen Clements_
                                      Notary Public

              My Commission Expires: 3/16/2014

<br>

STATE OF ALABAMA )
                 :
PERRY COUNTY     )

    I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that DAVID E. POTTS, whose name as President of JUDSON COLLEGE, a non-profit corporation organized and existing under the laws of the State of Alabama, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the said instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said non-profit corporation.

    GIVEN under my hand and seal, this 27th day of October, 2010.

[ NOTARIAL SEAL ]
                                  _Mary Ellen Clements_
                                      Notary Public

              My Commission Expires: 3/16/2014

3848985.4

46

DOCUMENT 3

**EXHIBIT A**
to
**LEASE AGREEMENT**
between
**EDUCATIONAL BUILDING
AUTHORITY OF THE CITY OF MARION**
and
**JUDSON COLLEGE**
dated as of October 1, 2010

DEED   612   696

The following parcels of land, which are located on that part of the campus of Judson College, in the City of Marion, Perry County, Alabama:

The Jewett Hall Site

Commence at the intersection of the East right-of-way margin of Bibb Street and the South right-of-way margin of East LaFayette Street; thence run South along the said East right-of-way margin of Bibb Street for 144 feet to the point of beginning of the parcel of land herein described; thence continue South along said East right-of-way margin of Bibb Street for 376.5 feet, more or less, to a point on the North margin of an unnamed street running from Bibb Street to an extension of Convenient Street (said described street runs between Jewett Hall and the parcel of land upon which is situated Alumnae Auditorium and Marian Acree Tucker Hall on the Judson College campus); thence run East along the North margin of the unnamed street described herein for 468 feet, more or less, to the intersection of the North margin of said unnamed street and the West margin of the extension of Convenient Street; thence run North along the West margin of the extension of Convenient Street for 376.5 feet, more or less, to a point which is the NE corner of the parcel of land herein described; thence run West parallel with East LaFayette Street for 448 feet, more or less, to the point of beginning and ending of the parcel of land herein described.

Being bounded on the North by the parcel of land upon which is located A. Howard Bean Hall, and the former King lot, on the East by the extension of Convenient Street, on the South by an unnamed street, and on the West by Bibb Street.

Being the same property conveyed by John Lockhart and Emily R. Lockhart, and Larkin Y. Tarrant and E. Tarrant to the Trustees of The Judson Female Institute by deed dated May 22, 1843 (a similar deed, dated October 12, 1839, having been lost or mislaid), and recorded in the Probate Office of Perry County, Alabama, in Book F, Page 609, plus the 132' x 227' lot conveyed by T. H. Lockett to the Trustees of the Baptist State Convention, by deed dated May 20, 1844, and recorded in the Probate Office of Perry County, Alabama, in Book G, Page 151, plus the 96.5' x 448' x 96.5' x 468' lot conveyed by Leita S. Hatchett and J. B. Hatchett, her husband, to The Judson Female Institute by deed dated October 2, 1901, and recorded in the Probate Office of Perry County, Alabama, in Book 113, Page 380.

A-1

DOCUMENT 3

<u>The Science Center Site</u>

DEED   612   697

Commence at the intersection of the south margin of East LaFayette Street and the east margin of the extension of Convenient Street (which runs northerly from the north margin of East DeKalb Street to the south margin of East LaFayette Street); thence run south, along the east margin of said extension of Convenient Street for 187 feet, more or less, to a point, which is the northwest corner of and the point of beginning of the property herein described (hereinafter, the Lowder property); thence run East for 298 feet, more or less, to the Northeast corner of the said Lowder property; thence run South along the east line of the Lowder property for 173 feet, more or less, to the Southeast corner of said Lowder property; thence run West along the south line of the Lowder property for 298 feet, more or less, to a point on the east margin of the extension of Convenient Street, and the Southwest corner of the Lowder property; thence run North along the east margin of said extension of Convenient Street for 173 feet, more or less, to the point of beginning and ending of the land herein described.

Being bounded on the North by a portion of the Women's Missionary Union (WMU) dormitory parking lot, lying just south of East LaFayette Street, on the East by parking area to the north of Riddle Gymnasium, which lies just West of Williams Circle, on the south by the hockey field, and on the West by the extension of Convenient Street.

Being part of the property conveyed by Ann C. Smith to the Trustees of Judson Female Institute, by deed dated December 26, 1846, and recorded in the Probate Office of Perry County, Alabama, in Deed Book H, Page 204; also, being part of the property conveyed by John D. Edwards, an unmarried man, to Judson College, by deed dated November 4, 1920, and recorded in the Probate Office of Perry County, Alabama, in Deed Book 240, Page 55; also, being part of the property conveyed by Mary A. Modawell and husband, William B. Modawell, to the Trustees of the Judson Female Institute, by deed dated October 14, 1880, and recorded in the Probate Office of Perry County, Alabama, in Deed Book SS, Page 512.

<u>The Women's Missionary Union Residence Hall Site</u>

Commence at the intersection of the south margin of East Lafayette Street and the east margin of Bibb Street, in said city of Marion;  thence run East along the south margin of East Lafayette Street for 230 feet, more or less, to the point of beginning on the northwest corner of the property herein described;  thence run East along the south margin of East Lafayette Street for 235 feet, more or less, to the west margin of the extension of Convenient Street;  thence run South along the west margin of the extension of Convenient Street for 192 feet, more or less;  thence run West along the north line of the Lockhart/Tarrant lot conveyed to Judson College in 1839 for 221 feet , more or less;  thence run North along the east line of the parcel formerly owned by Eliza A. West (now owned by Judson College) to the point of beginning.

Being bounded on the North by East Lafayette Street, on the East by the extension of Convenient Street, on the South by other property owned by Judson College upon which is located Jewett Hall, and on the West by the parcel of land on which is located A. Howard Bean Hall, and being the same property conveyed by William A. King to Judson College by deed dated September 1, 1915.

A-2

JBH-000054

DOCUMENT 3

# EXHIBIT B

JBH-000055

DOCUMENT 2

TRUST INDENTURE

between

**EDUCATIONAL BUILDING
AUTHORITY OF THE CITY OF MARION**

and

**REGIONS BANK**

Dated as of October 1, 2010

———————

Relating to

$11,230,000

**EDUCATIONAL BUILDING
AUTHORITY OF THE CITY OF MARION**

Revenue Bonds
Judson College
Series 2010

Dated October 1, 2010

JBH-000056

DOCUMENT 3

# TABLE OF CONTENTS*

to

TRUST INDENTURE
between
EDUCATIONAL BUILDING
AUTHORITY OF THE CITY OF MARION
and
REGIONS BANK

Page

Parties ........................................................................................................................ 1
Recitals ...................................................................................................................... 1

## ARTICLE I

### DEFINITIONS AND USE OF PHRASES

Section 1.1    Definitions ............................................................................................ 1
Section 1.2    Definitions Contained in the Lease ...................................................... 6
Section 1.3    Use of Phrases ...................................................................................... 6

## ARTICLE II

### GRANTING CLAUSES

Section 2.1    Granting Clauses .................................................................................. 6

## ARTICLE III

### DESCRIPTION OF BONDS

Section 3.1    Issuance of Bonds in Series ................................................................. 8
Section 3.2    Dates and Places of Payment of Bonds ................................................ 8
Section 3.3    Form of Bonds, Etc .............................................................................. 8

*This Table of Contents appears here for reference only and should not be considered a part of this Trust Indenture.

i

JBH-000057

## ARTICLE IV

### EXECUTION AND AUTHENTICATION OF THE BONDS

Section 4.1   Execution of Bonds................................................................ 9
Section 4.2   Authentication Certificate of Trustee.................................. 9
Section 4.3   Replacement of Mutilated, Lost, Stolen or Destroyed Bonds............................ 9

## ARTICLE V

### REGISTRATION, TRANSFERS AND EXCHANGES OF THE BONDS

Section 5.1   Book-Entry Procedures Applicable to Series 2010 Bonds. ................................ 10
Section 5.2   Registration and Transfer of Bonds. ................................. 12
Section 5.3   Exchange of Bonds. ............................................................. 13
Section 5.4   Persons Deemed Owners of Bonds. .................................. 13
Section 5.5   Expenses of Registration, Transfer and Exchange............................. 14

## ARTICLE VI

### GENERAL PROVISIONS RESPECTING REDEMPTION OF BONDS

Section 6.1   Manner of Effecting Redemption of Bonds. ......................... 14
Section 6.2   Presentation of Bonds for Redemption; Bonds Called for Redemption
              to Cease to Bear Interest. .................................................. 15
Section 6.3   Concerning the Redemption of Bonds of Different Series. ................... 16
Section 6.4   Termination of Lease. ......................................................... 16

## ARTICLE VII

### THE SERIES 2010 BONDS

Section 7.1   Issuance of Series 2010 Bonds; Interest Rate and Other Terms of the
              Series 2010 Bonds. ............................................................. 16
Section 7.2   Optional Redemption of Series 2010 Bonds. ...................... 17
Section 7.3   Scheduled Mandatory Redemption of Series 2010 Bonds....................... 18
Section 7.4   Extraordinary Redemption of Series 2010 Bonds............................ 20
Section 7.5   Special Provisions Respecting Partial Redemption of Series 2010
              Bonds. ................................................................................ 21
Section 7.6   Form of the Series 2010 Bonds............................................ 21
Section 7.7   Execution and Delivery of the Series 2010 Bonds. ............................ 29
Section 7.8   Application of Proceeds from Sale of Series 2010 Bonds. ................... 29

ii

JBH-000058

## ARTICLE VIII

### ADDITIONAL BONDS

Section 8.1    Additional Bonds - In General. ........................................................... 30
Section 8.2    Conditions Precedent to Issuance of Additional Bonds. ....................... 30

## ARTICLE IX

### CREATION OF BOND FUND

Section 9.1    Bond Fund. .......................................................................................... 32
Section 9.2    Retirement of Bonds Under Certain Conditions.  General Provisions
               Respecting Bond Fund. ....................................................................... 33
Section 9.3    Investment of Moneys in Bond Fund. ................................................. 33
Section 9.4    Commingling of Moneys in Separate Trust Funds. ............................. 34

## ARTICLE X

### PARTICULAR COVENANTS OF THE AUTHORITY

Section 10.1   Payment of the Bonds. ........................................................................ 35
Section 10.2   Priority of Pledge. .............................................................................. 35
Section 10.3   Concerning the Lease. ........................................................................ 35
Section 10.4   Agreement of Authority to Maintain Corporate Existence and Not to
               Dispose of the Leased Facilities. ....................................................... 36
Section 10.5   Payment of Trustee's Charges; Lien Therefor. ................................... 37
Section 10.6   Inspection by Trustee. ........................................................................ 37

## ARTICLE XI

### EVENT OF DEFAULT AND REMEDIES
### OF TRUSTEE AND BONDHOLDERS

Section 11.1   Events of Default Defined. .................................................................. 38
Section 11.2   Remedies on Default. .......................................................................... 38
Section 11.3   Application of Moneys Received From Enforcement of Rights Under
               the Indenture. ..................................................................................... 39
Section 11.4   Remedies Vested in Trustee. ............................................................... 41
Section 11.5   Rights of the College Upon Occurrence of an Event of Default. ........ 41
Section 11.6   Delay No Waiver. ............................................................................... 42
Section 11.7   Notice to Bondholders Upon Occurrence of Event of Default. ........... 42

iii

JBH-000059

## ARTICLE XII

### CONCERNING THE TRUSTEE

Section 12.1    Acceptance of Trusts. ........................................................... 42
Section 12.2    Acceptance of Duties Under Lease. ....................................... 44
Section 12.3    Trustee to Maintain Registration Book. ................................. 45
Section 12.4    Trustee May Institute Suit, etc. ............................................. 45
Section 12.5    Resignation by the Trustee. ................................................... 45
Section 12.6    Removal of the Trustee. .......................................................... 45
Section 12.7    Appointment of Successor Trustee by Bondholders; Temporary
                Trustee. ................................................................................ 45
Section 12.8    Concerning any Successor Trustee. ....................................... 46
Section 12.9    Merger or Consolidation of Trustee. ...................................... 46
Section 12.10   Trustee Required to Accept Directions and Action of College. .......................... 46

## ARTICLE XIII

### SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THE LEASE

Section 13.1    Supplemental Indentures without Bondholder Consent. ..................... 47
Section 13.2    Supplemental Indentures Requiring Bondholder Consent. ................. 47
Section 13.3    Execution of Supplemental Indentures. ................................. 48
Section 13.4    Amendments to the Lease.  With the prior written consent of the
                Trustee but without the consent of or notice to any Bondholders, the
                Authority and the College may .......................................... 49
Section 13.5    Notices With Respect to Certain Changes in the Indenture or the
                Lease. .................................................................................. 49
Section 13.6    Discretion of the Trustee. ...................................................... 50

## ARTICLE XIV

### PAYMENT AND CANCELLATION OF THE
### BONDS AND SATISFACTION OF THE INDENTURE

Section 14.1    Satisfaction of Indenture. ...................................................... 50
Section 14.2    Destruction of Surrendered Bonds. ....................................... 52
Section 14.3    Payment to College of Remaining Trust Fund Moneys. ........................ 52

## ARTICLE XV

### MISCELLANEOUS PROVISIONS

Section 15.1    Disclaimer of General Liability. ............................................ 52

iv

JBH-000060

Section 15.2    Retention of Moneys for Payment of Bonds..................................................... 54
Section 15.3    Payment Due on Saturdays, Sundays and Holidays. ........................................ 54
Section 15.4    Form of Requests, etc. by Bondholders. ......................................................... 54
Section 15.5    Limitation of Rights............................................................................................ 54
Section 15.6    Manner of Proving Ownership of Bonds. ........................................................ 55
Section 15.7    Indenture Governed by Alabama Law............................................................. 55
Section 15.8    Notices. ................................................................................................................ 55
Section 15.9    Severability. ......................................................................................................... 56
Section 15.10   Article and Section Captions. ............................................................................ 56


Testimonium ........................................................................................................................... 57
Signatures................................................................................................................................. 57
Acknowledgments................................................................................................................... 58

Exhibit A

v

DOCUMENT 2

TRUST INDENTURE between **EDUCATIONAL BUILDING AUTHORITY OF THE CITY OF MARION**, a public corporation and instrumentality under the laws of the State of Alabama, party of the first part, and **REGIONS BANK**, an Alabama banking corporation having its principal office in the City of Birmingham, Alabama, party of the second part;

## RECITALS

The party of the first part makes the following recitals of fact as the basis for the undertaking following:  it is duly incorporated under the provisions of Code of Alabama 1975, Title 16, Chapter 17, by Certificate of Incorporation duly filed for record in the office of the Judge of Probate of Perry County, Alabama; its Certificate of Incorporation has not been amended or revoked and is in full force and effect; it is not in default under any of the provisions contained in its Certificate of Incorporation, in its Bylaws or in the laws of the State of Alabama; by proper corporate action it has duly authorized the issuance of the Series 2010 Bonds hereinafter referred to; and to secure payment of the principal of and the interest and premium (if any) on all bonds that may be issued hereunder, it has by proper corporate action duly authorized the execution and delivery of this Indenture.

## NOW, THEREFORE, THIS INDENTURE

## WITNESSETH:

For the aforesaid purpose and in consideration of the respective agreements herein contained, it is hereby agreed between the parties signatory hereto and the holders of all bonds issued hereunder (the holders of said bonds evidencing their consent hereto by their acceptance of the said bonds and the parties signatory hereto evidencing their consent hereto by their execution hereof), each with each of the others, as follows (provided, that in the performance of any of the agreements of the party of the first part herein contained, any obligation it may thereby incur for the payment of money shall not be a general debt on its part but shall be payable solely from the sources of payment hereinafter specified):

## ARTICLE I

## DEFINITIONS AND USE OF PHRASES

Section 1.1   **Definitions.**

Unless the context clearly indicates a different meaning, the following words and phrases, as used herein, shall have the following respective meanings:

1

JBH-000062

DOCUMENT 2

"**Act**" means the statutes codified as Code of Alabama 1975, Title 16, Chapter 17, as amended and supplemented and at the time in force and effect.

"**Additional Bonds**" means bonds of the Authority authorized in Article VIII hereof to be issued hereunder and secured hereby on a parity with the Series 2010 Bonds.

"**Authority**" means the party of the first part hereto and, subject to the provisions of Section 10.4 hereof, includes its successors and assigns and any public corporation resulting from or surviving any consolidation or merger to which it or its successors may be a party.

"**Basic Rent**" means (i) the moneys payable by the College pursuant to the provisions of Section 5.2 of the Lease, (ii) any other moneys payable by the College pursuant to the Lease to provide for the payment of the principal of and the interest and premium (if any) on the Bonds (other than the aforesaid moneys payable pursuant to Section 5.2 of the Lease), and (iii) any other moneys payable by the College pursuant to the Lease that are therein referred to as Basic Rent.

"**Bond Counsel**" means Counsel whose opinions respecting the legality or validity of securities issued by or on behalf of states or political subdivisions thereof are generally recognized.

"**Bond Fund**" means the Judson College Series 2010 Bond Principal and Interest Fund created in Section 9.1 hereof.

"**Bondholder**" means the Holder of any Bond.

"**Bonds**" means all bonds of the Authority issued under the Indenture; i.e., the Series 2010 Bonds and all Additional Bonds which may from time to time be issued under the Indenture.

"**Capital Improvements**" means improvements, extensions and additions (including, without limitation, buildings, structures, land, interests in land and equipment and other personal property) to the facilities of the College that are properly chargeable to fixed capital account by generally accepted accounting principles.

"**City**" means the City of Marion, Alabama, or any municipal corporation resulting from or surviving any consolidation or merger to which it or its successors may be a party.

"**College**" means Judson College, a nonprofit corporation under the laws of the State of Alabama, and, subject to the provisions of Section 8.4 of the Lease, includes its successors and assigns and any corporation resulting from or surviving any consolidation or merger to which it or its successors may be a party.

"**Counsel**" means any attorney duly admitted to practice before the highest court of any state of the United States of America or the District of Columbia (including any officer or full-

2

JBH-000063

DOCUMENT 3

time employee of the Authority, the College or an affiliate of either thereof who is so admitted to practice), it being understood that "Counsel" may also mean a firm of attorneys all of whose members are so admitted to practice.

"**Directors**" means the Board of Directors of the Authority.

"**Eligible Certificates**" means certificates of deposit issued by, or any acceptance by, (i) any bank organized under the laws of the United States of America or any state thereof and having, at the time of the acquisition by the Authority of such certificates of deposit, combined capital, surplus and undivided profits of not less than $10,000,000 or (ii) by the Trustee irrespective of the amount of its combined capital, surplus and undivided profits.

"**Eligible Investments**" means (i) Eligible Certificates, (ii) Federal Securities, (iii) repurchase agreements that are collateralized to the extent of not less than 100% of the principal amount thereof by Federal Securities, (iv) shares or other investment units representing a beneficial interest in any money market funds provided that the investment portfolio of such money market funds consists of Federal Securities or repurchase agreements described in clause (iii) of this definition or both, and (v) any other debt securities in which the Authority is legally authorized to invest its funds.

"**Escrow Trustee**" means Regions Bank, Birmingham, Alabama, the trustee under the Escrow Trust Agreement.

"**Escrow Trust Agreement**" means that certain Escrow Trust Agreement dated as of October 1, 2010 between the Authority and the Escrow Trustee, providing for the payment and refunding of the Series 2000 Bonds and of the Series 2003 Bonds.

"**Event of Default**" means an "Event of Default" as specified in Section 11.1 hereof.

"**Federal Securities**" means (i) any debt securities that are direct obligations of the United States of America or any agency or instrumentality of the United States of America and (ii) any debt securities payment of the principal of and the interest on which is unconditionally guaranteed by the United States of America or any agency or instrumentality of the United States of America.

"**fully paid**," "**payment in full**," or any similar expression with respect to the Indenture Indebtedness, means that the entire Indenture Indebtedness has been paid in full or duly provided for pursuant to Section 14.1 hereof and that the lien of the Indenture has been cancelled, satisfied and discharged in accordance with the provisions of said Section 14.1.

"**Ground Lease**" means that certain Ground Lease Agreement dated as of October 1, 2010, between the College and the Authority pursuant to which the College has leased the Leased Facilities to the Authority, as said Ground Lease Agreement now exists or may hereafter be amended or supplemented.

3

JBH-000064

DOCUMENT 2

**"Holder,"** when used in conjunction with a Bond, means the Person in whose name such Bond is registered on the registry books of the Trustee pertaining to the Bonds.

**"Indenture"** means this Trust Indenture, as supplemented and amended by any Supplemental Indenture executed by the Authority and the Trustee in accordance with the applicable provisions of Article XIII hereof.

**"Indenture Indebtedness"** means all indebtedness of the Authority at the time secured by the Indenture, including, without limitation, (i) all principal of and interest and premium (if any) on the Bonds and (ii) all reasonable and proper fees, charges and disbursements of the Trustee for services performed under the Indenture.

**"Lease"** means that certain Lease Agreement dated as of October 1, 2010, between the Authority, as lessor, and the College, as lessee, as said Lease Agreement now exists and as it may from time to time be modified, supplemented or amended in accordance with the provisions of Article XIII hereof.

**"Lease Default"** means an "Event of Default" under the Lease, as such term is defined in Section 10.1 of the Lease.

**"Leased Facilities"** means Jewett Hall, the Science Center and the Women's Missionary Union Residence Hall on the campus of the College, as well as the Sites upon which they are situated.

**"outstanding,"** when used with reference to any of the Bonds, means, at any date as of which the amount of such Bonds outstanding is to be determined, all such Bonds which have been theretofore authenticated and delivered by the Trustee under the Indenture, except (i) those of such Bonds purchased for retirement which have been delivered to and cancelled by the Trustee, (ii) those of such Bonds cancelled by the Trustee because of payment at or after their respective maturities or redemption prior to their respective maturities, (iii) those of such Bonds for the payment or redemption of which provisions shall have been made with the Trustee as provided in Section 14.1 of the Indenture, and (iv) those of such Bonds in exchange for which, or in lieu of which, other Bonds have been authenticated and delivered under the Indenture. In determining whether the holders of a requisite aggregate principal amount of outstanding Bonds have concurred in any request, demand, authorization, direction, notice, consent or waiver under the provisions of the Indenture, Bonds which are owned by the College or any Affiliate thereof shall be disregarded and deemed not to be outstanding hereunder for the purpose of any such determination.

**"Outstanding Notes"** means the Promissory Notes of the College, which represent borrowings of the College for the purpose of paying certain of the costs of constructing Capital Improvements that are situated upon the Sites or elsewhere on the campus of the College:

4

DOCUMENT 3

Payable to:

First Cahawba Bank
Selma, Alabama

Marion Bank and Trust Company
Marion, Alabama

West Alabama Bank and Trust
Reform, Alabama

"**Person**" means any natural person, corporation, joint venture, partnership, trust, government or governmental body, political subdivision, or other legal entity as in the context may be possible or appropriate.

"**premium,**" when used with reference to the redemption or purchase for retirement of any of the Bonds, means the amount (if any) by which the redemption or purchase price (in all cases exclusive of accrued interest) of such Bonds exceeds the principal of the Bonds so redeemed or purchased for retirement, as the case may be.

"**Resolution**" means a resolution duly adopted by the Directors.

"**Series 2000 Bonds**" means the Tuition Revenue Bonds Judson College Series 2000, dated December 1, 2000 of the Authority, originally issued and now outstanding in the aggregate principal amount of $2,500,000.

"**Series 2003 Bonds**" means the Variable Rate Tuition Reserve Bonds (Judson College) Series 2003, dated March 28, 2003 of the Authority, originally issued in the aggregate principal amount of $6,715,000 and now outstanding in the aggregate principal amount of $5,725,000.

"**Series 2010 Bonds**" means those of the Bonds bearing the designation Revenue Bonds, Series 2010, authorized to be issued in Article VII hereof.

"**Sites**" means those parcels of land described on Exhibit A attached hereto and made a part hereof, upon which the said Jewett Hall, the Science Center and the Women's Missionary Union Residence Hall of the College are situated.

"**Student Fees**" means all tuition and student fees payable by or on behalf of students enrolled at the College net of scholarships granted, as well as payments by or on behalf of students at the College for housing, meals and books.

"**Supplemental Indenture**" means an agreement supplemental hereto.

5

JBH-000066

DOCUMENT 3

"**Trustee**" means the party of the second part hereto and its successors and any corporation resulting from or surviving any consolidation or merger to which it or its successors may be a party.

Section 1.2    **Definitions Contained in the Lease.**

Unless the context clearly indicates a different meaning, any words, terms or phrases that are used in the Indenture as defined terms without being herein defined and that are defined in the Lease shall have the meanings respectively given them in the Lease.

Section 1.3    **Use of Phrases.**

"Herein," "hereby," "hereunder," "hereof," "hereinbefore," "hereinafter" and other equivalent words refer to the Indenture as an entirety and not solely to the particular portion thereof in which any such word is used. The definitions set forth in Section 1.1 hereof include both singular and plural. Whenever used herein, any pronoun shall be deemed to include both singular and plural and to cover all genders. Any percentage of Bonds, specified herein for any purpose, is to be figured on the principal amount thereof then outstanding.

## ARTICLE II

### GRANTING CLAUSES

Section 2.1    **Granting Clauses.**

In order to secure to the Holders thereof payment of the principal of and the interest and premium (if any) on the Bonds and the performance and observance of the covenants and conditions herein and therein contained, and in consideration of their purchase and acceptance of the Bonds and of the acceptance by the Trustee of the trusts herein provided, the Authority does hereby grant, bargain, sell and convey, assign, transfer and pledge to and with the Trustee the following described properties of the Authority, whether the same are now owned by it or may be hereafter acquired:

I

All right, title and interest of the Authority in and to the Lease [except (i) the right to require the College to pay certain expenses incurred by the Authority as provided in Sections 5.5 and 10.4 of the Lease, (ii) the release and indemnification rights of the Authority contained in Section 8.2 of the Lease and (iii) any other rights personal to the Authority which are expressly provided in the Lease to be exercised by the Authority], but not including, however, any of the obligations of the Authority thereunder;

6

DOCUMENT 3

## II

The Basic Rent and all other revenues and receipts derived by the Authority from the leasing of the Leased Facilities, all other moneys required by the Lease or the Indenture to be deposited from time to time in the Bond Fund, and all other moneys from time to time held by the Trustee for the benefit of the Bondholders pursuant to the Indenture, together in each case with any investments and reinvestments of such moneys and the proceeds thereof; and

## III

Any and all moneys, rights and properties of every kind or description which may from time to time hereafter be sold, transferred, conveyed, assigned, hypothecated, endorsed, deposited, pledged, mortgaged, granted or delivered to, or deposited with, the Trustee by the Authority or anyone on its part as additional security for the payment of all or any specified series of the Bonds, or which pursuant to any of the provisions hereof or of the Lease may come into the possession or control of the Trustee as such additional security; and the Trustee is hereby authorized to receive any and all such moneys, rights and properties as and for additional security for the payment of all or any specified series of the Bonds and to hold and apply the same subject to the terms hereof;

TO HAVE AND TO HOLD the same unto the Trustee, its successor trustees and assigns forever, subject to Permitted Encumbrances; IN TRUST NEVERTHELESS, upon the terms and trusts herein set forth, for the equal and pro rata protection and benefit of the Holders, present and future, of the Bonds equally and ratably, without preference, priority or distinction of any over others by reason of priority in issuance or acquisition or otherwise, as if all the Bonds at any time outstanding had been executed, sold, authenticated, delivered and negotiated simultaneously with the execution and delivery hereof; subject, however, to the right and duty of the Trustee to apply solely for the benefit of the Holders of any particular series of the Bonds all moneys, rights and properties that are pledged or otherwise contractually obligated for the sole and exclusive benefit of the Holders of such particular series of the Bonds;

PROVIDED that no foreclosure or sale of any of the Leased Facilities shall be made under the provisions hereof;

PROVIDED FURTHER, that these presents are upon the condition that if the Authority shall pay or cause to be paid the principal of and the interest and premium (if any) on all Bonds secured hereby at the times and in the manner mentioned in the Bonds, according to the true intent and meaning thereof, or shall provide for such payment as specified in Section 15.1 hereof, and shall pay or cause to be paid all other Indenture Indebtedness, then the Indenture and the estate and rights granted hereby shall cease, determine and be void; otherwise the Indenture shall be and remain in full force and effect.

7

JBH-000068

DOCUMENT 3

# ARTICLE III

## DESCRIPTION OF BONDS

Section 3.1    **Issuance of Bonds in Series.**

The Bonds may be issued in different series, and each Bond shall have an appropriate series designation.  All the Bonds shall be equally and ratably secured by the Indenture and by the pledge herein contained, it being expressly understood and agreed that no Bonds issued hereunder shall be prior to any other Bonds thereafter issued hereunder, but shall be on a parity therewith with respect to the security afforded by the Indenture.

Section 3.2    **Dates and Places of Payment of Bonds.**

Subject to any applicable provisions pertaining to the dating of Bonds issued pursuant to the provisions of either Section 5.1 or 5.2 hereof, the Bonds of each series shall bear such date or dates as shall be specified in the Indenture or Supplemental Indenture under which such series is issued. Subject to compliance with the Act, the Bonds of each series shall mature on such dates and in such amounts, shall be subject to redemption at such times and on such terms and conditions, and shall bear interest for such periods, at such rate or rates and payable on such dates, all as shall be specified in the Indenture or Supplemental Indenture under which such series is issued. The principal of and the interest and premium (if any) on the Bonds of all series issued under the Indenture shall be payable in lawful money of the United States of America.

The principal of and the premium (if any) on the Bonds shall be payable at the principal office of the Trustee, upon presentation and surrender of the Bonds as the same become due. In case any Bond is called for partial redemption, the redemption price of the principal thereof so called for redemption shall be payable at the principal office of the Trustee (a) upon presentation and surrender of such Bond in exchange for a new Bond or Bonds of the same series and tenor and in authorized denominations having an aggregate principal amount equal to the unredeemed portion of the principal of the Bond so surrendered, or (b) upon presentation of such Bond for an appropriate endorsement by the Trustee of such partial redemption on such Bond or on any record of partial redemptions appertaining thereto and constituting a part thereof.  Subject to the provisions of Section 5.1 hereof, the interest on the Bonds shall be paid by check or draft mailed or otherwise delivered by the Trustee to the respective Holders thereof at their addresses as they appear on the registry books of the Trustee pertaining to the registration of the Bonds.  Such payment of interest shall be deemed timely made if so mailed on the interest payment date (or if such interest payment date is not a business day, on the business day next following such interest payment date) upon which the same shall become due.

Section 3.3    **Form of Bonds, Etc.**

The Series 2010 Bonds and the various certificates applicable thereto shall be in substantially the forms respectively provided therefor in Section 7.6 hereof.  The Bonds of each series of Additional Bonds and the various certificates and endorsements applicable thereto shall

8

DOCUMENT 3

be in substantially the forms respectively provided therefor in the Supplemental Indenture under which each such series of Additional Bonds is issued.

## ARTICLE IV

## EXECUTION AND AUTHENTICATION OF THE BONDS

### Section 4.1    Execution of Bonds.

The Bonds shall be executed by the Chairman or the Vice Chairman of the Directors, and the seal of the Authority shall be affixed thereto and attested by the Secretary or any Assistant Secretary of the Authority; provided that either or both of the signature of the Chairman or the Vice Chairman of the Directors and the signature of the Secretary or an Assistant Secretary of the Authority on the Bonds may be a facsimile of the signature of such officer; and provided further that a facsimile of the seal of the Authority may be imprinted thereon rather than manually affixed thereto.   Signatures on the Bonds by persons who were officers of the Authority at the time such signatures were written or printed shall continue effective although such persons cease to be such officers prior to the authentication or delivery of the Bonds.

### Section 4.2    Authentication Certificate of Trustee.

A duly executed authentication certificate by the Trustee in substantially the applicable form hereinafter recited shall be endorsed on each of the Bonds and shall be essential to its validity.  Such certificate shall be conclusive of the due issue of such Bond hereunder.

### Section 4.3    Replacement of Mutilated, Lost, Stolen or Destroyed Bonds.

In the event any Bond is mutilated, lost, stolen or destroyed, the Authority may execute, and the Trustee shall thereupon authenticate and deliver, a new Bond of like tenor as that mutilated, lost, stolen or destroyed; provided that (i) in the case of any such mutilated Bond, such Bond is first surrendered to the Authority and the Trustee, and (ii) in the case of any such lost, stolen or destroyed Bond, there is first furnished to the Authority, the Trustee and the College evidence of such loss, theft or destruction satisfactory to the Trustee, together with indemnity satisfactory to each of them.  The Authority may charge the Holder with the expense of issuing any such new Bond.  In lieu of issuing a new Bond to replace any mutilated, lost, stolen or destroyed Bond which shall have already matured, the Trustee may pay such Bond at or after the maturity thereof if the owner of such Bond satisfies the same terms and conditions as those provided in the preceding provisions of this section for the replacement thereof.

JBH-000070

DOCUMENT 2

# ARTICLE V

## REGISTRATION, TRANSFERS AND EXCHANGES OF THE BONDS

Section 5.1    **Book-Entry Procedures Applicable to Series 2010 Bonds.**

Except as provided in Section 5.1(c) hereof, the registered owner of all of the Series 2010 Bonds shall be The Depository Trust Company ("DTC") and the Series 2010 Bonds shall be registered in the name of Cede & Co., as nominee of DTC. Payment of semiannual interest for any Series 2010 Warrant registered as of a Record Date in the name of Cede & Co. shall be made by wire transfer to the account of Cede & Co. on the Interest Payment Date at the address indicated on the Record Date for Cede & Co. in the registry books of the Authority kept by the Trustee.

(a)    The Series 2010 Bonds shall be initially issued in the form of a separate single authenticated fully registered Warrant in the principal amount of each separately stated maturity. Upon initial issuance, the ownership of each such Series 2010 Warrant shall be registered in the registry book of the Authority kept by the Trustee in the name of Cede & Co., as nominee of DTC. The Trustee and the Authority may treat DTC (or its nominee) as the sole and exclusive owner of the Series 2010 Bonds registered in its name for the purposes of payment of the principal or redemption price of or interest on such Series 2010 Bonds, selecting such Series 2010 Bonds or portions thereof to be redeemed, giving any notice permitted or required to be given to Holders of Series 2010 Bonds under the Indenture, registering the transfer of Series 2010 Bonds, obtaining any consent or other action to be taken by Holders of Series 2010 Bonds and for all other purposes whatsoever; and neither the Trustee nor the Authority shall be affected by any notice to the contrary. Neither the Trustee nor the Authority shall have any responsibility or obligation to any DTC participant, any Person claiming a beneficial ownership interest in the Series 2010 Bonds under or through DTC or any DTC participant, or any other Person which is not shown on the registration books of the Authority kept by the Trustee as being a Holder of Series 2010 Bonds. The Authority and the Trustee shall have no responsibility with respect to the accuracy of any records maintained by DTC, Cede & Co. or any DTC participant with respect to any ownership interest in the Series 2010 Bonds; the payment by DTC or any DTC participant to any beneficial owner of any amount in respect of the principal or redemption price of or interest on the Series 2010 Bonds; the delivery to any DTC participant or any beneficial owner of any notice which is permitted or required to be given to Holders of the Series 2010 Bonds under the Indenture; the selection by DTC or any DTC participant of any Person to receive payment in the event of a partial redemption of the Series 2010 Bonds; or the authority for any consent given or other action taken by DTC as the Holder of Series 2010 Bonds. The Trustee shall pay all principal of and premium, if any, and interest on the Series 2010 Bonds only to Cede & Co., as nominee of DTC, and all such payments shall be valid and effective to fully satisfy and discharge the Authority's obligations with respect to the principal of and premium, if any,

10

JBH-000071

and interest on such Series 2010 Bonds to the extent of the sum or sums so paid. Upon delivery by DTC to the Trustee of written notice to the effect that DTC has determined to substitute a new nominee in place of Cede & Co. and direction to effect such change on the registry books maintained by the Trustee, the term "Cede & Co." in this Indenture shall refer to such new nominee of DTC.

(b)     In the event the Authority determines that it is in the best interest of the beneficial owners of the Series 2010 Bonds that they be able to obtain bond certificates, the Authority may notify DTC and the Trustee of the availability through DTC of bond certificates. In such event, the Trustee shall issue, transfer and exchange bond certificates as requested by DTC and any other Holders of Series 2010 Bonds in appropriate amounts. DTC may determine to discontinue providing its services with respect to the Series 2010 Bonds at any time by giving notice to the Authority and the Trustee and discharging its responsibilities with respect thereto under applicable law. Under such circumstances (if there is no successor securities depository), the Authority and Trustee shall be obligated to deliver bond certificates as described in the Indenture. In the event bond certificates are issued to Holders of the Series 2010 Bonds other than DTC, the provisions of Article V of the Indenture shall apply to, among other things, the transfer and exchange of such certificates and the method of payment of principal of and interest on such certificates. Whenever DTC requests the Authority and the Trustee to do so, the Authority and the Trustee will cooperate with DTC in taking appropriate action after reasonable notice (i) to make available one or more separate certificates evidencing the Series 2010 Bonds to any DTC participant having Series 2010 Bonds credited to its DTC account or (ii) to arrange for another securities depository to maintain custody of certificates evidencing the Series 2010 Bonds.

(c)     Notwithstanding any other provision of the Indenture to the contrary, so long as any Series 2010 Warrant is registered in the name of Cede & Co., as nominee of DTC, all payments with respect to the principal of and premium, if any, and interest on such Series 2010 Warrant and all notices with respect to such Series 2010 Warrant shall be made and given to DTC as provided in the Representation Letter to be signed by the Authority and the Trustee on or prior to the date of issuance and delivery of the Series 2010 Bonds and accepted by DTC. Without limitation of the foregoing, so long as any Series 2010 Warrant is registered in the name of Cede & Co., as nominee of DTC, the Trustee shall send a copy of any notice of redemption by overnight delivery not less than thirty (30) days before the redemption date to DTC, but such mailing shall not be a condition precedent to such redemption and failure to so mail any such notice (or failure of DTC to advise any DTC participant, or any DTC participant to notify the beneficial owner, of any such notice or its content or effect) shall not affect the validity of the proceedings for the redemption of the Series 2010 Bonds.

11

JBH-000072

(d)     In connection with any notice or other communication to be provided to Holders of the Series 2010 Bonds pursuant to the Indenture by the Authority or the Trustee with respect to any consent or other action to be taken by Holders of the Series 2010 Bonds, so long as any Series 2010 Warrant is registered in the name of Cede & Co., as nominee of DTC, the Authority or the Trustee, as the case may be, shall establish a record date for such consent or other action and give DTC notice of such record date not less than fifteen (15) calendar days in advance of such record date to the extent possible.

(e)     In the event of any inconsistency between the provisions of this Section 5.1 and any other provision of the Indenture or the forms of Series 2010 Bonds, the provisions of this Section 5.1 shall govern so long as bond certificates have not been issued to the Holders of the Series 2010 Bonds other than DTC in accordance with Section 5.1(c) hereof.

Section 5.2     **Registration and Transfer of Bonds.**

The Trustee shall be the registrar and transfer agent of the Authority and shall keep at its office proper registry and transfer books in which it will note the registration and transfer of such Bonds as are presented for those purposes, all in the manner and to the extent hereinafter specified.

The transfer of any Bond may be registered only upon the books kept by the Trustee, as registrar and transfer agent for the Authority, for the registration and registration of transfer of Bonds upon surrender thereof at the office of the Trustee with written power to transfer signed by the Holder thereof in person or by duly authorized attorney, properly stamped if required, in form and with guaranty of signature satisfactory to the Trustee.  Upon any such transfer the Authority shall execute, and the Trustee shall authenticate and deliver to the transferee, a new Bond registered in the name of such transferee and of like tenor as that presented for transfer.

Any Bond authenticated and delivered pursuant to the provisions of this section shall be dated as of the interest payment date next preceding the date of its authentication by the Trustee or, if the date of such authentication is an interest payment date, as of such date; provided that if any Bond is to be authenticated and delivered pursuant to this section prior to the first interest payment date with respect to the Bond or Bonds presented for transfer for which it is to be issued in lieu of, such Bond shall be dated the date of the Bond or Bonds for which it is to be so issued in lieu of; and provided further that if at the time of such authentication, the Authority is in default in payment of the interest on the Bonds, such Bond shall be dated as of the interest payment date to which interest has previously been paid or made available for payment on the Bonds.  In any case, any Bond issued in lieu of other Bonds presented for transfer shall bear interest at the rate borne by the Bonds so presented for transfer and shall bear interest from such date as is necessary to assure that no gain or loss of interest shall result from the transfer of any Bonds.

The Trustee shall not be required to transfer any Bond during the period of fifteen (15) days next preceding any interest payment date with respect thereto; and if any Bond shall be duly

12

called for redemption (in whole or in part), the Trustee shall not be required to transfer such Bond during the period of forty-five (45) days next preceding the date fixed for such redemption.

Section 5.3    **Exchange of Bonds.**

The Bonds of each series shall be freely exchangeable within the limits provided in the Indenture or Supplemental Indenture under which such series is issued; provided however, that under no circumstances shall a Bond be issuable in exchange for other Bonds unless all the Bonds being so exchanged are of the same series, bear interest at the same rate and have the same stated maturity. Upon the request of the Holder of any Bond in a principal amount greater than the minimum authorized denomination applicable to the series to which such Bond belongs, the Authority shall execute, and the Trustee shall thereupon authenticate and deliver, upon surrender to the Trustee of such Bond and in exchange therefor, two or more Bonds of like tenor as the Bond so surrendered and in authorized denominations aggregating the same principal amount as the Bond so surrendered. Upon the request of the Holder of two or more Bonds the Authority shall execute, and the Trustee shall thereupon authenticate and deliver, upon surrender to the Trustee of such Bonds and in exchange therefor, a new Bond or Bonds of like tenor in different authorized denominations and aggregating the same principal amount as the then unpaid principal amount of the Bonds so surrendered. Any Bonds surrendered for exchange pursuant to the provisions of this section shall be accompanied by a written power to transfer signed by the Holder thereof in person or by duly authorized attorney, properly stamped if required, in form and with guaranty of signature satisfactory to the Trustee.

Any Bond authenticated and delivered pursuant to the provisions of this section shall be dated as of the interest payment date next preceding the date of its authentication by the Trustee or, if the date of such authentication is an interest payment date, as of such date; provided that if any Bond is to be authenticated and delivered pursuant to this section prior to the first interest payment date with respect to the Bond or Bonds for which it is to be issued in exchange, such Bond shall be dated the date of the Bond or Bonds for which it is to be so issued in exchange; and provided further that if at the time of such authentication, the Authority is in default in payment of the interest on the Bonds, such Bond shall be dated as of the interest payment date to which interest on the Bonds has previously been paid. In any case, any Bond issued in exchange for other Bonds shall bear interest at the rate borne by the Bonds so surrendered for exchange and shall be dated so that no gain or loss of interest shall result from the exchange of any Bond for other Bonds.

The Trustee shall not be required to exchange any Bond pursuant to the provisions of this section during the period of fifteen (15) days next preceding any interest payment date with respect thereto or, if such Bond shall be duly called for redemption (in whole or in part), during the period of forty-five (45) days next preceding the date fixed for such redemption.

Section 5.4    **Persons Deemed Owners of Bonds.**

The Person in whose name a Bond is registered on the books of the Trustee shall be the sole Person to whom or on whose order payments on account of the principal thereof and of the interest and premium (if any) thereon may be made. The Authority and the Trustee may deem

13

and treat the Person in whose name a Bond is registered as the absolute owner thereof for all purposes; they shall not be affected by notice to the contrary; and all payments by either of them to the Person in whose name a Bond is registered, shall to the extent thereof fully discharge and satisfy all liability for the same.

Section 5.5    **Expenses of Registration, Transfer and Exchange.**

The Authority and the Trustee may charge the Holder with their reasonable fees and expenses in connection with any transfer or exchange of any of the Bonds; provided, however, that no charge shall be made for the issuance of a new Bond issued, pursuant to the provisions of Section 6.2 hereof, as a result of a call for partial redemption of any Bond.  In every case involving any transfer or exchange of any of the Bonds that is requested by the Holder thereof, such Holder shall pay all taxes and other governmental charges required to be paid in connection with such transfer or exchange.

## ARTICLE VI

## GENERAL PROVISIONS RESPECTING REDEMPTION OF BONDS

Section 6.1    **Manner of Effecting Redemption of Bonds.**

Any redemption of any Bonds of any series shall be effected in the following manner:

(a)    Call.  The Directors shall adopt a Resolution containing a call for redemption, on a specified date when they are by their terms subject to redemption, of Bonds bearing a stated series designation or designations and stated numbers (and, in the case of the partial redemption of any Bonds, the respective principal amounts thereof to be redeemed); provided, however, that it shall not be necessary for the Directors to adopt any such Resolution (i) in the case of Series 2010 Bonds that are to be redeemed pursuant to the provisions of Section 7.2 hereof, provided that the College shall have requested such redemption by a written request furnished to the Authority and the Trustee and shall have specified in such request the principal amount of Series 2010 Bonds to be so redeemed and the date on which the redemption thereof is to be effected, (ii) in the case of Series 2010 Bonds that are to be redeemed pursuant to the provisions of Sections 7.3 or 7.4 hereof, or (iii) in the case of any redemption of the Bonds of any series of Additional Bonds, if such redemption is required by the terms of the Supplemental Indenture under which such series of Additional Bonds is issued or if, in such Supplemental Indenture, the adoption of such Resolution is expressly stated to be unnecessary.

(b)    Notice by Registered or Certified Mail.  With respect to any Bonds called for redemption, in whole or in part, the Trustee (on behalf of the Authority) shall cause to be forwarded by United States registered or certified mail to the registered owner thereof, at the address of such registered owner as such address

14

JBH-000075

appears on the registry books of the Trustee pertaining to the registration of the Bonds, a notice stating the following: that Bonds bearing stated numbers and a stated series designation or designations (and, in the case of the partial redemption of any Bonds, the respective principal amounts thereof to be redeemed) have been called for redemption and will become due and payable at the applicable redemption price or prices on a specified redemption date, and that all interest thereon will cease after such redemption date if prior to such date, the total redemption price of the Bonds (or portions thereof) so called for redemption, together with the accrued interest thereon to such date, has been deposited with the Trustee. The notice provided for in this subsection (b) shall be mailed to all persons entitled to receive the same not more than sixty (60) nor less than thirty (30) days prior to the date fixed for redemption. The Holders of any Bonds may waive the requirements of this subsection with respect to the Bonds held by them without affecting the validity of the call for redemption of any other Bonds.

(c)   _Deposit._ Prior to the date fixed for redemption, or not later than 10:00 o'clock A.M. on the business day next preceding such date, the Authority shall deposit or cause to be deposited with the Trustee the total redemption price of the Bonds (or portions thereof) so called for redemption and shall further furnish or cause to be furnished to the Trustee the following: (1) a certified copy of the Resolution required by subsection (a) of this section (if, under the circumstances, the adoption of any such Resolution is required); and (2) in the case of the redemption of any Bonds on a date when such Bonds may be redeemed only with funds from a specified source or when such redemption is made subject, by the terms of the Indenture or any Supplemental Indenture, to any other restriction or requirement, evidence satisfactory to the Trustee showing compliance with such restriction or requirement.

Section 6.2    **Presentation of Bonds for Redemption; Bonds Called for Redemption to Cease to Bear Interest.**

Upon compliance by the Authority and the Trustee with the applicable requirements of Section 6.1 hereof [and, unless all the Bonds then outstanding are to be redeemed (or unless a portion of such outstanding Bonds are to be redeemed and the remainder are, simultaneously with or prior to such redemption, to be otherwise retired), if the Authority is not on the date fixed for redemption in default in payment of the principal of or the interest or premium (if any) on any of the Bonds], the Bonds so called for redemption (or, in the case of any Bonds called for redemption in part, the portions thereof called for redemption) shall become due and payable at the place or places at which the same shall be payable at the redemption price or prices and on the redemption date specified in such notice, anything herein or in such Bonds to the contrary notwithstanding, and the Holders thereof shall then and there surrender them for redemption; provided however, that with respect to any Bond called for partial redemption, the Holder thereof shall surrender such Bond to the Trustee in exchange for one or more Bonds in authorized denominations in an aggregate principal amount equal to the unredeemed portion of the Bond so surrendered, all as shall be requested by the Holder of such Bond so called for partial redemption. The preceding sentence to the contrary notwithstanding, the partial redemption of

15

JBH-000076

Bonds shall be subject to such Home Office Payment Agreements as may be in effect with respect thereto. All future interest on the Bonds so called for redemption (or, in the case of any Bonds called for redemption in part, the portions thereof called for redemption) shall cease to accrue after the date fixed for redemption. The Bonds so called (or, in the case of any Bonds called for redemption in part, the portions thereof called for redemption) shall, subject to such deposit having been made, be entitled to no security under the Indenture other than the moneys deposited with the Trustee under the provisions of this article; and out of the moneys so deposited with it, the Trustee shall pay on the redemption date the applicable redemption price or prices of the Bonds so called for redemption (or, in the case of any Bonds called for redemption in part, the portions thereof called for redemption).

Section 6.3    **Concerning the Redemption of Bonds of Different Series.**

Nothing contained in the Indenture shall be construed as requiring pro rata redemption of Bonds of different series, even though at the time that any redemption of Bonds is to be effected there are then outstanding Bonds of two or more series then subject to redemption.

Section 6.4    **Termination of Lease.**

In the event that the Lease terminates pursuant to Section 7.2(a) thereof, or in the event the College exercises the option to terminate the Ground Lease and the Lease granted in Section 11.1(a) thereof, then, in any of such events, the Trustee (i) shall segregate and set aside in the Bond Fund [out of moneys therein, any insurance proceeds or condemnation awards then held by the Trustee that are referable to the Leased Facilities and that are available for the retirement of Bonds, and any moneys payable by the College pursuant to the provisions of any of Sections 7.2(a), 11.1(a) and 11.2 of the Lease, in the order named] moneys sufficient to retire the Bonds and pay all other Indenture Indebtedness as provided in Section 7.2(a) or 11.1(a) of the Lease, as the case may be, and (ii) shall, in accordance with the applicable provisions of the Lease, dispose of any balance of such moneys not needed for the retirement of the Bonds and the payment of all other Indenture Indebtedness.

## ARTICLE VII

## THE SERIES 2010 BONDS

Section 7.1    **Issuance of Series 2010 Bonds; Interest Rate and Other Terms of the Series 2010 Bonds.**

In order to refund and retire the Series 2000 Bonds and the Series 2003 Bonds, and to pay and retire the Outstanding Notes, there is hereby authorized to be issued under the Indenture an issue or series of Bonds designated Revenue Bonds Judson College, Series 2010, limited in aggregate principal amount to $11,230,000. The Series 2010 Bonds shall (except as otherwise provided in Sections 5.1 and 5.2 hereof) be dated October 1, 2010, shall be issued in denominations of $5,000 or any integral multiple thereof, shall be numbered from R1 up, in the order issued, shall mature and become payable on October 1 in the following years and in the

16

JBH-000077

following amounts and shall bear interest from their date at the following per annum rates (payable on April 1, 2011, and on each April 1 and October 1 thereafter):

| Maturity Date | Principal Amount | Interest Rate |
|---|---|---|
| October 1, 2011 | $195,000 | 2.00% |
| October 1, 2012 | 200,000 | 2.25 |
| October 1, 2013 | 200,000 | 2.50 |
| October 1, 2014 | 205,000 | 2.70 |
| October 1, 2015 | 215,000 | 3.00 |
| October 1, 2016 | 220,000 | 3.25 |
| October 1, 2017 | 230,000 | 3.50 |
| October 1, 2018 | 235,000 | 3.75 |
| October 1, 2019 | 245,000 | 4.00 |
| October 1, 2020 | 255,000 | 4.20 |
| October 1, 2022 | 550,000 | 4.50 |
| October 1, 2024 | 605,000 | 4.75 |
| October 1, 2025 | 320,000 | 4.75 |
| October 1, 2027 | 695,000 | 5.00 |
| October 1, 2028 | 375,000 | 5.00 |
| October 1, 2029 | 395,000 | 5.10 |
| October 1, 2030 | 415,000 | 5.25 |
| October 1, 2035 | 2,445,000 | 5.50 |
| October 1, 2040 | 3,230,000 | 5.50 |

The interest on the Series 2010 Bonds shall be computed on the basis of a 360-day year of twelve consecutive 30-day months. Overdue payments of principal of and interest on each Series 2010 Bond (including all such payments becoming due as a result of acceleration, mandatory redemption or otherwise), shall bear interest from due dates of such principal and interest until paid or until moneys sufficient for payment thereof shall have been deposited for that purpose with the Trustee, whichever first occurs, at a per annum rate equal to the rate of interest borne by such Series 2010 Bond.

The principal of and the interest on the Series 2010 Bonds shall be payable in accordance with the provisions of Section 3.2 hereof.

Section 7.2   **Optional Redemption of Series 2010 Bonds.**

The Series 2010 Bonds having stated maturities on October 1, 2022 and thereafter will be subject to redemption, at the option of the Authority (which option shall be exercisable only upon request by the College), as a whole or in part (but only in installments of $5,000 or any integral multiple thereof with the Series 2010 Bonds to be redeemed to be designated by the Authority at the direction of the College, but if less than all the Series 2010 Bonds of a single maturity are to be redeemed, those to be called for redemption shall be selected by lot) on October 1, 2020, and on any date thereafter, such redemption, whether in whole or in part, to be at and for a redemption price equal to the par or face amount of each Series 2010 Bond so

17

JBH-000078

redeemed plus accrued interest thereon to the redemption date, without penalty or premium of any kind.

The redemption of Series 2010 Bonds pursuant to this section shall comply with the applicable provisions of Article VI hereof, including the giving of such notice to the Holders of Series 2010 Bonds called for redemption as may be required by Section 6.1(b) hereof. Any redemption of less than all the outstanding Series 2010 Bonds pursuant to this section shall comply with the provisions of Section 7.5 hereof.

Section 7.3    **Scheduled Mandatory Redemption of Series 2010 Bonds.**

Those of the Series 2010 Bonds having a stated maturity in 2022 (the "2022 Term Bonds") shall be subject to mandatory redemption and payment on October 1, 2021, in the principal amount of $270,000. In the absence of prior optional or extraordinary redemption, 2022 Term Bonds, in the aggregate principal amount of $280,000 will remain to be paid at their stated maturity on October 1, 2022.

Those of the Series 2010 Bonds having a stated maturity in 2024 (the "2024 Term Bonds") shall be subject to mandatory redemption and payment on October 1, 2023, in the principal amount of $295,000. In the absence of prior optional or extraordinary redemption, 2024 Term Bonds, in the aggregate principal amount of $310,000 will remain to be paid at their stated maturity on October 1, 2024.

Those of the Series 2010 Bonds having a stated maturity in 2027 (the "2027 Term Bonds") shall be subject to mandatory redemption and payment on October 1, 2026, in the principal amount of $340,000. In the absence of prior optional or extraordinary redemption, 2027 Term Bonds, in the aggregate principal amount of $355,000 will remain to be paid at their stated maturity on October 1, 2027.

Those of the Series 2010 Bonds having a stated maturity on October 1, 2035 (herein called the "2035 Term Bonds") will be subject to scheduled mandatory redemption prior to their stated maturity, at and for a redemption price equal to the principal amount thereof to be redeemed plus interest accrued to the redemption date, on October 1 in the following respective years and principal amounts:

| Year of Redemption | Principal Amount |
|---|---|
| October 1, 2031 | $435,000 |
| October 1, 2032 | 460,000 |
| October 1, 2033 | 490,000 |
| October 1, 2034 | 515,000 |

In the absence of prior optional or extraordinary redemption, 2035 Term Bonds, in the aggregate principal amount of $545,000 will remain to be paid at their stated maturity on October 1, 2035.

18

JBH-000079

Those of the Series 2010 Bonds having a stated maturity on October 1, 2040 (herein called the "2040 Term Bonds") will be subject to scheduled mandatory redemption prior to their stated maturity, at and for a redemption price equal to the principal amount thereof to be redeemed plus interest accrued to the redemption date, on October 1 in the following respective years and principal amounts:

| Year of Redemption | Principal Amount |
|---|---|
| October 1, 2036 | $575,000 |
| October 1, 2037 | 610,000 |
| October 1, 2038 | 645,000 |
| October 1, 2039 | 680,000 |

In the absence of prior optional or extraordinary redemption, 2040 Term Bonds, in the aggregate principal amount of $720,000 will remain to be paid at their stated maturity on October 1, 2040.

Each Series 2010 Bond (or portion of the principal thereof) called for such mandatory redemption shall be redeemed at and for a redemption price equal to the principal amount thereof to be redeemed plus accrued interest thereon to the date fixed for redemption, and such redemption shall be effected in accordance with the applicable provisions of Article VI and Section 7.5 hereof.  Not later than August 15 preceding each October 1 on which mandatory redemptions of Series 2010 Bonds are required by this section, the Trustee will take such actions as are necessary under the provisions of Article VI hereof to redeem the principal amount of Series 2010 Bonds required to be redeemed on such October 1.

In the event that any Series 2010 Bonds are required by this section to be redeemed on any October 1, then at the option of the College, to be exercised on or before the August 15 next preceding such October 1, the principal amount of Series 2010 Bonds so required to be redeemed shall be reduced to the extent of the sum of the following credits:

(a)     a credit equal to such principal amount of Series 2010 Bonds as shall have been delivered by the College to the Trustee for cancellation and retirement and as shall not have been theretofore credited against any previous mandatory redemption of Series 2010 Bonds;

(b)     a credit equal to such principal amount of Series 2010 Bonds as shall have been purchased by the Trustee for cancellation and retirement with moneys provided by the College and as shall not have been theretofore credited against any previous mandatory redemption of Series 2010 Bonds; and

(c)     a credit equal to that principal amount of Series 2010 Bonds which shall have been theretofore duly called for redemption on or before such October 1 pursuant to the provisions of Section 7.2 hereof, for which all moneys necessary to effect the redemption thereof shall have theretofore been deposited with the

19

JBH-000080

Trustee and which shall not have been theretofore credited against any previous mandatory redemption of Series 2010 Bonds.

The Series 2010 Bonds so delivered, purchased or redeemed, as the case may be, in respect of any redemption of Series 2010 Bonds required on any October 1 shall be credited by the Trustee at the face amount thereof against the principal amount of Series 2010 Bonds required to be redeemed on such October 1, and any unused credit shall be credited against future mandatory redemptions of Series 2010 Bonds as shall be specified by the College; provided that no credit in respect of the redemption of Series 2010 Bonds required on any October 1 shall be allowed for any Series 2010 Bond so delivered, purchased or redeemed, as the case may be, unless the delivery, purchase or redemption thereof is accomplished in a timely manner, which, in the case of any Series 2010 Bond delivered to or purchased by the Trustee pursuant to clauses (a) and (b), respectively, of this paragraph, shall mean that such Series 2010 Bond shall be delivered to or purchased by the Trustee before the August 15 next preceding such October 1 and which, in the case of any Series 2010 Bond to be credited in the manner contemplated by clause (c) of this paragraph, shall mean that such Series 2010 Bond shall have been duly called for redemption on or before such October 1, and all moneys necessary to effect such redemption deposited with the Trustee, on or before the date fixed for redemption. Upon the request of the College the Trustee shall use reasonable efforts to purchase Series 2010 Bonds with moneys provided by the College pursuant to clause (b) of this paragraph, including requesting or advertising for tenders if requested to do so by the College.

Section 7.4    **Extraordinary Redemption of Series 2010 Bonds.**

In the event that (i) all or substantially all of the Leased Facilities is taken through the exercise of the power of eminent domain with the consequences described in Section 7.2(a) of the Lease or (ii) the College exercises the option granted in Section 11.2 of the Lease to terminate the Ground Lease and the Lease, then, and in either of such events, the Series 2010 Bonds shall be subject to extraordinary mandatory redemption as a whole, at and for a redemption price, with respect to each Series 2010 Bond, equal to the principal amount thereof plus accrued interest thereon to the date fixed for redemption. In case all the Series 2010 Bonds are required to be redeemed pursuant to clause (i) of the first sentence of this paragraph, the date fixed for such redemption shall be the date on which the Lease terminates as provided in said Section 7.2(a) thereof (or such later date as may be required by the provisions of Section 15.3 hereof). In case all the Series 2010 Bonds are required to be redeemed pursuant to clause (ii) of the first sentence of this paragraph, the date fixed for such redemption shall be the business day next succeeding the date of purchase of the Leased Facilities determined by the College in accordance with the provisions of clause (2) of Section 11.2 of the Lease. The provisions of Section 6.4 hereof shall apply to the redemption of Series 2010 Bonds pursuant to this section. The redemption of Series 2010 Bonds pursuant to this section shall comply with the applicable provisions of Article VI hereof, including the giving of such notice to the Holders of Series 2010 Bonds called for redemption as may be required by Section 6.1(b) hereof.

20

JBH-000081

DOCUMENT 2

Section 7.5    **Special Provisions Respecting Partial Redemption of Series 2010 Bonds.**

The principal of any Series 2010 Bonds shall be redeemed only in the amount of $5,000 or any integral multiple thereof. If less than all the outstanding Series 2010 Bonds are to be redeemed on any single redemption date, the maturities of those to be redeemed shall be designated by the Authority at the request of the College. If less than all the Series 2010 Bonds of a single maturity are to be called for redemption on any single redemption date, the Trustee shall assign a number or other unique designation to each $5,000 in principal amount of the Series 2010 Bonds then outstanding and select by lot, from among all such numbers or other unique designations associated with the Series 2010 Bonds of such maturity then outstanding, numbers or other unique designations representing an aggregate principal amount equal to the principal amount of the Series 2010 Bonds of such maturity to be so called for redemption, whereupon there shall be called for redemption an amount of the unpaid principal of each Series 2010 Bond of such maturity equal to the principal amount represented by the numbers or other unique designations related thereto that were so selected.

Section 7.6    **Form of the Series 2010 Bonds.**

The Series 2010 Bonds, the Trustee's authentication certificate applicable thereto and the form of assignment applicable thereto, as well as any record of partial redemptions provided therefor, shall be in substantially the following forms, respectively, with such insertions, omissions and other variations as may be necessary to conform to the provisions hereof:

21

JBH-000082

No. R\_\_\_\_\_                                                                    $_____

### UNITED STATES OF AMERICA

### STATE OF ALABAMA

### EDUCATIONAL BUILDING AUTHORITY
### OF THE CITY OF MARION

### REVENUE BOND
### JUDSON COLLEGE
### Series 2010

| INTEREST RATE | MATURITY DATE | CUSIP |
|---|---|---|
| _____ | _____ | _____ |

On the date specified above (unless the principal of this bond shall have been duly called for previous redemption and payment duly provided for), for value received, EDUCATIONAL BUILDING AUTHORITY OF THE CITY OF MARION, a public corporation and instrumentality under the laws of the State of Alabama (herein called the "Authority"), will pay to _____, or registered assigns, solely out of the sources of payment hereinafter referred to, the sum of

### D O L L A R S

(or such lesser portion thereof then unpaid), with interest on the unpaid principal balance hereof from the date hereof at the rate per annum specified above (computed on the basis of a 360-day year of 12 consecutive 30-day months) payable on April 1, 2011, and semiannually thereafter on April 1 and October 1 in each year until and at the maturity hereof. The principal of and the premium (if any) on this bond shall be payable in lawful money of the United States of America at the principal office of Regions Bank, Birmingham, Alabama, or its successor as Trustee under the Indenture hereinafter referred to, and the interest on this bond shall be remitted, by the Trustee hereinafter referred to, by check or draft mailed or otherwise delivered to the then registered holder hereof at the address shown on the registry books of the said Trustee. Such payment of interest shall be deemed timely made if so mailed on the interest payment date (or if such interest payment date is not a business day, on the business day next following such interest payment date) upon which the same shall become due. The principal of and the interest and premium (if any) on this bond shall bear interest after their respective due dates until paid at the per annum rate shown above.

22

JBH-000083

This bond is one of a duly authorized issue or series of bonds authorized to be issued in the aggregate principal amount of $11,230,000, and designated Revenue Bonds Judson College Series 2010 (herein called the "Series 2010 Bonds"). The Series 2010 Bonds have been issued under a Trust Indenture dated as of October 1, 2010 (herein called the "Indenture"), between the Authority and Regions Bank, Birmingham, Alabama, as Trustee (herein, in such capacity, together with its successors in trust, called the "Trustee"), for the purpose of refunding certain outstanding indebtedness of the Authority and of Judson College (herein called the "College") in Marion, Alabama as well as the costs of issuing the Series 2010 Bonds. In connection with the issuance of the Series 2010 Bonds the Authority has leased certain facilities located on its campus (herein called the "Leased Facilities") to the College under a Lease Agreement dated as of October 1, 2010 (herein called the "Lease"), which obligates the College to pay rent directly to the Trustee, for the account of the Authority, on such dates and in such amounts as will provide moneys sufficient to pay, when due, the principal of and the interest on the Series 2010 Bonds.

The Series 2010 Bonds are subject to redemption prior to their maturities as follows:

(1)     Those of the Series 2010 Bonds having stated maturities in 2022 and thereafter are subject to redemption, at the option of the Authority, as a whole or in part (but only in installments of $5,000 or any integral multiple thereof with the maturities to be redeemed to be designated by the Authority at the direction of the College, but if less than all the Series 2010 Bonds of a single maturity are to be redeemed, those to be called for redemption shall be selected by lot) on October 1, 2020, and on any date thereafter, such redemption, whether in whole or in part, to be at and for a redemption price equal to the par or face amount of each Series 2010 Bond plus accrued interest thereon to the redemption date, without penalty or premium of any kind.

(2)     Those of the Series 2010 Bonds maturing on October 1, 2022 (the "2022 Term Bonds"), are subject to mandatory redemption on October 1, 2021, in the principal amount of $270,000. In the absence of prior optional or extraordinary redemption, 2022 Term Bonds in the aggregate principal amount of $280,000 will remain to be paid at their stated maturity on October 1, 2022.

(3)     Those of the Series 2010 Bonds maturing on October 1, 2024 (the "2024 Term Bonds"), are subject to mandatory redemption on October 1, 2023, in the principal amount of $295,000. In the absence of prior optional or extraordinary redemption, 2024 Term Bonds in the aggregate principal amount of $310,000 will remain to be paid at their stated maturity on October 1, 2024.

(4)     Those of the Series 2010 Bonds maturing on October 1, 2027 (the "2027 Term Bonds"), are subject to mandatory redemption on October 1, 2026, in the principal amount of $340,000. In the absence of prior optional or extraordinary redemption, 2027 Term Bonds in the aggregate principal

23

JBH-000084

amount of $355,000 will remain to be paid at their stated maturity on October 1, 2027.

(5)    Those of the Series 2010 Bonds maturing on October 1, 2035 (the "2035 Term Bonds"), are subject to mandatory redemption on October 1, 2031, and on each October 1 thereafter until and including October 1, 2035, in the following respective years and principal amounts:

| Year | Principal Amount |
|------|------------------|
| October 1, 2031 | $435,000 |
| October 1, 2032 | 460,000 |
| October 1, 2033 | 490,000 |
| October 1, 2034 | 515,000 |

In the absence of prior optional or extraordinary redemption, 2035 Term Bonds in the aggregate principal amount of $545,000 will remain to be paid at their stated maturity on October 1, 2035.

(6)    Those of the Series 2010 Bonds maturing on October 1, 2040 (the "2040 Term Bonds"), are subject to mandatory redemption on October 1, 2036, and on each October 1 thereafter until and including October 1, 2040, in the following respective years and principal amounts:

| Year | Principal Amount |
|------|------------------|
| October 1, 2036 | $575,000 |
| October 1, 2037 | 610,000 |
| October 1, 2038 | 645,000 |
| October 1, 2039 | 680,000 |

In the absence of prior optional or extraordinary redemption, 2040 Term Bonds in the aggregate principal amount of $720,000 will remain to be paid at their stated maturity on October 1, 2040.

(7)    The Series 2010 Bonds called for such mandatory redemption shall be selected by lot and shall be redeemed at and for a redemption price, with respect to each such Series 2010 Bond redeemed, equal to the principal amount thereof plus accrued interest thereon to the date fixed for redemption.

(8)    The Series 2010 Bonds are subject to mandatory redemption as a whole on any date, at and for a redemption price, with respect to each Series 2010 Bond, equal to the principal amount thereof plus accrued interest

24

JBH-000085

thereon to the date fixed for redemption, but only in the event of the substantial destruction of the Leased Facilities or the taking through the exercise of the power of eminent domain of all or substantially all the Leased Facilities or in the event of the exercise by the College of an option to acquire absolute fee simple title to the Leased Facilities granted in the Lease.

The Indenture requires written notice of the redemption of this bond (or portion of the principal hereof) to be forwarded by United States registered or certified mail to the registered holder hereof not less than thirty (30) nor more than sixty (60) days prior to the date fixed for redemption. In the event that less than all the principal of this bond is to be redeemed, the registered holder hereof shall surrender this bond to the Trustee in exchange for a new bond of like tenor herewith except in a principal amount equal to the unredeemed portion of this bond.

The Authority, with the consent of the College, is authorized by the Indenture to issue thereunder, upon the terms and conditions therein specified, additional bonds that are secured on a parity with the Series 2010 Bonds as respects the security afforded by the Indenture. Such additional parity bonds may be issued, at any time and from time to time, for the purposes of (i) obtaining funds, if additional funds are needed, to pay the costs of improving or renovating the Leased Facilities, (ii) obtaining funds to pay the costs of acquiring and constructing capital improvements to the facilities of the College, or to refund or retire any indebtedness or securities issued by or on behalf of the College to acquire or construct such capital improvements, (iii) refunding and retiring all or any portion of any one or more series of bonds then outstanding under the Indenture and (iv) any combination of the foregoing purposes (the Series 2010 Bonds and all such additional parity bonds being herein together called the "Bonds"). The College will also be authorized by the Indenture to pledge the Student Fees defined in the Indenture, on a parity with the pledge thereof for the Series 2010 Bonds, as security for any other securities or indebtedness issued by or on behalf of the College on the terms and conditions specified in the Indenture.

The principal of and the interest and premium (if any) on the Bonds are payable solely from the revenues and receipts to be derived from the leasing of the Leased Facilities and certain other moneys pledged under the Indenture. The payment of the principal of and the interest and premium (if any) on the Bonds is secured, pro rata and without preference or priority of one Bond over another or of the Bonds of any one series over the Bonds of any other, by a valid pledge of the aforesaid revenues, receipts and moneys out of which the Bonds are solely payable (including specifically the "Basic Rent" payable to the Authority by the College under the Lease), by the Indenture and by an assignment to the Trustee of all right, title and interest of the Authority in and to the Lease (except certain expense reimbursement and indemnification rights of the Authority and certain other rights which are expressly reserved to the Authority). The Series 2010 Bonds are also secured by a pledge made in the Lease by the College of all Student Fees payable by students enrolled at the College. The Series 2010 Bonds are not secured by a pledge of any other funds of the College nor are the Series 2010 Bonds secured by a lien or security interest in any part of the Leased Facilities or any other real or personal property owned by the Authority or the College. Reference is hereby made to the Lease and the Indenture for complete information respecting the nature and extent of the security afforded by each of such

JBH-000086

instruments, the rights and duties of the Authority and the Trustee with respect thereto, the rights of the holders of the Series 2010 Bonds and the terms and conditions on which additional series of Bonds may be issued.

The Indenture provides, inter alia, (a) that upon the occurrence and continuation of certain events of default as therein provided, the Trustee may declare the principal of and the interest accrued on this bond immediately due and payable, whereupon the same shall thereupon become immediately due and payable and the Trustee shall be entitled to pursue the remedies provided in the Indenture, (b) that the holder of this bond shall have no right to enforce the provisions of the Indenture except as provided therein and then only for the equal and pro rata benefit of the holders of all the Bonds, and (c) that if this bond shall not be presented for payment when due (whether by maturity or otherwise) and if funds sufficient for such payment shall have been made available to the Trustee therefor, all liability of the Authority to the holder of such bond and all rights of such holder against the Authority under such bond or under the Indenture shall cease and terminate and that the sole right of such holder shall thereafter be against the said funds so made available, which the Trustee is required to set aside and hold, subject to any applicable escheat or other similar law, for the benefit of such holder.   The Indenture also provides that the Authority and the Trustee, with the written consent of the holders of a majority in aggregate principal amount of the Bonds then outstanding under the Indenture, may at any time and from time to time amend the Indenture subject to the restrictions therein provided.

It is hereby expressly declared, and the holder hereof by acceptance of this bond hereby consents, that the Series 2010 Bonds shall not have or be entitled to any priority of payment or security over the Bonds of any other series hereafter issued under the Indenture, and that any series of Bonds hereafter issued under the Indenture shall be on a parity with the Bonds of all series theretofore issued under the Indenture.

The Authority is a public corporation organized under the provisions of Code of Alabama 1975, Title 16, Chapter 17, and the Series 2010 Bonds are authorized to be issued for the purposes for which bonds are authorized to be issued under the specified provisions of said Code.  The Series 2010 Bonds and the covenants and representations contained in the Indenture do not and shall never constitute a general liability or charge against the general credit of the Authority. Neither the State of Alabama nor the City of Marion nor any other political subdivision of said state shall in any manner be liable for payment of the principal of or the interest on the Series 2010 Bonds or for the performance of the undertakings of the Authority contained herein or in the Indenture.

It is hereby certified that all conditions, actions and things required by the Constitution and laws of the State of Alabama to exist, be performed and happen precedent to or in the issuance of this bond do exist, have been performed and have happened in due and legal form.

The Series 2010 Bonds are issuable as fully registered bonds without coupons in the denomination of $5,000 each or any integral multiple thereof. Provision is made in the Indenture for the exchange of Series 2010 Bonds for a like aggregate principal amount of Series 2010

26

JBH-000087

Bonds in authorized denominations, all as may be requested by the holder surrendering the Series 2010 Bond or Bonds to be so exchanged and upon the terms and conditions specified in the Indenture; provided that such exchanges may be made only with respect to Series 2010 Bonds of the same maturity and interest rate.

This bond is transferable by the registered holder hereof in person, or by duly authorized attorney, only on the books of the Trustee and only upon surrender of this bond to the Trustee for cancellation, and upon any such transfer a new fully registered bond of like tenor hereof will be issued to the transferee in exchange therefor, all as more particularly provided in the Indenture. Any assignee or transferee of this bond takes it subject to all payments of principal, interest and premium in fact made with respect hereto, whether or not such payments are reflected by endorsement on this bond or any payment record pertaining hereto.

The Trustee shall not be required to transfer or exchange this bond during the period of fifteen (15) days next preceding any interest payment date with respect thereto; and in the event this bond (or any portion of the principal hereof) is duly called for redemption, the Trustee shall not be required to transfer or exchange it during the period of forty-five (45) days next preceding the date fixed for such redemption.

Execution by the Trustee of its authentication certificate hereon is essential to the validity hereof and is conclusive of the due issue hereof under the Indenture.

IN WITNESS WHEREOF, the Authority has caused this bond to be executed by the signature of the Chairman of its Board of Directors, has caused its corporate seal to be hereunto impressed, has caused this bond to be attested by the signature of its Secretary, and has caused this bond to be dated October 1, 2010.

<div align="right">

EDUCATIONAL BUILDING AUTHORITY
OF THE CITY OF MARION


By_____
Chairman of the Board of Directors

</div>

ATTEST:


_____
Secretary


[ S E A L ]

JBH-000088

DOCUMENT 2

TRUSTEE'S AUTHENTICATION CERTIFICATE

DATE OF AUTHENTICATION: _____

The within bond is one of those described in the within-mentioned Trust Indenture.

REGIONS BANK,
Trustee

By_____
Authorized Officer

ASSIGNMENT

For value received _____ hereby sell(s), assign(s) and transfer(s) unto _____ the within bond and hereby irrevocably constitute(s) and appoint(s) _____, attorney, with full power of substitution in the premises, to transfer this bond on the books of the within-mentioned Bank.

Dated this _____ day of _____, ____.

_____

NOTE: The signature on this assignment must correspond with the name of the registered owner as it appears on the face of the within bond in every particular, without alteration, enlargement or change whatsoever.

JBH-000089

DOCUMENT 2

Signature guaranteed:

_____
(Bank, Broker or Firm*)

By_____

Its_____

Medallion Number_____

_____

* Signature(s) must be guaranteed by an eligible guarantor institution which is a member of a recognized signature guarantee program, i.e., Securities Transfer Agents Medallion Program (STAMP), Stock Exchanges Medallion Program (SEMP), or New York Stock Exchange Medallion Signature Program (MSP).

Section 7.7    **Execution and Delivery of the Series 2010 Bonds.**

The Series 2010 Bonds shall be forthwith executed and delivered to the Trustee and shall be authenticated and delivered by the Trustee from time to time upon receipt by the Trustee of an order signed on behalf of the Authority by the Chairman or the Vice Chairman of the Directors, requesting such authentication and delivery and designating the Person or Persons to receive the same or any part thereof.

Section 7.8    **Application of Proceeds from Sale of Series 2010 Bonds.**

The entire proceeds derived by the Authority from the sale of the Series 2010 Bonds shall be delivered to the Trustee and promptly thereafter applied by the Trustee for the following purposes in the following order:

(a)    payment into the Bond Fund of that portion of such proceeds that is allocable to premium (if any) and accrued interest;

(b)    payment of the sum of $8,342,457.55 to the Escrow Trustee for deposit into the Escrow Fund created in the Escrow Trust Agreement;

(c)    payment of the sum of $2,400,188.20 to the College, to be applied to payment of the principal of the Outstanding Notes; and

(d)    payment to The Frazer Lanier Company Incorporated, Montgomery, Alabama of the sum of $56,150.00, to pay expenses of issuance of the Series 2010 Bonds.

29

JBH-000090

Any remaining proceeds of the Series 2010 Bonds shall be applied to payment of the principal of the Outstanding Notes.

## ARTICLE VIII

## ADDITIONAL BONDS

Section 8.1    **Additional Bonds - In General.**

If no Event of Default shall have occurred and be continuing, the Authority may at any time and from time to time, if requested by the College, issue Additional Bonds, within the limitations of and upon compliance with the provisions of this Article VIII, for any one or more of the following purposes:

      (a)    for the purpose of acquiring and/or constructing Capital Improvements or for the purpose of refunding or retiring any indebtedness or securities issued by or on behalf of the College for the acquisition and/or construction of Capital Improvements,

      (b)    for the purpose of refunding or otherwise retiring all or any portion of any one or more series of Bonds then outstanding under the Indenture, and

      (c)    for any combination of the foregoing purposes.

The Additional Bonds may be in such denomination or denominations, shall bear interest at such rate or rates, shall bear such dates not inconsistent with the provisions hereof, shall mature in such amounts and at such times as are not in conflict with the provisions hereof, shall be in such form and may contain such provisions for redemption prior to maturity, all as may be provided in the Supplemental Indenture under which they are issued; provided that all such Additional Bonds shall be subject to redemption at any time, at such redemption price or prices as shall be fixed prior to their issuance, if (i) the College shall exercise the option to terminate the Ground Lease and the Lease granted in Section 11.2 of the Lease or (ii) all or substantially all of the Leased Facilities shall be taken under the exercise of the power of eminent domain. Any redemption of Additional Bonds prior to maturity shall be effected in the manner set forth in and shall be subject to the provisions of Article VI hereof. All Additional Bonds so issued shall contain an appropriate series designation.

Section 8.2    **Conditions Precedent to Issuance of Additional Bonds.**

Prior to the issuance of any Additional Bonds, the Authority shall deliver to the Trustee those of the Additional Bonds proposed to be issued, duly executed and sealed, accompanied by the following:

      (a)    <u>Supplemental Indenture</u>. A Supplemental Indenture duly executed, sealed and acknowledged on behalf of the Authority and containing the following

30

(to the extent applicable in the case of clause (ii) below): (i) a description of such Additional Bonds, including the aggregate principal amount, the numbers and series designation, the denomination or denominations, the date, the interest rate or rates and the maturity or maturities thereof, the provisions for redemption thereof prior to maturity and the forms of such Additional Bonds and the various certificates applicable thereto and (ii) any other provisions that do not conflict with the provisions hereof;

(b)    Supplemental Lease.  A fully executed and acknowledged copy of an agreement between the Authority and the College supplemental to the Lease containing the following [to the extent applicable in the case of clauses (ii) and (iii) below]:  (i) an agreement by the College to pay additional, supplemental or changed Basic Rent in amounts that will result in there being on deposit in the Bond Fund sums at least sufficient to pay, on or prior to the respective due dates thereof, the principal of and the interest and premium (if any) on all Bonds that will be outstanding hereunder immediately following the issuance of such Additional Bonds, (ii) in the event the last maturity of such Additional Bonds is subsequent to the date of expiration of the then current "Lease Term" of the Lease, an extension of such "Lease Term" until or beyond the last maturity of such Additional Bonds, (iii) provisions subjecting to the demise of the Lease all properties acquired and to be acquired in connection with any Capital Improvements financed by such Additional Bonds, and (iv) any other provisions not in conflict with the Indenture or the Lease;

(c)    Proceedings.  A certified copy of the proceedings taken by the Directors authorizing the issuance of such Additional Bonds and the execution and delivery of the Supplemental Indenture providing therefor, which said proceedings shall include a Resolution requesting the Trustee to authenticate and deliver such Additional Bonds and reciting the following:  (i) that no Event of Default has occurred and is continuing and that no event which, with the giving of notice or the passage of time or both, would constitute an Event of Default has occurred and is continuing, (ii) the Person or Persons to whom such Additional Bonds have been sold and awarded and shall be delivered, (iii) the purchase price of such Additional Bonds, and (iv) a list of all Additional Bonds previously issued by the Authority hereunder and at the time outstanding and of the Supplemental Indentures under which they were issued;

(d)    Certificate as to Student Fees.  If any series of Additional Bonds is to be secured by a pledge of the Student Fees on a parity with the pledge thereof for the benefit of any other series of Bonds issued hereunder, including the Series 2010 Bonds, or for the benefit of any other indebtedness or securities issued or incurred by, on behalf of or for the benefit of the College, a certificate signed by the Treasurer of the College certifying that the amount of the Student Fees received by the College in each of the two fiscal years of the College next preceding the fiscal year during which such Additional Bonds are proposed to be

31

DOCUMENT 2

issued was not less than Two Hundred Fifty Percent (250%) of the Maximum Annual Debt Service Requirement during the then current or any succeeding Bond Year immediately following the issuance of such Additional Bonds. For purposes of this paragraph (i) "Maximum Annual Debt Service Requirement" means the maximum amount of principal and interest payable or required to be redeemed during the then current or any succeeding Bond Year with respect to all Bonds and all other securities or indebtedness of the College or for the benefit of the College which are secured by a parity pledge of the Student Fees, excluding any Bonds, securities or indebtedness which are secured by a subordinate or inferior pledge of the Student Fees (provided that for purposes of determining maximum interest payable, any Additional Bonds or other securities or indebtedness which bear interest at a fluctuating rate shall be assumed to bear interest for the remainder of the term thereof at the rate in effect on the date when such determination is made), and (ii) "Bond Year" means the period beginning on October 2 of one calendar year and ending on October 1 of the next calendar year; and

(e)     Opinion of Bond Counsel.  An opinion, dated as of the date of the issuance of such Additional Bonds, of Bond Counsel approving the validity of such Additional Bonds.

Upon receipt of the documents required by the provisions of this section to be furnished to it, the Trustee shall, unless it has cause to believe any of the statements set out in said documents to be incorrect, thereupon execute the Supplemental Indenture so presented and cause the same to be filed for record at the expense of the Authority in the public office or offices in the State of Alabama in which such document is then required by law to be filed in order to constitute constructive notice thereof, and it shall further authenticate the Additional Bonds with respect to which the said documents shall have been provided and shall, upon receipt of evidence satisfactory to it that the Authority has received the purchase price or other consideration therefor, deliver such Additional Bonds to the Person or Persons to whom the Resolution provided for in this section directed that they be delivered.

## ARTICLE IX

## CREATION OF BOND FUND

Section 9.1     **Bond Fund.**

There is hereby created a special trust fund, the name of which shall be the "Judson College Series 2010 Bond Principal and Interest Fund," for the purpose of providing for payment of the principal of and the interest and premium (if any) on the Bonds and which shall be maintained until such principal, interest and premium (if any) have been paid in full. The Trustee shall be and remain the depository, custodian and disbursing agent for the Bond Fund.

32

DOCUMENT 2

So long as any part of the principal of or the interest or premium (if any) on any of the Bonds remains outstanding and unpaid, the Authority will pay into the Bond Fund, the Basic Rent, all other moneys that are required by the provisions of the Lease to be paid therein, and all moneys that are specifically required by the provisions hereof to be paid therein. Out of the moneys on deposit in the Bond Fund, the Trustee shall make provision for payment of the principal of and the interest on the Bonds as said principal and interest respectively become due, as well as for the redemption of any Bonds required by the provisions hereof or of any Supplemental Indenture to be redeemed prior to their respective maturities. Moneys on deposit in the Bond Fund shall be used only for the payment of the principal of and the interest on the Bonds upon or after their respective maturities, for the redemption of Bonds prior to their respective maturities, and for the purchase of Bonds for retirement.

Section 9.2   **Retirement of Bonds Under Certain Conditions.   General Provisions Respecting Bond Fund.**

In the event that at any time the total sum of moneys held in the Bond Fund is sufficient to provide for retirement of all the Bonds (including premium, if any, and the interest that will mature thereon until and on the date or dates they are retired), either by redemption prior to their respective maturities in accordance with the applicable provisions of the Indenture or by payment of a portion thereof at their respective maturities and redemption of the remainder prior to their respective maturities, the Trustee will so notify the Authority in writing, and the Authority and the Trustee will thereupon take such action as may be necessary under the provisions of Article VI hereof to call for redemption, on the earliest practicable redemption date thereafter on which under the terms of the Indenture such redemption may be effected, all the Bonds subject to redemption that will come due after such redemption date. Any redemption of Bonds effected pursuant to the requirements of this section shall be subject to the provisions of, and shall be effected in the manner provided by, Article VI hereof and (to the extent applicable) Section 7.5 hereof.

In the event that at any time the moneys held in the Bond Fund are sufficient so to effect retirement of all the Bonds or in the event that at any time the total of the moneys held in the Bond Fund equals or exceeds the aggregate principal of the Bonds then outstanding plus the aggregate interest thereon then due and to become due until the maturity thereof, then and in either of such events no further payments need thereafter be made into the Bond Fund unless (i) further payments are needed to make good moneys paid therein that may have been lost for any reason whatsoever, or (ii) any of the Bonds thereafter become subject to mandatory redemption under any of the provisions of the Indenture and further payments into the Bond Fund are needed to effect such redemption.

Section 9.3   **Investment of Moneys in Bond Fund.**

The Trustee shall, to the extent practicable, cause all the moneys held in the Bond Fund (exclusive of any amount held therein for payment of matured but unpaid Bonds, Bonds called for redemption but not yet redeemed and matured but unpaid interest) that will not be needed, during the then next ensuing ten (10) days, for payment of any maturing installment of principal of or interest on the Bonds or for payment of the redemption price of any Bond called for

33

JBH-000094

DOCUMENT 1

redemption, to be kept continuously invested in Eligible Investments having such stated maturities as will assure the availability of cash moneys necessary to provide for payment and redemption of the principal of and the interest on the Bonds, as such principal and interest respectively become due and payable (whether at maturity, upon earlier call for redemption or otherwise).

In order to comply with the requirements of the Indenture, the Trustee may, at any time and from time to time, cause any Eligible Investments forming a part of the Bond Fund to be sold or otherwise converted into cash, shall upon written request of an authorized representative of the College cause any such investments to be sold or otherwise converted into cash (but only if such sale or other conversion into cash will not jeopardize the payment, when due, of the principal of and the interest on any of the Bonds or of the redemption price of any Bond required, by the provisions hereof or of any Supplemental Indenture, to be redeemed prior to its maturity), and shall cause any such investments to be sold or otherwise converted into cash if and to the extent that such sale or conversion is necessary to obtain moneys to prevent a default in the payment, when due, of the principal of or the interest on the Bonds or of the redemption price of any Bond required, by the provisions hereof or of any Supplemental Indenture, to be redeemed prior to its maturity. The net proceeds from the sale or other conversion into cash of any Eligible Investments forming a part of the Bond Fund shall be paid into and become a part of the Bond Fund. In making any investment of moneys forming a part of the Bond Fund, the Trustee will follow such written instructions as shall be given to it by an authorized representative of the College, but if and only to the extent that such instructions are not inconsistent with any applicable provisions of the Indenture. The Trustee shall be fully protected in making any such investment, sale or conversion in accordance with the provisions of this section. In any determination of the amount of moneys at any time forming a part of the Bond Fund, all Eligible Investments in which any portion of such fund is at the time so invested shall be included therein at their then market value.

Section 9.4    **Commingling of Moneys in Separate Trust Funds.**

Any provision hereof to the contrary notwithstanding, moneys on deposit in the Bond Fund may be commingled and combined for the purpose of making investments, subject to the following conditions:

(a)    all interest, income or profit realized from any such commingled investment shall be credited, and all losses resulting therefrom shall be charged, to each such fund in the same respective proportions as the amount invested from each such fund bears to the total amount so invested; and

(b)    no moneys forming a part of either such fund shall be invested in any investments other than such as are expressly authorized herein.

34

JBH-000095

## ARTICLE X

## PARTICULAR COVENANTS OF THE AUTHORITY

Section 10.1   **Payment of the Bonds.**

The Authority will pay or will cause to be paid, out of the revenues and receipts derived from the leasing of the Leased Facilities and any other moneys deposited in the Bond Fund, the principal of and the interest and premium (if any) on the Bonds as specified therein, and it will otherwise perform all obligations that, either expressly or by reasonable implication, are imposed on it in the Indenture, and it will not default hereunder.

Section 10.2   **Priority of Pledge.**

The pledge herein made of the revenues and receipts from any leasing of the Leased Facilities shall be prior and superior to any pledge thereof hereafter made for the benefit of any other securities hereafter issued (other than Additional Bonds) or any contract hereafter made by the Authority.  In the event the Authority should hereafter issue any other securities (other than Additional Bonds) payable, in whole or in part, out of the revenues or receipts to be derived from the leasing of the Leased Facilities or for which any part of said revenues or receipts may be pledged or any part of the Leased Facilities  may be mortgaged, or in the event the Authority should hereafter make any contract payable, in whole or in part, out of said revenues and receipts or for which any part of said revenues and receipts may be pledged or any part of the Leased Facilities  may be mortgaged, the Authority will, in the proceedings under which any such securities or contract are hereafter authorized, recognize the priority of the pledge of said revenues and receipts made herein for the benefit of the Bonds.  The Authority recognizes that in the Lease it has agreed

(a)      not to issue any securities, other than the Series 2010 Bonds, that are payable out of or secured by a pledge of the revenues and receipts derived by the Authority from the leasing of the Leased Facilities or any part thereof, and

(b)      not to place any mortgage or other encumbrance on the Leased Facilities or any part thereof,

without, in either case, the prior written request or consent of the College.

Section 10.3   **Concerning the Lease.**

The Indenture and the rights and privileges of the Trustee and the Bondholders are specifically made subject to the rights, options and privileges of the College under the Lease, and nothing herein contained shall be construed to impair the rights, options and privileges granted to the College by the Lease.  The Authority will perform and observe, or cause to be performed and observed, all agreements, covenants, terms and conditions required to be observed and performed by it in the Lease.  Without relieving the Authority from the consequences hereunder of any default in connection therewith, the Trustee (on behalf of the Authority) may perform and

35

JBH-000096

observe, or cause to be performed and observed, any such agreement, covenant, term or condition, all to the end that the Authority's rights under the Lease may be unimpaired and free from default.

The Authority will promptly notify the Trustee in writing of the occurrence of any Lease Default, provided that the Authority has knowledge of such default. The Authority will also promptly notify the Trustee in writing if, to the knowledge of the Authority, the College fails to perform or observe any of the agreements or covenants on its part contained in the Lease. In the event of the occurrence of a Lease Default or any such failure, whether notice thereof is given to the Trustee by the Authority, as aforesaid, or whether the Trustee independently has knowledge thereof, the Trustee will promptly give written notice thereof to the College, with a copy to the Authority, and shall in such notice expressly require the College to perform or observe the agreement or covenant with respect to which the College is delinquent, all to the end that if the College does not perform or observe such agreement or covenant (or cause such agreement or covenant to be performed or observed) in the manner and within the time provided by the Lease, a Lease Default may be declared without delay.

So long as the Lease shall remain in effect the Authority will cause the Basic Rent to be paid directly to the Trustee as provided in the Lease. The Authority will not cancel, terminate or modify, or consent to the cancellation, termination or modification of, the Lease (except as is specifically provided, authorized or contemplated herein) unless and until the entire Indenture Indebtedness shall have been paid in full. In the event of a Lease Default, or in the event of a default on the part of the lessee under any subsequent lease entered into by the Authority with respect to the Leased Facilities or any part thereof, the Authority will exhaust or cause to be exhausted, as promptly as may be practicable, all legal remedies that it may have against the College, to obtain compliance with the provisions of the Lease or of any subsequent lease, including payment of the rentals therein provided and performance and observance of all agreements and covenants on the part of the College or other lessee therein contained.

Section 10.4  **Agreement of Authority to Maintain Corporate Existence and Not to Dispose of the Leased Facilities.**

Except to the extent specifically permitted otherwise by the provisions of the second paragraph of this section, the Authority will maintain its corporate existence, will not dissolve or sell, transfer or otherwise dispose of the Leased Facilities or any part thereof and will not consolidate with or merge into another corporation or permit one or more other corporations to consolidate with or merge into it. Further, the Authority will use its best efforts to maintain, preserve and renew all the rights and powers provided to it by the Act and any other applicable laws of the State of Alabama or the United States of America.

If the laws of the State of Alabama at the time shall permit such action to be taken, nothing contained in this section shall prevent (a) the consolidation of the Authority with, or the merger of the Authority into, any public corporation which has corporate authority to undertake and perform the obligations and agreements of the Authority under the Lease and the Indenture or (b) the transfer by the Authority of the Leased Facilities as an entirety to another public instrumentality which has corporate authority to undertake and perform the obligations and

36

JBH-000097

agreements of the Authority under the Lease and the Indenture; provided that upon any such consolidation, merger or transfer the following conditions shall be satisfied: (i) the due and punctual payment of the principal of and the interest and premium (if any) on the Bonds according to their tenor and the due and punctual performance and observance of all the agreements and conditions contained in the Lease and the Indenture to be kept and performed by the Authority shall be expressly assumed in writing by the corporation resulting from such consolidation or surviving such merger or the instrumentality to which the Leased Facilities shall be transferred as an entirety; (ii) such consolidation, merger or transfer shall not cause or result in any mortgage or other lien being imposed on the Leased Facilities or the revenues therefrom that will be prior to the lien of the Indenture covering the Leased Facilities or prior to the pledge of the revenues from the Leased Facilities made in the Indenture for the benefit of the Bonds; and (iii) such consolidation, merger or transfer shall not cause or result in the Leased Facilities or the revenues of the Authority therefrom becoming subject to any taxation to which the same was not theretofore subject, or in the interest income on any of the Bonds becoming subject to income taxation by the State of Alabama or any political subdivision thereof.

Section 10.5    **Payment of Trustee's Charges; Lien Therefor.**

Subject to the provisions of Section 15.1 hereof, the Authority will discharge, pay or satisfactorily provide to the Trustee, or cause to be discharged, paid or provided, all liabilities, expenses, and advances reasonably incurred, disbursed or made by the Trustee in the execution of the trusts hereby created (including the reasonable compensation and expenses and disbursements of its Counsel and of all other persons not regularly in its employ), and it will from time to time pay to the Trustee, or cause to be paid, reasonable compensation for its services hereunder, including extra compensation for unusual or extraordinary services. As security for the payment of such liabilities, expenses, advances and compensation, the Trustee shall have a first lien on the revenues and receipts from the Lease pledged hereunder and all funds held or collected by the Trustee as such (except funds held in trust for the benefit of the Holders of particular Bonds), with right of payment therefrom prior to the rights of the Holders of the Bonds.

Section 10.6    **Inspection by Trustee.**

Subject to the provisions of Section 8.3 of the Lease, the Authority will permit the Trustee and its duly authorized agents to inspect the Leased Facilities, at any reasonable time and will permit the Trustee and the Holder of any Bond to inspect, at any reasonable time, the books and records of the Authority pertaining to the Leased Facilities. The Authority will assist in furnishing facilities for any such inspection.

JBH-000098

DOCUMENT 2

## ARTICLE XI

## EVENT OF DEFAULT AND REMEDIES
## OF TRUSTEE AND BONDHOLDERS

Section 11.1    **Events of Default Defined.**

Any of the following shall be "Events of Default" under the Indenture, and the term "Event of Default" shall mean, whenever it is used in the Indenture, any one or more of the following conditions or events:

(a)    failure by the Authority to pay the principal of or the interest or premium (if any) on any Bond as and when the same become due as therein and herein provided (whether such shall become due at maturity, upon redemption, by acceleration or otherwise) and the continuation of such failure for a period of ten (10) days after written notice shall be given to the Authority by the Trustee;

(b)    a Lease Default;

(c)    failure by the Authority to perform or observe any agreement, covenant or condition required by the Indenture to be performed or observed by it [other than (i) its agreement to pay the principal of and the interest and premium (if any) on the Bonds, and (ii) any other agreement, covenant or condition with respect to which its failure to perform or observe is the result of a Lease Default] after sixty (60) days' written notice to it of such failure given by the Trustee or by the Holders of not less than twenty-five percent (25%) in principal amount of any series of the Bonds then outstanding hereunder, unless during such period or any extension thereof the Authority has commenced and is diligently pursuing appropriate corrective action; or

(d)    appointment by a court having jurisdiction of a receiver for the Leased Facilities  or for a substantial part thereof, or approval by a court of competent jurisdiction of any petition for rearrangement or readjustment of the obligations of the Authority under any provisions of the bankruptcy laws of the United States of America.

Section 11.2    **Remedies on Default.**

Upon the occurrence and continuation of any Event of Default, the Trustee shall have the following rights and remedies, subject to the provisions of Section 11.5 hereof:

(a)    <u>Acceleration</u>.  The Trustee may, by written notice to the Authority and the College, declare the principal of and the interest accrued on all the Bonds forthwith due and payable, and thereupon they shall so be, anything herein or therein to the contrary notwithstanding; provided however, that the Trustee may not have or exercise the right or remedy granted by this subsection (a) unless the

38

JBH-000099

Event of Default that has occurred and is continuing is one of those specified in subsection (a) or (b) of Section 11.1 hereof.

(b)     Other Remedies.  The Trustee shall have the power to proceed with any other right or remedy independent of or in aid of the foregoing powers, as it may deem best, the right to enforce any obligation of the Authority or the College contained in the Lease or the Indenture.

If, upon the occurrence of an Event of Default, the Authority makes good the default which is the reason for such Event of Default and every other default hereunder (except any principal and interest declared payable that would, absent such declaration, not then be payable), with interest on all overdue payments of principal, interest and premium (if any), and makes reimbursement of all the reasonable expenses of the Trustee, then the Trustee may in its discretion, and shall upon the written request of the Holders of a majority in principal amount of the then outstanding Bonds, waive such default and its consequences, but no such waiver shall affect any subsequent default or right relative thereto.  Further, upon the occurrence of any Event of Default, except a default in the payment of the principal of or the interest or premium (if any) on the Bonds, the Trustee may in its discretion, and shall upon the written request of the Holders of a majority in principal amount of the then outstanding Bonds, waive such default and its consequences without the Authority having theretofore made good such default, but no such waiver shall affect any subsequent default or right relative thereto.  In case any proceeding taken by the Trustee on account of any Event of Default shall have been discontinued or abandoned for any reason, or shall have been determined adversely to the Trustee, then and in every case the Authority, the Trustee and the Holders of the Bonds shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies and powers of the Trustee shall continue as though no such proceeding had been taken.

Section 11.3  **Application of Moneys Received From Enforcement of Rights Under the Indenture.**

Upon the occurrence and continuation of an Event of Default, any moneys derived by the Trustee from the leasing of the Leased Facilities or from the enforcement of the Authority's rights under the Lease or from the exercise of any other right or remedy granted to the Trustee under the Indenture, together with all other funds then held by it hereunder, shall, after payment of all proper costs, expenses and liabilities incurred and disbursements made by the Trustee hereunder, and all liens and charges on the Leased Facilities  prior to the rights of the Trustee which in the opinion of the Trustee it is advisable to pay, be applied as follows:

(a)     Unless the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied:

FIRST - to the payment to the Persons entitled thereto of all installments of interest then due on the Bonds, in the order of the maturity of the installments of such interest, with interest on overdue installments of interest, and, if the amount available shall not be sufficient to pay in full any particular installment plus said

39

JBH-000100

DOCUMENT 3

interest thereon, then to the payment ratably, according to the amounts due on such installments and with respect to said interest, to the Persons entitled thereto, without any discrimination or privilege;

SECOND - to the payment to the Persons entitled thereto of the unpaid principal of and premium (if any) on any of the Bonds which shall have become due (other than Bonds matured or called for redemption for the payment of which moneys are held pursuant to the provisions of this Indenture), in the order of the maturity of such principal and premium, with interest on overdue installments of principal and premium (if any), and, if the amount available shall not be sufficient to pay in full all principal and premium (if any) due on any particular date, together with the aforesaid interest thereon, then to the payment of such principal and premium (if any) due on such date, together with such interest, ratably, without any discrimination or privilege; and

THIRD - the surplus, if any there be, into the Bond Fund, or in the event the Indenture Indebtedness has been fully paid, to the Authority or to whosoever may be entitled thereto.

(b)    If the principal of all the Bonds shall have become or been declared due and payable, all such moneys shall be applied as follows:

FIRST - to the payment of the principal and interest then due and unpaid upon the Bonds (with interest on overdue principal and interest), without preference or priority of principal over interest or of interest over principal, or of any installment of interest over any other installment of interest, or of any Bond over any other Bond, ratably, according to the amounts due respectively for principal and interest, to the Persons entitled thereto without any discrimination or privilege; provided, however, that if the principal of all the Bonds shall have been declared due and payable and if such declaration shall thereafter have been rescinded under the provisions of Section 11.2 hereof, then, subject to the provisions of this subsection (b) in the event that the principal of all the Bonds shall later become or be declared due and payable, such moneys shall be applied in accordance with the provisions of subsection (a) of this section; and

40

JBH-000101

DOCUMENT 3

> SECOND - the surplus, if any there be, into the Bond
> Fund, or in the event the Indenture Indebtedness has been fully
> paid, to the Authority or to whosoever may be entitled thereto.

Whenever moneys are to be applied pursuant to the provisions of this section, such moneys shall be applied at such time or times, and from time to time, as the Trustee shall determine, having due regard to the amount of such moneys available for application and the likelihood of additional moneys becoming available for such application in the future. Whenever the Trustee shall apply such funds, it shall fix the date (which shall be an interest payment date unless it shall deem another date more suitable) upon which such application is to be made, and upon such date interest on the amounts of principal and interest to be paid on such dates shall cease to accrue. The Trustee shall give such notice as it may deem appropriate of the deposit with it of any such moneys and of the fixing of any such date and shall not be required to make payment to the Holder of any Bond until such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

Section 11.4  **Remedies Vested in Trustee.**

All remedies hereunder are vested exclusively in the Trustee for the equal and pro rata benefit of all the Holders of the Bonds, unless the Trustee refuses or neglects to act within a reasonable time after written request so to act addressed to the Trustee by the Holders of twenty-five percent (25%) in principal amount of any series of the outstanding Bonds, accompanied by indemnity satisfactory to the Trustee, in which event the Holder of any of the Bonds may thereupon so act in the name and behalf of the Trustee or may so act in his own name in lieu of action by or in the name and behalf of the Trustee. Except as above provided, no Holder of any of the Bonds shall have the right to enforce any remedy hereunder, and then only for the equal and pro rata benefit of the Holders of all the Bonds.

Notwithstanding any other provision hereof, the right of the Holder of any Bond, which is absolute and unconditional, to payment of the principal of and the interest and premium (if any) on such Bond on or after the due date thereof, but solely from the revenues and receipts from the leasing of the Leased Facilities as therein and herein expressed, or to institute suit for the enforcement of such payment on or after such due date, or the obligation of the Authority, which is also absolute and unconditional, to pay, but solely from said revenues and receipts, the principal of and the interest on the Bonds to the respective Holders thereof at the time and place in said Bonds expressed, shall not be impaired or affected without the consent of such Holder.

Section 11.5  **Rights of the College Upon Occurrence of an Event of Default.**

If an Event of Default should occur solely by reason of some action or failure to act on the part of the Authority, and if at the time there shall have not occurred and be continuing a Lease Default, the Trustee shall notify the College in writing of the occurrence of such Event of Default and the College shall have the right to remedy such Event of Default hereunder within sixty (60) days after such written notice, and the Trustee shall accept performance of such actions by the College as performance by the Authority in such event, provided that the College shall pay all expenses of curing such Event of Default. The exercise of the remedies set forth in

41

DOCUMENT 2

Section 11.2 hereof are subject to the right of the College to cure such Event of Default as provided in this section.

Section 11.6   **Delay No Waiver.**

No delay or omission by the Trustee or by any Bondholder to exercise any available right, power or remedy hereunder shall impair or be construed a waiver thereof or an acquiescence in the circumstances giving rise thereto; every right, power or remedy given herein to the Trustee or to the Bondholders may be exercised from time to time and as often as deemed expedient.

Section 11.7   **Notice to Bondholders Upon Occurrence of Event of Default.**

If an Event of Default occurs that is known to the Trustee, or if any event or condition occurs that is known to the Trustee and that with the giving of notice or the passage of time or both would constitute an Event of Default, and if such Event of Default or such event or condition, as the case may be, continues for a period of at least ninety (90) days after the Trustee first learns thereof, then the Trustee will, at or before the end of such period of ninety (90) days, give written notice thereof by United States regular mail, postage prepaid, to all Holders of Bonds at their respective addresses appearing in the records of the Trustee pertaining to the registration of the Bonds.  Nothing contained in this section shall be deemed to require the Trustee to undertake independent inquiries or investigations which would disclose to it the occurrence of an Event of Default or any event or condition that with the giving of notice or the passage of time or both would constitute an Event of Default, unless the Trustee shall have first received, without effort on its part, information which would warrant the undertaking of such independent inquiries or investigations.

## ARTICLE XII

### CONCERNING THE TRUSTEE

Section 12.1   **Acceptance of Trusts.**

The Trustee accepts the trusts hereby created and agrees to perform the duties herein required of it, either expressly or by reasonable implication, subject, however, to the following conditions:

(a)      It shall not be liable hereunder except for its non-compliance with the provisions hereof, its willful misconduct or its gross negligence.

(b)      It may execute any of the trusts and powers conferred on it hereunder or perform any duty hereunder either directly or through agents and attorneys in fact who are not regularly in its employ and who are selected by it with reasonable care, but it shall be responsible for the observance by such agents and attorneys in fact of the terms and conditions hereof.

42

JBH-000103

(c)    It may consult Counsel on any matters connected herewith and shall not be answerable for any action taken or failure to take any action in good faith on the advice of Counsel, provided that its action or inaction is not contrary to any express provision hereof.

(d)    It need not recognize a Holder of a Bond as such without the satisfactory establishment of title to such Bond.

(e)    It shall not be answerable for any action taken in good faith on any notice, request, consent, certificate or other paper or document which it believes to be genuine and signed or acknowledged by the proper party.

(f)    Except for giving notice to Bondholders in accordance with the provisions of Section 11.7 hereof, it need not take any action with respect to any Event of Default or with respect to any event or condition which with the giving of notice or the passage of time or both would constitute an Event of Default, unless requested so to do by the Holders of twenty-five percent (25%) in aggregate principal amount of any series of the Bonds then outstanding.

(g)    Upon the occurrence of an Event of Default, the Trustee need not exercise any of its rights or powers specified in Section 11.2 hereof or take any action under said Section 11.2 unless requested in writing so to do by the Holders of twenty-five percent (25%) in aggregate principal amount of any series of Bonds then outstanding; it may exercise any such rights or powers or take any such action, if it thinks advisable, without any such request; it shall do so when so requested, provided that the furnishing of indemnity, satisfactory to the Trustee, against its prospective liabilities and expenses by the Bondholders requesting any action by the Trustee under said Section 11.2 shall be a condition precedent to the duty of the Trustee to take or continue any action under said Section 11.2 which in the opinion of the Trustee would involve it in any such liabilities or expenses. Whenever it has a choice of remedies under said Section 11.2 or a discretion as to details in the exercise of its powers thereunder, it must follow any specific directions given by the Holders of a majority in principal amount of the Bonds at the time outstanding, anything therein or herein to the contrary notwithstanding, unless the observance of such directions would, in the opinion of the Trustee, unjustly prejudice the non-assenting Bondholders.

(h)    It shall be entitled to reasonable compensation for its services hereunder, including extra compensation for unusual or extraordinary services.

(i)    Any action taken by the Trustee at the request of and with the consent of the Holder of a Bond will bind all subsequent Holders of the same Bond and any Bond issued hereunder in lieu thereof.

43

JBH-000104

(j)     It may be the Holder of Bonds as if not Trustee hereunder.

(k)     It shall not be liable for the proper application of any moneys other than those that may be paid to or deposited with it.

(l)     It shall not unreasonably withhold or delay any consent or approval required of it under the provisions of the Lease or the Indenture.

(m)     All moneys received by the Trustee to be held by it hereunder shall be held as trust funds until disbursed in the manner herein provided therefor. The Trustee shall not be liable to pay or allow interest thereon or otherwise to invest any such moneys except as specifically required herein.

(n)     It may make any investments permitted hereby through its own Bond Department, and any Eligible Certificates issued or held by it hereunder shall be deemed investments and not deposits.

(o)     It shall, upon reasonable request, advise the Authority or the College of the amount at the time on deposit in any of the special funds herein created.

(p)     It shall, upon reasonable request, issue to the Authority or the College a certificate indicating whether, to the knowledge of the Trustee, the Authority or the College is in default under the provisions of the Lease or the Indenture, and, in the event there is such a default, briefly describing the nature thereof.

(q)     The recitals of fact herein and in the Bonds are statements by the Authority and not by the Trustee, and the Trustee is in no way responsible for the validity or security of the Bonds, the validity or enforceability of the Lease or the Indenture, the existence of any part of the Leased Facilities, the value thereof, the title of the Authority thereto, the security afforded hereby, or the validity or priority of the lien hereof. The Trustee does, however, assume responsibility for its eligibility to accept and administer the trusts created hereby, and it warrants and represents that it is duly authorized to accept and administer such trusts and that the acceptance and administration by it of such trusts do not violate or contravene, and are not void or voidable under, any applicable state or federal law now existing.

Section 12.2    **Acceptance of Duties Under Lease.**

Whenever the Lease imposes any duties or obligations on the Trustee, the Trustee hereby accepts such duties and obligations and agrees to perform such duties and obligations in accordance with the terms of the Lease.

44

JBH-000105

### Section 12.3   Trustee to Maintain Registration Book.

The Trustee will keep on file at its principal corporate trust office a registration book, listing the names and addresses of the Bondholders.  At reasonable times and under reasonable regulations established by the Trustee, said registration book may be inspected and copied by the College, any Bondholder or the duly authorized agents and representatives of any thereof.

### Section 12.4   Trustee May Institute Suit, etc.

The Trustee may, in its own name and at any time, institute or intervene in any suit or proceeding for the enforcement of all rights of action (including the right to file proof of claims in connection with any reorganization, bankruptcy, receivership or like proceeding) under any of the Bonds or under the Lease or the Indenture without the necessity of joining as parties to such suit or proceeding any Holders of the Bonds and without the necessity of possessing any of such Bonds or producing same in any trial or other proceedings related to such rights of action.  The Holders of the Bonds do hereby appoint the Trustee as their irrevocable agent and attorney in fact for the purpose of enforcing all such rights of action, but such appointment shall not include the power to agree to accept new securities of any nature in lieu of the Bonds or to alter or amend the terms of the Lease or the Indenture except as herein provided.

### Section 12.5   Resignation by the Trustee.

The Trustee and any successor Trustee may at any time resign from the trusts created hereunder by giving thirty (30) days' written notice to the Authority, the College and each Bondholder. Such resignation shall take effect at the end of such period of thirty days, or upon the earlier appointment of a successor Trustee by the Bondholders or the Authority.

### Section 12.6   Removal of the Trustee.

The Trustee may be removed at any time by an instrument or concurrent instruments in writing delivered to the Trustee and to the Authority and signed by the Holders of a majority in aggregate principal amount of the Bonds then outstanding.

### Section 12.7   Appointment of Successor Trustee by Bondholders; Temporary Trustee.

In case the Trustee shall resign, be removed, be dissolved, be in course of dissolution or liquidation, or otherwise become incapable of acting hereunder, or in case it shall be taken under the control of any public officer or officers or of a receiver appointed by a court, a successor may be appointed by the Holders of a majority in aggregate principal amount of Bonds then outstanding through an instrument or concurrent instruments in writing signed by such Holders. In case of any such resignation or event which causes the Trustee to be incapable of acting, the Authority by an instrument signed by the Chairman of the Directors and attested by the Secretary of the Authority under its seal, shall appoint a temporary Trustee to serve until a successor Trustee shall be appointed by the Bondholders in the manner provided above.  Whenever necessary to avoid or fill a vacancy in the office of Trustee, the Authority will so appoint a

45

JBH-000106

temporary Trustee in order that there shall at all times be a Trustee hereunder. Any temporary Trustee so appointed by the Authority shall immediately and without further act be superseded by the Trustee appointed by the Bondholders. Every successor Trustee appointed pursuant to this section shall be a trust company or bank authorized to administer trusts and having, at the time of its acceptance of such appointment, capital, surplus and undivided profits of not less than $50,000,000.

### Section 12.8    Concerning any Successor Trustee.

Every successor Trustee shall execute, acknowledge and deliver to its predecessor and also to the Authority an instrument in writing accepting its appointment as Trustee hereunder, and thereupon such successor Trustee, without any further act, deed or conveyance, shall become fully vested with all the estate and title of its predecessor to the Leased Facilities and with all the rights, powers, trusts, duties and obligations of its predecessor. Such predecessor shall, nevertheless, on the written request of the Authority or such successor Trustee, execute and deliver an instrument transferring to such successor Trustee all the estate and title of such predecessor to the Leased Facilities and all rights, powers and trusts of such predecessor hereunder; and every predecessor Trustee shall deliver all securities and moneys held by it as Trustee hereunder to its successor. Should any instrument in writing from the Authority be required by any successor Trustee for more fully and certainly vesting in it the properties, rights, powers and duties hereby vested or intended to be vested in the Trustee, any and all such instruments in writing shall, on request, be executed, acknowledged and delivered by the Authority.

### Section 12.9    Merger or Consolidation of Trustee.

Any corporation into which the Trustee may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Trustee shall be a party, or any corporation succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto. In case any Bonds shall have been authenticated, but not delivered, by the Trustee then in office, any successor by merger or consolidation to such authenticating Trustee may adopt such authentication and deliver the Bonds so authenticated with the same effect as if such successor Trustee had itself authenticated such Bonds.

### Section 12.10   Trustee Required to Accept Directions and Action of College.

Whenever, after a reasonable request by the College, the Authority shall fail, refuse or neglect to give any direction to the Trustee or to require the Trustee to take any action which the Authority is required to have the Trustee take pursuant to the provisions of the Lease or the Indenture, the College as agent of the Authority may give any such direction to the Trustee or require the Trustee to take any such action, and the Trustee is hereby irrevocably empowered and directed to accept such direction from the College as sufficient for all purposes of the Indenture. The College shall have the right as agent of the Authority to cause the Trustee to comply with

46

any of the Trustee's obligations under the Indenture to the same extent that the Authority is empowered so to do.

## ARTICLE XIII

### SUPPLEMENTAL INDENTURES
### AND AMENDMENTS TO THE LEASE

Section 13.1   **Supplemental Indentures without Bondholder Consent.**

Without the consent of or notice to any Bondholders, the Authority and the Trustee may, at any time and from time to time, enter into such Supplemental Indentures (in addition to such Supplemental Indentures as are otherwise provided for herein or contemplated hereby, including, without limitation, Supplemental Indentures pursuant to which Additional Bonds may be issued) as shall not be inconsistent with the terms and provisions hereof, for any one or more of the following purposes:

(a)   to add to the covenants and agreements of the Authority herein contained other covenants and agreements thereafter to be observed and performed by the Authority, provided that such other covenants and agreements shall not either expressly or impliedly limit or restrict any of the obligations of the Authority contained in the Indenture;

(b)   to grant to or confer upon the Bondholders or to the Trustee for the benefit of the Bondholders any right, power or authority that may lawfully be granted to or conferred upon the Bondholders or the Trustee;

(c)   or correct any ambiguity, defect or inconsistent provision contained in the Indenture or in any Supplemental Indenture or to make any provisions with respect to matters arising under the Indenture or any Supplemental Indenture for any other purpose if such provisions are necessary or desirable and are not inconsistent with the provisions of the Indenture or any Supplemental Indenture and do not adversely affect the interests of the Bondholders; or

(d)   to grant or pledge to the Trustee for the benefit of the Bondholders any additional security other than that granted or pledged under the Indenture.

Section 13.2   **Supplemental Indentures Requiring Bondholder Consent.**

In addition to those Supplemental Indentures permitted by Section 14.1 hereof, the Authority and the Trustee may, at any time and from time to time, with the written consent of the Holders of a majority in aggregate principal amount of the Bonds then outstanding, enter into such Supplemental Indentures as shall be deemed necessary or desirable by the Authority and the Trustee for the purpose of modifying, altering, amending, adding to or rescinding, in any

JBH-000108

particular, any of the terms or provisions contained in the Indenture or in any Supplemental Indenture; provided that, without the written consent of the Holder of each Bond affected, no reduction in the principal amount of, the rate of interest on, or the premium payable upon the redemption of, any Bond shall be made; and provided further that, without the written consent of the Holders of all the Bonds then outstanding, none of the following shall be permitted:

      (a)     an extension of the maturity of any installment of principal of or interest on any Bond;

      (b)     a reduction in principal amount or a postponement in the redemption date of any Bonds required to be redeemed prior to the stated maturities thereof pursuant to any mandatory redemption provisions applicable to such Bonds;

      (c)     the creation of a lien or charge on the revenues pledged under the Indenture ranking prior to or (except in connection with the issuance of Additional Bonds) on a parity with the lien and charge thereon contained in the Indenture;

      (d)     the establishment of preferences or priorities as between the Bonds; or

      (e)     a reduction in the aggregate principal amount of Bonds the Holders of which are required to consent to such Supplemental Indenture.

Section 13.3    **Execution of Supplemental Indentures.**

The Authority and the Trustee recognize that under the terms of Section 9.2 of the Lease, they may not make any amendment of the Indenture or any Supplemental Indenture without the prior written consent of the College. Subject to such consent (if required by the terms of said Section 9.2), the Trustee is authorized to join with the Authority in the execution of any Supplemental Indenture authorized under the provisions of this article and to make the further agreements and stipulations which may be contained therein, but the Trustee shall not be obligated to enter into any such Supplemental Indenture which affects its rights, duties or immunities under the Indenture. Upon the execution of any Supplemental Indenture under and pursuant to the provisions of this article, the Indenture shall be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under the Indenture of the Authority, the Trustee and all Holders of the Bonds then outstanding shall thereafter be determined, exercised and enforced hereunder, subject in all respects to such modifications and amendments.

JBH-000109

Section 13.4   **Amendments to the Lease.**  With the prior written consent of the Trustee but without the consent of or notice to any Bondholders, the Authority and the College may

(a)   amend, change or modify the Lease to correct or amplify the description of any property at any time subject to the demise of the Lease or subject to the demise of the Lease additional property, and

(b)   amend, change or modify the Lease to cure or correct any ambiguity, defect or inconsistent provision contained in the Lease or to make provision with respect to matters arising under the Lease for any other purpose if such provisions are necessary or desirable, are not inconsistent with the provisions of the Lease or the Indenture and do not, in the sole and uncontrolled judgment of the Trustee, adversely affect the interests of the Bondholders.

The Authority and the College may, at any time and from time to time, with the written consent of the Trustee and the written consent of the Holders of a majority in principal amount of the Bonds then outstanding, amend, change or modify the Lease to such extent as shall be deemed necessary or desirable by the Authority and the College, provided that without the written consent of the Holders of all the Bonds then outstanding, no such amendment, change or modification shall permit (i) any abatement of, or reduction in the amount of, the Basic Rent prior to payment in full of the principal of and the interest and premium (if any) on the Bonds [other than a reduction resulting from, and directly proportional to, a reduction in the amounts required for payment of the principal of or the interest or premium (if any) on the Bonds], (ii) any change in the due dates of the Basic Rent prior to such full payment of the Bonds, or (iii) any other change that, in the sole and uncontrolled judgment of the Trustee, might adversely affect the interests of the Bondholders.

Section 13.5   **Notices With Respect to Certain Changes in the Indenture or the Lease.**

If at any time the Authority shall request the Trustee to enter into any Supplemental Indenture requiring the written consent of the Holders of any Bonds then outstanding, or to consent to any amendment, change or modification to the Lease requiring the written consent of the Holders of any Bonds then outstanding, the Trustee shall, upon being satisfactorily indemnified with respect to its prospective expenses incident thereto, cause notice of the proposed Supplemental Indenture or the proposed amendment, change or modification to the Lease, as the case may be, to be forwarded by United States registered or certified mail, postage prepaid, to every Bondholder then shown on the registry books of the Trustee.  Such notice shall briefly set forth the nature of the proposed Supplemental Indenture or the proposed amendment, change or modification to the Lease, as the case may be.

If, within sixty (60) days (or such longer period as shall be prescribed by the Trustee) following the date on which the last of the notices to Bondholders were mailed as aforesaid, the Holders of the required amount of the Bonds outstanding at the time of the execution of any such Supplemental Indenture or at the time of the execution of such proposed amendment, change or modification to the Lease, as the case may be, shall have consented to and approved the

49

JBH-000110

execution thereof as herein provided, and if such Supplemental Indenture or proposed amendment, change or modification to the Lease, as the case may be, does not require the written consent of the Holders of all the Bonds then outstanding, and if all other conditions hereof prerequisite to the execution of such Supplemental Indenture or proposed amendment, change or modification to the Lease, as the case may be (including, without limitation, such consent of the College as may then be required by the provisions hereof), shall have been satisfied, then, and in such case, no Holder of any Bond shall have any right to object to any of the terms and provisions contained therein, or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Trustee or the Authority from executing the same or from taking any action pursuant to the provisions thereof.

It shall not be necessary for any written consent of any Bondholder under this article to approve the particular form of any proposed Supplemental Indenture or any proposed amendment, change or modification to the Lease, but it shall be sufficient if such consent shall approve the substance thereof.

Section 13.6   **Discretion of the Trustee.**

In the case of (i) any Supplemental Indenture authorized by Section 13.1 or 13.2 hereof or (ii) any amendment, change or modification to the Lease authorized by Section 13.4 hereof, the Trustee shall be entitled to exercise its discretion in determining whether or not any proposed Supplemental Indenture, or any proposed amendment, change or modification to the Lease, or any term or provision contained in any thereof, is proper or desirable, having in view the purposes of such instrument, the needs of the Authority and the College and the rights and interests of the Bondholders, and the Trustee shall not be under any responsibility or liability to the Authority or to any Bondholder or to anyone whomsoever for any act or thing which it may in good faith do or decline to do under the provisions of this article.  The Trustee shall be entitled to receive, and shall be fully protected in relying upon, an opinion of Counsel as conclusive evidence that any such Supplemental Indenture, or any such amendment, change or modification to the Lease, complies with the provisions of the Indenture and that it is proper for the Trustee acting under the provisions of this article to join in the execution of such Supplemental Indenture or to consent to such amendment, change or modification to the Lease.

## ARTICLE XIV

### PAYMENT AND CANCELLATION OF THE
### BONDS AND SATISFACTION OF THE INDENTURE

Section 14.1   **Satisfaction of Indenture.**

Whenever the Indenture Indebtedness shall have been fully paid and the Authority shall have performed and observed all the covenants and promises expressed in the Bonds and in the Indenture to be performed and observed by it or on its part, the Trustee shall, at the expense of the Authority, cancel, satisfy and discharge the lien of the Indenture and shall execute and deliver to the Authority such instruments as shall be requisite to satisfy the lien hereof.  For

50

JBH-000111

purposes of the Indenture (except as may herein or in the Lease be expressly provided otherwise), any of the Bonds shall be deemed to have been fully paid when there shall have been irrevocably deposited with the Trustee for payment thereof the entire amount (principal, interest and premium, if any) due or to become due thereon until and at maturity, and, further, any Bonds subject to redemption shall also be deemed to have been fully paid when the Authority shall have deposited with the Trustee the following:

      (a)     the applicable redemption price in cash of such Bonds, including the interest that will mature thereon to the earliest date on which they may, under the terms of the Indenture, be redeemed, and

      (b)     a certified copy of a Resolution calling such Bonds for redemption (if, under the terms of Section 6.1 hereof, the adoption of such a Resolution is required).

In addition, any of the Bonds shall, for all purposes of the Indenture (except as may herein be expressly provided otherwise), be considered as fully paid if the Trustee shall be provided with each of the following:

      (1) a trust agreement between the Authority and the Trustee making provision for the retirement of such Bonds by creating for that purpose an irrevocable trust fund sufficient to provide for payment and retirement of such Bonds (including payment of the interest that will mature thereon until and on the dates they are retired, as such interest becomes due and payable), either by redemption prior to their respective maturities, by payment at their respective maturities or by payment of part thereof at their respective maturities and redemption of the remainder prior to their respective maturities, which said trust fund shall consist of (i) Federal Securities which are not subject to redemption prior to their respective maturities at the option of the issuer and which, if the principal thereof and the interest thereon are paid at their respective maturities, will produce funds sufficient so to provide for payment and retirement of all such Bonds, or (ii) both cash and such Federal Securities which together will produce funds sufficient for such purpose, or (iii) cash sufficient for such purpose; provided, however, that said trust agreement shall require all cash held on deposit in such trust fund to be kept continuously secured in the manner provided in Section 9.4 hereof, but with the further condition that only Federal Securities shall qualify as collateral security for such cash so held on deposit;

      (2) a certified copy of a Resolution calling for redemption those of such Bonds that, according to said trust agreement, are to be redeemed prior to their respective maturities (if, under the terms of Section 6.1 hereof, the adoption of such a Resolution is required); and

51

JBH-000112

(3) a certificate of a firm of certified public accountants stating that, if the principal of and the interest on the Federal Securities (if any) forming part of the trust fund provided for in the preceding subparagraph (1) are paid on the respective due dates of such principal and interest, said trust fund will produce funds sufficient to provide for the full payment and retirement of such Bonds.

The Trustee is hereby irrevocably authorized to give notice, in accordance with the requirements of Article VI hereof, of the redemption of any Bonds to be effected in connection with arrangements made pursuant to the provisions of this section.

Section 14.2   **Destruction of Surrendered Bonds.**

Upon the surrender to the Trustee of any mutilated Bonds, Bonds transferred or exchanged for other Bonds, Bonds redeemed or paid at maturity by the Authority or Bonds purchased for retirement, such Bonds shall forthwith be cancelled and destroyed by the Trustee, which upon request shall deliver its certificate confirming such destruction to the Authority and the College.

Section 14.3   **Payment to College of Remaining Trust Fund Moneys.**

At such time as the entire Indenture Indebtedness shall have been fully paid in accordance with the provisions of Section 14.1 hereof, the Trustee shall, if the Lease has not theretofore been terminated as a result of a Lease Default, pay to the College any surplus moneys then remaining in any of the special trust funds created in the Indenture, but not including any amounts held by the Trustee for the payment of the principal of and the interest and premium (if any) on the Bonds.

## ARTICLE XV

## MISCELLANEOUS PROVISIONS

Section 15.1   **Disclaimer of General Liability.**

It is hereby expressly recognized and made a condition of this Indenture that

(a)   the liability of the Authority for the payment of the principal of and the interest and premium (if any) on the Bonds and the performance and observance of all agreements and covenants, warranties and representations of the Authority contained in the Indenture or the Bonds shall be limited to the proper application of the revenues and receipts derived from the leasing of the Leased Facilities,

(b)   the agreements, covenants, warranties or representations contained in the Indenture or in any of the Bonds do not and shall never constitute or give

52

JBH-000113

rise to any pecuniary liability or charge against the general credit of the Authority and the revenues and receipts therefrom, and

(c)    in the event of a breach of any such agreement, covenant, warranty or representation, no pecuniary liability or charge payable directly or indirectly from the general revenues of the Authority shall arise therefrom.

Neither the State of Alabama nor the City or any other political subdivision of said state shall in any manner be liable for the payment of the principal of or the interest or premium (if any) on any of the Bonds or for the performance or observance of any of the agreements, covenants, warranties or representations of the Authority contained in the Indenture or in any of the Bonds. Further, none of the directors, officers, employees or agents (other than the College when acting as agent of the Authority in accordance with the provisions of the Lease and the Indenture) of the Authority shall have any personal liability whatever hereunder or any liability for the breach by the Authority of any of the agreements, covenants, warranties or representations on its part herein contained. Nothing contained in this section, however, shall relieve the Authority from the observance and performance of the several covenants and agreements on its part herein contained or relieve the directors, officers, employees or agents of the Authority from performing all duties of their respective offices that may be necessary to enable the Authority to perform the covenants and agreements on its part herein contained.

It is acknowledged (i) that the Directors serve without compensation, (ii) that the Authority has and in all likelihood will continue to have little specific knowledge about the Leased Facilities and the affairs of the College, (iii) that the Authority will not undertake, unless requested as hereinafter provided, to determine whether the College, the Trustee, or any other party is complying with the terms of the Lease, the Indenture or any other document or instrument relating to the Leased Facilities, and (iv) that certain of the statements and agreements made by the Authority in the Indenture, the Lease and other documents or instruments delivered by the Authority in connection with the issuance of the Series 2010 Bonds have been made in reliance upon information provided and statements and representations made to the Authority by the College and other parties.

The Authority shall not be required to take any action or to exercise any of its powers under the Indenture or the Lease unless it shall have received a written notice or request to do so from the Trustee or other appropriate party stating the desirability or necessity for such action or such exercise of its powers (although it may take any such action or exercise any of such powers without any such request). The Authority shall take such action or exercise such powers within a reasonable period of time after such written notice or request, provided that there shall first be furnished indemnity to the Authority, satisfactory to it, covering its prospective liabilities and expenses (including all anticipated out-of-pocket expenses of the Authority and the fees and disbursements of its Counsel), as well as reasonable compensation for necessary services of the directors, officers, employees and agents of the Authority. Nothing contained in this section shall affect or restrict any right, power or duty of the Trustee to take any action or exercise any right, power or discretion under the Indenture or the Lease in accordance with the respective terms thereof.

JBH-000114

### Section 15.2    Retention of Moneys for Payment of Bonds.

Should any of the Bonds not be presented for payment when due, whether by maturity or otherwise, the Trustee shall, subject to the provisions of any applicable escheat or other similar law, retain from any moneys transferred to it for the purpose of paying said Bonds so due, for the benefit of the Holders thereof, a sum of money sufficient to pay such Bonds when the same are presented by the Holders thereof for payment (upon which sum the Trustee shall not be required to pay interest); provided, however, that the payment of any Bonds shall be subject to the provisions of any Home Office Payment Agreement in effect with respect to such Bonds.  All liability of the Authority to the Holders of such Bonds and all rights of such Holders against the Authority under the Bonds or under the Indenture shall thereupon cease and terminate, and the sole right of such Holders shall thereafter be against such deposit.  If any Bond shall not be presented for payment within a period of five (5) years following the date when such Bond becomes due, whether by maturity or otherwise, the Trustee shall, subject to the provisions of any applicable escheat or other similar law, return to the Authority any moneys theretofore held by it for payment of such Bond, and such Bond shall (subject to the defense of any applicable statute of limitation) thereafter be an unsecured obligation of the Authority.

### Section 15.3    Payment Due on Saturdays, Sundays and Holidays.

In any case where the date of maturity of the principal of or the interest or premium (if any) on the Bonds, or the redemption date of any Bonds, shall be, at the locale of payment, a Saturday, Sunday or legal holiday or a day on which banking institutions are authorized or obligated by law to close, then payment of such principal, interest and premium (if any) need not be made on such date, but may be made on the next succeeding business day not a Saturday, Sunday or a legal holiday or a day upon which banking institutions are authorized or obligated by law to close, with the same force and effect as if made on such date of maturity or such redemption date, and no interest shall accrue for the period after such date of maturity or such redemption date, as the case may be.

### Section 15.4    Form of Requests, etc. by Bondholders.

Any request, direction or other instrument required to be signed or executed by Bondholders may be in any number of concurrent instruments of similar tenor, signed, or executed in person or by agent appointed in writing.  Such signature or execution may be proved by the certificate of a notary public or other officer at the time authorized to take acknowledgments to deeds to be recorded in the State of Alabama, stating that the signer was known to him and acknowledged to him the execution thereof.

### Section 15.5    Limitation of Rights.

Nothing herein or in the Bonds shall confer any right on anyone other than the Authority, the Trustee, the College and the Holders of the Bonds; provided, however, that anything herein or in the Lease to the contrary notwithstanding, the College shall have no rights hereunder at any time during which a Lease Default shall have occurred and be continuing.

<div align="center">54</div>

JBH-000115

Section 15.6   **Manner of Proving Ownership of Bonds.**

The ownership at any given time of a Bond may be proved by a certificate of the Trustee stating that on the date stated the Bond described was registered on its books in the name of the stated party.

Section 15.7   **Indenture Governed by Alabama Law.**

The Indenture shall in all respects be governed by and construed in accordance with the laws of the State of Alabama.

Section 15.8   **Notices.**

All notices, demands, requests and other communications hereunder shall be deemed sufficient and properly given if in writing and delivered in person to the following addresses or received by certified or registered mail, postage prepaid with return receipt requested, at such addresses:

(a)   If to the Authority:

Educational Building Authority
    of the City of Marion
Post Office Box 955
Marion, Alabama  36756
    Attention:  Chairman of the Board of Directors

(b)   If to the College:

Judson College
302 Bibb Street
Marion, Alabama 36756
    Attention:  President

(c)   If to the Trustee:

Regions Bank
1901 Sixth Avenue North, 28th Floor
Birmingham, Alabama 35203
    Attention:  Trust Department

Any of the above-mentioned parties may, by like notice, designate any further or different addresses to which subsequent notices shall be sent.  The Trustee and the Authority will send a copy of each notice that either thereof gives to the other pursuant to the provisions hereof to the College; provided, however, that the failure of either the Authority or the Trustee to send a copy of any such notice to the College shall not invalidate such notice or render it ineffective unless

55

JBH-000116

DOCUMENT 1

notice to the College is otherwise expressly required herein.  Any notice hereunder signed on behalf of the notifying party by a duly authorized attorney at law shall be valid and effective to the same extent as if signed on behalf of such party by a duly authorized officer or employee.

Section 15.9   **Severability.**

In the event that any provision hereof shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

Section 15.10  **Article and Section Captions.**

The article and section headings and captions contained herein are included for convenience only and shall not be considered a part hereof or affect in any manner the construction or interpretation hereof.

56

JBH-000117

DOCUMENT 3

IN WITNESS WHEREOF, the Authority has caused this Indenture to be executed in its corporate name and behalf by the Chairman of the Directors, has caused its corporate seal to be hereunto affixed and has caused this Indenture to be attested by its Secretary, and the Trustee, to evidence its acceptance of the trusts hereby created, has caused this Indenture to be executed in its name and behalf, has caused its seal to be hereunto affixed and has caused this Indenture to be attested, by its duly authorized officers, all in six (6) counterparts, each of which shall be deemed an original, and the Authority and the Trustee have caused this Indenture to be dated as of October 1, 2010, although executed by the Authority on October 27, 2010, and by the Trustee on October 28, 2010, and delivered by said parties on October 28, 2010.

EDUCATIONAL BUILDING
AUTHORITY OF THE CITY OF MARION

By _____
Chairman of its Board of Directors

ATTEST:

_____
Its Secretary

[S E A L]

REGIONS BANK

By _____

Its _____VICE PRESIDENT_____

ATTEST:

_____
Its_____CORPORATE TRUST OFFICER_____

[S E A L]

57

JBH-000118

STATE OF ALABAMA      )
                      :
PERRY COUNTY          )

I, the undersigned authority, a Notary Public in and for said county in said state, hereby certify that ROY A. BARNETT, JR., whose name as Chairman of the Board of Directors of EDUCATIONAL BUILDING AUTHORITY OF THE CITY OF MARION, a public corporation and instrumentality under the laws of the State of Alabama, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the said instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said public corporation.

GIVEN under my hand and official seal of office, this 27th day of October, 2010.

[ NOTARIAL SEAL ]                   _Mary Ellen Clements_
                                        Notary Public

My Commission Expires:  3 / 16 / 2014


STATE OF ALABAMA      )
                      :
JEFFERSON COUNTY      )

I, the undersigned authority, a Notary Public in and for said county in said state, hereby certify that   T. FRANKLIN CALEY   , whose name as   VICE PRESIDENT   of REGIONS BANK, an Alabama banking corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the said instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said banking corporation.

GIVEN under my hand and official seal of office, this 28th day of October, 2010.

[ NOTARIAL SEAL ]                   _Deborah J. Muth_
                                        Notary Public

My Commission Expires:  5/16/2012

3857692_4

58

JBH-000119

DOCUMENT 2

**EXHIBIT A**
**to**
**TRUST INDENTURE**
**between**
**EDUCATIONAL BUILDING**
**AUTHORITY OF THE CITY OF MARION**
**and**
**REGIONS BANK**
**Dated as of October 1, 2010**

The following parcels of land, which are located on that part of the campus of Judson College, in the City of Marion, Perry County, Alabama:

<u>The Jewett Hall Site</u>

Commence at the intersection of the East right-of-way margin of Bibb Street and the South right-of-way margin of East LaFayette Street; thence run South along the said East right-of-way margin of Bibb Street for 144 feet to the point of beginning of the parcel of land herein described; thence continue South along said East right-of-way margin of Bibb Street for 376.5 feet, more or less, to a point on the North margin of an unnamed street running from Bibb Street to an extension of Convenient Street (said described street runs between Jewett Hall and the parcel of land upon which is situated Alumnae Auditorium and Marian Acree Tucker Hall on the Judson College campus); thence run East along the North margin of the unnamed street described herein for 468 feet, more or less, to the intersection of the North margin of said unnamed street and the West margin of the extension of Convenient Street; thence run North along the West margin of the extension of Convenient Street for 376.5 feet, more or less, to a point which is the NE corner of the parcel of land herein described; thence run West parallel with East LaFayette Street for 448 feet, more or less, to the point of beginning and ending of the parcel of land herein described.

Being bounded on the North by the parcel of land upon which is located A. Howard Bean Hall, and the former King lot, on the East by the extension of Convenient Street, on the South by an unnamed street, and on the West by Bibb Street.

Being the same property conveyed by John Lockhart and Emily R. Lockhart, and Larkin Y. Tarrant and E. Tarrant to the Trustees of The Judson Female Institute by deed dated May 22, 1843 (a similar deed, dated October 12, 1839, having been lost or mislaid), and recorded in the Probate Office of Perry County, Alabama, in Book F, Page 609, plus the 132' x 227' lot conveyed by T. H. Lockett to the Trustees of the Baptist State Convention, by deed dated May 20, 1844, and recorded in the Probate Office of Perry County, Alabama, in Book G, Page 151, plus the 96.5' x 448' x 96.5' x 468' lot conveyed by Leita S. Hatchett and J. B. Hatchett, her husband, to The Judson Female Institute by deed dated October 2, 1901, and recorded in the Probate Office of Perry County, Alabama, in Book 113, Page 380.

A-1

JBH-000120

<u>The Science Center Site</u>

Commence at the intersection of the south margin of East LaFayette Street and the east margin of the extension of Convenient Street (which runs northerly from the north margin of East DeKalb Street to the south margin of East LaFayette Street); thence run south, along the east margin of said extension of Convenient Street for 187 feet, more or less, to a point, which is the northwest corner of and the point of beginning of the property herein described (hereinafter, the Lowder property); thence run East for 298 feet, more or less, to the Northeast corner of the said Lowder property; thence run South along the east line of the Lowder property for 173 feet, more or less, to the Southeast corner of said Lowder property; thence run West along the south line of the Lowder property for 298 feet, more or less, to a point on the east margin of the extension of Convenient Street, and the Southwest corner of the Lowder property; thence run North along the east margin of said extension of Convenient Street for 173 feet, more or less, to the point of beginning and ending of the land herein described.

Being bounded on the North by a portion of the Women's Missionary Union (WMU) dormitory parking lot, lying just south of East LaFayette Street, on the East by parking area to the north of Riddle Gymnasium, which lies just West of Williams Circle, on the south by the hockey field, and on the West by the extension of Convenient Street.

Being part of the property conveyed by Ann C. Smith to the Trustees of Judson Female Institute, by deed dated December 26, 1846, and recorded in the Probate Office of Perry County, Alabama, in Deed Book H, Page 204; also, being part of the property conveyed by John D. Edwards, an unmarried man, to Judson College, by deed dated November 4, 1920, and recorded in the Probate Office of Perry County, Alabama, in Deed Book 240, Page 55; also, being part of the property conveyed by Mary A. Modawell and husband, William B. Modawell, to the Trustees of the Judson Female Institute, by deed dated October 14, 1880, and recorded in the Probate Office of Perry County, Alabama, in Deed Book SS, Page 512.

<u>The Women's Missionary Union Residence Hall Site</u>

Commence at the intersection of the south margin of East Lafayette Street and the east margin of Bibb Street, in said city of Marion; thence run East along the south margin of East Lafayette Street for 230 feet, more or less, to the point of beginning on the northwest corner of the property herein described; thence run East along the south margin of East Lafayette Street for 235 feet, more or less, to the west margin of the extension of Convenient Street; thence run South along the west margin of the extension of Convenient Street for 192 feet, more or less; thence run West along the north line of the Lockhart/Tarrant lot conveyed to Judson College in 1839 for 221 feet , more or less; thence run North along the east line of the parcel formerly owned by Eliza A. West (now owned by Judson College) to the point of beginning.

Being bounded on the North by East Lafayette Street, on the East by the extension of Convenient Street, on the South by other property owned by Judson College upon which is located Jewett Hall, and on the West by the parcel of land on which is located A. Howard Bean Hall, and being

JBH-000121

DOCUMENT 3

the same property conveyed by William A. King to Judson College by deed dated September 1, 1915.

A-3

JBH-000122

DOCUMENT 3

# EXHIBIT C

JBH-000123

## OFFICIAL STATEMENT

**Rating:**
**S&P: BBB-**
**(Stable Outlook)**

NEW ISSUE – BOOK-ENTRY ONLY

*In the opinion of Bond Counsel, under existing laws, regulations, rulings and court decisions, interest on the Series 2010 Bonds will not be includable in the gross income of the holders thereof for purposes of federal income taxation, except as discussed herein under the caption "TAX EXEMPTION." Further, in the opinion of Bond Counsel, interest on the Series 2010 Bonds will be exempt, under existing statutes, from Alabama income taxation. Prospective purchasers of the Series 2010 Bonds are referred to the discussion herein under the caption "TAX EXEMPTION" regarding possible impact of receipt of interest on the Series 2010 Bonds on the taxation of other income of a holder of the Series 2010 Bonds.*

<div align="center">

**$11,230,000**
**EDUCATIONAL BUILDING AUTHORITY**
**OF THE CITY OF MARION**
**REVENUE BONDS**
**JUDSON COLLEGE**
**Series 2010**

</div>

The Series 2010 Bonds will be limited obligations of the Authority payable solely from the rental payments received by the Authority from the leasing of certain facilities under a Lease Agreement with

<div align="center">

**JUDSON COLLEGE**
**An entity of The Alabama Baptist State Convention**

</div>

Dated: October 1, 2010                                                   Due: October 1, as shown below

| Year of Maturity | Principal Amount | Interest Rate | Yield | Year of Maturity | Principal Amount | Interest Rate | Yield |
|---|---|---|---|---|---|---|---|
| 2011 | $ 195,000 | 2.00% | 2.30% | 2018 | $ 235,000 | 3.75% | 3.94% |
| 2012 | 200,000 | 2.25 | 2.48 | 2019 | 245,000 | 4.00 | 4.17 |
| 2013 | 200,000 | 2.50 | 2.67 | 2020 | 255,000 | 4.20 | 4.36 |
| 2014 | 205,000 | 2.70 | 2.91 | 2025 | 320,000 | 4.75 | 4.96 |
| 2015 | 215,000 | 3.00 | 3.16 | 2028 | 375,000 | 5.00 | 5.20 |
| 2016 | 220,000 | 3.25 | 3.44 | 2029 | 395,000 | 5.10 | 5.30 |
| 2017 | 230,000 | 3.50 | 3.70 | 2030 | 415,000 | 5.25 | 5.36 |

<div align="center">

$550,000 4.50% Term Bonds due October 1, 2022, Yield: 4.69%
$605,000 4.75% Term Bonds due October 1, 2024, Yield: 4.88%
$695,000 5.00% Term Bonds due October 1, 2027, Yield: 5.12%
$2,445,000 5.50% Term Bonds due October 1, 2035, Yield: 5.69%
$3,230,000 5.50% Term Bonds due October 1, 2040, Yield: 5.77%

(accrued interest from October 1, 2010, to be added)

</div>

Issuable in the denomination of $5,000 or any integral multiple thereof. Semiannual interest, payable on each April 1 and each October 1 commencing on April 1, 2011, will be paid by check or draft mailed to the then registered holder by Regions Bank, Birmingham, Alabama, as Trustee. The principal of the Series 2010 Bonds will be payable upon surrender of the Series 2010 Bonds to the Trustee. The Series 2010 Bonds will be subject to redemption prior to maturity at the times, in the manner and on the terms specified herein.

The Series 2010 Bonds are offered when, as and if issued by the Authority and received by the Underwriter, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of legality of the Series 2010 Bonds by Haskell Slaughter Young & Rediker, LLC, Birmingham, Alabama, Bond Counsel. Certain legal matters will be passed upon for Judson College by Joseph W. Mathews, Jr., Esq., General Counsel, Judson College, Marion, Alabama, and for the Authority by James M. Barnes, Esq., Attorney at Law of Marion, Alabama. It is expected that the Series 2010 Bonds in definitive form will be available for delivery in Birmingham, Alabama on or about October 28, 2010.

<div align="center">

**THE FRAZER LANIER COMPANY**
**INCORPORATED**

</div>

October 20, 2010

JBH-000124

## EDUCATIONAL BUILDING AUTHORITY
## OF THE CITY OF MARION

Roy A. Barnett, Jr., Chairman
William Sanders, Vice Chairman
Sam Stevenson, Secretary-Treasurer

## JUDSON COLLEGE

### President

David E. Potts

### Vice President-Business Affairs

Dennis W. Frodsham

### Vice President-General Counsel

Joseph W. Mathews, Jr.

### Vice President and Academic Dean

Sara B. Kiser

### Vice President-Admissions and Financial Aid

Charlotte S. Clements

### Vice President and Dean of Students

Sandra S. Fowler

### Secretary

Daphne R. Robinson

### Bond Counsel

Haskell Slaughter Young & Rediker, LLC
Birmingham, Alabama

### Counsel to the Authority

James M. Barnes, Esq.
Marion, Alabama

JBH-000125

DOCUMENT 2

No dealer, broker, salesman or any other person has been authorized by Judson College or the Underwriter to give any information or to make any representations other than those contained in this Official Statement, and, if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Series 2010 Bonds by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information set forth herein has been obtained from sources which are believed to be reliable, but such information is not guaranteed as to accuracy or completeness, and is not to be construed as a representation by the Underwriter. The information and expressions of opinion herein are subject to change without notice and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of Judson College since the date hereof.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITER MAY OVERALLOT OR EFFECT TRANSACTIONS THAT STABILIZE OR MAINTAIN THE MARKET PRICE OF THE SERIES 2010 BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET.  SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1
THE SERIES 2010 BONDS ................................................................................................2
BOOK-ENTRY ONLY SYSTEM .......................................................................................6
THE STUDENT FEES........................................................................................................8
THE GENERAL ENDOWMENT ......................................................................................8
PURPOSE OF THE SERIES 2010 BONDS .....................................................................9
APPLICATION OF SERIES 2010 BOND PROCEEDS ..................................................9
OUTSTANDING AND PROPOSED INDEBTEDNESS.................................................10
DEBT SERVICE AND COVERAGE...............................................................................11
THE AUTHORITY ...........................................................................................................12
THE COLLEGE ................................................................................................................12
SUMMARY OF THE LEASE AGREEMENT ................................................................21
SUMMARY OF THE INDENTURE................................................................................23
LEGALITY OF THE SERIES 2010 BONDS FOR INVESTMENT ..............................27
RATING.............................................................................................................................27
TAX EXEMPTION ...........................................................................................................27
BANK QUALIFICATION ................................................................................................28
LEGAL MATTERS ..........................................................................................................28
LITIGATION ....................................................................................................................29
UNDERWRITING ............................................................................................................29
CONTINUING DISCLOSURE.........................................................................................29
MISCELLANEOUS ..........................................................................................................30

Appendix A:   Audited Financial Statements for the Fiscal Year Ended June 30, 2010
Appendix B:   Form of Opinion of Bond Counsel

JBH-000126

DOCUMENT 3

*[THIS PAGE INTENTIONALLY LEFT BLANK]*

JBH-000127

DOCUMENT 2

# OFFICIAL STATEMENT

**$11,230,000**
**EDUCATIONAL BUILDING AUTHORITY**
**OF THE CITY OF MARION**
**REVENUE BONDS**
**JUDSON COLLEGE**
**Series 2010**
**Dated October 1, 2010**

## INTRODUCTION

This Official Statement and appendices thereto set forth certain information in connection with the issuance by the Educational Building Authority of the City of Marion (the "Authority") of $11,230,000 in principal amount of its Revenue Bonds, Judson College Series 2010 to be dated October 1, 2010 (the "Series 2010 Bonds"). The Authority is a public corporation and instrumentality of the State of Alabama existing under the provisions of Chapter 17, Title 16, Code of Alabama 1975, as amended. The Series 2010 Bonds will be issued under the provisions of a Trust Indenture dated as of October 1, 2010 (the " Indenture"), between the Authority and Regions Bank, Birmingham, Alabama, as trustee (the "Trustee").

The Series 2010 Bonds are being issued by the Authority for the purpose of (i) refunding and retiring the Tuition Revenue Bonds, Judson College, Series 2000, dated December 1, 2000 (the "Series 2000 Bonds") of the Authority, originally issued and now outstanding in the aggregate principal amount of $2,500,000, as well as the Variable Rate Tuition Revenue Bonds (Judson College), Series 2003 dated March 28, 2003 (the "Series 2003 Bonds") of the Authority, originally issued in the aggregate principal amount of $6,715,000 and now outstanding in the aggregate principal amount of $5,725,000, (ii) refunding and retiring outstanding loans to the College from various banks (the "Outstanding Loans") in the aggregate principal amount of $2,400,000, which were made in order to finance certain capital improvements on the campus of Judson College (the "College") in Marion, Alabama, and (iii) paying the expenses of issuance of the Series 2010 Bonds. Simultaneously with the issuance of the Series 2010 Bonds, the Authority will enter into a Lease Agreement dated as of October 1, 2010 (the "Lease") with the College, pursuant to which the Authority will lease Jewett Hall, the Science Center and the Women's Missionary Union Residence Hall located on its campus to the College for rental payments in such amounts as will be sufficient to pay the principal of and the interest on the Series 2010 Bonds when due. In order to provide a basis for the Lease, the College will lease the land on which Jewett Hall, the Science Center and the Women's Missionary Union Residence Hall (together the "Leased Facilities") are located to the Authority under a Ground Lease Agreement to be dated as of October 1, 2010.

The Series 2010 Bonds will be limited obligations of the Authority payable solely from the rental payable by the College under the Lease. Payment of the Series 2010 Bonds will be secured by a pledge and assignment to the Trustee of the Lease under the Indenture. The Series 2010 Bonds will not be secured by a foreclosable lien on or security interest in any part of the Leased Facilities or any other real or personal property owned by the Authority or the College.

Payment of the Series 2010 Bonds will be secured by a pledge by the College in the Lease of the tuition and other fees (the "Student Fees") payable by or on behalf of students enrolled at the College, as more fully described herein. See "THE STUDENT FEES" herein. The obligation of the College to pay the said rental under the Lease is an unconditional obligation of the College, and is payable from other funds of the

1

JBH-000128

DOCUMENT 3

College in the event that the Student Fees are not sufficient for that purpose. However, the Series 2010 Bonds will not be secured by a direct pledge of any other funds of the College, although in the Lease the College has agreed to maintain the market value of all cash, bank deposits, stocks, bonds, evidences of indebtedness, income producing property and other capital assets in the General Endowment (as hereinafter defined) that are directly owned by the College or of which the College is the beneficiary at certain levels as hereinafter described.

The Series 2010 Bonds will not be general obligations of the Authority in any way. The Series 2010 Bonds will not in any way constitute a debt or liability of the State of Alabama, the City of Marion or any other political subdivision of said state, nor will they constitute a debt or liability of The Alabama Baptist State Convention, of which the College is an entity, which is not liable in any way for their payment. None of the Series 2010 Bonds will be payable from any funds other than those pledged for the payment thereof by the Authority under the Indenture and will not be secured by a pledge of any funds other than such funds so pledged under the Indenture and a pledge of the Student Fees. However, as stated above, in the Lease the College will make certain agreements respecting its General Endowment, including an agreement to maintain the market value of its General Endowment in an amount exceeding the unpaid principal balance of the Series 2010 Bonds.

## THE SERIES 2010 BONDS

### General

The Series 2010 Bonds will be issued as fully registered bonds in the denomination of $5,000 or any multiple thereof under the provisions of the Indenture and will become payable and will bear interest as shown on the cover page hereof.

### Security and Source of Payment

The principal of and the interest on the Series 2010 Bonds will be payable solely from the moneys to be paid to the Authority by the College under the Lease. The primary source of such payment under the Lease will be the Student Fees. However, in the Lease the College has agreed to maintain the market value of its General Endowment at not less than One Hundred Twenty-Five Percent (125%) of the principal amount of the Series 2010 Bonds that shall be outstanding from time to time. Further, in the Lease the College will agree that in the event that the Student Fees shall be insufficient to make any payment of principal or interest that shall come due with respect to the Series 2010 Bonds, then the College shall make any such payment from its General Endowment or from any other funds of the College that will be available for that purpose.

### Payment of Principal of and Interest on
### the Series 2010 Bonds

The principal of the Series 2010 Bonds is payable as provided in the Book-Entry System that is hereinafter described. Interest on the Series 2010 Bonds (computed on the basis of a 360-day year of twelve consecutive 30-day months) is payable semiannually each April 1 and October 1, commencing April 1, 2011. Interest on the Series 2010 Bonds is payable in lawful money of the United States also as provided in the said Book-Entry System.

2

JBH-000129

**Redemption Provisions Pertaining to the
Series 2010 Bonds**

The Series 2010 Bonds will be subject to redemption prior to their respective stated maturities as follows:

*Optional Redemption.* Those of the Series 2010 Bonds having stated maturities in 2022 and thereafter will be subject to redemption, at the option of the Authority (which option shall be exercisable only upon request by the College), as a whole or in part (but if in part only in installments of $5,000 or any integral multiple thereof with the maturities to be redeemed to be designated by the Authority with the consent of the College, and if less than all the Series 2010 Bonds of a single maturity are to be redeemed, those to be called for redemption shall be selected by lot) on October 1, 2020, and on any date thereafter, such redemption, whether in whole or in part, to be at and for a redemption price equal to the par or face amount of each Series 2010 Bond redeemed plus accrued interest to the date of redemption, without premium or penalty of any kind.

*Mandatory Redemption.* Those of the Series 2010 Bonds having a stated maturity on October 1, 2022 (the "2022 Term Bonds") will be subject to scheduled mandatory redemption prior to their stated maturity, at and for a redemption price equal to the principal amount thereof to be redeemed plus interest accrued to the redemption date, on October 1, 2021, in the aggregate principal amount of $270,000. As a result of such mandatory redemption, $280,000 in principal amount of 2022 Term Bonds will remain to be paid on October 1, 2022, their stated maturity date.

Those of the Series 2010 Bonds having a stated maturity on October 1, 2024 (the "2024 Term Bonds") will be subject to scheduled mandatory redemption prior to their stated maturity, at and for a redemption price equal to the principal amount thereof to be redeemed plus interest accrued to the redemption date, on October 1, 2023, in the aggregate principal amount of $295,000. As a result of such mandatory redemption, $310,000 in principal amount of 2024 Term Bonds will remain to be paid on October 1, 2024, their stated maturity date.

Those of the Series 2010 Bonds having a stated maturity on October 1, 2027 (the "2027 Term Bonds") will be subject to scheduled mandatory redemption prior to their stated maturity, at and for a redemption price equal to the principal amount thereof to be redeemed plus interest accrued to the redemption date, on October 1, 2026, in the aggregate principal amount of $340,000. As a result of such mandatory redemption, $355,000 in principal amount of 2027 Term Bonds will remain to be paid on October 1, 2027, their stated maturity date.

Those of the Series 2010 Bonds having a stated maturity on October 1, 2035 (the "2035 Term Bonds") will be subject to scheduled mandatory redemption prior to their stated maturity, at and for a redemption price equal to the principal amount thereof to be redeemed plus interest accrued to the redemption date, on October 1 in the following respective years and principal amounts:

| Year of Redemption | Principal Amount |
|---|---|
| October 1, 2031 | $ 435,000 |
| October 1, 2032 | 460,000 |
| October 1, 2033 | 490,000 |
| October 1, 2034 | 515,000 |

As a result of such mandatory redemption, $545,000 in principal amount of 2035 Term Bonds will remain to be paid on October 1, 2035, their stated maturity date.

3

JBH-000130

DOCUMENT 2

Those of the Series 2010 Bonds having a stated maturity on October 1, 2040 (the "2040 Term Bonds") will be subject to scheduled mandatory redemption prior to their stated maturity, at and for a redemption price equal to the principal amount thereof to be redeemed plus interest accrued to the redemption date, on October 1 in the following respective years and principal amounts:

| Year of Redemption | Principal Amount |
|---|---|
| October 1, 2036 | $ 575,000 |
| October 1, 2037 | 610,000 |
| October 1, 2038 | 645,000 |
| October 1, 2039 | 680,000 |

As a result of such mandatory redemption, $720,000 in principal amount of 2040 Term Bonds will remain to be paid on October 1, 2040, their stated maturity date.

*Extraordinary Redemption.* The Series 2010 Bonds will be subject to mandatory redemption prior to their respective stated maturities as a whole on any date, at and for a redemption price equal to the principal amount thereof plus accrued interest thereon to the redemption date, (i) in the event that all or substantially all the Leased Facilities is taken through the exercise of the power of eminent domain or (ii) in the event that the College exercises an option to purchase the Leased Facilities and to terminate the Lease, which option shall be exercisable by the College upon the occurrence of any of the following events:

(a)     any part of the Leased Facilities is damaged or destroyed, by fire or other casualty, to such extent that, in the opinion of the College in good faith, (a) the normal instructional programs of the College at the Leased Facilities are substantially impaired and (b) the restoration or repair of the property damaged or destroyed to the condition thereof immediately preceding such damage or destruction would not be economically practicable or desirable or such restoration or repair cannot be accomplished within a period of 4 months or the College is thereby prevented from carrying on its normal instructional programs in any part of the Leased Facilities for a period of not less than 4 months;

(b)     under the exercise of the power of eminent domain by any governmental authority or person, firm or corporation acting under governmental authority, (i) title to all or substantially all the Leased Facilities is taken, or (ii) the temporary use of all or part of the Leased Facilities, or title to part of the Leased Facilities, is taken to such extent that, in the opinion of the College in good faith, (a) the normal instructional programs of the College are substantially impaired and (b) the College will thereby be prevented, or is likely to be thereby prevented, from making normal use of any part of the Leased Facilities for a period of not less than 4 months;

(c)     as a result of (i) any changes in the Constitution of the State of Alabama or the Constitution of the United States of America, (ii) any legislative or administrative action (whether local, state or federal) or (iii) any final decree, judgment or order of any court or administrative body (whether local, state or federal) entered after the contest thereof by the College in good faith, the Lease becomes void or unenforceable or impossible of performance in accordance with the intent and purposes of the parties as expressed therein, or unreasonable burdens or excessive liabilities are imposed on the Authority or the College; or

4

JBH-000131

DOCUMENT 3

(d)      the use and occupancy of the Leased Facilities by the College is legally curtailed for any reason other than the circumstances described in the preceding clauses (a), (b) and (c).

## Notice of Redemption of the Series 2010 Bonds

Notice of the redemption of any of the Series 2010 Bonds is required to be mailed by United States registered or certified mail to the registered holder of each Series 2010 Bond (or portion thereof) to be redeemed not more than sixty (60) nor less than thirty (30) days prior to the date fixed for redemption. No further interest will accrue after the date fixed for redemption on the principal of any Series 2010 Bond called for redemption upon notice duly given as provided in the Indenture and if payment therefor has been duly provided; and in such event, any Series 2010 Bond (or portion thereof) called for redemption will no longer be protected by the provisions of the Indenture.

## Registration, Transfer and Exchange

The Series 2010 Bonds will be issued in book-entry only form, as described below under "Book-Entry System", and the method for registration and exchange of the Series 2010 Bonds will be as provided in the book-entry only system. The provisions set forth in this section below will apply in the event that the use of the book-entry only system for the Series 2010 Bonds is discontinued.

The Series 2010 Bonds are transferable only on the bond register maintained at the designated office of the Trustee. Upon surrender of a Series 2010 Bond to be transferred, properly endorsed, a new Series 2010 Bond will be issued to the designated transferee.

The Series 2010 Bonds will be issued in denominations of $5,000 or any integral multiple thereof and, subject to the provisions of the Indenture, may be exchanged for a like aggregate principal amount of Series 2010 Bonds, of any authorized denominations and of the same maturity, as requested by the holder surrendering the same.

No service charge shall be made for any transfer or exchange, but the Authority may require payment by the holder of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

## Additional Bonds

The Indenture permits the Authority to issue thereunder additional bonds ("Additional Bonds") on a parity with the Series 2010 Bonds as respects the pledge of the Student Fees payable by the College under the Lease. Additional Bonds may be issued for the purpose of (i) obtaining funds to pay the costs of constructing additional capital improvements to the facilities of the College or to refund or otherwise retire any indebtedness incurred for such improvements, (ii) refunding or otherwise retiring all or any portion of any one or more series of bonds then outstanding under the Indenture, or (iii) any combination of the preceding purposes. Among the conditions precedent to the issuance of Additional Bonds will be (a) a supplemental lease between the Authority and the College obligating the College to pay such additional rent as will be sufficient to provide for the payment of the principal of and the interest on such Additional Bonds, and (b) a supplemental indenture between the Authority and the Trustee providing for and describing such Additional Bonds. The Series 2010 Bonds and all Additional Bonds outstanding under the Indenture are herein referred to together as the "Bonds."

The College will also be permitted to pledge the Student Fees, on a parity with the pledge for the benefit of the Series 2010 Bonds, as security for any Additional Bonds or any other securities or indebtedness

JBH-000132

issued by, on behalf of or for the benefit of the College provided that the College furnishes the Trustee with a certificate to the effect that the Student Fees received during each of the two fiscal years of the College next preceding the fiscal year during which such Additional Bonds or other securities or indebtedness are issued or incurred was not less than 250% of the Maximum Annual Debt Service Requirement during the then current or any subsequent bond year (a period beginning on October 2 of one calendar year and ending on October 1 of the next calendar year) immediately following the issuance or incurring of such Additional Bonds, or other bonds or indebtedness. "Maximum Annual Debt Service Requirement" means the maximum amount of principal and interest payable or required to be redeemed during the then current or any succeeding bond year with respect to all securities (including the Series 2010 Bonds and all Additional Bonds) or other indebtedness which is secured by a parity pledge of the Student Fees, excluding any securities or other indebtedness secured by an inferior or subordinate pledge of the Student Fees. For purposes of determining maximum interest payable, any Additional Bonds or other securities or indebtedness which bear interest at a fluctuating rate shall be assumed to bear interest for the remainder of the term thereof at the rate in effect on the date when such determination is made.

## BOOK-ENTRY ONLY SYSTEM

The information in this section concerning The Depository Trust Company ("DTC") and DTC's book-entry system has been obtained from sources the Authority and the Underwriter believe to be reliable, but neither the Authority nor the Underwriter take responsibility for the accuracy or completeness thereof. There can be no assurance that DTC will abide by its procedures or that such procedures will not be changed from time to time.

The Series 2010 Bonds will be issued as fully-registered warrants in the name of Cede & Co., as nominee of DTC, as registered owner of the Series 2010 Bonds. Purchasers of such warrants will not receive physical delivery of warrant certificates. For purposes of this Official Statement, so long as all of the Series 2010 Bonds are in the custody of DTC, references to Bondholders or Owners shall mean DTC or its nominee.

DTC will act as securities depository for the Series 2010 Bonds. The Series 2010 Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Series 2010 Bond will be issued for each maturity of the Series 2010 Bonds, in the aggregate principal amount of such maturity, and will be deposited with DTC.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation and Emerging Markets Clearing Corporation, (NSCC, FICC and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC

6

JBH-000133

system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with Direct Participants, either directly or indirectly ("Indirect Participants"). DTC has Standard & Poor's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of Series 2010 Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series 2010 Bonds on DTC's records. The ownership interest of each actual purchaser of each Series 2010 Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participants through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series 2010 Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in Series 2010 Bonds, except in the event that use of the book-entry system for the Series 2010 Bonds is discontinued.

To facilitate subsequent transfers, all Series 2010 Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of Series 2010 Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Series 2010 Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Series 2010 Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Series 2010 Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Series 2010 Bonds, such as redemptions, defaults and proposed amendments to the Series 2010 Bonds. For example, Beneficial Owners of Series 2010 Bonds may wish to ascertain that the nominee holding the Series 2010 Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Series 2010 Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issues to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Series 2010 Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the issuer as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts Series 2010 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds and distributions on the Series 2010 Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct

JBH-000134

Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Authority or the Trustee, on payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC or its nominee, the Trustee, or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds and distributions to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Authority or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Series 2010 Bonds at any time by giving reasonable notice to the Authority or the Trustee. Under such circumstances, in the event that a successor depository is not obtained, Series 2010 Bonds are required to be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Series 2010 Bonds will be printed and delivered to DTC.

## THE STUDENT FEES

The term "Student Fees" as used herein to describe the revenues of the College pledged as security for the Series 2010 Bonds includes all tuition and student fees payable by or on behalf of students enrolled at the College net of scholarships granted, as well as payments by or on behalf of students at the College for housing, meals and books. The pledge of the Student Fees will be a first pledge thereof, subject only to the reserved right of the College to issue Additional Bonds. The following table sets forth the Student Fees received by the College during its five most recent fiscal years ended on June 30:

| Fiscal Year Ended June 30 | Student Fees |
|---|---|
| 2006 | $ 2,819,792 |
| 2007 | 2,759,625 |
| 2008 | 3,147,947 |
| 2009 | 3,443,205 |
| 2010 | 3,531,199 |

## THE GENERAL ENDOWMENT

The General Endowment of the College (the "General Endowment") consists of all stocks, bonds and other financial assets of the College, including pledges payable to the College as well as the corpus of all trust funds the income of which is payable to the College. The market value of the General Endowment is the aggregate market value of all those assets at any given point in time. The following was the market value of the General Endowment on June 30 in each of the past five calendar years:

8

JBH-000135

DOCUMENT 3

| | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| Endowment and Investments | $ 4,952,232 | $ 6,945,142 | $ 6,470,205 | $ 6,393,100 | $ 6,792,984 |
| Trusts | 8,400,243 | 9,344,086 | 7,737,045 | 6,286,040 | 6,584,301 |
| Endowment Net Pledges Receivable | --- | 560,810 | 505,654 | 538,514 | 289,802 |
| Total Endowment and Investment Assets | 13,352,475 | 16,850,038 | 14,712,904 | 13,217,654 | 13,667,087 |
| Temporarily Restricted and Unrestricted Net Pledges Receivable | 2,980,453 | 2,380,933 | 2,780,672 | 1,837,107 | 2,372,854 |
| Total | $ 16,332,928 | $ 19,230,971 | $ 17,493,576 | $ 15,054,761 | $ 16,039,941 |

## PURPOSE OF THE SERIES 2010 BONDS

As previously stated, the Series 2010 Bonds are being issued to refund the Series 2000 Bonds and the Series 2003 Bonds and to refund and retire the Outstanding Loans.

## APPLICATION OF
## SERIES 2010 BOND PROCEEDS

It is anticipated that the principal proceeds from the Series 2010 Bonds will be applied as follows:

SOURCES:

| | | |
|---|---|---|
| Principal Amount of Series 2010 Bonds | $ | 11,230,000.00 |
| Less Original Issue Discount | | (262,754.25) |
| Total | $ | 10,967,245.75 |

USES:

| | | |
|---|---|---|
| Refunding the Series 2000 Bonds and the Series 2003 Bonds | $ | 8,342,457.55 |
| Payment of the Outstanding Loans | | 2,400,188.20 |
| Underwriter's Discount and Expenses of Issuance | | 224,600.00 |
| Total | $ | 10,967,245.75 |

9

JBH-000136

DOCUMENT 3

## OUTSTANDING AND PROPOSED INDEBTEDNESS

**Outstanding Indebtedness**

The College has no debt outstanding other than the Series 2000 Bonds, the Series 2003 Bonds and the Outstanding Loans. Therefore, upon their issuance, the Series 2010 Bonds will constitute the only outstanding funded indebtedness of the College.

The College does not have any present plans for incurring additional indebtedness.

JBH-000137

DOCUMENT 3

## DEBT SERVICE AND COVERAGE

The following table reflects debt service (principal and interest) payable with respect to the Series 2010 Bonds at the rates of interest shown on the cover page hereof with respect to the Series 2010 Bonds:

| Period Ending September 30 | Principal | Interest | Total Debt Service |
|---|---|---|---|
| 2011 | | $273,076.25 | $273,076.25 |
| 2012 | $195,000 | 544,202.50 | 739,202.50 |
| 2013 | 200,000 | 540,002.50 | 740,002.50 |
| 2014 | 200,000 | 535,252.50 | 735,252.50 |
| 2015 | 205,000 | 529,985.00 | 734,985.00 |
| 2016 | 215,000 | 523,992.50 | 738,992.50 |
| 2017 | 220,000 | 517,192.50 | 737,192.50 |
| 2018 | 230,000 | 509,592.50 | 739,592.50 |
| 2019 | 235,000 | 501,161.25 | 736,161.25 |
| 2020 | 245,000 | 491,855.00 | 736,855.00 |
| 2021 | 255,000 | 481,600.00 | 736,600.00 |
| 2022 | 270,000 | 470,170.00 | 740,170.00 |
| 2023 | 280,000 | 457,795.00 | 737,795.00 |
| 2024 | 295,000 | 444,488.75 | 739,488.75 |
| 2025 | 310,000 | 430,120.00 | 740,120.00 |
| 2026 | 320,000 | 415,157.50 | 735,157.50 |
| 2027 | 340,000 | 399,057.50 | 739,057.50 |
| 2028 | 355,000 | 381,682.50 | 736,682.50 |
| 2029 | 375,000 | 363,432.50 | 738,432.50 |
| 2030 | 395,000 | 343,985.00 | 738,985.00 |
| 2031 | 415,000 | 323,018.75 | 738,018.75 |
| 2032 | 435,000 | 300,162.50 | 735,162.50 |
| 2033 | 460,000 | 275,550.00 | 735,550.00 |
| 2034 | 490,000 | 249,425.00 | 739,425.00 |
| 2035 | 515,000 | 221,787.50 | 736,787.50 |
| 2036 | 545,000 | 192,637.50 | 737,637.50 |
| 2037 | 575,000 | 161,837.50 | 736,837.50 |
| 2038 | 610,000 | 129,250.00 | 739,250.00 |
| 2039 | 645,000 | 94,737.50 | 739,737.50 |
| 2040 | 680,000 | 58,300.00 | 738,300.00 |
| 2041 | 720,000 | 19,800.00 | 739,800.00 |
| **TOTAL** | $11,230,000 | $11,180,307.50 | $22,410,307.50 |

| | |
|---|---|
| Maximum Annual Debt Service Requirement | $740,170 |
| Average Annual Debt Service Requirement | $722,913 |

11

JBH-000138

For the fiscal year of the College that ended in June 30, 2010, Student Fees were $3,531,199. This amount provided the following coverage of Maximum Annual Debt Service Requirement and of Average Annual Debt Service Requirement with respect to the Series 2010 Bonds as projected above.

| | |
|---|---|
| Coverage of Maximum Annual Debt Service Requirement | 4.77 times |
| Coverage of Average Annual Debt Service Requirement | 4.88 times |

However, prospective purchasers of the Series 2010 Bonds should recognize that the Student Fees are also used to provide instruction, housing, meals and other services to students at the College, and all of the Student Fees will therefore not be available to pay the principal of and the interest on the Series 2010 Bonds.

## THE AUTHORITY

The Authority is a public corporation and instrumentality of the State of Alabama organized and existing under and pursuant to the laws of that state and a resolution adopted by the governing body of the City of Marion authorizing its incorporation. The general purpose of the Authority is to provide educational facilities for private educational institutions in the State of Alabama, including colleges, universities, graduate schools, professional schools, junior colleges, secondary schools and elementary schools. The Authority is empowered to finance the costs of acquiring, constructing and equipping such educational facilities through the issuance of its revenue bonds and to lease or sell such facilities to such educational institutions. The powers of the Authority are exercised by a Board of Directors consisting of citizens who reside in the City of Marion and who are appointed for six-year terms by the governing body of that city.

## THE COLLEGE

### Introduction and History

The College was founded as a liberal arts college for women in 1838. As such Judson is the oldest women's college in Alabama, and is also one of the oldest women's colleges in the United States. It became an entity of The Alabama Baptist State Convention in 1843. The College has been committed to providing quality undergraduate instruction, to building leadership skills, to strengthening faith, and to preparing women for ever-expanding roles in society.

Judson's 80 acre campus is located in the small town of Marion in southwest Alabama. The College is thirty miles north of Selma, Alabama; fifty miles south of Tuscaloosa, Alabama; 70 miles northwest of Montgomery, Alabama; and 75 miles southwest of Birmingham, Alabama. Campus facilities include Jewett Hall (administration, dining hall, Ramsay Chapel), Woman's Missionary Union residence hall, Kirtley and Barron residence halls, Bean Hall (Alabama Women's Hall of Fame, history and political science departments), Alumnae Auditorium and Tucker Hall (fine arts center), Archibald Hall dining and conference center, Mead Hall and Lowder Science Center (academic classroom buildings), Riddle Gymnasium, Bowling Library, Blount Student Union, Crawford riding arena, stables, club house, tennis courts and Dunkin Athletic Park.

JBH-000139

DOCUMENT 1

Judson offers a broad liberal arts curriculum and confers both a bachelor of arts and bachelor of science degrees. In addition to liberal arts majors, pre-professional programs are offered in medicine, dentistry, pharmacy, physical therapy, law, and engineering.

The College operates under an academic calendar of two semesters and one short spring term. An innovative alternative to the traditional four-year degree plan is The Judson Option. Under this three-year plan, students attend classes September through June, two semesters (September through April) and a short term (May and June), graduating in slightly less than three years.

The Adult Studies Division of the College offers coeducational opportunities for adult students who find it impossible to attend traditional classes on campus. Through the Adult Degree Program students can maintain jobs and care for families while earning a college degree. In cooperation with Seminary Extension of the Southern Baptist Seminaries and the Adult Degree Program, Judson offers a Bachelor of Ministry degree. This program allows ministers and other church staff to complete a college degree while remaining in their positions of ministry.

Judson provides opportunities for participation in foreign study programs through the American Institute of Foreign Study, Hong Kong Baptist University, Salzburg College, and International Study Programs sponsored by the Council for Christian Colleges and Universities.

### Enrollment Information

With an average ACT of 22.96 and an average GPA of 3.42, the class that entered the College in August, 2009 was well prepared for college. Among this class are valedictorians, salutatorians and talented athletes and musicians. The following are the number of applications, acceptances and enrollments at the College for the academic years that ended on June 30 in each of the following calendar years:

|                  | 2006 | 2007 | 2008 | 2009 | 2010 |
|------------------|------|------|------|------|------|
| Applications     | 410  | 433  | 468  | 431  | 379  |
| Accepted         | 327  | 363  | 381  | 338  | 298  |
| New Enrollment   | 140  | 130  | 164  | 157  | 130  |
| Total Enrollment | 388  | 373  | 358  | 379  | 337  |

### Relationship to The Alabama Baptist State Convention

Judson College is one of the three incorporated entities of The Alabama Baptist State Convention which offer Christian Higher Education. The Committee on Boards and Commissions of the Convention is responsible for nominating persons for election by the Convention to serve on the Boards of Trustees. The State Board of Missions is the administrative and promotional agency of the Convention and recommends proposed goals and objectives for raising funds and a proposed distribution. Education and other benevolent causes receive funds according to the annual budget adopted by the Convention. In the 2009-2010 academic year Judson College received $1,030,462 from The Alabama Baptist State Convention, which accounts for approximately 11% of the College's annual budget.

13

JBH-000140

**Accreditation**

The College is accredited by the following:

Alabama State Department of Education

National Association of Schools of Music

Southern Association of Colleges and Schools

**Memberships**

The College holds memberships in each of the following organizations:

Academy of Criminal Justice Sciences
Alabama AHEAD
Alabama Association of Colleges for Teacher Education
Alabama Association of Collegiate Registrars and Admissions Officers
Alabama Association for Institutional Research
Alabama Association for Independent Colleges and Universities
Alabama Field Directors Forum
Alabama Poverty Project
Alabama Reading Association
American Chemical Society
American Society of Composers, Authors and Publishers
Business Council of Alabama
CASE
College and University Personnel Association
Consortium for Global Education
C.O.P.E.
Council for Christian Colleges and Universities
Council for Higher Education Accreditation
Institutional Research and Evaluation
Intercollegiate Horse Show Association
International Association of Baptist Colleges and Universities
Mathematics Association of America
National Association for College Admission Counseling
National Association of Equine Affiliated Academics
National Association of Independent Colleges and Universities
National Association of Schools of Music
North American Coalition for Christian Admissions Professionals
Perry County Chamber of Commerce
Sigma Tau Delta
Sigma Xi
Southern Association of College and Schools
Southern Association of College and University Business Officers
Southern Association of Institutional Research
The Tuition Exchange
United States Collegiate Athletic Association
Women's College Coalition

14

JBH-000141

DOCUMENT 3

**Faculty**

The Judson faculty represents a wealth of knowledge gained through academic studies and experiences at over 90 colleges and universities in the United States, Austria, France, Germany, Italy, England, Norway, Spain and Mexico. A student faculty ratio of 15:1 allows for small classes and individual attention, and senior faculty members teach first year students as well as upperclass students.

The faculty of the College is composed of twenty-three full-time faculty members and five part-time faculty members. The full-time faculty consists of five full professors, five associate professors, nine assistant professors, and one artist-in-residence. Three members of the part-time faculty previously held the rank of full professor, one held the rank of associate professor and one held the rank of instructor. Approximately 84% percent of the College's full and part-time faculty members hold either a doctorate degree, the terminal degree in their field, or are completing their doctorate.

In addition to the faculty, the College employs 59 full-time employees and 5 part-time employees. The College is an equal opportunity employer.

**Summary of Operations**

The following represents the revenues, expenditures and mandatory transfers of the College (including depreciation allowances) for each of its past five fiscal years, which ended on June 30 in each of the indicated calendar years. The Statement of Operations reflects changes in the Unrestricted Net Assets of the College. The College began separately stating its Appropriation from Endowment Assets in 2009.

JBH-000142

DOCUMENT 3

*Judson College*
*Statement of Operations*

| | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| **REVENUES:** | | | | | |
| Tuition and fees | $ 2,559,179 | $ 2,491,567 | $ 2,820,988 | $ 3,182,165 | $ 3,339,522 |
| Contributions | 3,114,291 | 1,460,300 | 2,454,039 | 1,031,863 | 2,202,105 |
| Investment income | 725,847 | 1,427,900 | 552,348 | 414,026 | 526,814 |
| Appropriation from endowment assets | --- | --- | --- | 200,100 | 466,000 |
| Sales and services of auxiliary enterprises | 1,415,643 | 1,359,452 | 1,549,530 | 1,701,362 | 1,712,681 |
| Net assets released from restriction | 1,182,543 | 2,283,558 | 2,105,136 | 1,777,696 | 1,541,702 |
| Other income | 300,633 | 362,235 | 57,820 | 255,678 | 182,156 |
| Total revenues and gains | 9,298,136 | 9,385,012 | 9,539,861 | 8,562,890 | 9,970,980 |
| **EXPENSES:** | | | | | |
| Educational and general: | | | | | |
| Instruction | 2,771,045 | 2,641,219 | 2,212,976 | 2,278,532 | 2,172,358 |
| Academic support | 352,299 | 372,076 | 606,413 | 510,463 | 482,150 |
| Student services | 1,021,411 | 1,103,186 | 1,486,896 | 1,589,380 | 1,639,706 |
| Institutional support | 1,528,982 | 1,721,403 | 1,317,929 | 1,104,120 | 1,041,758 |
| Public service | --- | --- | 90,520 | 91,106 | 105,091 |
| Scholarships | 1,155,030 | 1,091,394 | 1,222,571 | 1,440,322 | 1,521,004 |
| Total educational and general expenses | 6,829,367 | 6,929,278 | 6,937,305 | 7,013,923 | 6,962,067 |
| Auxiliary enterprises | 1,156,956 | 853,888 | 1,278,276 | 1,161,532 | 1,144,243 |
| Interest | 490,459 | 697,024 | 453,182 | 419,850 | 380,399 |
| Depreciation & Amortization | 798,823 | 812,560 | 806,855 | 815,002 | 797,735 |
| Total expenses | 9,275,605 | 9,292,750 | 9,475,618 | 9,410,307 | 9,284,444 |
| Adjustments: | | | | | |
| UPMIFA reclassification | --- | --- | --- | 267,487 | --- |
| Increase (Decrease) in net assets | 22,531 | 92,262 | 64,243 | (579,930) | 686,536 |
| **Funds Available for Debt Service:** | | | | | |
| Increase (Decrease) in net assets | 22,531 | 92,262 | 64,243 | (579,930) | 686,536 |
| Depreciation (Non-Cash Charge) | 798,823 | 812,560 | 806,855 | 815,002 | 797,735 |
| Cash Paid for Interest | 490,459 | 697,024 | 453,183 | 419,850 | 380,399 |
| **Total Funds Available for Debt Service:** | $ 1,311,813 | $ 1,601,846 | $ 1,324,280 | $ 654,922 | $ 1,864,670 |

**Investment in Plant**

     Prior to the issuance of the Series 2000 Bonds the Board of Trustees of the College determined that a number of buildings on the campus of the College required substantial renovation and improvement. The Board of Trustees also found that if carried out such a program of renovations and improvement would, in all likelihood, increase the demand for places at the College, and thereby increase the amount of Student Fees received by the College in future years. The Board of Trustees therefore resolved to expend approximately $7,000,000 to renovate and improve various buildings at the College, over a period of six to eight years. As a result the College's investment in plant, exclusive of depreciation, has increased from $6,527,802 in 1992 to $12,822,197 in 2010. The following are the historical balance sheets of the College "Plant Fund" for each of the fiscal years indicated, which show the College's investment in its campus, buildings, library and equipment in the past five years.

16

JBH-000143

### JUDSON COLLEGE
### MARION, ALABAMA
### HISTORICAL BALANCE SHEETS
### (PLANT FUND)

| | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| Land | $    215,243 | $    215,243 | $    215,243 | $    215,243 | $    215,243 |
| Buildings | 15,972,384 | 16,991,132 | 16,777,534 | 17,037,765 | 17,781,532 |
| Vehicles | 219,553 | 129,719 | 126,398 | 126,398 | 130,298 |
| Furniture and equipment | 4,760,018 | 3,938,808 | 4,173,429 | 4,437,962 | 4,583,256 |
| Construction in progress | 1,284,907 | 1,651,084 | 1,054,794 | 383,951 | 146,700 |
| Land improvements | 213,224 | 213,224 | 1,448,028 | 2,425,695 | 2,473,834 |
| Livestock and tack | 44,356 | 62,973 | 62,973 | 72,970 | 78,620 |
| | 22,709,685 | 23,202,183 | 23,858,399 | 24,699,984 | 25,409,483 |
| Less: Accumulated depreciation | (10,834,600) | (10,614,412) | (10,986,735) | (11,799,975) | (12,587,286) |
| Total property and equipment | $ 11,875,085 | $ 12,587,771 | $ 12,871,664 | $ 12,900,009 | $ 12,822,197 |

## Balance Sheets

The following are the balance sheets of the College at the end of each of its past five fiscal years:

### JUDSON COLLEGE
### MARION, ALABAMA
### HISTORICAL BALANCE SHEETS
### (ALL FUNDS)

#### ASSETS

| | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| Cash and cash equivalents | $    112,449 | $    225,298 | $    373,241 | $    330,749 | $    316,066 |
| Restricted cash | 199,845 | 108,230 | 84,076 | 67,629 | 58,790 |
| Accounts receivable | 220,981 | 113,584 | 61,889 | 80,414 | 118,311 |
| Contributions receivable, net | 2,980,453 | 2,941,743 | 3,286,326 | 2,375,621 | 2,662,656 |
| Estates receivable | 8,400,568 | 1,070,509 | 660,568 | 47,667 | --- |
| Student loans receivable | 401,742 | 363,845 | 288,340 | 278,587 | 295,644 |
| Prepaid expenses | --- | 120,804 | 137,794 | 19,366 | 5,275 |
| Inventories | 60,861 | 87,676 | 68,431 | 73,470 | 103,111 |
| Investments | 4,952,232 | 6,945,142 | 6,470,205 | 6,393,100 | 6,792,984 |
| Investment in plant assets, net | 11,875,085 | 12,587,771 | 12,871,664 | 12,900,009 | 12,822,197 |
| Bond issuance cost, net | 123,715 | 118,468 | 113,221 | 107,974 | 102,727 |
| Interests in perpetual trusts held by others | 8,400,243 | 9,344,086 | 7,737,045 | 6,286,040 | 6,584,301 |
| Assets held in charitable remainder unitrust | --- | 106,900 | 91,988 | 66,505 | 71,384 |
| Total assets | $ 37,728,174 | $ 34,134,056 | $ 32,244,788 | $ 29,027,131 | $ 29,933,446 |

17

JBH-000144

DOCUMENT 2

## LIABILITIES AND NET ASSETS

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Accounts payable | $ | 350,820 | $ | 180,424 | $ | 235,118 | $ | 279,628 | $ 235,229 |
| Notes payable, short term | | 3,885,000 | | --- | | --- | | --- | --- |
| Accrued liabilities | | 402,625 | | 309,560 | | 344,551 | | 278,833 | 330,275 |
| Amounts held on behalf of others | | 57,636 | | 25,074 | | 19,992 | | 4,405 | 6,550 |
| Notes payable, long term | | --- | | 575,142 | | 994,921 | | 1,827,648 | 2,399,902 |
| Capitalized lease obligations | | 8,955,000 | | 8,785,000 | | 8,605,000 | | 8,420,000 | 8,225,000 |
| Advances from Federal government for student loans | | 278,533 | | 289,309 | | 216,463 | | 216,463 | 218,486 |
| Liability under unitrust agreement | | --- | | 50,211 | | 39,975 | | 26,524 | 27,110 |
| Total liabilities | | 13,929,614 | | 10,214,720 | | 10,456,020 | | 11,053,501 | 11,442,552 |
| Net assets | | 23,798,560 | | 23,919,336 | | 21,788,768 | | 17,973,630 | 18,490,894 |
| Total liabilities and net assets | $ | 37,728,174 | $ | 34,134,056 | $ | 32,244,788 | $ | 29,027,131 | $ 29,933,446 |

## Board of Trustees

The Board of Trustees consists of 38 members, each of whom is appointed by The Alabama Baptist State Convention, and is responsible for owning, maintaining, and operating the College as an institution of higher learning related to The Alabama Baptist State Convention, and, in so doing, striving to maintain a high standard of academic excellence and an atmosphere conducive to the developing and maturing Christian faith and character.

The Board of Trustees is vested with the authority to do and perform all the acts and things necessary or appropriate for the carrying out and accomplishment of any and all purposes of the College that come legitimately within its scope.

The current members of the Board of Trustees are the following persons:

Mr. Charles F. Dunkin, Chairman
Vestavia Hills, AL  35216

Dr. Robert B. Adams
Montgomery, AL  36111

Mrs. Eugenia G. Anderson
Birmingham, AL  35213

Mr. James L. Armour
Notasulga, AL  36866

Mr. Roy Barnett, Jr.
Marion, AL  36756

Dr. Robert Bentley
Tuscaloosa, AL  35406

Mr. James E. Brady, Jr.
Marion, AL  36756

Rev. David Byrd
Jasper, AL  35501

Mrs. Emelyn M. Carlson
Tuscaloosa, AL  35406

Mrs. Patricia B. Compton
Georgiana, AL  36033

Dr. Henry H. Cox
Bay Minette, AL  36507

Mrs. Jackie B. Crowell
Enterprise, AL  36330

Rev. Ed Cruce
Bessemer, AL  35020

Dr. Daveta Best Dozier
Thomasville, AL  36784

18

JBH-000145

Dr. Judith K. Favor
Birmingham, AL 35205

Mr. Bruce Fuller
Selma, AL 36701

Dr. James H. Gentry
Aliceville, AL 35442

Dr. R. Douglas Halbrooks
Marion, AL 36756

Dr. Robin Tate Hall, Vice Chairman
Cullman, AL 35055

Dr. Frances D. Hamilton
Montgomery, AL 36111

Dr. Troy Morrison
Gadsden, AL 35901

Dr. S. O. Moseley
Selma, AL 36701

Mr. James D. Nabors
Alexander City, AL 35011

Mrs. N. C. Newell
Birmingham, AL 35226

Mr. Don Norton
Tuscaloosa, AL 35406

Ms. P. Leigh O'Dell
Montgomery, AL 36104

Ms. Lenora W. Pate
Birmingham, AL 35222

Mrs. Ann T. Ray
Decatur, AL 35601

Mrs. Daphne R. Robinson, Secretary
Daphne, AL 36526

Mr. James H. Sanford
Prattville, AL 36066

Mrs. Anne W. Shumaker
Centre, AL 35960

Mr. Jerry Thomas
Northport, AL 35473

Mrs. Leigh H. Wiatt
Montgomery, AL 36106

Mr. Rod Wilkin
Tuscaloosa, AL 35406

Dr. Sonya L. Wintzell
Huntsville, AL 35802

Dr. David E. Potts, President (ex-officio)
Marion, AL 36756

Dr. Rick Lance (ex-officio)
Montgomery, AL 36198

Dr. Jimmy Jackson (ex-officio)
Huntsville, AL 35802

19

JBH-000146

### Administration

The chief executive officer of the College, the President, is elected and serves at the pleasure of the Board of Trustees. The immediate government of the College is delegated to the President and, through the President, to his assisting officers.

The current principal administrative officers of the College are as follows:

> Dr. David E. Potts, President
>
> Dennis W. Frodsham, Vice President-Business Affairs
>
> Joseph W. Mathews, Jr., Vice President-General Counsel
>
> Sara B. Kiser, Vice President and Academic Dean
>
> Charlotte S. Clements, Vice President-Admissions and Financial Aid
>
> Sandra S. Fowler, Vice President and Dean of Students

### Student Financial Aid

College financial aid includes loans, scholarships and student employment. The College also participates in various federal student loan programs such as Perkins Loans and the Federal Family Educational Loan Program, as well as Federal Work Study Program, Supplemental Educational Opportunity Grant and Pell Grant programs.

### Financial Matters

The College accounts are maintained in accordance with the principles and practices of fund accounting. Fund accounting is the procedure by which resources for various purposes are classified for accounting purposes in accordance with activities or objectives specified by donors.

Net assets and revenues, expenses, gains and losses are classified based on the existence or absence of donor imposed restrictions. Accordingly, net assets and changes therein are classified as follows:

Permanently restricted net assets-Net assets subject to donor-imposed stipulations that they be maintained permanently by the College. Generally, the donors of these assets permit the institutions to use all or part of the income earned on related investments for general or specific purposes.

Temporarily restricted net assets-Net assets subject to donor imposed stipulations that may or will be met by actions of the College and/or the passage of time.

Unrestricted net assets-net assets not subject to donor imposed stipulations.

The Financial Statements of the College for the fiscal year ended June 30, 2010, and the opinion of Haynes Downard LLP, the College's independent certified public accountants, are attached hereto as Appendix A.

JBH-000147

DOCUMENT 3

**Gifts and Grants**

Total gifts and contributions to the College for the past six fiscal years were as follows:

| | | Fiscal Year Ended June 30 | | | |
|---|---|---|---|---|---|
| 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| $ 4,646,693 | $ 5,140,687 | $ 3,086,928 | $ 3,971,405 | $ 2,445,816 | $ 3,091,059 |

## SUMMARY OF THE LEASE AGREEMENT

**Duration of Term and Rental Provisions**

The term of the Lease will begin with its delivery and will continue, subject to prior termination as therein provided, until and including October 1, 2040. No such prior termination will be permitted unless prior thereto or simultaneously therewith all Bonds issued under the Indenture have been fully paid and retired as therein provided. The Lease will grant the College certain options to purchase the Leased Facilities. See "Options in Favor of the College."

The Lease will obligate the College to pay to the Trustee, for the account of the Authority, not later than 10:00 a.m. on the business day next preceding each interest payment date with respect to the Series 2010 Bonds, such installments of Basic Rent as defined in the Lease ("Basic Rent") in immediately available funds which, when added to certain moneys (if any) then on deposit in the Bond Fund established under the Indenture, will be sufficient to pay (i) the interest maturing with respect to the Series 2010 Bonds on such interest payment date, plus (ii) the principal of the Series 2010 Bonds (if any) maturing, or required by the terms of the Indenture to be redeemed, on such interest payment date.

The Lease will also require the College to pay as additional rent (i) any expenses incurred by the Authority in connection with the ownership or financing of the Leased Facilities, and (ii) the Trustee's fees and charges for services performed under the Indenture, together with all advances made or expenses incurred by it in connection with the performance of such services.

**Pledge of the Student Fees**

In the Lease the College will pledge the Student Fees as security for the Series 2010 Bonds. The College will be permitted to pledge the Student Fees for other bonds and indebtedness as described under "THE SERIES 2010 BONDS," "Additional Bonds" herein.

**Obligations of the College Unconditional**

The obligation of the College to make all rental payments required by the Lease and to perform and observe the other agreements and covenants contained therein will be absolute and unconditional, irrespective of any defense or rights of set-off, recoupment or counterclaim it might otherwise have against the Authority. Until such time as the principal of and the interest and premium (if any) on the Series 2010 Bonds have been fully paid, the College will not suspend or discontinue any payment required by the Lease or fail to perform and observe any of its other agreements and covenants contained therein or, except as expressly authorized therein, terminate the Lease for any cause, including, without limiting the generality of the foregoing, or any acts or circumstances that may deprive the College of the use and occupancy of the Leased Facilities, or any acts or circumstances that may constitute failure of consideration or commercial frustration of purpose, or any

21

JBH-000148

damage to or destruction of the Leased Facilities or any part thereof, or the taking by eminent domain of title to or the right to temporary use of all or any part of the Leased Facilities, or any change in the tax or other laws of the United States of America, the State of Alabama or any political or taxing subdivision of either thereof, or any failure of the Authority to perform and observe any agreement, duty, liability or obligation, whether express or implied, arising out of or connected with the Lease.

**Maintenance of General Endowment**

In the Lease the College will agree to maintain the market value of the General Endowment at a level that shall be not less than One Hundred Twenty-Five Percent (125%) of the unpaid principal of the Series 2010 Bonds that shall be outstanding from time to time under the Indenture. Further, in the event that the Student Fees shall be insufficient to pay any installment of the principal of or the interest on any of the Series 2010 Bonds that shall be outstanding under the Indenture, the College shall pay any such installment from its General Endowment.

**Insurance**

The Lease will require the College to maintain in effect such insurance with respect to the Leased Facilities as institutions of like size and type customarily maintain in effect with respect to the properties similar in nature to the Leased Facilities.

**Assignment and Subleasing**

The Lease will permit the College to assign its rights thereunder or to sublease the Leased Facilities or any part thereof without the necessity of obtaining the consent of the Authority or the Trustee. No assignment of the Lease or any subleasing of the Leased Facilities will in any way relieve the College from primary liability for its obligations under the Lease.

**Options in Favor of the College**

Option to Prepay Rent. The Lease will permit the College, at any time and from time to time, to prepay Basic Rent in an amount sufficient to retire and redeem any or all the Series 2010 Bonds. Any prepaid Basic Rent referable to Series 2010 Bonds shall be applied for their redemption at and for the redemption price applicable to the optional redemption thereof. Any such prepayment of Basic Rent will result in a total or partial abatement of the Basic Rent that would thereafter become due under the Lease had it not been for such prepayment.

Option to Purchase the Leased Facilities Upon Occurrence of Certain Events. Upon the occurrence of certain events, the Lease will permit the College to purchase the Leased Facilities for an amount sufficient to redeem and retire, without payment of any premium or penalty, all the Series 2010 Bonds. See "Redemption Provision--*Extraordinary Redemption*" under "THE SERIES 2010 BONDS."

**Events of Default and Remedies**

Any one or more of the following events will constitute an "Event of Default" by the College under the Lease:

> (a)      failure by the College to pay any installment of Basic Rent on the date that such installment or such payment shall become due and payable by the terms of the Lease and the continuation of such failure for a period of 10 days after written notice by the Trustee;

22

JBH-000149

DOCUMENT 2

(b)      failure by the College to pay any amount due the Trustee for its reasonable fees, charges or disbursements within 60 days after written demand for such payment by the Trustee, which demand shall not be made earlier than the date on which such amount is due and payable;

(c)      failure by the College to perform or observe any of its agreements or covenants contained in the Lease [other than its failure to pay, when due, any payment referred to in the preceding clauses (a) and (b)], which failure shall have continued for a period of 30 days after written notice, unless (i) the Authority and the Trustee shall agree in writing to an extension thereof, (ii) the College has commenced and is diligently pursuing appropriate corrective action, or (iii) the College is, by reason of *force majeure* (as defined in the Lease), at the time prevented from observing or performing the agreement or covenant with respect to which it is delinquent; or

(d)      the filing by the College of a voluntary petition in bankruptcy, its adjudication as a bankrupt, an assignment by it for the benefit of creditors or certain other similar events.

Whenever any Event of Default shall have happened and be continuing the Authority and the Trustee (or the Trustee on behalf of the Authority) may take any one or more of the following remedial actions: (i) declare immediately due and payable rent in an amount equal to the principal amount of all Bonds then outstanding under the Indenture plus interest accrued thereon to the date of such declaration; or (iii) take whatever other actions at law or in equity may appear necessary or desirable to collect the rent due or to enforce any obligation, covenant or agreement of the College under the Lease.

## Amendment of the Lease

Any amendment of the Lease will require the prior written consent of the Authority and the Trustee and must comply with the applicable provisions of the Indenture.  See "Amendment of the Lease" under "SUMMARY OF THE INDENTURE."

## SUMMARY OF THE INDENTURE

### Pledge and Assignment

Under the Indenture, in order to secure to the holders thereof the payment of the principal of and interest (and premium, if any) on the Series 2010 Bonds, the Authority will (1) will pledge to the Trustee all rents, revenues, receipts and income from the Leased Facilities and (2) will assign to the Trustee its rights under the Lease.

### Issuance of the Series 2010 Bonds

The Indenture will set forth detailed provisions for (1) the issuance of the Series 2010 Bonds, (2) the form of the Series 2010 Bonds, (3) the transfer and exchange of the Series 2010 Bonds and (4) the redemption of the Series 2010 Bonds.

JBH-000150

DOCUMENT 1

**The Bond Fund**

The Indenture has established a Bond Fund (herein called the "Bond Fund"), which is held by the Trustee. The Indenture provides that the Trustee will deposit in the Bond Fund (i) all rental payments under the Lease with respect to the principal of and the interest on the Series 2010 Bonds, (ii) all other money required to be deposited therein by the Lease or the Indenture, and (iii) any other money received by the Trustee with instructions to deposit the same in the Bond Fund. Money in the Bond Fund is to be used to pay the principal of and interest and premium (if any) on the Series 2010 Bonds as the same shall become due and payable.

**Investment of Funds**

The Indenture will require the Trustee to keep all moneys on deposit in the Bond Fund fully invested to the extent practicable. Moneys on deposit in the Bond Fund may be invested in Eligible Investments as hereinafter defined. The Indenture will require investments forming a part of the Bond Fund to come due at such times and in such amounts as will assure the availability of cash sufficient to pay, when due, required debt service with respect to the Series 2010 Bonds, including any required redemption of such Bonds. The Indenture will provide that all investments and the income therefrom shall become a part of the fund from which moneys were used to make such investments.

As used in this Official Statement, the terms "Federal Securities," "Eligible Certificates" and "Eligible Investments" shall have the following meanings: "Federal Securities" means securities that are direct obligations of the United States of America or an agency thereof or that are unconditionally guaranteed by the United States of America or an agency thereof as to the payment of both principal and interest; "Eligible Certificates" means certificates of deposit issued by any bank organized under the laws of the United States of America or any state thereof and having, at the time of the acquisition by the Authority of such certificates of deposit, combined capital, surplus and undivided profits of not less than $10,000,000; and "Eligible Investments" means Federal Securities, Eligible Certificates and any other debt securities in which the Authority is legally authorized to invest its moneys.

**Events of Default and Remedies**

An "Event of Default" by the Authority under the Indenture will result from (i) the failure by the Authority to pay, when due, the principal of and the interest and premium (if any) on any of the Series 2010 Bonds and the continuation of such failure for 10 days after notice from the Trustee, or (ii) an "Event of Default" by the College under the Lease (as "Event of Default" is defined in the Lease) has occurred and is continuing, or (iii) the failure by the Authority to perform any of its obligations under the Indenture if, after 60 days' written notice to it of such failure, it shall not have commenced and be diligently pursuing appropriate corrective action, or (iv) the appointment of a receiver for the Authority, readjustment of the obligations of the Authority under the bankruptcy laws or other similar events.

The Indenture will provide that upon the occurrence of an Event of Default the Trustee shall have the right (a) to declare the principal of and the interest accrued on the Series 2010 Bonds immediately due and payable and (b) to proceed with any other right or remedy available to it.

The Indenture will further provide that the Trustee is not required (except as noted in the immediately preceding sentence), upon the occurrence and continuation of an Event of Default, to exercise any of its rights or powers thereunder unless requested so to do by the holders of 25% or more in principal amount of any series of the Bonds then outstanding and unless indemnified by such holders against the prospective liabilities and expenses that, in its opinion, might result from the requested exercise of such rights or powers. Whenever the

JBH-000151

DOCUMENT 1

Trustee shall have a choice of remedies or a discretion as to details in the exercise of its powers with respect thereto, it will be required, under the terms of the Indenture, to follow any specific directions given by the holders of a majority in principal amount of the Series 2010 Bonds at the time outstanding unless the observance of such directions would, in the opinion of the Trustee, unjustly prejudice any nonassenting holders of any of the Series 2010 Bonds.

**Supplemental Indentures**

The Indenture will permit the Authority and the Trustee, without the consent of or notice to the holders of any of the Series 2010 Bonds, to enter into supplemental indentures (which will become a part of the Indenture) for the purpose of adding further covenants and agreements on the part of the Authority, curing ambiguities, defects or inconsistent provisions, and subjecting additional property and the revenues therefrom to the lien of the Indenture. The Indenture will also permit the Authority and the Trustee to enter into other supplemental indentures, with the written consent of the holders of a majority in principal amount of the Series 2010 Bonds then outstanding thereunder, except that, without the written consent of the holder of each Bond affected, the Authority and the Trustee may not enter into any supplemental indenture that has the effect of reducing the principal amount of, the rate of interest on, or the premium payable upon the redemption of, any Series 2010 Bond. Moreover, without the written consent of the holders of all the Series 2010 Bonds then outstanding under the Indenture, the Authority and the Trustee will not be permitted to enter into any supplemental indenture permitting the extension of the maturity of any installment of principal of or interest on any Bond, a reduction in principal amount or a postponement in the redemption date of any Bonds required to be redeemed prior to the stated maturities thereof pursuant to any mandatory redemption provisions applicable to such Bonds, the creation of a lien or charge on the Leased Facilities or on the revenues therefrom ranking prior to or (except in connection with the issuance of Additional Bonds) on a parity with the lien of the Indenture, the establishment of preferences or priorities as between Bonds, or a reduction in the aggregate principal amount of Bonds the holders of which are required to consent to such supplemental indenture.

**Amendment of the Lease**

The Indenture will permit the College and the Authority, with the written consent of the Trustee but without the consent of or notice to the holders of any of the Series 2010 Bonds, to amend the Lease for the purpose of substituting or adding property subject to the demise thereof, curing ambiguities, defects or inconsistent provisions, or making provision with respect to matters arising under the Lease for any other purpose if such provisions are necessary or desirable and are not inconsistent with the provisions of the Lease or the Indenture and do not, in the judgment of the Trustee, adversely affect the interest of the holders of any of the Series 2010 Bonds. The Indenture will also permit the College and the Authority, with the written consent of the Trustee and the holders of a majority in principal amount of the Series 2010 Bonds then outstanding thereunder, to amend the Lease to such extent as shall be deemed necessary or desirable by the Authority and the College, except that, without the written consent of the holders of all the Series 2010 Bonds then outstanding under the Indenture, no such amendment with respect to the Lease shall permit a reduction in the amount of Basic Rent payable under the Lease (other than a reduction resulting from, and directly proportional to, a reduction in the amounts required for payment of the principal of or the interest or premium (if any) on the Series 2010 Bonds), any change in the due dates of the installments of Basic Rent, or any other change that, in the sole judgment of the Trustee, might adversely affect the interests of the holders of any of the Series 2010 Bonds.

25

JBH-000152

DOCUMENT 2

**The Trustee**

In the Indenture the Trustee will agree to perform the duties required of it therein, either expressly or by reasonable implication, but the Trustee will not be liable under the Indenture except for its non-compliance with the provisions thereof, its willful misconduct or its gross negligence.

The obligation of the Authority to pay the expenses incurred by the Trustee and the advances made by it in the performance of its duties under the Indenture, as well as reasonable compensation for the Trustee's services, will be secured by the Indenture, and the payment of such expenses, advances and compensation will be given priority in the Indenture over the payment of the principal of and the interest and premium (if any) on the Series 2010 Bonds.

The Indenture will permit the Trustee, upon written notice to the Authority and publication of such notice as required in such Indenture, to resign and be discharged of the trusts created thereby. Any successor Trustee shall be a bank or trust company authorized to administer trusts and having combined capital, surplus and undivided profits of at least $15,000,000.

**Defeasance of the Indenture**

The Indenture will provide that it may be cancelled and satisfied of record upon the deposit with the Trustee of cash sufficient to provide for full payment of all the Series 2010 Bonds then outstanding thereunder, including the interest that will mature thereon until such payment. In addition, any of the Series 2010 Bonds may, for purposes of the Indenture, be considered as fully paid upon the execution by the Authority and the Trustee of an appropriate trust agreement under which there shall be deposited, for payment or redemption of such Bonds and for payment of the interest to mature thereon until maturity or redemption, Federal Securities or any combination of cash and Federal Securities, which together with the income anticipated to be derived from such securities, will produce moneys sufficient to provide for the payment, redemption and retirement of such Bonds. For purposes of said trust agreement, Federal Securities shall have the meaning given to such term in the section hereof captioned "Investment of Funds" under "SUMMARY OF THE INDENTURE."

Further conditions precedent to any of the Series 2010 Bonds being considered "paid" as a result of the effectuation of any such trust agreement are (i) that there shall have theretofore been adopted all necessary proceedings relating to the redemption of any Bonds that are required to be redeemed prior to their respective maturities and (ii) that the Trustee shall have been furnished a certificate of a firm of certified public accountants stating that the trust fund established by such trust agreement will produce moneys sufficient to provide for the full payment and retirement of such Bonds.

When any of the Series 2010 Bonds are considered "paid" under the conditions described above, they shall no longer be secured by or entitled to the benefit of the Indenture (except for the right to have the moneys held for their benefit to be applied to the payment of the principal thereof and the interest and premium (if any) thereon), nor will the holders of such Bonds (or the Trustee on their behalf) thereafter have any rights to require the College to make any additional Basic Rent payments under the Lease, even though for some reason moneys for the payment of the principal and the interest and premium (if any) on such Bonds may not be available on the respective due dates thereof.

Should any of the Series 2010 Bonds not be presented for payment when due, the Trustee will be required, subject to the provisions of any applicable escheat or other similar law, to retain and set aside in the Bond Fund (but separate and apart from the other moneys therein) a sum of money sufficient to pay such Bonds when the same shall be presented (upon which sum the Trustee shall not be required to pay interest and which the Trustee may not invest). All liability of the Authority to the holders of such Bonds and all rights of

26

JBH-000153

such holders against the Authority under such Bonds or under the Indenture shall thereupon cease and terminate, and the sole right of such holders shall thereafter be against such deposit.

## LEGALITY OF THE SERIES 2010 BONDS
## FOR INVESTMENT

Section 16-17-17, Code of Alabama 1975, as amended, provides that bonds issued by the Authority shall be eligible for the investment of trust or other fiduciary funds in the exercise of prudent judgment by those making such investment.

## RATING

Standard & Poor's Credit Markets Services, a Division of The McGraw-Hill Companies, has assigned a rating of "BBB-" with a stable outlook to the Series 2010 Bonds. Any explanation of the significance of this rating may be obtained only from the rating agency assigning the same. Generally, rating agencies base their ratings on the information and materials furnished them by the prospective issuer, as well as on investigations, studies and assumptions by the rating agencies. There is no assurance that the said rating will remain in effect for any given period of time or that it will not be lowered or withdrawn entirely if, in the judgment of the agency originally establishing that rating, circumstances so warrant. Any such downward change in or withdrawal of the rating may have an adverse affect on the market price of the Series 2010 Bonds.

## TAX EXEMPTION

In the opinion of Haskell Slaughter Young & Rediker, LLC, Birmingham, Alabama, Bond Counsel, interest on the Series 2010 Bonds under existing statutes, regulations, rulings and court decisions, (a) is excluded from gross income for federal income tax purposes and (b) is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, it should be noted that with respect to corporations (as defined for federal income tax purposes), such interest is taken into account in determining adjusted current earnings for the purpose of computing the alternative minimum tax imposed on such corporations. The opinion set forth in clause (a) of the next preceding sentence is subject to the condition that the Authority and the College comply with all requirements of the Internal Revenue Code of 1986 (the "Code") that must be satisfied subsequent to the issuance of the Series 2010 Bonds in order that interest thereon be (or continue to be) excluded from gross income for federal income tax purposes. Failure to comply with certain of such requirements could cause the interest on the Series 2010 Bonds to be so included in gross income retroactive to the date of issuance of the Series 2010 Bonds. The Authority and the College have covenanted to comply with all such requirements. Furthermore, in the opinion of said Bond Counsel, the interest on the Series 2010 Bonds is exempt, under existing statutes, from income taxation by the State of Alabama.

Prospective purchasers of the Series 2010 Bonds should be aware that (i) with respect to insurance companies subject to the tax imposed by Section 831 of the Code, Section 832(b)(5)(B)(i) reduces the deduction for loss reserves by 15 percent of the sum of certain items, including interest on the Series 2010 Bonds; (ii) interest on the Series 2010 Bond earned by some corporations could be subject to the environmental tax imposed by Section 59A of the Code; (iii) interest on the Series 2010 Bonds earned by certain foreign corporations doing business in the United States could be subject to a branch profits tax imposed by Section 884 of the Code; (iv) passive investment income, including interest on the Series 2010 Bonds, may be subject to federal income taxation under Section 1375 of the Code for Subchapter S

27

DOCUMENT 3

corporations that have Subchapter C earnings and profits at the close of the taxable year of greater than 25% of the gross receipts of such Subchapter S corporation is passive investment income; and (v) Section 86 of the Code requires recipients of certain Social Security and certain Railroad Retirement benefits to take into account, in determining the taxability of such benefits, receipts or accruals of interest on the Series 2010 Bonds.

A prospective purchaser of the Series 2010 Bonds should consult his personal tax advisor in this regard in connection with his decision to purchase any of the Series 2010 Bonds.

## BANK QUALIFICATION

Prior to enactment of the Code, financial institutions (including commercial banks) generally were permitted to invest deposited funds in tax-exempt obligations, while continuing to deduct interest paid to depositors. The corporate tax preference rules reduced by 20% the amount that could be deducted by financial institutions for interest on funds allocable to tax-exempt obligations acquired after 1982. In general, the Code denies financial institutions 100% of interest deductions that are allocable to tax-exempt obligations acquired on or after August 8, 1986. The prior law (i.e., 20-percent) reduction continues to apply with respect to "qualified tax-exempt obligations" acquired by financial institutions on or after August 8, 1986. Qualified tax-exempt obligations will have to be designated as such by the issuer, and not more than $30,000,000 of obligations may be so designated by any issuer (including subordinate entities) for any calendar year. Under the 1986 Code, qualified tax-exempt obligations will be treated as acquired by the financial institution before August 7, 1986. The Series 2010 Bonds are being designated as qualified tax-exempt obligations by the Authority and under the Code the interest allocable to the Series 2010 Bonds will remain subject to the 20-percent disallowance contained in present law.

## LEGAL MATTERS

The legality and validity of the Series 2010 Bonds will be approved by Haskell Slaughter Young & Rediker, LLC, Bond Counsel. Bond Counsel has been employed primarily for the purpose of preparing certain legal documents and supporting certificates, reviewing the transcript of proceedings by which the Series 2010 Bonds have been authorized to be issued and rendering an opinion in conventional form as to the validity and legality of the Series 2010 Bonds and the exclusion of the interest thereon from gross income for federal income tax purposes and the exemption of interest thereon from State of Alabama income taxes. Although Bond Counsel assisted in the preparation of certain portions of this Official Statement and is of the opinion that the statements made herein under the captions "THE SERIES 2010 BONDS," "SUMMARY OF THE LEASE AGREEMENT," "SUMMARY OF THE INDENTURE" and "TAX EXEMPTION" fairly summarize the matters therein referred to, Bond Counsel has not been requested to check or verify, has not checked or verified, and will express no opinion with respect to the adequacy, accuracy, completeness or fairness of any other information contained in this Official Statement. It is anticipated the approving opinion of Bond Counsel will be in substantially the form attached hereto as Appendix B.

In addition, certain legal matters in connection with the Series 2010 Bonds will be passed on for the College by Joseph W. Mathews, Jr., Esq., General Counsel, Judson College, Marion, Alabama, and for the Authority by James M. Barnes, Esq., Attorney at Law of Marion, Alabama.

JBH-000155

DOCUMENT 2

## LITIGATION

There is no suit, action, or proceeding of any nature, pending or threatened, to restrain or enjoin the issuance, sale, execution, or delivery of the Series 2010 Bonds or to contest the validity of the Series 2010 Bonds, or the proceedings of the College taken with respect to the issuance or sale of the Series 2010 Bonds, the pledge or application of any moneys, revenues or security provided for the payment of the Series 2010 Bonds, or the existence or powers of the College.

The College has no litigation or proceedings pending or to its knowledge, threatened against it which, if adversely determined, would have a materially adverse effect on its financial condition or operation.

## UNDERWRITING

The Frazer Lanier Company Incorporated, as underwriter (the "Underwriter"), has agreed to purchase the Series 2010 Bonds at a price of $10,798,795.75 (representing an underwriter's discount of $168,450.00 and "original issue discount" of $262,754.25), plus accrued interest.  The Underwriter may offer and sell the Series 2010 Bonds to certain dealers (including dealers depositing the Series 2010 Bonds into investment trusts) and others at prices lower than those stated on the front page hereof.

## CONTINUING DISCLOSURE

In accordance with the requirements of Rule 15c2-12 (the "Rule") promulgated by the Securities and Exchange Commission, the College has agreed in the Lease to provide to the Trustee, or cause to be provided through the Trustee,

    (a)    to the Municipal Securities Rulemaking Board ("MSRB"), certain annual financial information and operating data of the College; such information is expected to be available on or before December 1 of each year for the fiscal year ending on the preceding June 30 and will be made available, in addition to the MSRB, to the Trustee and to each holder of Series 2010 Bonds who make requests for such information;

    (b)    in a timely manner, to the MSRB, notice of the occurrence of any of the following events with respect to the Series 2010 Bonds:

        (1)    principal and interest payment delinquencies;
        (2)    non-payment related defaults;
        (3)    unscheduled draws on debt service reserves reflecting financial difficulties;
        (4)    unscheduled draws on credit enhancements reflecting financial difficulties;
        (5)    substitution of credit or liquidity providers, or their failure to perform;
        (6)    adverse tax opinions or events affecting the tax-exempt status of the Series 2010 Bonds;
        (7)    modifications to rights of holders of the Series 2010 Bonds;
        (8)    bond calls;
        (9)    defeasances;

29

JBH-000156

DOCUMENT 1

(10)   release, substitution, or sale of property securing repayment of the securities; or

(11)   rating changes.

The College will from time to time choose to provide notice of the occurrence of certain other events, in addition to those listed above, if, in the judgment of the College, such other event is material with respect to the Series 2010 Bonds, but the College does not undertake to commit to provide any such notice of the occurrence of any material event except those events listed above.

The College reserves the right to modify from time to time the specific types of information provided or the format of the presentation of such information, to the extent necessary or appropriate in the judgment of the College; provided that, the College agrees that any such modification will be done in a manner consistent with the Rule. The College reserves the right to terminate its obligations to provide annual financial information and notices of material events, as set forth above, if and when the College no longer remains an obligated person with respect to the Series 2010 Bonds within the meaning of the Rule. The College acknowledges that its undertakings pursuant to the Rule described under this heading is intended to be for the benefit of the holders of the Series 2010 Bonds and shall be enforceable by the Trustee on behalf of such holders; provided that, the Trustee's right to enforce the provisions of this undertaking shall be limited to a right to obtain specific enforcement of the obligations of the College hereunder.

## MISCELLANEOUS

The College has furnished all information in this Official Statement relating to the College. Any statements in this Official Statement involving matters of opinion or estimation, whether or not expressly so stated, are intended merely as such and not as representations of a fact.

The agreement of the Authority with the holders of the Series 2010 Bonds is fully set forth in the Indenture, and this Official Statement is not to be construed as constituting an agreement with the purchasers of the Series 2010 Bonds.

The College has reviewed the information herein and has approved this Official Statement. The execution and delivery of this Official Statement on behalf of the Authority by the Chairman of its Board of Directors have been duly authorized by the Authority.

EDUCATIONAL BUILDING AUTHORITY
OF THE CITY OF MARION

By_____/s/ Roy A. Barnett, Jr._____
Chairman of the Board of Directors

30

JBH-000157

DOCUMENT 3

The foregoing Official Statement is approved.

JUDSON COLLEGE

By_____ /s/ David E. Potts_____
President

3993611.1

31

JBH-000158

DOCUMENT 2

*[THIS PAGE INTENTIONALLY LEFT BLANK]*

JBH-000159

**APPENDIX A**

**JUDSON COLLEGE**

**AUDITED FINANCIAL STATEMENTS**

**For the Fiscal Year Ended**
**June 30, 2010**

JBH-000160

DOCUMENT 2

*[THIS PAGE INTENTIONALLY LEFT BLANK]*

JBH-000161

DOCUMENT 2

**JUDSON COLLEGE
(A NONPROFIT ORGANIZATION)
FINANCIAL STATEMENTS
JUNE 30, 2010 AND 2009**

JBH-000162

DOCUMENT 3

*[THIS PAGE INTENTIONALLY LEFT BLANK]*

JBH-000163

DOCUMENT 2

Judson College
Table of Contents
June 30, 2010 and 2009

| | Page |
|---|---|
| **INDEPENDENT AUDITORS' REPORT** | 1 |
| **FINANCIAL STATEMENTS** | |
| Statements of financial position | 2 |
| Statements of activities | 3-4 |
| Statements of cash flows | 5 |
| Notes to financial statements | 6-20 |

JBH-000164

DOCUMENT 3

## INDEPENDENT AUDITORS' REPORT

To the President and Board of Trustees
Judson College
Marion, Alabama

We have audited the accompanying statements of financial position of Judson College (a nonprofit organization) as of June 30, 2010 and 2009 and the related statements of activities and cash flows for the year then ended. These financial statements are the responsibility of Judson College's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Judson College as of June 30, 2010 and 2009 and the changes in its net assets and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

Haynes Downard LLP

September 17, 2010

JBH-000165

DOCUMENT 2

**STATEMENTS OF FINANCIAL POSITION**
**JUDSON COLLEGE**
**JUNE 30, 2010 AND 2009**

|  | 2010 | 2009 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | $ 316,066 | $ 330,749 |
| Accounts and other receivables, net | 118,311 | 80,414 |
| Pledges receivable, net | 2,662,656 | 2,375,621 |
| Estates receivable | - | 47,667 |
| Student loans receivable | 295,644 | 278,587 |
| Inventories | 103,111 | 73,470 |
| Prepaid expenses and other assets | 5,275 | 19,366 |
| Bond issuance cost, net | 102,727 | 107,974 |
| Restricted cash | 58,790 | 67,629 |
| Investments | 6,792,984 | 6,393,100 |
| Beneficial interest in perpetual trusts | 6,584,301 | 6,286,040 |
| Assets held in charitable remainder unitrust | 71,384 | 66,505 |
| Property and equipment, net | 12,822,197 | 12,900,009 |
| Total assets | $ 29,933,446 | $ 29,027,131 |
| **LIABILITIES AND NET ASSETS** | | |
| Accounts payable | $ 235,229 | $ 279,628 |
| Accrued liabilities | 330,275 | 278,833 |
| Liability under unitrust agreement | 27,110 | 26,524 |
| Amounts held on behalf of others | 6,550 | 4,405 |
| Notes payable, long-term | 2,399,902 | 1,827,648 |
| Capitalized lease obligations | 8,225,000 | 8,420,000 |
| Advances from Federal government for student loans | 218,486 | 216,463 |
| Total liabilities | 11,442,552 | 11,053,501 |
| **Net Assets** | | |
| Unrestricted | 5,107,140 | 4,420,604 |
| Temporarily restricted | 2,721,339 | 2,746,214 |
| Permanently restricted | 10,662,415 | 10,806,812 |
| Total net assets | 18,490,894 | 17,973,630 |
| Total liabilities and net assets | $ 29,933,446 | $ 29,027,131 |

See accompanying notes.

2

JBH-000166

DOCUMENT 3

**STATEMENTS OF ACTIVITIES**
**JUDSON COLLEGE**
**FOR THE YEARS ENDED JUNE 30, 2010 AND 2009**

|  | 2010 | 2009 |
|---|---|---|
| **CHANGES IN UNRESTRICTED NET ASSETS** | | |
| **Revenues** | | |
| Tuition and fees | $ 3,339,522 | $ 3,182,165 |
| Less scholarships | (1,521,004) | (1,440,322) |
| Net tuition and fees | 1,818,518 | 1,741,843 |
| Contributions from the Alabama Baptist State Convention | 406,023 | 436,403 |
| Other contributions and pledges | 1,796,082 | 595,460 |
| Investment income (losses) | 120,457 | (16,324) |
| Endowment appropriation | 466,000 | 200,100 |
| Distribution from perpetual trust | 406,357 | 430,350 |
| Other income | 182,156 | 255,678 |
| Sales and services from auxiliary enterprises | 1,712,681 | 1,701,362 |
| Net assets released from restrictions | 1,541,702 | 1,777,696 |
| Total unrestricted revenues and other support | 8,449,976 | 7,122,568 |
| **Expenses** | | |
| Education and general: | | |
| Instruction | 2,359,899 | 2,450,696 |
| Academic support | 509,839 | 546,171 |
| Student services | 1,683,262 | 1,663,772 |
| Institutional support | 1,071,249 | 1,150,456 |
| Public service | 105,882 | 94,507 |
| Total educational and general expenses | 5,730,131 | 5,905,602 |
| Auxiliary enterprises | 1,235,574 | 1,254,628 |
| Depreciation expense | 797,735 | 809,755 |
| Total unrestricted expenses | 7,763,440 | 7,969,985 |
| Change in unrestricted net assets before UPMIFA reclassification | 686,536 | (847,417) |
| UPMIFA reclassification | - | 267,487 |
| *Increase (Decrease) in Unrestricted Net Assets* | 686,536 | (579,930) |

See accompanying notes.          3

JBH-000167

DOCUMENT 3

**STATEMENTS OF ACTIVITIES - CONTINUED**
**JUDSON COLLEGE**
**FOR THE YEARS ENDED JUNE 30, 2010 AND 2009**

|  | 2010 | 2009 |
|---|---|---|
| **CHANGES IN TEMPORARILY RESTRICTED NET ASSETS** | | |
| Contributions from the Alabama Baptist State Convention | $ 624,439 | $ 636,632 |
| Other contributions and pledges | 118,532 | 206,749 |
| Investment income (losses) | 651,215 | (532,059) |
| Endowment appropriation | (466,000) | (200,100) |
| Net assets released from restrictions | (953,061) | (1,009,672) |
| **Change in temporarily restricted net assets before UPMIFA reclassification** | (24,875) | (998,450) |
| UPMIFA reclassification | - | 1,279,144 |
| *Increase (Decrease) in Temporarily Restricted Net Assets* | (24,875) | 280,694 |
| **CHANGES IN PERMANENTLY RESTRICTED NET ASSETS** | | |
| Other contributions and pledges | 145,983 | 570,572 |
| Distribution from perpetual trusts | (406,357) | (430,350) |
| Change in value of beneficial interest in perpetual trusts | 704,618 | (1,341,469) |
| Net assets released from restrictions | (588,641) | (768,024) |
| **Change in permanently restricted net assets before UPMIFA reclassification** | (144,397) | (1,969,271) |
| UPMIFA reclassification | - | (1,546,631) |
| *Increase (Decrease) in Permanently Restricted Net Assets* | (144,397) | (3,515,902) |
| *Increase (Decrease) in Total Net Assets* | 517,264 | (3,815,138) |
| Total net assets, beginning of year | 17,973,630 | 21,788,768 |
| Total net assets, end of year | $ 18,490,894 | $ 17,973,630 |

See accompanying notes.                    4

JBH-000168

DOCUMENT 3

**STATEMENTS OF CASH FLOWS**
**JUDSON COLLEGE**
**FOR THE YEARS ENDED JUNE 30, 2010 AND 2009**

|  | 2010 | 2009 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Change in net assets | $ 517,264 | $ (3,815,138) |
| Adjustments to reconcile changes in net assets to net cash | | |
| provided by operating activities: | | |
| Depreciation and amortization | 802,982 | 815,002 |
| Provision for doubtful accounts | 44,057 | 20,510 |
| (Gain) loss on sale of property and equipment | (65,623) | 1,286 |
| Net realized and unrealized (gains) losses on investments | (679,893) | 811,618 |
| (Increase) decrease in value of beneficial interests in perpetual trusts | (704,618) | 1,341,469 |
| Contributions of investments | (240,676) | - |
| Contributions restricted for permanent investment | - | (320,814) |
| Change in value of charitable remainder trust, net | (4,293) | 12,032 |
| Changes in assets and liabilities that provided (used) cash: | | |
| Accounts and other receivables | (81,954) | (39,035) |
| Pledges receivable | (287,035) | 910,705 |
| Estates receivable | 47,667 | 612,901 |
| Inventories | (29,641) | (5,039) |
| Prepaid expenses | 14,091 | 42,891 |
| Accounts payable and accrued liabilities | 9,188 | (36,795) |
| Net cash (used in) provided by operating activities | (658,484) | 351,593 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Proceeds from the sale of property and equipment | 67,998 | 2,601 |
| Purchase of property and equipment | (722,298) | (841,987) |
| Purchase of investments | (3,098,974) | (3,481,922) |
| Proceeds from sales and maturity of investments | 3,619,659 | 2,502,132 |
| Distributions received from perpetual trusts | 406,357 | 430,350 |
| Net change in student loans | (15,034) | 9,753 |
| Net change in restricted cash | 8,839 | 16,447 |
| Net cash provided by (used in) investing activities | 266,547 | (1,362,626) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Repayments of notes payable | (753,000) | (567,273) |
| Proceeds from issuance of notes payable | 1,325,254 | 1,400,000 |
| Payments under capitalized lease obligations | (195,000) | (185,000) |
| Contributions restricted for permanent investment | - | 320,814 |
| Net cash provided by financing activities | 377,254 | 968,541 |
| **Net Decrease in Cash** | (14,683) | (42,492) |
| Cash, beginning of year | 330,749 | 373,241 |
| Cash, end of year | $ 316,066 | $ 330,749 |
| **Supplemental Cash Flow Data** | | |
| Cash paid for interest | $ 364,496 | $ 419,850 |

See accompanying notes.                    5

JBH-000169

DOCUMENT 2

## NOTES TO FINANCIAL STATEMENTS
## JUDSON COLLEGE
## JUNE 30, 2010 AND 2009

NOTE 1.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Nature and Purpose of Organization**

Judson College (the "College") is an educational institution affiliated with the Alabama Baptist State Convention ("the Convention") and is governed by a Board of Trustees (the "Board"). The College was founded in 1838 in Marion, Alabama. The purpose of the College is to educate young women in a Christian environment.

**Basis of Presentation**

The accompanying financial statements are prepared on the accrual basis of accounting.

Net assets, revenues, expenses, gains, and losses are classified based on the existence or absence of donor-imposed restrictions. Accordingly, net assets of the College and changes therein are classified and reported as follows:

*Unrestricted Net Assets*
Net assets that are not subject to donor-imposed stipulations.

*Temporarily Restricted Net Assets*
Net assets subject to donor-imposed stipulations that may or will be met either by actions of the College and/or the passage of time.

*Permanently Restricted Net Assets*
Net assets subject to donor-imposed stipulations that require the assets to be maintained in perpetuity by the College. Generally, the donors of these assets permit the College to use all or part of the income earned on related investments for general or specific purposes.

The College reports gifts of cash and other assets as restricted support if they are received with donor stipulations that limit the use of the donated assets. When a donor restriction expires, that is, when a stipulated time restriction ends or purpose restriction is accomplished, temporarily restricted net assets are reclassified to unrestricted net assets and reported in the statements of activities and changes in net assets as net assets released from restrictions. Support that is restricted by the donor is reported as an increase in unrestricted net assets if the restriction expires in the reporting period in which the support is recognized. The College reports gifts of property, plant, and equipment as unrestricted support unless explicit stipulations specify how the assets are to be used and gifts of cash or other assets designated by the donor to acquire long-lived assets are reported as restricted support. Absent explicit donor stipulations regarding how long those long-lived assets must be maintained, the College reports expirations of donor restrictions when the donated or acquired long-lived assets are placed in service.

**Cash and Cash Equivalents**

The College considers all highly liquid financial instruments purchased with an original maturity of three months or less to be cash equivalents, except those cash equivalents that are a portion of the endowment investment portfolio or that are otherwise restricted.

6

JBH-000170

**NOTES TO FINANCIAL STATEMENTS**
**JUDSON COLLEGE**
**JUNE 30, 2010 AND 2009**

**NOTE 1.**     **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES - Continued**

**Cash and Cash Equivalents - Continued**

The College maintains its cash in bank deposit accounts, which at times may exceed federally insured limits.  The College has not experienced any losses on such accounts and does not believe it is exposed to any significant credit risk on cash and cash equivalents.

**Accounts Receivable**

Included in accounts receivable are student receivables derived from the College's billing of tuition and fees.  The amount of student receivables included in accounts receivable were $124,375 and $76,490 at June 30, 2010 and 2009, respectively, which is presented net of an allowance for doubtful accounts of $111,041 and $66,984, respectively.  Management of the College determines the allowance for doubtful accounts by identifying troubled accounts and by using historical experience applied to an aging of accounts receivable.

**Pledges Receivable**

Unconditional promises to give are recognized as revenues at their fair values in the period they are received.  Unconditional promises to give with payments due in future periods are discounted using a rate commensurate with the risks involved.  An intention to give exists in those instances in which the donor reserves the right to rescind their indication of a promise to give.  Intentions to give do not meet the criteria for recognition in the financial statements.  The College is aware of approximately $10,170,000 of intentions to give at June 30, 2010, which have not been included in these financial statements.

**Investments**

Investments in equity securities, common funds, and debt securities are reported at fair value. Fair market value for these investments is based on quoted market prices or dealer quotes, where available.  Investments in real estate are reported at fair value based on appraisal amounts.  Investments acquired by gift or bequest are recorded at market or appraised value as of the date of the gift.  Both realized and unrealized gains and losses are reflected in the statements of activities as changes in unrestricted or temporarily restricted net assets, unless permanently restricted by the donor, in accordance with the donor's stipulations concerning the purposes for which income may be used.

**Inventories**

Inventories, which consist of merchandise primarily to be used for the campus bookstore, are stated at the lower of cost or net realizable value.

**Student Loans Receivable**

Student loans receivable represents financial aid awarded to students primarily under Title IV federal programs.  Federal contributions to the College's loan programs are considered refundable advances and are included as advances from Federal government for student loans on the statement of financial position.

7

JBH-000171

DOCUMENT 3

## NOTES TO FINANCIAL STATEMENTS
### JUDSON COLLEGE
### JUNE 30, 2010 AND 2009

NOTE 1.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES - Continued

**Property and Equipment**

Property and equipment are stated at cost at date of acquisition or fair value at date of donation, less accumulated depreciation computed on a straight-line basis over the estimated useful lives of the related assets.  Gain or loss on disposition of assets is reflected in the statements of activities and changes in net assets and the related asset cost and accumulated depreciation are removed from the respective accounts.  Useful lives by major asset class are as follows:

| | |
|---|---|
| Land improvements | 10-20 years |
| Buildings | 30-50 years |
| Furniture, fixtures, and computer equipment | 3-10 years |
| Library books | 10 years |

**Long Lived Assets**

The College recognizes impairment losses on long-lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the carrying values.  There were no such losses during fiscal 2010.

**Beneficial Interest in Perpetual Trusts**

Perpetual trusts are trusts under which the College will receive income distributions in perpetuity, but the assets remain under the control of the trustee. Perpetual trusts are initially recorded as permanently restricted contribution revenue at the current fair value of the College's interest in the trust assets at the date of gift.  Subsequent changes to the trust's fair value are recorded as change in value of beneficial interest in perpetual trusts in the statement of activities.  The income received from perpetual trusts is recognized in the statement of activities as distributions from perpetual trusts.

**Split Interest Agreements**

The College's split interest agreements primarily consist of an irrevocable charitable remainder trust.  The College serves as the trustee under this agreement.  The assets under this agreement are recorded at fair market value and are included as assets held in charitable remainder trust on the statement of financial position.  Contribution revenues are recognized at the date the trust is established after recording a liability for the present value of the estimated future payments to be made to the donor.  The liability, recorded as liability under unitrust agreement on the statement of financial position, is adjusted during the term of the trust for changes in the value of the assets, amortization of the discount and other changes in the estimates of future benefits.

**Functional Expenses**

The cost of providing various programs and supporting services has been summarized on a functional basis in the statement of activities.  Accordingly, certain supporting expenditures have been allocated to these functional categories based on an estimate of the relative portion of the College's buildings occupied by each function and supporting services provided to each function, respectively.

8

JBH-000172

**NOTES TO FINANCIAL STATEMENTS**
**JUDSON COLLEGE**
**JUNE 30, 2010 AND 2009**

NOTE 1.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES - Continued

**Use of Estimates**

The preparation of the financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.   Actual results could differ from those estimates.

**Income Taxes**

The College is exempt from federal income taxes under Section 501(c)(3) of the Internal Revenue Code, except for income taxes on any unrelated business income, if applicable.   No income taxes were due as of June 30, 2010.

As of June 30, 2010, the College has no uncertain tax positions that qualify for recognition or disclosure in the financial statements.

**Subsequent Events**

The College evaluates events occurring subsequent to the statement of financial position date to determine if recognition in the financial statements or disclosure is appropriate.   The College has evaluated subsequent events through September 17, 2010, the date the financial statements were available to be issued.

**Reclassifications**

Certain amounts in the prior year presentation have been reclassified to conform to the current year presentation.

NOTE 2.   PLEDGES RECEIVABLE

Pledges receivable, consisting of unconditional promises to give, are as follows at June 30:

|  | 2010 |  | 2009 |
|---|---|---|---|
| Less than one year | $ 1,573,915 | $ | 1,654,029 |
| One year to five years | 1,213,378 |  | 714,101 |
| Thereafter | - |  | 100,000 |
| Total pledges receivables | 2,787,293 |  | 2,468,130 |
| Less: Discounts to net present value | (124,637) |  | (92,509) |
| Pledges receivable, net | $ 2,662,656 | $ | 2,375,621 |

9

JBH-000173

DOCUMENT 3

## NOTES TO FINANCIAL STATEMENTS
## JUDSON COLLEGE
## JUNE 30, 2010 AND 2009

**NOTE 3.    INVESTMENTS**

Investments at June 30 consist of the following:

|  | 2010 | | 2009 | |
|---|---|---|---|---|
|  | Cost | Fair Value | Cost | Fair Value |
| Corporate stocks | $  3,603,547 | $  4,143,759 | $  4,044,584 | $  3,845,077 |
| Corporate bonds | 646,002 | 700,481 | 644,919 | 671,712 |
| Government bonds | 98,391 | 109,906 | 123,326 | 133,875 |
| U.S. Government obligations | 422,004 | 431,754 | 541,331 | 538,499 |
| Common funds | - | - | 13,092 | 7,296 |
| Money Market | 301,002 | 301,002 | 57,171 | 57,171 |
| Certificate of deposit | - | - | 10,000 | 10,000 |
| Total marketable securities | $  5,070,946 | $  5,686,902 | $  5,434,423 | $  5,263,630 |
| Real estate |  | 998,191 |  | 994,993 |
| Other investments |  | 107,891 |  | 134,477 |
| Total other investments |  | 1,106,082 |  | 1,129,470 |
| Total investments |  | $  6,792,984 |  | $  6,393,100 |

Investment income (losses) consists of the following:

|  | 2010 | 2009 |
|---|---|---|
| Interest and dividend income | $  147,971 | $  225,725 |
| Rental income, net | 2,406 | 10,595 |
| Management fees | (53,560) | (66,012) |
| Realized and unrealized gain (loss) | 679,893 | (811,618) |
| Other | (5,038) | (7,073) |
| Investment income | $  771,672 | $  (648,383) |

**NOTE 4.    ENDOWMENT**

The College's endowment consists of approximately 100 individual funds established for a variety of purposes.   Endowment fund balances, including funds functioning as endowment, are classified and reported as unrestricted, temporarily restricted, or permanently restricted net assets in accordance with donor specifications.   The College is also the beneficiary of trusts held and administered by others.   The estimated fair value of trust assets, which is based upon the fair value of the underlying assets of the perpetual trusts, are recognized as assets and increases in net assets when the required trust documentation is provided to the College.   The fair values of these trusts are provided by the external trustees and are adjusted periodically by the College.

10

JBH-000174

### NOTES TO FINANCIAL STATEMENTS
### JUDSON COLLEGE
### JUNE 30, 2010 AND 2009

NOTE 4.    **ENDOWMENT – Continued**

Endowment net asset composition as of June 30 is as follows:

| | 2010 | | | |
|---|---|---|---|---|
| | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
| Donor-designated endowment funds | $ - | $ 1,267,593 | $ 3,788,312 | $ 5,055,905 |
| Board-designated endowment funds | 1,295,798 | - | - | 1,295,798 |
| Pledges receivable, net | - | - | 289,802 | 289,802 |
| Beneficial interest in perpetual trusts | - | - | 6,584,301 | 6,584,301 |
| Total endowment net assets | $ 1,295,798 | $ 1,267,593 | $10,662,415 | $13,225,806 |

| | 2009 | | | |
|---|---|---|---|---|
| | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
| Donor-designated endowment funds | $ - | $ 1,160,819 | $ 3,982,258 | $ 5,143,077 |
| Board-designated endowment funds | 543,151 | - | - | 543,151 |
| Pledges receivable, net | - | - | 538,514 | 538,514 |
| Beneficial interest in perpetual trusts | - | - | 6,286,040 | 6,286,040 |
| Total endowment net assets | $ 543,151 | $ 1,160,819 | $10,806,812 | $12,510,782 |

Changes in endowment net assets for the years ended June 30, are as follows:

| | 2010 | | | |
|---|---|---|---|---|
| | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
| Endowment net assets, beginning of year | $ 543,151 | $ 1,160,819 | $10,806,812 | $12,510,782 |
| Investment income | 63,924 | 651,215 | - | 715,139 |
| Contributions | 23,777 | 1,450 | 145,983 | 171,210 |
| Appropriation of endowment assets for expenditure | - | (466,000) | - | (466,000) |
| Release of restrictions pursuant to UPMIFA | 664,946 | (76,305) | (588,641) | - |
| Release of restriction by donor | - | (3,586) | - | (3,586) |
| Distributions from perpetual trusts | - | - | (406,357) | (406,357) |
| Change in value of beneficial interest in perpetual trusts | - | - | 704,618 | 704,618 |
| Endowment net assets, end of year | $ 1,295,798 | $ 1,267,593 | $10,662,415 | $13,225,806 |

11

JBH-000175

DOCUMENT 3

**NOTES TO FINANCIAL STATEMENTS**
**JUDSON COLLEGE**
**JUNE 30, 2010 AND 2009**

**NOTE 4.     ENDOWMENT – Continued**

| | Unrestricted | | Temporarily Restricted | Permanently Restricted | Total |
|---|---|---|---|---|---|
| | | | 2009 | | |
| Endowment net assets, beginning of year | $ | 512,052 | $ 924,657 | $13,810,662 | $15,247,371 |
| Investment income | | - | (632,059) | - | (632,059) |
| Contributions | | 31,099 | 56,157 | 570,572 | 657,828 |
| Appropriation of endowment assets for expenditure | | - | (200,100) | - | (200,100) |
| UPMIFA reclassification | | - | 1,012,164 | (1,546,631) | (534,467) |
| Reclassification | | - | - | 512,052 | 512,052 |
| Release of restriction by donor | | - | - | (768,024) | (768,024) |
| Distributions from perpetual trusts | | - | - | (430,350) | (430,350) |
| Change in value of beneficial interest in perpetual trusts | | - | - | (1,341,469) | (1,341,469) |
| Endowment net assets, end of year | $ | 543,151 | $ 1,160,819 | $10,806,812 | $12,510,782 |

The following is a description of the strategies and policies related to the endowment funds under the College's control.

**Interpretation of Relevant Law**

The Board of Trustees of the College has interpreted the Alabama Uniform Prudent Management of Institutional Funds Act (UPMIFA) as requiring the preservation of the fair value of gifts as of March 31, 2009 or the fair value of the original gift as of the gift date, if the gift was made subsequent to March 31, 2009, absent explicit donor stipulations to the contrary. As a result of this interpretation, the College classifies as permanently restricted net assets (a) the fair market value of gifts as of March 31, 2009, for all gifts received before such date, or (b) the original value of subsequent gifts to the permanent endowment. The remaining portion of the endowment fund that is not classified in permanently restricted net assets is classified as unrestricted or temporarily restricted net assets until those amounts are appropriated for expenditure by the College in a manner consistent with the standard of prudence prescribed by UPMIFA.

JBH-000176

**NOTES TO FINANCIAL STATEMENTS**
**JUDSON COLLEGE**
**JUNE 30, 2010 AND 2009**

**NOTE 4.     ENDOWMENT – Continued**

In accordance with UPMIFA, the College considers the following factors in making a determination to appropriate or accumulate donor-restricted endowment funds:

(1) The duration and preservation of the fund
(2) The purposes of the College and the donor-restricted endowment fund
(3) General economic conditions
(4) The possible effect of inflation and deflation
(5) The expected total return from income and the appreciation of investments
(6) Other resources of the College
(7) The investment policies of the College

**Funds with Deficiencies**

From time to time, the fair value of assets associated with individual donor restricted endowment funds may fall below the level that the donor or UPMIFA requires the College to retain a fund of perpetual duration. There were no such deficiencies as of June 30, 2010.

**Return Objectives and Risk Parameters**

The College has adopted investment and spending policies for endowment assets that attempt to provide a predictable stream of funding to programs supported by its endowment while seeking to maintain the purchasing power of the endowment assets. Endowment assets include those assets of donor-restricted funds that the College must hold in perpetuity or for a donor-specified period. Under this policy, as approved by the Board of Trustees, the endowment assets are invested in a manner that is intended to produce results that exceed the price and yield results of comparable recognized measures of performance, while assuming a moderate level of investment risk. The College expects its endowment funds, over time, to provide an average rate of return of approximately 6 percentage points higher than the rate of inflation as measured by the Consumer Price Index over the same period of time. Actual returns in any given year may vary from this amount.

**Strategies Employed for Achieving Objectives**

To satisfy its long-term rate-of-return objectives, the College relies on a total-return strategy in which investment returns are achieved through both capital appreciation (realized and unrealized) and current yield (interest and dividends). The College targets a diversified asset allocation that places a greater emphasis on equity-based investments to achieve its long-term return objectives within prudent risk constraints.

JBH-000177

**NOTES TO FINANCIAL STATEMENTS**
**JUDSON COLLEGE**
**JUNE 30, 2010 AND 2009**

**NOTE 4.     ENDOWMENT — Continued**

**Spending Policy and How the Investment Objectives Relate to Spending Policy**

The College has a policy of appropriating for distribution each year up to 6% of the average market value of the endowment funds, excluding beneficial interest in perpetual trusts, at the end of the three previous calendar years through the calendar year-end preceding the fiscal year in which the distribution is planned. In establishing this policy, the College considered the long-term expected return on its endowment. Accordingly, over the long-term, the College expects the current spending policy to allow its endowment to grow an average of 2.5% annually. This is consistent with the College's objective to maintain the purchasing power of the endowment assets held in perpetuity or for a specified term as well as to provide additional real growth through new gifts and investment return.

**NOTE 5.     PROPERTY AND EQUIPMENT**

Property and equipment consists of the following at June 30:

| | 2010 | 2009 |
|---|---|---|
| Land | $         215,243 | $         215,243 |
| Buildings | 17,781,532 | 17,037,765 |
| Furniture and equipment | 4,583,256 | 4,437,962 |
| Land improvements | 2,473,834 | 2,425,695 |
| Construction in progess | 146,700 | 383,951 |
| Vehicles | 130,298 | 126,398 |
| Livestock and tack | 78,620 | 72,970 |
| | 25,409,483 | 24,699,984 |
| Less: accumulated depreciation | (12,587,286) | (11,799,975) |
| Total property and equipment | $      12,822,197 | $      12,900,009 |

Depreciation expense was $797,735 and $809,755 for the years ended June 30, 2010 and 2009, respectively.

**NOTE 6.     CAPITAL LEASE OBLIGATIONS**

The College has a lease agreement with the Educational Building Authority of the City of Marion (the "Authority") through January 2033, for the purpose of providing permanent financing of the costs of various capital improvements on the campus of the College. The lease covers various capital improvements, including Jewett Hall and the Lowder Science Building. The lease is in conjunction with the issue of tuition revenue bonds (Series 2000 and Series 2003) by the Authority, which are secured by the bondholders' first right to the College's tuition and fees payable by students enrolled in the College, otherwise from its general endowment. Rental payments under the lease are to be in amounts sufficient to pay the principal and interest on these bonds as due.

14

JBH-000178

DOCUMENT 1

## NOTES TO FINANCIAL STATEMENTS
## JUDSON COLLEGE
## JUNE 30, 2010 AND 2009

**NOTE 6.    CAPITAL LEASE OBLIGATIONS – Continued**

The outstanding balance on the Series 2000 bonds is $2,500,000, as of June 30, 2010 and 2009. The Series 2000 bonds mature between January 1, 2017 and January 1, 2025, and have interest rates from 5.75% to 6.20%. Interest in the amount of $150,786 is payable annually until 2017, at which time payments of maturing principal and interest will be made.

The outstanding balance on the Series 2003 bonds is $5,725,000 and $5,920,000 as of June 30, 2010 and 2009, respectively. The Series 2003 bonds mature serially between January 1, 2005 and January 1, 2033. The bonds bear interest at a variable rate (approximately .50% on June 30, 2010) determined in a manner that results in the market value of the Series 2003 bonds being 100% of their principal amount on the date of determination. The variable rate cannot exceed 8%. The Series 2003 bonds are also secured by an irrevocable letter of credit issued by Wells Fargo Bank which extends credit to the Authority in an amount equal to the outstanding principal balance and any accrued interest thereon.

The capital leases are for property with a cost of $8,612,661 and accumulated depreciation of $3,191,405 at June 30, 2010. These amounts are included in property and equipment on the accompanying statement of financial position.

Future minimum lease payments under capital leases at June 30, 2010 are as follows:

| Years ending June 30: | | |
|---|---|---:|
| 2011 | $ | 578,646 |
| 2012 | | 580,514 |
| 2013 | | 581,980 |
| 2014 | | 583,044 |
| 2015 | | 583,706 |
| Thereafter | | 10,514,852 |
| Total future minimum lease payments | | 13,422,742 |
| Less: amounts representing interest | | (5,197,742) |
| Capital lease obligation | $ | 8,225,000 |

**NOTE 7.    NOTES PAYABLE**

The College has $5,379,520 unsecured line of credit agreements with three local financial institutions with interest rates varying from 4.25% to 5%. The line of credit agreements mature in August 2011 and May 2012. $2,399,902 and $1,827,648 was outstanding under these agreements as of June 30, 2010 and 2009, respectively.

**NOTE 8.    RETIREMENT BENEFITS**

The College has a defined contribution pension plan. Contributions by the College are based on years of service and contributions by the participant. The Board of the College temporarily suspended employer matching contributions on January 1, 2009.

15

JBH-000179

DOCUMENT 3

## NOTES TO FINANCIAL STATEMENTS
## JUDSON COLLEGE
## JUNE 30, 2010 AND 2009

**NOTE 9.**   **RELATED PARTY TRANSACTIONS**

The Alabama Baptist State Convention (the "Convention") supports the College with annual allocations from its Cooperative Program.  The College received $1,034,462 and $1,073,035 in such revenues from the Convention during the years ended June 30, 2010 and 2009, respectively.   A receivable in the amount of $673,961 and $636,632, was due from the Convention as of June 30, 2010 and 2009, respectively, and is included in pledge receivables on the statements of financial position.

The College is the income beneficiary of various trust funds administered by The Baptist Foundation of Alabama, totaling $3,038,219 and $2,993,350, as of June 30, 2010 and 2009, respectively.  This amount is included in beneficial interest in perpetual trusts on the statement of financial position.  Under the terms of the trusts, the College has the right to receive the income generated from these trusts in perpetuity.

**NOTE 10.**   **RESTRICTED NET ASSETS**

Temporarily restricted net assets at June 30 are available for the following purposes:

|  | 2010 | 2009 |
|---|---|---|
| Future operations | $ 905,246 | $ 989,395 |
| Endowment appropriations | 1,267,593 | 1,160,819 |
| Capital expenditures | 548,500 | 596,000 |
| Total temporarily restricted net assets | $ 2,721,339 | $ 2,746,214 |

**NOTE 11.**   **NET ASSETS RELEASED FROM RESTRICTIONS**

Net assets are released from donor restrictions when expenses are incurred to satisfy the restricted purposes or by occurrence of other events as specified by the donors.  Net assets were released from restrictions during the years ended June 30, are as follows:

Release of temporary restrictions:

|  | 2010 | 2009 |
|---|---|---|
| Satisfaction of time restrictions | $ 825,670 | $ 1,009,672 |
| Release of restrictions pursuant to UPMIFA | 76,305 | - |
| Capital expenditures | 47,500 | - |
| Other | 3,586 | - |
| Net assets released from temporary restrictions | $ 953,061 | $ 1,009,672 |

16

JBH-000180

**NOTES TO FINANCIAL STATEMENTS**
**JUDSON COLLEGE**
**JUNE 30, 2010 AND 2009**

**NOTE 11.    NET ASSETS RELEASED FROM RESTRICTIONS – Continued**

Release of permanent restrictions:

|  | 2010 | 2009 |
|---|---|---|
| Release of restrictions pursuant to UPMIFA | $    588,641 | $        - |
| Donor release of restrictions | - | 768,024 |
| Net assets released from permanent restrictions | $    588,641 | $    768,024 |

Pursuant to Section 19-3C-6(d), Code of Alabama 1975, as amended, the College was granted approval by the Office of the Attorney General of the State of Alabama to release the restrictions on certain institutional endowment funds.  Total institutional endowment funds approved for release from restrictions was $664,946.

**NOTE 12.    COMMITMENTS**

Commitments for the purchase of property and equipment at June 30, 2010, approximated $233,000.

**NOTE 13.    FAIR VALUE MEASUREMENTS**

Authoritative accounting literature establishes a framework for using fair value to measure assets and liabilities and defines fair value as a price that would be received to sell an asset or paid to transfer a liability (an exit price) as opposed to the price that would be paid to acquire the asset or received to assume the liability (an entry price).  A fair value measure should reflect the assumptions that market participants would use in pricing the asset or liability, including the assumptions about the risk inherent in a particular valuation technique, the effect of a restriction on the sale or use of an asset and the risk of nonperformance.  Required disclosures include stratification of statement of financial position amounts measured at fair value based on inputs the Company uses to derive fair value measurements.  These strata include:

Level 1 valuations, where the valuation is based on quoted market prices for identical assets or liabilities traded in active markets (which include exchanges and over-the-counter markets with sufficient volume),

Level 2 valuations, where the valuation is based on quoted market prices for similar instruments traded in active markets, quoted prices for identical or similar instruments in markets that are not active and model-based valuation techniques for which all significant assumptions are observable in the market, and

17

JBH-000181

**NOTES TO FINANCIAL STATEMENTS**
**JUDSON COLLEGE**
**JUNE 30, 2010 AND 2009**

NOTE 13.    FAIR VALUE MEASUREMENTS - Continued

Level 3 valuations, where the valuation is generated from model-based techniques that use significant assumptions not observable in market, but observable based on Company-specific data. These unobservable assumptions reflect the Company's own estimates for assumptions that market participants would use in pricing the asset or liability. Valuation techniques typically include option pricing models, discounted cash flow models and similar techniques, but may also include the use of market prices of assets or liabilities that are not directly comparable to the subject asset or liability.

The assets' or liabilities' fair value measurement level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement. Valuation techniques used need to maximize the use of observable inputs and minimize the use of unobservable inputs.

Following is a description of the valuation methodologies used for assets measured at fair value.

**Common stocks, government bonds, government obligations and corporate bonds:** Valued at the closing price reported on the active market on which the individual securities are traded - Level 1 valuations.

**Common funds:** Valued at the net asset value of shares held by the College at year end - Level 1 valuations.

**Other Investments:** Valued at independent appraised value - Level 3 valuations.

**Beneficial interests in perpetual trusts:** Valued at the current fair value of the College's interest in the trust assets at each measurement date, thus the carrying value recorded in the financial statements approximates fair value - Level 1 valuations.

**Pledges receivable:** Pledges receivable due within one year are valued at net realizable value, which approximates the fair value. Pledges receivable with due dates greater than one year are discounted at an appropriate rate commensurate with the risks involved - Level 3 valuations.

The methods described above may produce a fair value calculation that may not be indicative of net realizable value or reflective of future fair values. Furthermore, while the College believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement at the reporting date.

18

JBH-000182

DOCUMENT 2

**NOTES TO FINANCIAL STATEMENTS**
**JUDSON COLLEGE**
**JUNE 30, 2010 AND 2009**

**NOTE 13.   FAIR VALUE MEASUREMENTS - Continued**

The following tables present financial assets measured at fair value on a recurring basis as of June 30, by caption on the statement of financial position and by the valuation hierarchy defined above:

| | 2010 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| Common stock | $ 4,079,936 | $ - | $ 63,823 | $ 4,143,759 |
| Real estate | - | - | 998,191 | 998,191 |
| Corporate bonds | 700,481 | - | - | 700,481 |
| U.S. Government obligations | 431,754 | - | - | 431,754 |
| Government bonds | 109,906 | - | - | 109,906 |
| Money market | 301,002 | - | - | 301,002 |
| Other investments | - | - | 107,891 | 107,891 |
| Total Investments | $ 5,623,079 | $ - | $ 1,169,905 | $ 6,792,984 |
| Perpetual trusts | $ 6,584,301 | $ - | $ - | $ 6,584,301 |
| Pledges receivable, net | $ - | $ - | $ 2,662,656 | $ 2,662,656 |

| | 2009 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| Common stock | $ 3,786,204 | $ - | $ 58,873 | $ 3,845,077 |
| Real estate | - | - | 994,993 | 994,993 |
| Corporate bonds | 671,712 | - | - | 671,712 |
| U.S. Government obligations | 538,499 | - | - | 538,499 |
| Government bonds | 133,875 | - | - | 133,875 |
| Common funds | 7,296 | - | - | 7,296 |
| Certificate of deposit | 10,000 | - | - | 10,000 |
| Money market | 57,171 | - | - | 57,171 |
| Other investments | - | - | 134,477 | 134,477 |
| Total investments | $ 5,204,757 | $ - | $ 1,188,343 | $ 6,393,100 |
| Perpetual trusts | $ 6,286,040 | $ - | $ - | $ 6,286,040 |
| Pledges receivable, net | $ - | $ - | $ 2,375,621 | $ 2,375,621 |

19

JBH-000183

DOCUMENT 2

### NOTES TO FINANCIAL STATEMENTS
### JUDSON COLLEGE
### JUNE 30, 2010 AND 2009

**NOTE 13.    FAIR VALUE MEASUREMENTS - Continued**

The following tables illustrate a roll forward for all assets measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the year ended June 30:

| | 2010 | | | |
| --- | --- | --- | --- | --- |
| | Common Stock | Real Estate | Other | Pledges Receivable |
| Balance, beginning of year | $   58,873 | $ 994,993 | $   134,477 | $ 2,375,621 |
| Unrealized gain | 4,950 | - | 6,929 | - |
| Purchases or donations | - | 3,198 | - | - |
| Disposals | - | - | (33,515) | - |
| New pledge receivables | - | - | - | 1,896,461 |
| Collections | - | - | - | (1,577,298) |
| Write off of uncollectible pledge | - | - | - | - |
| Increase in discount | - | - | - | (32,128) |
| Balance, end of year | $   63,823 | $ 998,191 | $   107,891 | $ 2,662,656 |

| | 2009 | | | |
| --- | --- | --- | --- | --- |
| | Common Stock | Real Estate | Other | Pledges Receivable |
| Balance, beginning of year | $   51,480 | $ 994,993 | $   124,738 | $ 3,286,326 |
| Unrealized gain | 7,393 | - | 7,026 | - |
| Purchases or donations | - | - | 2,713 | - |
| New pledge receivables | - | - | - | 780,182 |
| Collections | - | - | - | (1,732,786) |
| Write off of uncollectible pledge | - | - | - | (25,755) |
| Amortization of discount | - | - | - | 67,654 |
| Balance, end of year | $   58,873 | $ 994,993 | $   134,477 | $ 2,375,621 |

JBH-000184

DOCUMENT 3

*[THIS PAGE INTENTIONALLY LEFT BLANK]*

JBH-000185

DOCUMENT 2

APPENDIX B

FORM OF LEGAL OPINION
Haskell Slaughter Young & Rediker, LLC
Birmingham, Alabama

[Closing Date]

Educational Building Authority
   of the City of Marion
Marion, Alabama

Judson College
Marion, Alabama

The Frazer Lanier Company
   Incorporated
Montgomery, Alabama

Dear Sirs:

    We have examined certified copies of proceedings and other documents showing the organization under the laws of the State of Alabama of the EDUCATIONAL BUILDING AUTHORITY OF THE CITY OF MARION (herein called the "Authority"), together with copies of proceedings of the Authority and other documents submitted to us pertaining to the issuance and validity of

$11,230,000
EDUCATIONAL BUILDING AUTHORITY
OF THE CITY OF MARION
Revenue Bonds
Judson College
Series 2010

Dated October 1, 2010

(which bonds are herein called the "Series 2010 Bonds"). We have not examined any of the executed Series 2010 Bonds, but we have been furnished with appropriate certificates respecting their form and execution. In our examination of all documents pertaining to the organization of the Authority and the issuance of the Series 2010 Bonds, we have assumed the authenticity of documents submitted to us as originals, the conformity to the original documents of documents submitted to us as copies, the authenticity of the originals of such latter documents and the correctness of any facts stated in such documents.

JBH-000186

DOCUMENT 2

The documents submitted to us show as follows:

(a)     the Series 2010 Bonds have been issued under a Trust Indenture dated as of October 1, 2010 (herein called the " Indenture"), between the Authority and Regions Bank, Birmingham, Alabama, as trustee (herein, together with its successors in trust under the Indenture, called the "Trustee");

(b)     the Authority and Judson College, an entity of The Alabama Baptist State Convention (herein called the "College"), have entered into a Lease Agreement dated as of October 1, 2010 (herein called the "Lease"), pursuant to which the Authority has leased the Leased Facilities (as defined in the Lease and herein called the "Leased Facilities") to the College for a primary term extending until and including October 1, 2040;

(c)     the Lease obligates the College to pay rent directly to the Trustee, for the account of the Authority, on such dates and in such amounts as shall, together with certain other moneys, be sufficient to provide for the payment, when due, of the principal of and the interest and premium (if any) on the Series 2010 Bonds; and

(d)     in the Indenture, the Authority has reserved the right to issue additional bonds (herein called "Additional Bonds") for certain specified purposes, without express limit as to principal amount and on a parity with the Series 2010 Bonds as respects the security afforded by the Indenture, but only upon compliance with the applicable conditions precedent specified in the Indenture.

In rendering the opinion hereinafter expressed that the interest on the Series 2010 Bonds is, with certain exceptions, excludable from gross income for purposes of federal income taxation, we have relied, in part, upon certain covenants, representations and warranties made by the College, including representations and warranties respecting the status of the College as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986 (herein called the "Code").

Based upon the foregoing, we are of the following opinion:

(1)     The Authority has been duly organized as and is a validly existing public corporation and instrumentality pursuant to and under the laws of the State of Alabama and has corporate power to sell and issue the Series 2010 Bonds, to execute and deliver the Lease and the Indenture and to perform the agreements on its part contained in each of said instruments.

(2)     The Series 2010 Bonds have been duly authorized, sold, executed, authenticated and issued in the manner provided by the applicable provisions of the Constitution and laws of the State of Alabama, are in due and legal form and evidence valid and binding special obligations of the Authority payable, as to principal, interest and premium (if any), solely out of (i) the revenues and receipts to be derived by the Authority from the leasing of the Leased Facilities, as they may at any time exist, or (ii) any other moneys which may be made available to the Trustee under the Indenture.

(3)     Under the Indenture the payment of the principal of and the interest and premium (if any) on the Series 2010 Bonds is secured, without preference or priority of one over another or of any of the Series 2010 Bonds over any of the Additional Bonds, (i) by a valid pledge and assignment of the rental payable to the Authority by the College under the Lease and (ii) by a valid assignment to the Trustee of all right, title and interest of the Authority in and to the Lease, except certain release and indemnification rights of the Authority and certain rights which are therein expressly provided to be exercised by the Authority.

JBH-000187

DOCUMENT 2

(4)    The Lease and the Indenture have each been duly authorized, executed and delivered on behalf of the Authority and constitute legal, valid and binding agreements of the Authority enforceable in accordance with their respective terms, except to the extent that the enforceability of either such agreement may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, or (ii) equity principles and proceedings.

(5)    Under existing statutes, the interest on the Series 2010 Bonds is exempt from income taxation in the State of Alabama.

(6)    Under existing statutes, regulations, rulings and court decisions, the interest on the Series 2010 Bonds is excluded from gross income for federal income tax purposes subject to the limitation set forth in Section 145(b) of the Code. Moreover, such interest is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations, although it should be noted that, in the case of corporations (as defined for federal income tax purposes), such interest is taken into account in determining adjusted current earnings the purpose of computing the alternative minimum tax imposed on such corporations. In addition to the exception stated therein, the opinion set forth in the first sentence of this paragraph is subject to the condition that the Authority and the College comply with all requirements of the Code that must be satisfied subsequent to the issuance of the Series 2010 Bonds in order that interest thereon be, or continue to be, excluded from gross income for federal income tax purposes. The Authority and the College have covenanted to comply with each such requirement. Failure to comply with certain of such requirements may cause the inclusion of interest on the Series 2010 Bonds in gross income for federal income tax purposes retroactive to the date of issuance of the Series 2010 Bonds. We express no opinion regarding other federal tax consequences arising with respect to the Series 2010 Bonds.

We have not examined the title of the Authority to any property, whether real, personal or mixed, constituting part of the Leased Facilities and we therefore express no opinion thereon.

We have been employed solely for the purpose of preparing certain legal documents and supporting certificates, reviewing the transcript of proceedings by which the Series 2010 Bonds have been authorized to be issued and rendering an opinion relating to the essential legality and validity of the Series 2010 Bonds, to the legal security for their payment, to the exemption of the interest thereon from income taxation by the State of Alabama, to the exclusion of the interest thereon from gross income for purposes of federal income taxation and to certain related matters. While we have assisted in the preparation of certain portions of the Official Statement of the Authority respecting the Series 2010 Bonds, and we are of the opinion that the statements made therein under the captions "The Series 2010 Bonds", "Summary of the Lease Agreement", "Summary of the Indenture" and "Tax Exemption" fairly summarize the matters therein referred to, we have not been requested independently to check or verify, and have not independently checked or verified, and will express no opinion with respect to the adequacy, accuracy, completeness or fairness of any other information contained therein. We have not made or participated in any investigation or inquiry into the financial condition of the College, nor have we reviewed any documents relating thereto. We have not participated in any way in the preparation of the Appendices to said Official Statement (other than the Appendix containing a form of this opinion), and we express no opinion whatever as to the accuracy or completeness of any information contained in such Appendices.

Yours very truly,

HASKELL SLAUGHTER YOUNG
& REDIKER, LLC

B-3

JBH-000188

DOCUMENT 2

*[THIS PAGE INTENTIONALLY LEFT BLANK]*

JBH-000189

DOCUMENT 3

# EXHIBIT D

JBH-000190

DOCUMENT 3

**Judson College**
**Revenue Bonds Series 2010**
**General Endowment Covenant**

Prepared:
5/8/2020
jm

| | | As Of 3/31/2020 | |
|---|---|---|---|
| **Coverage Calculation:** | | | |
| Principal Amount of Bonds Outstanding | $ | 9,285,000 | |
| Percent Coverage Requirement | | 125% | |
| Amount of General Endowment Required | $ | 11,606,250 | |
| Market Value of General Endowment | $ | 15,122,736 | |
| **Endowment Coverage Percentage** | | **163%** | |
| **Components of the General Endowment:** | | | |
| Subject to Covenant * | | | |
| Endowment and Investments | $ | 8,744,737 | |
| Trust Funds | | 6,080,920 | |
| Total Components Subject to Covenant | | | $ 14,825,657 |
| Not Subject to Covenant * | | | |
| Endowment Pledges Receivable, Net | $ | 9,647 | |
| Temporarily Restricted and Unrestricted Pledges Receivable, Net | | 287,432 | |
| Total Components Not Subject to Covenant | | | 297,079 |
| | | | $ 15,122,736 |

\* Covenant refers to Article VIII, Section 8.1
of the Lease Agreement Judson College and
the Educational Building Authority of the
City of Marion, dated as of October 1, 2010

Prepared by: _____
Jo Ann Morina, CPA
Dated: _____5 - 8 -2020_____

JBH-000191

**Judson College**

| | | As of 3/31/2020 |
|---|---|---|
| Endowment and Investments | $ | 8,744,737 |
| Trusts | | 6,080,920 |
| Endowment Pledges Receivable, Net | | 9,647 |
| Total Endowment and Investment Assets | $ | 14,835,304 |
| Temporarily Restricted and Unrestricted Pledges Receivable, Net | | 287,432 |
| Total | $ | 15,122,736 |

Note - Endowment and Investments and Trusts are stated at market value.
Pledges receivable are stated at net present value of pledge amount.

Prepared by: _____
Jo Ann Morina, CPA
Dated: _____5-8-2020_____

| | | |
|---|---|---|
| Endowment Pledges Receivable: | | |
| Permanently Restricted Pledges Receivable (#5-1308-000) | $ | 11,029 |
| Discount on Perm. Restricted Pledges Receivable (#5-1309-000) | $ | (1,382) |
| Endowment Pledges Receivable, Net | $ | 9,647 |
| | | |
| Temporarily & Unrestricted Pledges Receivable: | | |
| Temporarily Restricted Pledges Receivable (#3-1308-000) | $ | 20,430 |
| Discount on Temp. Restricted Pledges Receivable (#3-1309-000) | $ | (11,373) |
| Temporarily Restricted Pledges Receivable, Net | $ | 9,057 |
| | | |
| Unrestricted Pledges Receivable (Account #1-1308-000) | $ | 308,516 |
| Discount on Unrestricted Pledges Receivable (Account #1-1309-000) | $ | (30,141) |
| Unrestricted Pledges Receivable, Net | $ | 278,375 |
| | | |
| Unrestricted and Temp. Restricted Pledges Receivable, Net | | 287,432 |
| Plus: Pledge Receivable - AL Baptist State Convention, Net | | - |
| | $ | 287,432 |
| | | |
| Pledge Receivable - AL Baptist State Convention (#3-1308-002) | $ | 487,973 |
| Less: Amounts Collected (#1-4007-000) July - June | $ | (487,973) |
| Pledge Receivable - AL Baptist State Convention, Net | $ | - |

DOCUMENT 2

Judson College
The Student Fees
Fiscal Year Ended June 30

| Fiscal Year End | Student Fees |
|---|---|
| 2010 | $ 3,339,522 |
| 2011 | 3,634,994 |
| 2012 | 4,223,574 |
| 2013 | 4,515,790 |
| 2014 | 4,268,901 |
| 2015 | 4,818,882 |
| 2016 | 4,559,607 |
| 2017 | 5,375,387 |
| 2018 | 5,151,082 |
| 2019 | 4,537,179 |

Prepared by: _____
Jo Ann Morina, CPA
Dated: _____ 5-8-2020 _____

JBH-000193

DOCUMENT 3

# EXHIBIT E

JBH-000194



JUDSON COLLEGE

KNOWLEDGE AND FAITH FOR A PURPOSEFUL LIFE

October 28, 2010

The Frazer Lanier Company Incorporated
Montgomery, Alabama

Educational Building Authority
   of the City of Marion
Marion, Alabama

Haskell Slaughter Young & Rediker, LLC
Birmingham, Alabama

<div align="center">

Re:       **$11,230,000**
**Educational Building Authority**
**of the City of Marion**
**Revenue Bonds**
**Judson College**
**Series 2010**
</div>

Dear Sirs:

I am counsel to Judson College, an Alabama non-for-profit corporation (the "College"). As such I am familiar with its Certificate of Incorporation, By-Laws and other corporate proceedings and records, with the contracts, agreements and other instruments to which it is a party or by which it is bound, with governmental orders applicable to it and with the judgments and other court orders by which it is bound.  In addition, I have examined and am familiar with the following:

(a)    an executed counterpart of a Lease Agreement dated as of October 1, 2010 (the "Lease"), between Educational Building Authority of the City of Marion (the "Authority") and the College;

(b)    an executed counterpart of a Ground Lease Agreement dated as of October 1, 2010 (the "Ground Lease"), between the Authority and the College;

(c)    a certified copy of a resolution of the Board of Trustees of the College adopted at a meeting of the said Board of Trustees held on October 7, 2010, (i) authorizing the College to enter into the Lease and the Ground Lease and to carry out the transactions contemplated thereby, (ii) approving the execution and delivery of the Official Statement hereinafter referred to, and (iii) approving the

JBH-000195

The Frazer Lanier Company Incorporated
Educational Building Authority
  of the City of Marion
Haskell Slaughter Young & Rediker, LLC
October 28, 2010
Page 2

sale and issuance of the Series 2010 Bonds referred to above (the "Series 2010 Bonds");

(d) an executed copy of the Official Statement of the Authority, dated October 21, 2010 pertaining to the Series 2010 Bonds (the "Official Statement"); and

(e) such matters of law and such other documents and information as I believe necessary to enable me to render the opinions hereinafter expressed.

Based upon and subject to the foregoing, I am of the following opinion:

(1) The College is a not-for-profit corporation duly organized and validly existing and in good standing under the laws of the State of Alabama and has all necessary power and authority to own or lease its properties, to conduct its business and to enter into and perform its obligations under the Lease and the Ground Lease.

(2) The Lease and the Ground Lease have each been duly authorized, executed and delivered on behalf of the College and constitute legal, valid and binding agreements of the College that are enforceable against the College in accordance with their respective terms, except to the extent that the enforceability of any thereof may be limited by (i) bankruptcy, insolvency, reorganization and other similar laws affecting creditors' rights generally, and (ii) the discretion of any court before which any enforcement proceeding may be brought to deny or limit the remedy of specific performance or other equitable relief with respect to contractual obligations other than for the payment of money.

(3) The Official Statement has been duly approved, executed and delivered by or on behalf of the College and such approval, execution and delivery were duly authorized.

(4) No authorization, approval, consent or other order of any governmental authority or agency is required for the valid authorization, execution and delivery by the College of the Lease or the Ground Lease or for the full effectiveness or enforceability of any thereof under the circumstances.

(5) The execution and delivery by the College of the Lease and the Ground Lease and the performance or observance by the College of the terms and conditions thereof will not violate, or result in a breach of, or constitute a default under, the Certificate of Incorporation or the By-Laws of the College or any indenture, mortgage, deed of trust, agreement or other instrument to which the College is a party or by which it is bound or to which any of its property is subject, or any judgment, order, decree, rule or regulation of any court or other governmental body that is applicable to the College.

Office of the Vice President and General Counsel

302 Bibb Street, Marion, AL 36756-2504          Phone: 334-683-5156          Email: bmathews@judson.edu

JBH-000196

The Frazer Lanier Company Incorporated
Educational Building Authority
    of the City of Marion
Haskell Slaughter Young & Rediker, LLC
October 28, 2010
Page 3

(6)     Under a ruling or determination letter of the Internal Revenue Service which is now in full force and effect, the College is an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, and the income thereof is exempt from federal income taxation under Section 501(a) of the said Internal Revenue Code.

Nothing has come to my attention to suggest that the Official Statement contains any untrue statement of a material fact or fails to state any material fact necessary in order to make statements contained therein not misleading.

There is, to the best of my knowledge, no action, suit, proceeding, inquiry or investigation performed by any court, public board or body that is pending or overtly threatened against the College nor, to the best of my knowledge, is there any basis therefor, wherein an unfavorable decision, ruling or finding that would materially or adversely affect the transactions contemplated by the Lease and the Ground Lease or which, in any way, would adversely affect the validity or enforceability of the Series 2010 Bonds, the Lease or the Ground Lease or any other agreement or instrument which pertains to the transactions contemplated by the Lease or the Ground Lease.

Very truly yours,

Joseph W. Mathews, Jr.

3997661_1

Office of the Vice President and General Counsel

302 Bibb Street, Marion, AL 36756-2504          Phone: 334-683-5156          Email: bmathews@judson.edu

DOCUMENT 3

# EXHIBIT F

JBH-000198

*The McGraw·Hill Companies*

# STANDARD
# &POOR'S

500 North Akard Street
Lincoln Plaza, Suite 3200
Dallas, TX 75201
tel 214 871-1402
reference no.: 1141238

September 20, 2010

Judson College
P.O. Box 120
Marion, AL 36756
Attention: Mr. David Potts, President

Re: *US$10,995,000 Judson College, Alabama, (Warrants), Series 2010, dated: October 1, 2010,
due: April 1, 2040*

Dear Mr. Potts:

Pursuant to your request for a Standard & Poor's rating on the above-referenced obligations, we have reviewed the information submitted to us and, subject to the enclosed *Terms and Conditions*, have assigned a rating of "BBB-". Standard & Poor's views the outlook for this rating as stable. A copy of the rationale supporting the rating is enclosed.

The rating is not investment, financial, or other advice and you should not and cannot rely upon the rating as such. The rating is based on information supplied to us by you or by your agents but does not represent an audit. We undertake no duty of due diligence or independent verification of any information. The assignment of a rating does not create a fiduciary relationship between us and you or between us and other recipients of the rating. We have not consented to and will not consent to being named an "expert" under the applicable securities laws, including without limitation, Section 7 of the Securities Act of 1933. The rating is not a "market rating" nor is it a recommendation to buy, hold, or sell the obligations.

This letter constitutes Standard & Poor's permission to you to disseminate the above-assigned rating to interested parties. Standard & Poor's reserves the right to inform its own clients, subscribers, and the public of the rating.

Standard & Poor's relies on the issuer/obligor and its counsel, accountants, and other experts for the accuracy and completeness of the information submitted in connection with the rating. This rating is based on financial information and documents we received prior to the issuance of this letter. Standard & Poor's assumes that the documents you have provided to us are final. If any subsequent changes were made in the final documents, you must notify us of such changes by sending us the revised final documents with the changes clearly marked.

To maintain the rating, Standard & Poor's must receive all relevant financial information as soon as such information is available. Placing us on a distribution list for this information would facilitate the process. You must promptly notify us of all material changes in the financial information and the documents. Standard & Poor's may change, suspend, withdraw, or place on

JBH-000199

Mr. David Potts
Page 2
September 20, 2010

CreditWatch the rating as a result of changes in, or unavailability of, such information.  Standard & Poor's reserves the right to request additional information if necessary to maintain the rating.

Please send all information to:

Standard & Poor's Ratings Services
Public Finance Department
55 Water Street
New York, NY  10041-0003

Standard & Poor's is pleased to be of service to you.  For more information on Standard & Poor's, please visit our website at www.standardandpoors.com.  If we can be of help in any other way, please call or contact us at nypublicfinance@standardandpoors.com.  Thank you for choosing Standard & Poor's and we look forward to working with you again.

Sincerely yours,

Standard & Poor's Ratings Services
a Standard & Poor's Financial Services LLC business

ss
enclosures
cc:   Mr. Randall Rushton, Executive Vice President
      Frazer Lanier Company, Inc.



# Global Credit Portal

## RatingsDirect®

September 27, 2010

# Judson College, Alabama; Private Coll/Univ - General Obligation

**Primary Credit Analyst:**
Blake Cullimore, Boston (1) 617-530-8312; blake_cullimore@standardandpoors.com

**Secondary Credit Analyst:**
Jessica Lukas, Chicago (1) 312-233-7004; jessica_lukas@standardandpoors.com

## Table Of Contents

Rationale

Outlook

Niche Demand And Enrollment Levels

Finances

Related Criteria And Research

JBH-000201

# Judson College, Alabama; Private Coll/Univ - General Obligation

## Credit Profile

US$10.995 mil rev bnds (Warrants) ser 2010 dtd 10/01/2010 due 04/01/2040

| | | |
|---|---|---|
| Long Term Rating | BBB-/Stable | New |

## Rationale

Standard & Poor's Ratings Services assigned its 'BBB-' long-term rating to the series 2010 bonds issued by the Educational Building Authority of the City of Marion, Ala. for Judson College. The outlook is stable.

The 'BBB-' rating reflects our assessment of Judson's:

- Expected fall 2010 enrollment of 385, a five-year average of 375 students with 210 residing on campus and 100 enrolled in distance-learning programs;
- Low levels of expendable resources with $4.5 million representing 48% of operations and 44% of fiscal 2009 pro forma debt;
- Expected post-issuance reduction of debt burden, but still somewhat high fiscal 2009 pro forma debt service burden of 7.1%; and
- Above-average endowment spend rate of 6%, which puts additional pressure on their bond covenants.

In our opinion, the rating also reflects the following positive credit factors:

- Strong and consistent support from the Alabama Baptist State Convention, which contributed $1 million in revenues in fiscal 2009 or approximately 11% of operations that management treats as unrestricted funds;
- Historically balanced operations on a full accrual basis with a small surplus expected for fiscal 2010;
- Niche demand and enrollment levels as a Christian-based all-female college that are consistent from year to year and do not reflect a downward trend, and are supported by consistent levels of transfer students; and
- A small, but adequate endowment of $13.2 million as of June 30, 2010.

The college expects to use the series 2010 bonds to refund the series 2000 fixed-rate bonds and series 2003 variable-rate (unswapped) bonds (both series were previously unrated), as well as three bank lines. The college is issuing the series 2010 bonds for nearly $11 million in a fixed-rate mode with a 30-year maturity. This effectively extends the maturity of the refunded bonds to 2030. We consider the bonds a general obligation of the college secured by student tuition and fees. The bonds are not secured by a lien or security interest in any facilities.

The college covenants to maintain a general endowment at 125% of the principal outstanding amount of the series 2010 bonds. The general endowment includes pledges payable to the college, which we believe weakens the covenant. However, the college is required to report to the trustee the market value of the endowment in January, April, July, and October of each year. Additionally, the college provides additional support to the tuition and fee security, should it be insufficient, pledging to make available funds from the general endowment and any other available funds from the college to meet its debt payment obligations. We expect maximum annual debt service burden (MADS) to decline to a more favorable but in our view somewhat high 7.2% post issuance. Additional

JBH-000202

*Judson College, Alabama; Private Coll/Univ - General Obligation*

bonds can be issued on parity if the college can provide the trustee with a certificate that student fees for the two years before the planned issuance of the additional bonds is 250% of the MADS of the outstanding bonds.

As of fiscal 2009, the outstanding bonds include the series 2000 bonds, in a fixed-rate mode, in the amount of $2.5 million; the series 2003 bonds, currently in a variable-rate mode supported by a letter of credit in the amount of $5.9 million; and an unsecured line of credit with a balance of $694,901 and one with a balance of $1.1 million.

Founded in 1838, Judson College is small undergraduate liberal arts women's college located in Marion, Ala. Affiliated with the Alabama Baptist State Convention since 1843, the college receives funds from the convention annually. The convention has provided more than $1 million annually since 2007 and has a long-term trend of increasing financial support for the college, which we view as an important factor that supports the schools rating.

## Outlook

The stable outlook reflects our expectation that over the next two years the Alabama Baptist State Convention will continue to provide significant support to the college and on-campus student demand and enrollment will remain stable or increase, the college will grow into its debt burden, and financial performance will continue to be balanced on a full accrual basis.

Credit factors that could lead to a negative rating action include further reduced support from the Alabama State Convention without a replacement source of revenue; declines in the endowment; reduced levels of total or on-campus enrollment; and deficit operations on a cash basis. Any additional long- or short-term debt that is not supported by commensurate growth in financial resources would put further downward pressure on the rating.

While we do not expect a positive rating action during the outlook period, such an action would require a growth in on-campus and total enrollment, surpluses on a full accrual basis, and maintenance of solid financial resources and endowment.

## Niche Demand And Enrollment Levels

The college has a narrow and dedicated niche as an all-women's college, however, the low number of headcount full-time equivalents, makes the college susceptible to enrollment risk. For fall 2010, the school matriculated 35% of its accepted students or 104 new freshmen bolstered by a small, but solid level of transfer students averaging 75 annually over the past five years.

Student quality is above the state average according to management with an expected fall 2010 entering-class ACT score of 22.9 and GPA of 3.42. Retention remains volatile between 60% and 80% over the past five years. The campus houses approximately 210 students on campus with capacity for 260 students. Management indicates that it enrolled approximately 100 students of its 379 headcount through its distance-learning curriculum in fiscal 2009. We consider tuition competitive at $21,940 for 2010-2011 academic year.

## Finances

While somewhat variable, we consider the operations generally balanced on a full accrual basis with the college expecting a small surplus for fiscal 2010. The balanced operations are based on adjusting operating revenues for the

JBH-000203

DOCUMENT 3

*Judson College, Alabama; Private Coll/Univ - General Obligation*

Alabama Baptist State Convention contributions, which are appropriated based on a calendar year by the convention and thus are reported as temporarily restricted revenues due to time constraints for the schools fiscal year. We consider revenue diversity a strength as the student dependence is a low 57% with endowment income representing (4.4%) and contributions from the convention providing (11%) of annual revenues in fiscal 2009. While the total budget is relatively small and has limited flexibility, we believe the management team has a demonstrated history working within these margins for a number of years. The college's endowment spending rate is 6% of the average market value of the endowment fund. The endowment provides 1x coverage of debt, which we consider a strength and due to recent changes in legislation in Alabama, the endowment is predominately unrestricted. The endowment is invested in 58% equities, 31% fixed income, 7% in real estate, and 4% cash.

The college is currently conducting a fundraising campaign for $10 million and has received pledges of $2.5 million. In our view, development for a school of this size is solid, with a decent giving rate, averaging $2.7 million annually over the past 10 years including annual giving and the capital campaign.

| Judson College Financial And Demand Statistics | | | | |
|---|---|---|---|---|
| | --Fiscal year ended June 30-- | | | |
| Enrollment and demand | 2009 | 2008 | 2007 | 2006 |
| Headcount (HC) | 384 | 374 | 363 | 421 |
| Full-time equivalent | 389 | 369 | 353 | 421 |
| Freshman selectivity (%) | 83.8 | 80.4 | 81.9 | 78.3 |
| Freshman matriculation (%) | 37.1 | 32.3 | 30.2 | 44.1 |
| Undergraduate HC to total HC (%) | 100.0 | 100.0 | 100.0 | 100.0 |
| Income statement | | | | |
| Adjusted operating revenue ($000s) | 9,199 | 10,476 | 9,131 | 8,767 |
| Adjusted operating expense ($000s) | 9,410 | 9,476 | 9,292 | 9,276 |
| Operating income ($000s) | (211) | 1,000 | (161) | (509) |
| Operating margin (%) | (2.2) | 10.6 | (1.7) | (5.5) |
| Change, unrestricted net assets (UNA) ($000s) | (580) | 65 | 92 | 23 |
| Bottom-line change, UNA (%) | (6.2) | 0.7 | 1.0 | 0.2 |
| Institution tuition discount (%) | 45.3 | 43.4 | 43.8 | 45.1 |
| Debt | | | | |
| Outstanding debt ($000s) | 10,248 | 9,599 | 9,360 | 12,840 |
| Pro forma debt ($000s) | 10,248 | 9,599 | 9,360 | 12,840 |
| Net available for debt service ($000s) | 1,019 | 2,260 | 1,349 | 780 |
| Pro forma MADS ($000s) | 672 | N.A. | N.A. | N.A. |
| Pro forma MADS coverage (x) | 1.5 | N.A. | N.A. | N.A. |
| MADS as % of expenses (%) | 7.1 | N.A. | N.A. | N.A. |
| Liquidity ratios | | | | |
| Endowment market value ($000s) | 11,972 | 14,742 | 16,533 | 15,143 |
| Cash and investments ($000s) | 6,641 | 6,843 | 7,170 | 4,750 |
| Unrestricted resources (UR) ($000s) | 1,769 | 1,728 | 1,708 | 5,809 |
| Expendable resouces (ER) ($000s) | 4,515 | 4,194 | 4,158 | 9,081 |
| UR to pro forma debt (%) | 17.3 | 18.0 | 18.2 | 45.2 |
| UR to expenses (%) | 18.8 | 18.2 | 18.4 | 62.6 |

842252 | 300000255

JBH-000204

*Judson College, Alabama; Private Coll/Univ - General Obligation*

| Judson College Financial And Demand Statistics  (cont.) | | | | |
|---|---|---|---|---|
| ER to pro forma debt (%) | 44.1 | 43.7 | 44.4 | 70.7 |
| ER to expenses (%) | 48.0 | 44.3 | 44.7 | 97.9 |
| Net fixed assets ($000s) | 12,900 | 12,872 | 12,588 | 11,875 |
| Average age of plant (years) | 14.6 | 13.6 | 13.1 | 13.6 |

## Related Criteria And Research

USPF Criteria: Higher Education, June 19, 2007

JBH-000205

Copyright © 2010 by Standard & Poor's Financial ,<FONT COLOR="BLUE">Services LLC (S&P)</FONT>, a subsidiary of The McGraw-Hill Companies.

No content (including ratings, credit-related analyses and data, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P. The Content shall not be used for any unlawful or unauthorized purposes. S&P, its affiliates, and any third-party providers, as well as their directors, officers, shareholders, employees or agents (collectively S&P Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content, or for the security or maintenance of any data input by the user. The Content is provided on an "as is" basis. S&P PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs) in connection with any use of the Content even if advised of the possibility of such damages.

Credit-related analyses, including ratings, and statements in the Content are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions. S&P assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P's opinions and analyses do not address the suitability of any security. S&P does not act as a fiduciary or an investment advisor. While S&P has obtained information from sources it believes to be reliable, S&P does not perform an audit and undertakes no duty of due diligence or independent verification of any information it receives.

S&P keeps certain activities of its business units separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain business units of S&P may have information that is not available to other S&P business units. S&P has established policies and procedures to maintain the confidentiality of certain non-public information received in connection with each analytical process.

S&P may receive compensation for its ratings and certain credit-related analyses, normally from issuers or underwriters of securities or from obligors. S&P reserves the right to disseminate its opinions and analyses. S&P's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

JBH-000206

DOCUMENT 3

# EXHIBIT G

JBH-000207

DOCUMENT 1

**Judson College**
**Revenue Bonds Series 2010**
**General Endowment Covenant**

Prepared:
5/8/2021

As Of
3/31/2021

**Coverage Calculation:**

| | | |
|---|---|---|
| Principal Amount of Bonds Outstanding | $ | 9,030,000 |
| Percent Coverage Requirement | | 125% |
| Amount of General Endowment Required | $ | 11,287,500 |
| Market Value of General Endowment | $ | 16,369,903 |
| Endowment Coverage Percentage | | 181% |

**Components of the General Endowment:**

Subject to Covenant *

| | | | | |
|---|---|---|---|---|
| Endowment and Investments | $ | 8,744,737 | | |
| Trust Funds | | 7,625,166 | | |
| Total Components Subject to Covenant | | | $ | 16,369,903 |

Not Subject to Covenant *

| | | | | |
|---|---|---|---|---|
| Endowment Pledges Receivable, Net | $ | - | | |
| Temporarily Restricted and Unrestricted Pledges Receivable, Net | | - | | |
| Total Components Not Subject to Covenant | | | | - |
| | | | $ | 16,369,903 |

\* Covenant refers to Article VIII, Section 8.1
of the Lease Agreement Judson College and
the Educational Building Authority of the
City of Marion, dated as of October 1, 2010

Prepared by: _Glen E Branum_
Glenn E Branum, CPA

Dated: _5/11/21_

JBH-000208

**Judson College**

|  |  | As of 3/31/2021 |
|---|---|---|
| Endowment and Investments | $ | 8,744,737 |
| Trusts | | 7,625,166 |
| Endowment Pledges Receivable, Net | | - |
| Total Endowment and Investment Assets | $ | 16,369,903 |
| Temporarily Restricted and Unrestricted Pledges Receivable, Net | | - |
| Total | $ | 16,369,903 |

Note - Endowment and Investments and Trusts are stated at market value.
     Pledges receivable are stated at net present value of pledge amount.

Prepared by: *Glen E Branum*
              Glenn E Branum, CPA
       Dated: 5/11/21

Endowment Pledges Receivable:
  Permanently Restricted Pledges Receivable (#5-1308-000)
  Discount on Perm. Restricted Pledges Receivable (#5-1309-000)
  Endowment Pledges Receivable, Net                                    $              -

Temporarily & Unrestricted Pledges Receivable:
  Temporarily Restricted Pledges Receivable (#3-1308-000)
  Discount on Temp. Restricted Pledges Receivable (#3-1309-000)
  Temporarily Restricted Pledges Receivable, Net                       $              -

  Unrestricted Pledges Receivable (Account #1-1308-000)
  Discount on Unrestricted Pledges Receivable (Account #1-1309-000)
  Unrestricted Pledges Receivable, Net                                 $              -

  Unrestricted and Temp. Restricted Pledges Receivable, Net                           -
  Plus: Pledge Receivable - AL Baptist State Convention, Net                          -
                                                                       $              -

    Pledge Receivable - AL Baptist State Convention (#3-1308-002)
    Less: Amounts Collected (#1-4007-000) July - June
    Pledge Receivable - AL Baptist State Convention, Net               $              -

JBH-000209

DOCUMENT 1

Judson College
The Student Fees
Fiscal Year Ended June 30

| Fiscal Year End | Student Fees |
|---|---|
| 2010 | $  3,339,522 |
| 2011 | 3,634,994 |
| 2012 | 4,223,574 |
| 2013 | 4,515,790 |
| 2014 | 4,268,901 |
| 2015 | 4,618,882 |
| 2016 | 4,559,607 |
| 2017 | 5,375,387 |
| 2018 | 5,151,082 |
| 2019 | 4,537,179 |
| 2020 | 3,900,474 |

Prepared by: _Glen  E Branum_

Glenn E Branum, CPA

Dated: _5/11/21_

Note:  Judson changed their year end to May 31 for fye 5/31/20.  Numbers
reported for 2020 are for 11 month period ended May 31, 2020

JBH-000210

DOCUMENT 3

ELECTRONICALLY FILED
7/15/2022 11:42 AM
01-CV-2022-902060.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
JACQUELINE ANDERSON  SMITH, CLERK

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

| | |
|---|---|
| FRANK C. MANN, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **CIVIL ACTION NO.** |
| CHARLES F. DUNKIN, ROY A. BARNETT | ) |
| JR., DAPHNE RUDICELL ROBINSON, | ) **CV-2022-_____** ` |
| BRUCE FULLER, JOSEPH W. MATHEWS, | ) |
| JR., JUDITH KAREN FAVOR, JOAN | ) |
| VIGNES NEWMAN, RICK LANCE, and | ) |
| THE ALABAMA BAPTIST STATE | ) |
| CONVENTION, | ) |
| | ) |
|    Defendants. | ) |

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS PURSUANT TO ALABAMA RULE 34, SERVED WITH COMPLAINT

Pursuant to Rule 34 of the Alabama Rules of Civil Procedure, Plaintiff Frank C. Mann II ("Plaintiff") requests that Defendants CHARLES F. DUNKIN ("Dunkin"), ROY A. BARNETT JR. ("Barnett"), DAPHNE RUDICELL ROBINSON ("Robinson"), BRUCE FULLER ("Fuller"), JOSEPH W. MATHEWS, JR. ("Mathews"), JUDITH KAREN FAVOR ("Favor"), JOAN VIGNES NEWMAN ("Newman"), RICK LANCE ("Lance"), and THE ALABAMA BAPTIST STATE CONVENTION (the "Convention") (collectively, Defendants"), within forty-five (45) days from the date hereof, each produce separately by paragraph of this request all responsive documents described below, in electronic form or as otherwise agreed by the parties to permit Plaintiff to inspect and copy at a location mutually agreed upon by the parties, the documents described below.  Documents (copied onto electronic or computer media or otherwise delivered) can also be sent directly to J. Michael Rediker, Esq., Rumberger Kirk & Caldwell, P.C., 1300 Park

Place Tower, 2001 Park Place North, Birmingham, Alabama 35203. Plaintiff is also willing to enter into a reasonable and reciprocal confidentiality stipulation, in customary form, scope and terminology, prior to the use, in briefing or discovery, of any such documents.

## DEFINITIONS

As used herein:

1.      "Document" is defined to be synonymous and equal in scope to usage of this term in Ala. R. Civ. P. 34(a). A copy or duplicate of a document which has any non-conforming notes, marginal annotations or other markings, and any preliminary versions, draft or revision of the foregoing is a separate document within the meaning of this term. Documents include, by way of example only, any memorandum, letter, envelope, correspondence, electronic mail, text message, report, meeting book or folder, presentation, "Powerpoint," note or notes, Post-it, message, telephone message, telephone log, diary, journal, appointment calendar, calendar, group schedule calendar, spreadsheet, database, accounting paper, minutes, appendices and meeting books prepared for or used at meetings of Trustees and directors and committees, working paper, financial report or financial statement, affidavit, statement, contract, invoice, record of transaction, ticket, slip, Teletype message, chart, graph, index, specification, directory, index, computer directory, computer disk, computer tape, zip drive, thumb drive, internal and external computer drives, videotape, audio tape or recording, or any other written, printed, typed, punched, recorded, taped, filmed, or graphic matter however produced or reproduced. Documents also include the file, folder tabs, and labels appended to or containing any documents and any drafts of such documents.

The term document also includes any media or document which contains, stores, embodies or sets forth any "correspondence" or any "Communication" (as herein defined).

The term document also includes "electronic data," and Electronically Stored Information

("ESI") as used under the Alabama Rules of Civil Procedure which means the original (or identical duplicate when the original is not available), and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind) of mechanical, facsimile, electronic, magnetic, digital, or other programs (whether private, commercial or work-in-progress); programming notes or instructions; activity listings of electronic mail receipts and/or transmittals; output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines; electronic mail; operating systems; source code of all types; programming languages; linkers and compilers; peripheral drivers; batch files; files stored in the cloud by any cloud storage service; ASCII files; code keys; pull-down tables; logs; file layouts; and any and all miscellaneous files and/or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists of an active file, deleted file or file fragment, including drafts of such documents. ESI and electronic data includes each ESI item's hashtag and other unique identifiers and its metadata (without alteration from original state), as well as any and all items stored on computer memories, hard disks, floppy disks, CD-ROM, zip drives, external and removable media and drives and their equivalent, magnetic tape of all types, microfiche, punched cards, punched tape, computer chips on or in any other vehicle for digital data storage and/or transmittal. The term electronic data also includes the production (besides hashtag and identifiers and metadata) of files, folder designations, and/or drives and partitions of or appended to, or associated with, any physical storage device associated with each original and/or copy.

    2.    "You" and "yours" mean the Defendant (and each such Defendant) answering these Interrogatories, your agents, employees, attorneys, representatives, consultants, accountants and

all other persons purporting to act or to have acted on your behalf.

3.      "Relating to," "relate to," "concern" or "concerning," mean reflecting, referring to, having any relationship to, pertaining to, evidencing, or constituting, in whole or in part, the subject matter of the particular discovery item or request.

4.      "Communication," "communicate," and "communicated," mean any oral or written utterance, notation or statement of any nature whatsoever, by or to whomsoever made, and regardless of method used to make the communication, including, but not limited to correspondence, messages, emails, social media and internet postings, conversations, dialogues, discussions, interviews, consultations, agreements, and other understandings, between two or more persons.

5.      "Meeting," "meet," or "met" means any assembly, convocation, encounter, or contemporaneous presence of two or more persons for any purpose, whether planned or not planned, arranged or scheduled in advance during which a communication of any kind occurred and shall include, but not be limited to, formal and informal gatherings, conversations, video conferences and telephone calls.

6.      "Policy" means any practice, procedure, directives, routine, rules, courses of conduct or code of conduct, written or unwritten, formal or informal, recorded or unrecorded, which were recognized, adopted, issued or followed or observed by you.

7.      "Describe" means to state with particularity each date, fact, event, document and occurrence and also to identify each person who can testify as to such stated dates, facts, events, occurrences and documents.

8.      "Person" includes natural persons, groups of natural persons acting in a concerted action capacity (e.g., a committee or council or panel or board), corporations, partnerships, joint

4

ventures, associations, trusts, and any other incorporated or unincorporated business, governmental, public or legal entity. A reference to any person shall include, when applicable, its subsidiaries, control persons, controlling persons, partners, shareholders, officers, directors, employees, agents, or other persons acting or purporting to act on its behalf.

9.      Any reference to a Defendant by name (including any short-hand reference to a defendant's name) shall be deemed to mean and include a reference to such Defendant as well as to his, her, or its predecessors, successors, parents, subsidiaries, divisions, affiliates, operating units, financing entities, controlling persons, controlled persons, partners, principals, members, shareholders, officers, trustees, directors, employees, and representatives or agents.

10.     "Financial statements" means, but is not limited to, the following (whether audited or unaudited or compiled, and whether final, interim, *pro forma*, complete, or partial): consolidated and non-consolidated balance sheets, statements of earnings, additional paid-in capital, retained earnings, source and application of funds, cash flow, projections, and notes that pertain to the designated entity's past or present financial condition, including general ledgers, subsidiary ledgers, trial balances, bookkeeping entries, journals, bank account statements, investment account statements, loan account statements, tax returns and accountant's workpapers with their supporting documents.

11.     "Judson" or "College" means and refers to Judson College, an Alabama non-profit corporation, and includes (unless the context otherwise requires) trustees, officers, employees, agents, representatives and affiliates of Judson College.

12.     "Convention" means and refers to Defendant Alabama Baptist State Convention, an Alabama non-profit corporation, and includes (unless the context otherwise requires) trustees, officers, directors, leaders, employees, agents, representatives, subsidiaries, units, boards,

5

committees, divisions and affiliates of the Convention, including without limitation The Baptist Foundation of Alabama ("Foundation" or "Baptist Foundation"), the Committee on Boards and Commissions of the Convention, and the State Board of Missions of the Convention.

13.     "Authority" means and refers to the Educational Building Authority of the City of Marion, Alabama and includes (unless the context otherwise requires) officers, directors, employees, agents, representatives and affiliates of the Authority.

14.     "Bonds" means and refers to any and all of the $11,230,000 principal amount of Educational Building Authority of the City of Marion ("Authority") Revenue Bonds, Judson College Series 2010. "Bondholder" means and refers to any individual and entity which is or during the Relevant Time Period has been a holder of record and/or beneficial owner of one or more Bonds.

15.     "Official Statement" or "OS" means and refers to the Official Statement disclosure document issued in the name of the Authority and the College dated as of October 20, 2010, with reference to the issuance, offer and sale of the Bonds, *see* Exhibit C to the Complaint filed in this action.

16.     "Lease" means and refers to the Lease dated as of October 1, 2010 between the Authority as conduit financing Bond issuer and the College as the obligor and tenant, assigned as security for the Bonds, and recorded November 1, 2010 in Deed Book 612, beginning at Page 645, in the Probate Office of Perry County, Alabama, *see* Exhibit A to the Complaint filed in this action.

17.     "Indenture" means and refers to the Trust Indenture dated as of October 1, 2010 between the Authority as conduit financing Bond issuer and Regions Bank as indenture trustee for the Bondholders, *see* Exhibit B to the Complaint filed in this action.

18.     "General Endowment Coverage Certification" shall mean and refer to any of the

6

semi-annual reports by the College, due within 45 days of each April 1 and October 1 of each year beginning in 2011, pursuant to Lease §8.1, of "those components of the General Endowment that shall be subject to the covenant of [said] Section 8.1," including without limitation any such reports or certifications published or provided any person or the EMMA web-based site in a form substantially similar to Exhibit D to the Complaint filed in this action.

19.     Terms and names or short-hand references, including the names of and abbreviations of names of and short-hand references to any Defendant or alleged co-conspirator or other person or entity, that are defined in the Complaint (as from time to time amended) in this action, or that are defined in the Lease or the Indenture, shall have the same meanings in this discovery request as are defined or referenced in the Complaint, the Lease and/or the Indenture, as the context, subject matter or language of a discovery request indicates.  Without limiting the generality of the foregoing, the following terms shall have the meanings respectively defined for them in the Lease: "General Endowment"; "Basic Rent"; and "Student Fees."

20.     "Marion Bank" means and includes, and refers to Marion Bank & Trust Company (Marion, Alabama) and its parent holding company, Marion Bancshares, and the officers, directors, shareholders, employees, agents, representatives and affiliates of Marion Bank and of its parent holding company, respectively.

21.     "Requests" or "requests" refers to the interrogatories and document requests propounded herein.

22.     Words used in the plural include the singular, and words used in the singular include the plural.  The words "and" and "or" shall be used interchangeably and interpreted in the most inclusive manner possible.

23.     "Relevant Time Period" refers to the period encompassed by the allegations of the

Complaint, from the earliest date of a Defendant's acts or conduct set forth therein, and at least from January 1, 2010 (the year of issuance of the within-described Bonds) through the date of your full response to these requests.

24.     For purpose of responding to these requests, the terms shall be given their most expansive and inclusive interpretation unless otherwise specifically limited by the language of an individual request.

## INSTRUCTIONS

1.      If you claim that any document or oral communication that is required to be identified or produced by you in response to any of these requests is privileged or protected as attorney work product, deliver to the Plaintiff within the time required to answer these discovery requests a Privilege Log, in which you:

a.      Identify the portion of the request to which the document or communication is otherwise responsive;

b.      If a document, state:

(i)     Its nature, e.g., agreement, letter, memorandum, email, text message, ESI, etc.;

(ii)    The date it was prepared;

(iii)   The date it bears;

(iv)    The date it was sent;

(v)     The date it was received;

(vi)    The identity of the person preparing it;

(vii)   The identity of the person sending it;

(viii)  The identity of all persons to whom it was sent or given, or was to

8

have been sent or given, including all addressees and all recipients of any copies; and

(ix)    A statement as to whom each identified person represented or purported to represent, or by whom each such person was employed, at all relevant times;

(x)    A precise description of the place where each copy of that document is kept, including the title or description of the file in which said document may be found and the location of such file, and any other places of storage of such document during the Relevant Time Period;

c.    If an oral communication, identify all persons present at the time of the oral communication;

d.    State the nature of the privilege (including work product doctrine) claimed; and

e.    State in detail each and every fact upon which you base your claim of privilege (or work product).

2.    All documents shall be produced in the order they are kept in the ordinary course of business, and shall be produced in their original media, folders, binders, covers or containers, or facsimile thereof, unless and to the extent otherwise agreed by counsel for Plaintiff. Plaintiff requests that a producing Defendant shall sequentially number (e.g., with "bates number" or equivalent methods) its documents that are produced, and that any documents produced in native format or ESI format shall have an accompanying cover sheet which is thus numbered.

3.    These requests relate to all documents that are in your possession, custody or

control, or in the possession, custody or control of your predecessors, successors, parents, subsidiaries, divisions or affiliates, or your respective officers, trustees, directors, agents, attorneys, accountants, employees, representatives, affiliates, partners or other persons occupying similar positions or performing similar functions, or in the possession, custody or control of committees of which you are an officer, executive or leader.

4.       Except in the cases where you make production via images on computer media, you shall produce the original of each document described below or if the original is not in your custody, then a copy thereof, and in any event, all non-identical copies that differ from the original or from the other copies produced for any reason, including, but not limited to, the making of notes thereon.  If any documents you produce via images on computer media shall prove, upon review, to be smudged, faint, obscured, or otherwise difficult to read from images, Plaintiff reserves the right to request access to inspect the original(s) thereof. Any native format documents (e.g., in Word, Excel, Powerpoint, Wordpad or Notepad or ASCII text, or PDF) shall be preserved and then produced or made available to Plaintiff in such native format upon request of counsel for Plaintiff. Any document produced in ESI or computer readable form must include the hashtag or unique identifier and the metadata of such document without alteration from or by reason of processing or production process.

5.       Documents shall be produced in such fashion as to identify the department, branch or office in whose possession they were located and, where applicable, the natural person in whose possession they were found and the business address of each document's custodian(s).

6.       Whenever a document is not produced in full or is produced in redacted form, so indicate on the document and state with particularity the reason or reasons it is not being produced in full and describe to the best of your knowledge, information and belief, and with as much

particularity as possible, those portions of the document which are not being produced and the bases for withholding the redacted portions.

      7.     If a document responsive to these requests was at any time in your possession, custody or control, but is no longer available for production, as to each such document state the following information:

         (a)     Whether the document is missing or lost;

         (b)     Whether the document has been destroyed;

         (c)     Whether the document has been transferred or delivered to another person and, if so, at whose request;

         (d)     Whether the document has been otherwise disposed of; and

         (e)     A precise statement of the circumstances surrounding the disposition of the document and the date of its disposition.

      8.     These requests shall be deemed continuing so as to require further and supplemental responses as specified in Ala. R. Civ. P. 26.

      9.     Unless otherwise specified, each of the Requests herein calls for production of documents created or existing during the Relevant Time Period.

## REQUESTS FOR PRODUCTION

      1.     Produce all documents evidencing, referring or relating to any position, title, office, ownership interest, family affiliations, business relationship and/or transactional dealings of yourself with:

         a.   Any other Defendant named in this action.

         b.   Judson College.

         c.   The Authority.

DOCUMENT 3

    d.  The Convention.

    e.  The Baptist Foundation.

    f.  Marion Bank (as defined to include its parent).

    g.  Any person who served or has served or is serving as Trustee or officer of the College during the Relevant Time Period.

    h.  Any person or entity you know or believe to be or have been a Bondholder.

2.    Produce all documents evidencing, referring or relating to any Communication between you and any one or more of the following persons and entities which mentions, refers or relates to (whether now or at the time of the Communication) to the Bonds, the Authority, Judson College, the Convention, the Baptist Foundation, Marion Bank, the Lease, the Indenture, the General Endowment, any General Endowment component (including trusts held at institutions and accounts held at Regions Bank), or the rating agency (Standard & Poor's Rating Services) rating of the Bonds:

    a.  Any other Defendant named in this action.

    b.  Judson College.

    c.  The Authority.

    d.  The Convention.

    e.  The Baptist Foundation.

    f.  Marion Bank.

    g.  Any person who served or has served or is serving as Trustee or officer of the College during the Relevant Time Period.

    h.  Any Bondholder or Bondholder representative.

    i.  Regions Bank as indenture trustee.

     j.   Standard & Poor's Rating Services.

     k.   The Frazier Lanier Company.

     l.   Wyatt R. Haskell.

     m.  Joseph W. "Bill" Mathews.

     n.   Haynes Downard LLP (CPA firm in Birmingham, Alabama)

     o.   Glenn E. Branum, CPA (in Greenville, Alabama)

3.     Produce all documents evidencing, referring or relating to the Bonds, the Official Statement, the Lease, the Indenture and/or any General Endowment Coverage Certification.

4.     Produce all documents evidencing, referring or relating to the General Endowment or any components or funds comprising any part of the General Endowment or investments of the College and/or the Baptist Foundation or any "perpetual trusts" held at any institution where the College was or is a beneficiary (wherever held and by whomever held), including any instruments, trusts, accounts, funds, account records, donations, agreements, restrictions, and communications pertaining to the General Endowment.

5.     Produce all documents evidencing, embodying, referring or relating to any financial statements, bank accounts, investment accounts, trust accounts, financial transactions and/or any operating data of Judson College, including financial records and valuation records and Lease covenant compliance calculations and General Endowment Coverage Certifications of the General Endowment and its components.

6.     Produce all documents evidencing, embodying, referring or relating to any meetings, and any actions and resolutions proposed or adopted or approved in lieu of holding a meeting, and any other actions of Judson College's Board of Trustees and any committee (including without limitation the Finance Committee) of the College's Board of Trustees,

1

including without limitation agendas, draft and final resolutions, draft and final minutes, meeting books and meeting materials, all calendar and diary entries relating to any such meeting, and any notes of or taken at or during any such meeting.

      7.    Produce all documents, including correspondence and communications, evidencing, embodying, referring or relating to any contributions and any donations of moneys You or any Defendant have made since 2006 to Judson College, including without limitation the donations and contributions made by or on behalf of the defendant Convention to Judson College to the present date.

      8.    Produce all documents, including correspondence and communications, evidencing, embodying, referring or relating to any decisions and any actions of the defendant Convention to terminate or cease making contributions and donations to Judson College.

      9.    Produce all documents, including correspondence and communications, evidencing, embodying, referring or relating to any transactions, financial dealings, trusteeship appointments, and any other business or charitable or governance matters and dealings (i) between Judson College and the Convention or (ii) between Judson College and the Baptist Foundation.

      10.    Produce all documents evidencing, embodying, referring or relating to any transactions, loans, advances, security interests, mortgages, pledges, lines of credit, financial dealings and any other business dealings or charitable transactions (including gifts and donations) between Judson College and Marion Bank or between Judson College and any officer, director or shareholder of Marion Bank or Marion Bancshares, between 2000 and the present.

      11.    Produce all documents evidencing, referring or relating to any Communication which concerns, involves, embodies or references any planning or communications on the subjects of suspending or closing the operations of Judson College.

12.     Produce all documents evidencing, referring or relating to any Communication which concerns, involves, embodies or references any planning or communications on the subjects of dissolving and/or liquidating Judson College.

13.     Produce all documents evidencing, referring or relating to any Communication which concerns, involves, embodies or references any planning or communications on the subjects of a workout by Judson College with any of its creditors, the wind-down of College affairs, any possible or potential transfer or assignment or disposition of the College's General Endowment or its campus, and/or any liquidation, dissolution or bankruptcy of the College.

14.     Produce all documents evidencing, referring or relating to any Communication with any donors, trustees, grantors and other persons and entities with reference to the General Endowment or any component or fund of any part of the General Endowment, including without limitation any components or funds or trusts held by or under the control or direction of the Baptist Foundation and/or any other financial, banking or trust institution.

15.     Produce all documents evidencing, embodying, referring or relating to the charter or articles of incorporation (as amended), bylaws (as amended), and other organizational and governance documents of Judson College.

16.     Produce all documents referring or relating to your appointment to and tenure with, the Board of Trustees of Judson College, as well as any committees of such Board, and any meetings of said Board or a committee of such Board that you have ever participated in by personal attendance or telephone or other means, including actions of Trustees or a committee by consent without the holding of a meeting.

17.     Produce your personal resume or curriculum vitae, including your educational background and any degrees at a level beyond high school that you have received, your

1

employment history, and positions held by you with any employers.

18.     For Defendants Dunkin, Barnett and Fuller, produce all documents referring, relating to or embodying your (i) ownership of any stock or securities of Marion Bancshares between 2010 and the present, (ii) your service at any time since 1990 as an officer or director of Marion Bank & Trust Company, and (iii) your service at any time since 1990 as an officer or director of Marion Bancshares.

19.     For Defendants Dunkin, Barnett and Fuller, produce all documents referring, relating to or embodying any minutes, agendas, resolutions, meeting books, meetings and/or actions of officers and of directors of Marion Bank & Trust Company and of Marion Bancshares that are in your possession or under your control.

20.     For Defendant Convention, produce all documents and communications of any kind referring, relating to or embodying: (1) each and all appointments of persons to serve as Trustee of Judson College, between 2000 and 2021; (2) decisions, communications, budgets and actions to provide funds of the Convention or the Baptist Foundation to Judson College, including without limitation the annual amounts referenced in the Official Statement and all budgets referring or relating to such annual funding provided to Judson College; (3) decisions, communications and actions to stop providing funds to Judson College from the Convention and from the Baptist Foundation at any time or times after February 2021; (4) reports and information received from any source about the financial position and results of operations of Judson College from 2010 to the present; (5) communications to, from, with, involving, or referring to any officer, employee, agent or representative of Judson College or Wyatt Haskell or any officer or employee of Frazer Lanier, or Joseph W. Mathews.

21.     Produce all documents evidencing, embodying, referring or relating to any policies

1

and any procedures you have or the College has, or in the past has maintained, on the subject of document retention and document disposal, that relates to or encompasses any categories of documents referenced in this production request.

22.     Produce all documents evidencing, embodying, referring or relating to any communications with, and provision of any information to, the Southern Association of Colleges and Schools ("SACS") relating to Judson College and/or its trustees and/or any transactions between the Convention and Judson College.

23.     Produce all documents evidencing, embodying, referring or relating to any valuations for any purpose of real or personal property of the College including but not limited to appraisals, market valuations, tax valuations and internal valuations.

24.     Produce all documents evidencing, embodying, referring or relating to any correspondence or communications between the College or its trustees or its officers with any outside accountants for the College.

*J. Michael Rediker*

J. Michael Rediker (RED004)
R. Scott Williams (WIL167)
E. Berton Spence (SPE 027)
Counsel for Plaintiff

Of Counsel:
Rumberger Kirk & Caldwell, P.C.
Renasant Place, Suite 1300
2001 Park Place North
Birmingham, Alabama  35203-2700
Telephone:  (205) 327-5550
Facsimile:  (205) 326-6786
E-mail: mrediker@rumberger.com
E-mail: swilliams@rumberger.com
E-mail: bspence@rumberger.com

## SERVICE OF THIS DISCOVERY REQUEST

1

DOCUMENT 3

Serve this Discovery Request upon each Defendant with the Summons and Complaint in this action.

DOCUMENT 4

ELECTRONICALLY FILED
7/17/2023 12:12 PM
53-CV-2023-900035.00
CIRCUIT COURT OF
PERRY COUNTY, ALABAMA
MIA JACOBS-TURNER, CLERK

# EXHIBIT B

## Indian Harbor policy of the Underlying Suit



**X⊾ Insurance**

**Regulatory Office**
Dept: Regulatory
505 Eagleview Blvd., Suite 100
Exton, PA 19341-1120
(800) 688-1840

**INSURANCE COMPANY PROVIDING COVERAGE:** Indian Harbor Insurance Company

## EDUCATORS LEGAL LIABILITY AND EMPLOYMENT PRACTICES LIABILITY INSURANCE DECLARATIONS

**POLICY NUMBER:** ELL0951876-03          **RENEWAL OF:** ELL0951876-02

### NOTICES

SUBJECT TO ITS TERMS, THIS POLICY PROVIDES COVERAGE FOR CLAIMS FIRST MADE DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE. DEFENSE EXPENSES ARE GENERALLY PAID IN ADDITION TO THE LIMITS OF LIABILITY; EXCEPT THAT FOR SPECIFIC CLAIMS UNDER INSURING AGREEMENT A.1.b.  THE APPLICABLE LIMITS OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES.

PLEASE READ AND REVIEW THE ENTIRE POLICY CAREFULLY AND DISCUSS THE COVERAGE HEREUNDER WITH YOUR INSURANCE BROKER.

Item 1.   NAMED INSURED:
Judson College

ADDRESS:
302 Bibb Street
Marion, AL 36756

Item 2.   POLICY PERIOD:  (a) Inception Date:  01/01/2021          (b) Expiration Date:  01/01/2022
(12:01 A.M. Standard Time at the Address Stated in Item 1.)

Item 3.   LIMITS OF LIABILITY:

(a)   Educators  Legal Liability
$ 5,000,000          **Company's** maximum Limit of Liability for all **Loss** from each **Claim** under **INSURING AGREEMENT** A.1.a.; or for **Loss** and **Defense Expenses** from each **Claim** under **INSURING AGREEMENT** A.1.b.

(b)   Employment Practices Liability and Third Party Liability
$ 5,000,000          **Company's** maximum Limit of Liability for all **Loss** from each **Claim** under **INSURING AGREEMENT** A.2.

DOCUMENT 4

    (c)  Policy Aggregate

        $ 5,000,000      **Company's** maximum aggregate Limit of Liability for all **Loss** from all **Claims** under **INSURING AGREEMENT A**.1.a. and **INSURING AGREEMENT A**.2., and for all **Loss** and **Defense Expenses** from all **Claims** under **INSURING AGREEMENT A**.1.b.

    (d)  Reimbursement of Defense Expenses

        $ 50,000      **Company's** maximum Limit of Liability for all **Defense Expenses** from each **Claim** under **INSURING AGREEMENT A**.3.

    (e)  Reimbursement of Defense Expenses Aggregate

        $ 100,000      **Company's** maximum Limit of Liability for all **Defense Expenses** from all **Claims** under **INSURING AGREEMENT A**.3.

Item 4.   RETENTIONS

    (a)  $ 10,000      each and every **Claim** under **INSURING AGREEMENT A**.1.

    (b)  $ 25,000      each and every **Claim** under **INSURING AGREEMENT A**.2.

    (c)  $ 10,000      each and every **Claim** under **INSURING AGREEMENT A**.3

Item 5.   NOTICES REQUIRED TO BE GIVEN TO THE **COMPANY** MUST BE ADDRESSED TO:

AXA XL Claims             Phone: 972.383.7186
P.O. Box 211547          Fax: 972.383.7177
Dallas, TX 76211        Email: proclaimnewnotices@axaxl.com

Item 6.   POLICY PREMIUM:       $17,137.00
           Policy Fee           $245.00

| | |
|---|---|
| Premium: | $17,137.00 |
| Company Policy Fee | $245.00 |
| Broker Fee | $250.00 |
| State Tax: | $1,057.92 |
| Grand Total: | $18,689.92 |

           Total Policy Premium:     $17,382.00

Item 7.   RETROACTIVE DATE:  None - Full Prior Acts

Item 8.   ENDORSEMENTS ATTACHED AT POLICY ISSUANCE: REFER TO PGU 2002 04 17

This contract is registered and delivered as a surplus line coverage under the Alabama Surplus Line Insurance Law. Philip S Hagan License #0214821.

DOCUMENT 4

Item 9.  PRODUCER NAME:  Professional Governmental Underwriters, Inc.
         ADDRESS:         9020 Stony Point Parkway, Suite 455
         CITY, STATE, ZIP:  Richmond, VA 23235

**THESE DECLARATIONS, THE POLICY FORM, ANY ENDORSEMENTS AND THE APPLICATION CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE COMPANY AND THE INSURED RELATING TO THIS INSURANCE.**

This contract is registered and delivered as a surplus lines coverage under the Alabama Surplus Lines Insurance Law.

_____01/04/2021_____          _____
            Date                           Authorized Representative

PGU ELL 2000 0819                                          Page 3 of 3

# IN WITNESS

## INDIAN HARBOR INSURANCE COMPANY

REGULATORY OFFICE
505 EAGLEVIEW BOULEVARD, SUITE 100
DEPARTMENT: REGULATORY
EXTON, PA  19341-1120
PHONE:  800-688-1840

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

Joseph Tocco
President

Toni Ann Perkins
Secretary

IL MP 9104 0314 IHIC
©2014 X.L. America, Inc.  All rights reserved.  May not be copied without permission.

DOCUMENT 4

# SCHEDULE OF POLICY FORMS AND ENDORSEMENTS

Form(s) and Endorsement(s) made a part of this policy at time of issue.

| Form Number | Edition Date | Description |
|---|---|---|
| PGU ELL 2000 | 2019-08-01 | Educators Liability and Employment Practices Liability Declarations |
| IL MP 9104 0314 IHIC | 2014-03-01 | In Witness |
| PGU 2002 | 2017-04-01 | Schedule of Policy Forms and Endorsements |
| PGU ELL 2001 | 2017-04-01 | Educators Liability and Employment Practices Liability Insurance Po |
| PGU 1000 | 2017-04-01 | Additional Insureds |
| PGU ELL 1048 | 2017-04-01 | Act of School Violence Crisis Management Coverage |
| PGU 1052 (ELL) | 2017-04-01 | Minimum Earned |
| PGU 1087 | 2017-04-01 | Network Security Identity Theft Event Coverage |
| PGU ELL 1120 | 2017-04-01 | Harassment / Bullying Coverage |
| XL-ALSOP | 2010-11-01 | Service of Process |
| PN CW 01 | 2015-09-01 | Notice to Policyholders - Fraud Notice |
| PN CW 02 | 2015-10-01 | Notice to Policyholders - Privacy Policy |
| PN CW 05 | 2014-09-01 | Notice to Policyholders - U.S. Treasury Department's Office of Forei |

PGU 2002 0417

# EDUCATORS LEGAL LIABILITY AND
# EMPLOYMENT PRACTICES LIABILITY
# INSURANCE COVERAGE FORM
# (CLAIMS-MADE)

## TABLE OF CONTENTS

| | | | Page No. |
|---|---|---|---|
| A. | | INSURING AGREEMENTS | 3 |
| | 1. | Educators Legal Liability | 3 |
| | 2. | Employment Practices Liability and Third Party Liability | 3 |
| | 3. | Reimbursement of Defense Expenses | 3 |
| | 4. | Supplemental Payments | 3 |
| B. | | DEFENSE AND SETTLEMENT | 4 |
| C. | | LIMITS OF LIABILITY / RETENTIONS | 4 |
| | 1. | Educators Legal Liability | 4 |
| | 2. | Employment Practices Liability and Third Party Liability | 5 |
| | 3. | Policy Aggregate | 5 |
| | 4. | Reimbursement of Defense Expenses | 5 |
| | 5. | Retention | 5 |
| D. | | EXCLUSIONS | 5 |
| E. | | DEFINITIONS | 7 |
| F. | | CONDITIONS | 13 |
| | 1. | Other Insurance: | 13 |
| | 2. | Cooperation: | 13 |
| | 3. | Subrogation: | 13 |
| | 4. | Extended Reporting Period: | 13 |
| | 5. | Notice; Timing, and Interrelationship of Claims: | 14 |
| | 6. | Cancellation; No Obligation to Renew: | 15 |
| | 7. | Representations: | 15 |
| | 8. | Separation of Insureds; Protection of Innocent Insureds: | 15 |

DOCUMENT 4

9.     No Action against Us: ............................................................................. 15

10.    Insolvency of Insured: ............................................................................ 16

11.    Non-Accumulation of Limits: ................................................................. 16

12.    Territory: ................................................................................................... 16

13.    Authorization and Notices: .................................................................... 16

14.    Changes: ................................................................................................... 16

15.    Assignment: ............................................................................................. 16

16.    Entire Agreement: ................................................................................... 16

17.    Choice of Law .......................................................................................... 16

18.    Premium ................................................................................................... 17

19.    Conformity to Statute ............................................................................ 17

20.    Headings ................................................................................................... 17

### EDUCATORS LEGAL LIABILITY AND
### EMPLOYMENT PRACTICES LIABILITY
### INSURANCE COVERAGE FORM
### (CLAIMS-MADE)

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and what is not covered. Throughout the Policy the words "**You**" and "**Your**" refer to the **Named Insured**. The words "**We**", "**Us**", "**Our**" and the "**Company**" refer to the Company providing this insurance.

This Policy is incomplete unless the Declarations and all applicable forms and endorsements are attached. Words and phrases that appear in bold have special meaning and are defined in Section **E. DEFINITIONS**. Singular words shall include the plural, and plural words shall include the singular.

**A.    INSURING AGREEMENTS**

Subject to the Limits of Liability set forth in the Declarations, and all other terms and conditions of this Policy, **we** agree as follows:

1.    Educators Legal Liability

   a.    **We** will pay on behalf of an **Insured Loss** that the **Insured** becomes legally obligated to pay as a result of a **Claim** first made against an **Insured** during the **Policy Period** or applicable Extended Reporting Period for an **Educators Wrongful Act** occurring on or after the **Retroactive Date** and before the end of the **Policy Period**.

   b.    **We** will pay on behalf of an **Insured Loss** and **Defense Expenses** that the **Insured** becomes legally obligated to pay as a result of a **Claim** seeking, in whole or in part, **Non-Monetary Relief** at any stage of the **Claim**, and first made against an **Insured** during the **Policy Period** or any applicable Extended Reporting Period for an **Educators Wrongful Act** occurring on or after the **Retroactive Date** and before the end of the **Policy Period**.

2.    Employment Practices Liability and Third Party Liability

   **We** will pay on behalf of an **Insured Loss** that the **Insured** becomes legally obligated to pay as a result of a **Claim** first made against an **Insured** during the **Policy Period** or any applicable Extended Reporting Period for an **Employment Practices Wrongful Act** or **Third Party Wrongful Act** occurring on or after the **Retroactive Date** and before the end of the **Policy Period**.

3.    Reimbursement of Defense Expenses

   **We** will reimburse **Defense Expenses** incurred by an **Insured** in connection with a **Claim** alleging an **IEP Act**, **Collective Bargaining Act** or **Student Program Act** that is first made against an **Insured** during the **Policy Period** or any applicable Extended Reporting Period, and arising out of a **Wrongful Act** occurring on or after the **Retroactive Date** and before the end of the **Policy Period**.

4.    Supplemental Payments

   **We** will pay on behalf of an **Insured**, in addition to the Limits of Liability set forth in the Declarations, all reasonable expenses incurred by the **Insured** at **Our** request to assist **Us** in the investigation or defense of any **Claim**, including actual loss of earnings of an **Insured**, because of time off from work; provided that the most **We** will pay will be $500 per day, per **Insured**. Such "expenses" shall not include salaries of **Your Employees**.

For purposes of this Section, a **Claim** will be deemed to have been made when an **Insured** receives notice of the **Claim**.

**B.    DEFENSE AND SETTLEMENT**

1.    **We** will have the right and duty to defend any **Claim** made against an **Insured** for a **Wrongful Act** covered under Section **A. INSURING AGREEMENTS**, Item 1. Educators Legal Liability or Item 2. Employment Practices Liability and Third Party Liability, even if the allegations of such **Claim** are groundless, false or fraudulent. **We** will have no obligation to pay any **Loss** or **Defense Expenses**, or to defend any **Claim** after the applicable Limit of Liability set forth in Item 3. of the Declarations has been exhausted.

2.    For any **Claim** **We** defend under Section **B. DEFENSE AND SETTLEMENT**, Item 1., **We** will have the right to make investigations, conduct negotiations and enter into the settlement of any such **Claim** as **We** deem appropriate, with the consent of the **Insured**. If the **Insured** refuses to consent to a settlement acceptable to the claimant in accordance with **Our** recommendation, then, subject to the applicable Limit of Liability, **Our** liability for such **Claim** will not exceed:

    a.    The amount for which such **Claim** could have been settled by **Us** plus **Defense Expenses** up to the date the **Insured** refused to settle such **Claim**; plus

    b.    Sixty percent (60%) of any **Loss** or **Defense Expenses** in excess of the amount in Section **B.2.a.** above, incurred in connection with such **Claim**.

3.    It shall be the duty of the **Insured**, and not **Us**, to defend any **Claim** covered under Section **A. INSURING AGREEMENTS**, Item 3. Reimbursement of Defense Expenses. The **Insured** shall have the right to select defense counsel for the investigation and defense of any such **Claim**, subject to **Our** consent and approval, which shall not be unreasonably withheld.

4.    **We** shall have no duty to continue to reimburse **Defense Expenses** after the applicable Limit of Liability for **Claims** arising under Section **A. INSURING AGREEMENTS**, Item 3. Reimbursement of Defense Expenses has been exhausted by the reimbursement of **Defense Expenses**.

**C.    LIMITS OF LIABILITY / RETENTIONS**

Regardless of the number of **Claims**, **Insureds** or claimants, **Our** liability under this Policy is limited as follows:

1.    Educators Legal Liability

    a.    The amount set forth in Item 3.(a) of the Declarations is the most **We** will pay for all **Loss** in excess of the Retention set forth in Item 4. of the Declarations resulting from each **Claim** covered under Insuring Agreement A.1.a. The payment of **Defense Expenses** shall be in addition to, and will not reduce, the applicable Limits of Liability.

    b.    The amount set forth in Item 3.(a) of the Declarations is the most **We** will pay for all **Loss** and **Defense Expenses** in excess of the Retention set forth in Item 4. of the Declarations resulting from each **Claim** covered under Insuring Agreement A.1.b. The payment of **Defense Expenses** shall be part of and not in addition to the applicable Limits of Liability, and **Our** payment of such **Defense Expenses** will reduce those Limits of Liability.

DOCUMENT 4

2.    <u>Employment Practices Liability and Third Party Liability</u>

The amount set forth in Item 3.(b) of the Declarations is the most **We** will pay for all **Loss** in excess of the Retention set forth in Item 4. of the Declarations resulting from each **Claim** covered under Insuring Agreement A.2. The payment of **Defense Expenses** shall be in addition to, and will not reduce, the applicable Limits of Liability.

3.    <u>Policy Aggregate</u>

The amount set forth in Item 3.(c) of the Declarations is the most **We** will pay for all **Loss** resulting from all **Claims** covered under Insuring Agreements A.1.a. and A.2., and for all **Loss** and **Defense Expenses** resulting from all **Claims** covered under Insuring Agreement A.1.b.

4.    <u>Reimbursement of Defense Expenses</u>

The amount set forth in Item 3.(d) of the Declarations is the most **We** will reimburse for all **Defense Expenses** resulting from each **Claim** covered under Insuring Agreement A.3. The amount set forth in Item 3.(e) of the Declarations is the most **We** will reimburse for all **Defense Expenses** resulting from all **Claims** covered under Insuring Agreement A.3. Payments under Insuring Agreement A.3. are in addition to the Limits of Liability applicable to all other insuring agreements.

5.    <u>Retention</u>

**Our** obligation to pay or reimburse **Loss** or **Defense Expenses** under this Policy will only be in excess of the applicable Retention set forth in Item 4. of the Declarations. **We** will have no obligation to pay all or any portion of any Retention amount on behalf of an **Insured**, although **We** may, at **Our** sole discretion, advance such amount, in which event the **Insureds** agree to repay any amounts so advanced upon written request.

D.    **EXCLUSIONS**

This Policy shall not apply to any **Claim** arising from or relating to:

1.    The performance of any willful misconduct or dishonest, fraudulent, criminal or malicious act, error or omission by an **Insured**; the willful violation by an **Insured** of any law, statute, ordinance, rule or regulation; or an **Insured** gaining any profit, remuneration or advantage to which such **Insured** is not legally entitled.

Notwithstanding the above, **We** will defend the **Insured** or pay or reimburse **Defense Expenses** in connection with a **Claim** otherwise covered by this Policy until and unless the **Insured** admits, is adjudged or is otherwise proven to have committed any act, error or omission subject to this exclusion, in which case the **Insured** shall reimburse **Us** for any **Defense Expenses** advanced to or paid on behalf of such **Insured**.

2.    The special educational needs of any student with a disability as that term is defined under the Individuals with Disabilities Education Act or any similar state statute; provided that this exclusion shall not apply to the reimbursement of **Defense Expenses** under Insuring Agreement A.3.

3.    **Loss** or **Defense Expenses** covered under Insuring Agreements A.1. or A.2., if Insuring Agreement A.3. also applies.

4.    A **Claim**, other than one alleging an **Employment Practices Wrongful Act**, that is brought by, on behalf of, or in the name or right of **You** or any of **Your** directors, officers, regents, trustees or school board members, or their functional equivalents, unless in the form of a cross-claim or third-party complaint arising from a **Claim** made against such director, officer, regent, trustee or school board member that is otherwise covered under this Policy.

Notwithstanding the above, this exclusion shall not apply to a **Claim** brought by a former director, officer, regent, trustee or school board member who has not served in that capacity for at least three (3) years prior to the date such **Claim** is first made and where such **Claim** is brought and maintained without the support, solicitation, assistance, participation or intervention of the **Named Insured** or an **Insured** not otherwise subject to this exception.

5.  An actual or alleged violation of the Fair Labor Standards Act, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, any workers' compensation, unemployment insurance, social security, or disability benefits law, other similar provisions of any federal, state or local statutory or common law or any rules or regulations promulgated under any of the foregoing; provided that this exclusion shall not apply to the extent that a **Claim** for an **Employment Practices Wrongful Act** alleges retaliatory action by an **Insured** in response to an **Employee's** exercise of rights under such statute or law.

6.  Damage to, destruction or loss of use of tangible property, **bodily injury**, corporal punishment, sickness, disease or death.

7.  Emotional distress, mental anguish, or humiliation not arising from an **Employment Practices Wrongful Act** or **Third Party Wrongful Act**.

8.  **Sexual Abuse and Molestation**, including the allowance of or failure to prevent, stop, detect or reveal **Sexual Abuse and Molestation**.

9.  The actual, alleged or threatened exposure to, or generation, storage, transportation, discharge, emission, release, dispersal, seepage, migration, release, growth, infestation, spread, escape, treatment, removal or disposal of, any **Pollutant**, or any regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutant**, or any action taken in contemplation or anticipation of any such regulation, order, direction or request.

10. A **Benefit Plan Act**, provided that this exclusion shall not apply to any **Claim** for actual or alleged retaliation with regards to benefits paid or payable. **We** will defend a **Claim** otherwise subject to this exclusion subject to a $25,000 Limit of Liability for all **Defense Expenses** in excess of the applicable Retention set forth in Item 4. of the Declarations. **Defense Expenses** payable under this section are part of and not in addition to the applicable Limits of Liability set forth in Item 3. of the Declarations, and payment of such **Defense Expenses** by **Us** will reduce such Limits of Liability.

11. An **Insured's** liability under a contract or agreement, other than a manual of employment policies or procedures issued by **You**, unless such liability would have attached in the absence of such express contract or agreement. This exclusion shall not apply to the payment of **Defense Expenses** in connection with a **Collective Bargaining Act** or to the payment of **Defense Expenses** incurred in connection with a **Claim** for an **Employment Practices Wrongful Act** in the form of an actual or alleged breach of a contract to commence or continue employment with **You**.

12. A failure to obtain, implement, effect, comply with, provide notice under or maintain insurance, reinsurance, self-insurance, suretyship or bond.

13. Facts, circumstances, situations, transactions, events or **Wrongful Acts**:

    a.  Underlying or alleged in any mediation, arbitration, grievance proceeding, litigation or administrative or regulatory proceeding brought prior to and/or pending as of the Inception Date set forth in Item 2. of the Declarations:

        (1)  to which an **Insured** is or was a party; or

(2)    with respect to which an **Insured,** as of the Inception Date set forth in Item 2. of the Declarations, knew or should reasonably have known that an **Insured** would be made a party thereto;

b.    Which was the subject of any notice given prior to the Inception Date set forth in Item 2.of the Declarations under any other Policy of insurance or plan or program of self-insurance; or

c.    Which was the subject of any **Claim** made prior to the Inception Date set forth in Item 2.of the Declarations.

If, however, this Policy is a renewal of one or more policies issued by **Us** or an affiliate to **You**, and such coverage was in effect without interruption from the inception date of the first such Policy to the Inception Date of this Policy, the reference in this exclusion to the Inception Date will be deemed to refer instead to the Inception Date of the first Policy under which **We** or an affiliate began to provide **You** with the continuous and uninterrupted coverage of which this Policy is a renewal.

14.    A lockout, strike, picket line, hiring of replacement workers, riot or other civil commotion or other similar actions in connection with labor disputes or labor negotiations; provided that this exclusion shall not apply to the payment of **Defense Expenses** covered under Insuring Agreement A.3.

15.    Construction, architectural, engineering, legal, procurement, security or other professional services, including any contract or agreement pertaining to such services.

16.    War, whether or not declared, or any act or condition incidental to war, including civil war, insurrection, rebellion or revolution; or **Terrorism**.

17.    The failure to integrate or desegregate student enrollment, or the operation or administration of any student program on a discriminatory basis, whether in violation of a court order or otherwise; provided that this exclusion shall not apply to the reimbursement of **Defense Expenses** in connection with a **Student Program Act**.

18.    The actual or alleged performance of or failure to perform **Medical Services** by an **Insured** or any person or entity for whom an **Insured** may be legally liable, or the supervision, hiring, retaining or accreditation of or granting of privileges to any person performing **Medical Services**.

19.    The Securities Act of 1933, the Securities Exchange Act of 1934, any state "blue sky" law, or any other federal, state or local securities law, or any rule or regulation promulgated under any of the foregoing; or any provision of the common law imposing liability in connection with the offer, sale or purchase of securities.

20.    The sale or offering of securities by **You**, whether or not such securities are exempt from registration by the SEC; **Your** actual or proposed filing for an Initial Public Offering; or a debt offering or debt financing, including but not limited to bonds, notes, debentures and guarantees of debt.

21.    Tax credits or tax incentives or the application thereof; the formulation of tax rates; the assessment, appraisal or valuation of property; the assessment of taxes or other fees; the collection of taxes, fees or other amounts; and the disbursement of tax refunds.

**E.    DEFINITIONS**

Whenever used in this Policy, the term:

1.    **Application** means all applications submitted to **Us**, including any and all attachments and other materials submitted to **Us** in connection with the underwriting of this Policy or for any other policy of

which this Policy is a renewal.

2.   **Benefit Plan Act** means a **Claim** alleging liability under a pension, profit sharing, welfare benefit or other employee benefit program established in whole or part for the benefit of an **Insured**, or based upon, arising out of or in any way involving the Employee Retirement Security Act of 1974 (except Section 510 thereof) or any amendments thereto or regulations promulgated thereunder or similar provisions of any federal, state or local law or common law.

3.   **Bodily Injury** means physical injury, sickness or disability of a person, including mental incapacity or death resulting from any of these at any time.

4.   **Business Invitee** means a natural person, solely in their capacity as one who is invited to enter into and remain on any **Premises** for a purpose directly or indirectly connected with **Your** business or commercial dealings therein.  A Business Invitee does not include a trespasser or any person who enters any **Premises** without **Your** knowledge or permission, or any **Employee**, student or minor.

5.   **Claim** means:

   a.   A written demand for monetary damages or **Non-Monetary Relief**;

   b.   A written request to toll or waive any statute of limitations, or to waive any contractual time bar, relating to a potential suit against an **Insured** for a **Wrongful Act**;

   c.   A civil proceeding in a court of law or equity, including any appeal therefrom, which is commenced by the filing of a complaint, motion for judgment, or similar proceeding;

   d.   A criminal proceeding that is commenced by the return of an indictment or similar document;

   e.   An administrative or regulatory proceeding or investigation, including a proceeding brought by or before the Equal Employment Opportunity Commission or similar state or local agency, commenced by the filing of a notice of charges, formal order of investigation or similar document; or

   f.   An arbitration proceeding or other alternative dispute resolution proceeding, to which the **Insured** must submit or does submit with **Our** consent.

6.   **Collective Bargaining Act** means a **Claim** made by or on behalf of an **Employee** that at all times during the course of such **Claim** exclusively alleges the breach of a collective bargaining agreement.

7.   **Defense Expenses** means reasonable legal fees and expenses **We** incur for the investigation, defense and appeal of a **Claim** by attorney(s) retained by **Us**, as well as all other fees, costs or expenses resulting from the investigation, adjustment, defense and appeal of such **Claim** by **Us**, or by **You** with **Our** prior, written consent.  Defense Expenses does not include any expenses incurred by **You** prior to the date a **Claim** is first reported to **Us**, nor does it include the time and expense incurred by **You** in resolving a **Claim**, including but not limited to the costs of **Your** in-house counsel.

8.   **Educators Wrongful Act** means:

   a.   Any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty, including any **Personal Injury**, by an **Insured**, committed in the performance of his or her duties for **You**;

b.    Any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by any natural person **Insured** while serving at the direction or request of the **Named Insured** in the natural person **Insured's** capacity as a board member or committee member of an organization, other than the **Named Insured**, that is exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. The coverage provided by this Subsection b. is excess of, and shall not contribute with, any other insurance plan or program of self-insurance carried by such not-for-profit corporation, and any contribution or indemnification to which a natural person **Insured** is entitled to from such not-for-profit organization;

c.    Any matter claimed against an **Insured** solely by reason of his or her status as an **Insured** during the **Policy Period** and committed solely in the performance of duties for **You**.

An Educators Wrongful Act shall not include an **Employment Practices Wrongful Act** or a **Third Party Wrongful Act**.

9.    **Employee** means the following natural persons, but only for **Wrongful Acts** committed while acting within the scope of employment for **You**:

a.    Full-time, part-time, seasonal and temporary Employees, including, but not limited to, any teachers, principals, assistant principals, deans, administrators or similar educational service providers;

b.    Teachers, administrators and similar educational service providers under written contract with, or under retainer for services provided for or on **Your** behalf;

c.    Student teachers and student aides; and

d.    Persons who perform services on a volunteer basis for **You**, and under **Your** direction and control.

10.   **Employment Practices Wrongful Act** means any of the following, when alleged by any of **Your** past or present **Employees** or any applicant for employment with **You**, in connection with that person's actual or proposed employment relationship with **You**:

a.    Wrongful dismissal, discharge or termination of employment, whether actual or constructive;

b.    Harassment (including sexual harassment whether "quid pro quo," hostile work environment or otherwise);

c.    Discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability or any basis prohibited by federal, state or local laws;

d.    Breach of any manual of employment policies or procedures issued to the **Insureds** by **You**;

e.    Retaliatory action in response to that **Employee's**:

(1)    disclosure or threat of disclosure of any act by an **Insured** alleged to be a violation of any federal, state, local or foreign law, common or statutory, or any rule or regulation promulgated thereunder;

(2)    actual or attempted exercise of any right that **Employee** has under law;

(3)    filing of any **Claim** under the Federal False Claims Act or any other federal, state, local or foreign "whistleblower" law;

f.    Misrepresentation, libel, slander, humiliation, defamation, invasion of privacy, infliction of emotional distress or mental anguish;

g.    Wrongful failure to employ or promote, wrongful deprivation of career opportunity, including tenure, wrongful demotion or evaluation or wrongful discipline; or

h.    Breach of a contract to commence or continue employment with **You**.

An Employment Practices Wrongful Act shall not include an **Educators Wrongful Act**.

11.    **IEP Act** means a **Claim** under the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act, or any similar state or federal statute, whether brought as a due process hearing, mediation, arbitration or lawsuit to address a dispute between the **Named Insured** and its student, or the parent or guardian of a student of the **Named Insured**, concerning: the **Named Insured's** proposal of, or refusal to initiate or change the identification, evaluation or provisions of, an Individual Education Plan ("IEP") or 504 Plan for such student; the implementation of the IEP or 504 Plan for such student; the educational placement of such student; or the provision of a free appropriate public education.

12.    **Insured** means:

a.    **You**;

b.    **Your** past, present or future duly elected, appointed or employed directors, officers, regents, trustees or school board members, or their functional equivalents;

c.    **Employees**;

d.    In the event of the death, incapacity or bankruptcy of a natural person Insured, such Insured's estate, heirs, legal representatives or assigns, but only in connection with a **Claim** arising from a **Wrongful Act** against the Insured individual; and

e.    The lawful spouse or domestic partner of any individual Insured identified in the paragraphs above, but only with respect to liability arising out of **Wrongful Acts** committed by such individual, and provided that such spouse or domestic partner is represented by the same counsel as such individual with respect to any **Claim**.

13.    **Loss** means damages, pre-judgment interest, post-judgment interest, front pay and back pay, judgments, settlements, punitive or exemplary damages where insurable under applicable law, or other amounts that an **Insured** is legally obligated to pay as a result of a **Claim**.

Loss will not include:

a.    **Defense Expenses**;

b.    **Non-Monetary Relief**;

c.    Any amount representing the value of diminished or lost retirement, health care or other benefits;

d.    Fines, taxes, penalties;

e.    The cost of disaster response activities conducted by the **Insured** as required by the Federal Emergency Management Agency (FEMA);

f.     Amounts due under any contract to commence, continue or separate from employment with **You**, including but not limited to the value of any compensation or employment benefits lost, or the cost of specific performance in connection with any such contract; or

g.     The multiplied portion of multiplied damages; provided that Loss will include any multiplied damages awarded pursuant to the Age Discrimination in Employment Act or the Equal Pay Act ("Specified Multiplied Damages") that an **Insured** is obligated to pay as a result of a **Claim**, but only if such Specified Multiplied Damages are insurable under applicable law.

For the purpose of determining the insurability of punitive damages, exemplary damages or Specified Multiplied Damages under this Policy, the laws of the jurisdiction most favorable to the insurability of such damages shall control, provided that such jurisdiction:

(1)     is the location of the court which awarded or imposed such punitive, exemplary damages or Specified Multiplied Damages;

(2)     is where **You** are incorporated or otherwise organized or have a place of business; or

(3)     is where **We** are incorporated or has **Our** principal place of business.

14.    **Medical Services** means services performed in the treatment or care of any person, including but not limited to: medical, dental, nursing, psychiatric, osteopathic, chiropractic or other medical professional care or services; the furnishing or dispensing of medications, drugs, blood, blood products, or medical, dental or surgical supplies, equipment or appliances in connection with such treatment or care; the furnishing of food or beverages in connection with such treatment or care; the providing of counseling or social services in connection with such treatment or care; and the handling of or performance of post-mortem examinations on human bodies, including autopsies, organ donations or other procedures. Medical Services shall also include an **Insured's** activities as a member of an accreditation, standards review or professional review board, quality assurance board or committee, or any similar board or committee for a healthcare entity or organization.

15.    **Named Insured** means the educational entity set forth in Item 1. of the Declarations.

16.    **Non-Monetary Relief** means relief or redress in any form other than compensatory or monetary damages, including: the costs of complying with any injunctive, declaratory or equitable relief, remedy or order; the costs of compliance with the Americans with Disabilities Act or any similar provisions of federal, state or local statutory or common law; and any award of claimant's or plaintiff's attorneys fees or costs, whether or not provided for by statute, but only with respect to **Claims** seeking such Non-Monetary Relief.  Non-Monetary Relief shall not include the cost of disaster response activities conducted by the **Insured** as required by the Federal Emergency Management Agency (FEMA).

17.    **Personal Injury** means the following, when alleged against an **Insured** by an entity or a person who is not a past or present **Insured**, or applicant for employment with the **Insured**: libel, slander, or other defamation, invasion of privacy, false arrest, wrongful detention or imprisonment, malicious prosecution, wrongful entry or eviction, infringement or copyright or trademark, or other unauthorized use of title, or plagiarism or misappropriation of ideas.

18.    **Policy Period** means the period from the Inception Date of this Policy set forth, in Item 2. of the Declarations, to the Expiration Date of this Policy set forth in Item 2. of the Declarations, or to any earlier cancellation date of this Policy.

19.   **Pollutant** means any of the following:

    a.    Smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials (including medical or pharmaceutical supplies and materials which are intended to be or have been recycled, reconditioned or reclaimed) or other irritants, Pollutants or contaminants;

    b.    Mold(s), mildew(s), fungi and/or spore(s); or any materials, goods or products containing, harboring or nurturing any such mold(s), mildew(s), fungi and/or spore(s);

    c.    Lead, silica or asbestos, whether or not airborne as a particle, contained in or formed as part of a product, structure or other real or personal property, ingested or inhaled or transmitted in any fashion, or found in any form whatsoever; or

    d.    Nuclear reaction, radioactive contamination or any radiation of any kind, including but not limited to nuclear radiation and electromagnetic radiation.

20.   **Premises** means the following, if located in the continental United States:

    a.    A building, facility or other real property including adjoining ways, which **You** own, rent or lease and is used by **You** to conduct **Your** business, including administration, maintenance and recreational facilities;

    b.    A building, facility, or other real property being visited by **Your** elected, appointed or employed, directors, officers, regents, trustees, or school board members, or their functional equivalents, or **Employees**, on an official business trip on **Your** behalf;

    c.    A vehicle that **You** own or lease pursuant to a written contract, but solely if being used in the transportation of **Your** elected or appointed or employed, directors, officers, regents, trustees or school board members, or their functional equivalents, or **Employees**.

Premises does not include any location for an event independently organized by **Employees** or others without **Your** knowledge or approval.

21.   **Related Claims** means all **Claims** based upon, arising out of, resulting from, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events, whether related logically, casually or in any other way.  All Related Claims will be deemed to be a single **Claim** for purposes of Section **C. LIMITS OF LIABILITY / RETENTIONS**, Item 5.

22.   **Retroactive Date** means the applicable date set forth in Item 7. of the Declarations.

23.   **Sexual Abuse and Molestation** means any actual or alleged conduct, physical act, gesture or spoken or written word of a sexual nature directed by an **Insured**, or by any person for whom an **Insured** is legally responsible, toward any of **Your** students or any minor not a student of **You**, and including without limitation any actual, alleged or threatened sexual intimacy (even if allegedly consensual), molestation, assault or battery, exploitation or any other sexual act.

24.   **Student Program Act** means a **Claim** alleging the failure to integrate or desegregate student enrollment, or the operation or administration of any student program on a discriminatory basis, whether in violation of a court order or otherwise.

25.   **Terrorism** means "Certified Acts" as defined by the Terrorism Risk Insurance Act of 2002, or any subsequent amendments or reauthorizations of such Act (TRIA).

26.   **Third Party Wrongful Act** means any of the following, when alleged against an **Insured** by **Your** **Business Invitee** or by a third party individual (other than another **Insured**, student or minor) with

whom an **Insured** interacts outside of the **Premises** for the purpose of conducting official business on **Your** behalf:

a.  Harassment (including sexual harassment);

b.  Discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability or any basis prohibited by federal, state or local laws; or

c.  Invasion of privacy.

A Third Party Wrongful Act shall not include an **Educators Wrongful Act**.

27.  **Wrongful Act** means, for purposes of Insuring Agreements A.1. or A.2., an **Educators Wrongful Act**, **Employment Practices Wrongful Act** or **Third Party Wrongful Act**. For purposes of Insuring Agreements A.3. Wrongful Act means an **IEP Act**, **Collective Bargaining Act** or **Student Program Act**.

## F.    CONDITIONS

1.  **Other Insurance:**

Insurance provided under this Policy will be excess of and will not contribute with other valid and collectible insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically stated to be in excess of this Policy by reference in such other policy to the Policy number of this Policy. This Policy will not be subject to the terms of any other insurance.

In the event that coverage is available for a **Claim** under any other insurance policy that applies to **Claims** for **Bodily Injury**, **Personal Injury** or property damage, **We** will have no duty to defend such **Claim**, or to pay any **Defense Expenses** incurred by **You** or on **Your** behalf, or to contribute to or reimburse **Defense Expenses** incurred by such other insurance policy in connection with such **Claim**.

2.  **Cooperation:**

In the event of a **Claim**, the **Insured** will provide **Us** with all information, assistance and cooperation that **We** reasonably request, and will do nothing that may prejudice **Our** position or potential or actual rights of recovery. The **Insured** shall not make any payment, admit any liability, settle any **Claim**, assume any obligation, or incur any expense without **Our** consent. At **Our** request, the **Insured** will assist in any actions, suits, or proceedings, including but not limited to attending hearings, trials and depositions, securing and giving evidence, and obtaining the attendance of witnesses, and will also assist in making settlements.

3.  **Subrogation:**

**We** will be subrogated to the extent of any payment **We** make under this Policy to all of the rights of recovery of the **Insured**. The **Insured** will execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable **Us** effectively to bring suit in their name. The obligations of the **Insured** under this condition will survive the expiration or cancellation of the Policy.

4.  **Extended Reporting Period:**

a.  If this Policy is cancelled or non-renewed for any reason other than nonpayment of premium, the **Named Insured** will have the right to:

(1)    a seventy-five (75) day Automatic Extended Reporting Period, beginning on the effective date of such cancellation or non-renewal, for no additional premium charge; and

(2)    to purchase an Additional Extended Reporting Period, beginning on the effective date of the cancellation or non-renewal, for an additional premium; provided that the **Named Insured** elects to purchase the Additional Extended Reporting Period in writing and provides **Us** any additional premium due within thirty (30) days of the effective date of cancellation or non-renewal, subject to the available options as set forth in subparagraph c.

b.    The coverage otherwise afforded by this Policy will be extended to apply to **Loss** or **Defense Expenses** from **Claims** first made during the Extended Reporting Period, but only if such **Claims** are for **Wrongful Acts** committed on or after the **Retroactive Date** and before the end of the **Policy Period**. An Extended Reporting Period does not increase or reinstate any Limit of Liability and may only be effective if all premiums and retentions due under the Policy have been paid. The Automatic Extended Reporting Period shall not become effective if the **Insured** procures replacement coverage. Once purchased, the Extended Reporting Period may not be canceled and the premium shall be deemed fully earned.

c.    Extended Reporting Period Options:

(1)    a one (1) year extended reporting period for an additional premium of seventy percent (70%) of the Premium set forth in Item 6. of the Declarations;

(2)    a two (2) year extended reporting period for an additional premium of one hundred percent (100%) of the Premium set forth in Item 6. of the Declarations; or

(3)    a three (3) year extended reporting period for an additional premium of one hundred and fifty percent (150%) of the Premium set forth in Item 6. of the Declarations.

5.    **Notice; Timing, and Interrelationship of Claims:**

a.    As a condition precedent to any right to payment under this Policy, the **Insured** must give **Us** written notice of a **Claim** with full details, as soon as practicable after any of **Your** school administrators becomes aware of such **Claim** and in no event, no later than seventy-five (75) days after the expiration of the **Policy Period**.

b.    If, during the **Policy Period**, the **Insured** first becomes aware of any **Wrongful Act** that may subsequently give rise to a **Claim**, and, as soon as practicable thereafter but before the expiration or cancellation of this Policy:

(1)    gives **Us** written notice of such **Wrongful Act**, including a description of the **Wrongful Act** in question, the identities of the potential claimants, the consequences that have resulted or may result from such **Wrongful Act**, the damages that may result from such **Wrongful Act** and the circumstances by which the **Insured** first became aware of such **Wrongful Act**; and

(2)    requests coverage under this Policy for any subsequently resulting **Claim** for such **Wrongful Act**;

then **We** will treat any such subsequently resulting **Claim** as if it had been first made during the **Policy Period**.

c.    All notices under this condition must be sent in writing to the address or email address set

DOCUMENT 4

forth in Item 5. of the Declarations.

d.  All **Related Claims** will be treated as a single **Claim** made when the earliest of such **Related Claims** was first made, or when the earliest of such **Related Claims** is treated as having been made in accordance with Condition 5.b., whichever is earlier.

6.  **Cancellation; No Obligation to Renew:**

a.  **We** may not cancel this Policy except for **Your** failure to pay a premium when due.  **We** will deliver or mail by first class, registered or certified mail to **You** at **Your** last known address, written notice of cancellation at least twenty (20) days before the effective date of cancellation.  Such notice shall state the reason for cancellation.  A copy of such notice shall be sent to the agent of record.

b.  **You** may cancel this Policy by mailing to **Us** written notice stating when, not later than the Expiration Date set forth in Item 2. of the Declarations, such cancellation will be effective. In such event, return premium will be computed as 0.90 times the pro rata unearned premium shown in Item 6. of the Declarations and rounded to the nearest whole dollar. Premium adjustment may be made either at the time that cancellation by **You** is effective or as soon as practicable thereafter.  If **Our** maximum aggregate Limit of Liability for Insuring Agreements A.1. and A.2., as set forth Item 3.(c) of the Declarations, is exhausted by the payment of **Loss** or **Defense Expenses**, the entire premium will be deemed fully earned.

c.  **We** will not be required to renew this Policy upon its expiration.  If **We** elect not to renew this Policy, **We** will deliver or mail by first class, registered or certified mail to **You** at **Your** last known address, written notice to that effect at least sixty (60) days before the Expiration Date set forth in Item 2. of the Declarations.  Such notice shall state the specific reason(s) for non-renewal.  A copy of such notice shall be sent to the agent of record.

7.  **Representations:**

The **Named Insured** represents that the statements contained in the **Application** are true, accurate and complete, and agrees that this Policy is issued in reliance upon the truth thereof, which are deemed to be incorporated into and to constitute a part of this Policy.

8.  **Separation of Insureds; Protection of Innocent Insureds:**

a.  In the event of any material untruth, misrepresentation or omission in connection with any of the particulars or statements in the **Application**, this Policy will be void:

(1)  with respect to any natural person **Insured** who knew of such untruth, misrepresentation or omission; and

(2)  with respect to **You**, if, and only if, **Your** principal, assistant principal, dean, assistant dean, director, officer, regent, trustee or school board member, or any other person in a functionally equivalent position, knew of such untruth, misrepresentation or omission.

b.  No act, error or omission of any **Insured** will be imputed to any other **Insured** to determine the application of any exclusion set forth in Section **D. EXCLUSIONS** of this Policy.  If it is determined that an exclusion applies to an **Insured** in connection with a **Claim**, no coverage shall be available under this Policy for such **Insured**, however, coverage shall continue in effect under this Policy for any other **Insured**, subject to all other terms, conditions, and exclusions herein.

9.  **No Action against Us:**

a.    No action may be taken against **Us** unless, as conditions precedent thereto, there has been full compliance with all of the terms of this Policy and the amount of an **Insured's** obligation to pay has been finally determined either by judgment against an **Insured** after adjudicatory proceedings, or by written agreement of an **Insured**, the claimant and **Us**.

b.    No person or entity will have any right under this Policy to join **Us** as a party to any **Claim** to determine the liability of an **Insured**; nor may **We** be impleaded by an **Insured** or his, her or its legal representative in any such **Claim**.

10.    **Insolvency of Insured:**

**We** will not be relieved of any of **Our** obligations under this Policy by the bankruptcy or insolvency of an **Insured**.

11.    **Non-Accumulation of Limits:**

If coverage is provided under this Policy and any other policy or policies underwritten or reinsured by **Us** to **You**, the maximum amount payable in the aggregate under this Policy and all such other policies shall not exceed the single highest Limit of Liability available under all such policies. Only one retention or deductible will apply, which shall be the retention or deductible corresponding to the Limit of Liability applied to the **Claim**.

12.    **Territory:**

This Policy applies to **Wrongful Acts** committed by an **Insured**, or to any **Claim** brought against an **Insured**, anywhere in the world.

13.    **Authorization and Notices:**

The **Insureds** agree that **You** will act on their behalf with respect to receiving any notices and return premiums from **Us**.

14.    **Changes:**

This Policy contains all the agreements between any and all **Insureds** and **Us** concerning this insurance. The **Named Insured** is authorized on behalf of all **Insureds** to make changes in the terms of this Policy with **Our** consent. This Policy's terms can be amended or waived only by endorsement issued by **Us** and made part of this Policy.

15.    **Assignment:**

No assignment of interest under this Policy will bind **Us** without **Our** consent.

16.    **Entire Agreement:**

The **Insured** agrees that this Policy, including the **Application** and any endorsements, constitutes the entire agreement between every **Insured** and **Us** or any of **Our** agents relating to this insurance.

17.    **Choice of Law:**

All matters arising hereunder, including but not limited to questions related to the validity, interpretation, performance and enforcement of this Policy, shall be determined in accordance with the law and practice of the State of New York, notwithstanding New York's conflicts of law rules.

18.    **Premium:**

The **Named Insured** shall be responsible for payment of all premiums and will be the payee of any return premium.   The Policy premium may be changed at any time if the Policy terms and conditions are changed by, among other things, adding additional insureds, changing limits of liability or extending the **Policy Period**.   The **Named Insured** or its designee agrees to pay all increased premiums promptly in accordance with the Company's invoices.

19.   **Conformity to Statute:**

All terms of this Policy that conflict with any applicable laws or regulations are hereby amended to conform to such laws or regulations.

20.   **Headings:**

The descriptions in the headings and sub-headings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

**In witness whereof, the Insurer has caused this Policy to be executed on the Declarations Page.**

ENDORSEMENT NO._____

**ADDITIONAL INSUREDS**

This Endorsement, effective at 12:01 a.m. on 01/01/2021 , forms part of

    Policy No.: ELL0951876-03
    Issued to:  Judson College
    Issued by:  Indian Harbor Insurance Company

In consideration of the premium charged, it is hereby agreed that:

Section **E. DEFINITIONS, Insured** as defined in the Policy is amended to include:

    Judson College Foundation

All other terms, conditions and limitations of this Policy shall remain unchanged.

_Martin H. Kauspe, Jr._
_____
(Authorized Representative)

PGU 1000 0417                                                                                 Page 1 of 1

**ENDORSEMENT NO._____**

## ACT OF SCHOOL VIOLENCE CRISIS MANAGEMENT COVERAGE

This Endorsement, effective at 12:01 a.m. on 01/01/2021 , forms part of

Policy No.: ELL0951876-03
Issued to:  Judson College
Issued by: Indian Harbor Insurance Company

In consideration of the premium charged, it is hereby agreed that:

I.   The following is added to Section **A. INSURING AGREEMENTS**:

   5.   Act of School Violence Crisis Management

      **We** will pay on behalf of the **Named Insured** those **Crisis Management Expenses** incurred in response to any **Act of School Violence** first taking place during the **Policy Period** and reported to **Us** in accordance with Item VIII. of this Endorsement, subject to the applicable Limits of Liability set forth in Item 3(f) of the Declarations.

II.   Item 3. of the Declarations, Limits of Liability, is amended by the addition of the following:

   (f)   Act of School Violence Crisis Management Limits of Liability

      (1)   $ 250,000   **Company's** maximum Limit of Liability for all **Crisis Management Expenses** from each **Act of School Violence** under **INSURING AGREEMENT A**.5.

      (2)   $ 250,000   **Company's** maximum Limit of Liability for all **Crisis Management Expenses** from all **Acts of School Violence** under **INSURING AGREEMENT A**.5.

III.   Item 4. of the Declarations, Retentions, is amended by the addition of the following:

   (d)   $ 10,000   all **Acts of School Violence** in the aggregate under **INSURING AGREEMENT A**.5.

IV.   The amount set forth in Item 3.(f)(1) of the Declarations is the most **We** will pay for all **Crisis Management Expenses** from each **Act of School Violence**.  The amount set forth in Item 3.(f)(2) of the Declarations is the most **We** will pay for all **Crisis Management Expenses** from all **Acts of School Violence**.

V.   Solely with respect to the coverage provided pursuant to this Endorsement, the following definitions shall apply:

**Act of School Violence** means:

   a.   Any violent act of a criminal nature taking place on the **Named Insured's Premises** which causes **Bodily Injury** to a **Victim**; or

b.    A credible threat communicated to the **Named Insured** of a violent act of a criminal nature taking place on **Your Premises** which **You** reasonably believe may imminently cause **Bodily Injury** to a **Victim**; in response to which the **Named Insured**:

    (1)    reasonably determines it is necessary to suspend all classes for one or more days or lock down all or a substantial part of **Your Premises**;

    (2)    implements its **Emergency Response Plan**; and

    (3)    contacts federal, state or local police authorities for assistance.

Acts of School Violence involving a sequence or series of related violent acts or threats will be deemed to have taken place at the time the first of such acts began or the threat occurred and shall be considered one Act of School Violence, regardless of the number of **Victims** or perpetrators.

**Bodily Injury** means bodily injury, sickness or disability sustained by a **Victim**, including death resulting from any of these at any time.

**Crisis Management Expenses** means **Public Relations Expenses**, **Insured's Travel/Printing Expenses**, **Extraordinary Family Travel Expenses** and **Post-Violence Avoidance Expenses**; provided, however, that **Crisis Management Expenses** shall not include:

(1)    The **Named Insured's** overhead expenses or any salaries, wages, fees or benefits of **Employees**; or

(2)    The cost of medical, psychiatric or counseling services, even if provided by a **Crisis Management Firm**.

**Crisis Management Firm** means any public relations firm, crisis management firm or law firm hired or appointed by the **Named Insured** to perform Crisis Management Services in connection with **Acts of School Violence**.

**Emergency Response Plan** means the formal written school safety and crisis response manual that details the **Named Insured's** policies and procedures in the event of an **Act of School Violence**.

**Extraordinary Family Travel Expenses** means the reasonable and necessary expenses incurred by any natural or adoptive parent, legal guardian, spouse, or child of a **Victim** within thirty (30) days after such **Act of School Violence** took place to travel to the location where the **Act of School Violence** took place, so long as the **Act of School Violence** took place on an official trip sponsored by the **Named Insured**. For the purpose of this definition, coach air transportation or ground transportation and standard class hotel accommodations shall be deemed reasonable expenses.

**Insured's Travel/Printing Expenses** means the reasonable and necessary expenses incurred by the **Named Insured** in response to an **Act of School Violence** within one hundred (120) days after such **Act of School Violence** took place for printing, advertising, mailing materials, or travel by any **Insured** or the **Crisis Management Firm** in connection with such **Act of School Violence**.

**Named Insured's Premises** means the following, if located at the time of the **Act of School Violence** in the United States:

a.      Any building, facility or other real property including adjoining ways, which **You** own, rent or lease and is used by the **Named Insured** at the time of the **Act of School Violence** to conduct education, including administration, maintenance and recreational facilities, or for school authorized after-school or extracurricular activities for the **Named Insured's** students;

b.      Any other location, but solely if being visited at the time of the **Act of School Violence** by the **Named Insured's** students or **Employees** on an official trip sponsored by the **Named Insured**;

c.      Any other location, but solely if being used at the time of the **Act of School Violence** for a special event sponsored by a Parent Teacher Organization, Association or Council affiliated with the **Named Insured**; and

d.      Any school bus or other vehicle that the **Named Insured** owns or leases pursuant to a written contract, but solely if being used at the time of the **Act of School Violence** in the transportation of the **Named Insured's** students;

provided, however, the Named Insured's Premises does not include: (i) any building, facility, or other real property owned, rented or leased by, or under the management and direction of any individual or entity other than the **Named Insured**; (ii) any location for an event independently organized by students; or (iii) any other vehicle.

**Post-Violence Avoidance Expenses** means the reasonable costs incurred by the **Named Insured** within sixty (60) days after the **Act of School Violence** took place to purchase equipment or make property improvements that are not covered by other insurance and that relate directly to the security of the **Named Insured's** school and may assist in prevention or mitigation of future **Acts of School Violence**.

**Public Relations Expenses** means the reasonable and necessary fees and expenses incurred by the **Named Insured** in response to an **Act of School Violence** within one hundred twenty (120) days after such **Act of School Violence** took place for services performed by a **Crisis Management Firm** to minimize potential harm to the name or reputation of the **Named Insured** arising from such **Act of School Violence**, including but not limited to maintaining and restoring public confidence in the **Named Insured** and providing advice to the **Insureds**; provided, however, Public Relations Expenses do not include **Post-Violence Avoidance Expenses**, **Insured's Travel/Printing Expenses** or any fees or expenses related to civil or criminal investigations, proceedings or litigation.

**Victim** means:

a.      Any student of the **Named Insured**, including a student attending **Your** school as part of a school sponsored exchange program;

b.      Any **Business Invitee**, including any parent or legal guardian of a student of the **Named Insured** or any person visiting the **Your Premises** for purposes related to students' education; or

c.      Any **Employee**;

provided, however, Victim does not include any independent contractors or subcontracted personnel working on the **Named Insured's Premises** or any person who has or is alleged to have made any attempt at, or knowingly participated in, or encouraged any **Act of School Violence**.

VI.     Solely with respect to the coverage provided pursuant to this Endorsement, Section **F. CONDITIONS**, Item 2. **Cooperation**, is amended by the deletion of the words: "In the event of a **Claim**."

VII.    **We** shall not pay any **Crisis Management Costs** from any **Act of School Violence** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any war, whether or not declared, or any act or condition incidental to war, including civil war, insurrection, rebellion or revolution.

VIII.   As a condition precedent to coverage under this Endorsement, **You** must notify **Us** in writing as soon as practicable during the **Policy Period**, but in no event more than ten (10) days after such **Act of School Violence** first took place. The written notice to **Us** must be as complete as possible, stating how, when, and where such **Act of School Violence** took place and the **Bodily Injury** or damage arising therefrom and providing a complete and detailed summary of the **Crisis Management Expenses** incurred or expected to be incurred.

To be eligible for coverage, **Crisis Management Expenses** must be submitted **Us** no later than ninety (90) days after such **Crisis Management Expenses** are incurred.

IX.     **We** will be permitted, but not obligated, to inspect **Your** property and operations and to review the **Emergency Response Plan** at any time, upon reasonable notice. Neither the Company's right to make such inspection or review nor the making of any such inspection or review shall constitute an undertaking, on behalf of or for the benefit of the **Insured** or others, to determine or warrant that such property and operations are safe or that the **Emergency Response Plan** is adequate, effective or legal.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
(Authorized Representative)

DOCUMENT 4

ENDORSEMENT NO._____

**MINIMUM EARNED PREMIUM UPON CANCELLATION**

This Endorsement, effective at 12:01 a.m. on 01/01/2021 , forms part of

    Policy No.: ELL0951876-03
    Issued to:  Judson College
    Issued by:  Indian Harbor Insurance Company

In consideration of the premium charged, it is hereby agreed that:

Section **F. CONDITIONS**, Item 6. **Cancellation; No Obligation to Renew**, Paragraph b. is deleted in its entirety and replaced as follows:

    b.    **You** may cancel this Policy by mailing **Us** written notice stating when, no later than the Expiration Date set forth in Item 2.(b) of the Declarations, such cancellation will be effective.  In such event, the earned premium amount to be retained by **Us** will be the greater of:

        (1)    The amount computed in accordance with **Our** customary short rate table and procedure;

        (2)    25% of the total policy premium shown in Item 6. of the Declarations; or

        (3)    $1,500.00 .

    Premium adjustment may be made either at the time that cancellation by **You** is effective or as soon as practicable thereafter. If the Policy Aggregate Limit of Liability, as set forth Item 3.(c) of the Declarations, is exhausted by the payment of **Loss** or **Defense Expenses**, the entire premium will be deemed fully earned.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_Martin H. Kaufin, Jr._
_____
(Authorized Representative)

PGU 1052 0417

Page 1 of 1

ENDORSEMENT NO._____

### NETWORK SECURITY IDENTITY THEFT EVENT COVERAGE

This Endorsement, effective at 12:01 a.m. on 01/01/2021 , forms part of

> Policy No.: ELL0951876-03
> Issued to:  Judson College
> Issued by:  Indian Harbor Insurance Company

In consideration of the premium charged, it is hereby agreed that:

I.    Subject to the Limits of Liability and Retention set forth herein, and the Exclusions and Conditions set forth in this Policy and in this endorsement, **We** will reimburse expenses incurred by the **Named Insured** for notification to third parties or credit monitoring arising from a **Network Security Identity Theft Event** that takes place during the **Policy Period**, but only if:

    1.    The expenses must are incurred pursuant to a federal or state statutory mandate, and are not eligible for coverage as **Loss** from a **Claim** under this Policy; and

    2.    The notice or credit monitoring expenses are reported to **Us** as soon as practicable after the **Network Security Identity Theft Event** takes place, but in no event later than thirty (30) days after the **Named Insured** first incurs such expenses.

II.    The most **We** will pay in connection with the coverage provided by this endorsement is $100,000 in the aggregate, which amount shall be part of and not in addition to the maximum aggregate Limit of Liability as set forth in Item 3. of the Declarations.  A Retention in the amount of $500      shall apply to each and every **Network Security Identity Theft Event**.

III.    The following definitions apply to this endorsement:

**Identity Theft** means the misappropriation of the **Personally Identifiable Information** that is in the **Insured's** care, custody and control and stored in the **Insured's Network**, which results in the wrongful or fraudulent use of such **Personally Identifiable Information**, including but not limited to, fraudulently emulating the identity of an individual.

**Network** means computer hardware, software, firmware, and components thereof, including electronic data and information stored thereon, which are connected through two (2) or more computers, including such networks accessible through the Internet, intranets, extranets or virtual private networks.  Network shall not include the computer hardware, software, firmware, or components thereof, of any third party provider of telephone, telecommunications, cable, Internet, or satellite services.

**Network Security** means the use of hardware, software and firmware, including, without limitation, firewalls, filters, routers, intrusion detection software, antivirus software, automated password management applications and other authentication mechanisms, which are designed to control or restrict the access to a **Network**, or parts thereof.

**Network Security Identity Theft Event** means a breach of the **Insured's Network Security** by a third party other than an **Insured**, the consequences of which are reasonably likely to result in **Identity Theft**.

DOCUMENT 4

**Personally Identifiable Information** means:

1. Information from which an individual may be uniquely and reliably identified, including, but not limited to an individual's name, address, telephone number, in combination with their social security number, account relationships, account numbers, passwords, PIN numbers, credit card numbers or biometric information;

2. Nonpublic personal information as defined by Title V of the Gramm-Leach Bliley Act of 1999 (Public Law 106-102, 113 Stat. 1338) ("G-L-B"), as amended, and any regulations promulgated thereto;

3. Protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) ("HIPAA"), as amended, and any regulation promulgated thereto; or

4. Personal information as defined in an applicable state privacy protection law governing the control and use of an individual's personal and confidential information, such as the California Database Protection Act of 2003 (Cal. SB 1386) and California A.B. 1950, as amended, and any regulations promulgated thereto.

IV. The following Exclusions shall apply to the coverage granted pursuant to this endorsement, in addition to those set forth in Section **D. EXCLUSIONS** of the Policy:

This Policy does not cover **Loss**, including **Defense Expenses**, from **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any of the following:

A. The failure, interruption or reduction in supply of utility service or infrastructure, including, without limitation, electrical, gas, water, telephone, Internet, cable, satellite, or telecommunications;

B. Any failure of an **Insured** to continuously implement its own written or established security procedures and risk controls;

C. The expiration or withdrawal of technical support by a software vendor; and

D. The transfer, exchange or payment of funds, money or securities.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_(signature)_

_____
(Authorized Representative)

DOCUMENT 4

ENDORSEMENT NO._____

**HARASSMENT/BULLYING COVERAGE**

This Endorsement, effective at 12:01 a.m. on  01/01/2021  , forms part of

     Policy No.: ELL0951876-03
     Issued to:  Judson College
     Issued by:  Indian Harbor Insurance Company

In consideration of the premium charged, it is hereby agreed that:

I.    **We** will reimburse **Defense Expenses** incurred by an **Insured** in connection with a **Claim** alleging **Harassment or Bullying Activities** that is first made against an **Insured** during the **Policy Period** or any applicable Extended Reporting Period, and arising out of **Harassment or Bullying Activities** occurring on or after the **Retroactive Date** and before the end of the **Policy Period**.

II.    It shall be the duty of the **Insured**, and not **Us**, to defend such **Claims**.  The **Insured** shall have the right to select defense counsel for the investigation and defense of such **Claims**, subject to **Our** consent and approval, which shall not be unreasonably withheld.  **We** shall have the right to associate in the defense and settlement of any such **Claim**.

III.    The    most **We**    shall reimburse the **Insured** for all **Defense Expenses** from **Claims** arising out of **Harassment or Bullying Activities** is $50,000    , which shall be part of and not in addition to the Limit of Liability shown in the Declarations.

    The Limit of Liability set forth above is the most **We** will pay for all **Claims** against one or more **Insureds** involving **Harassment or Bullying Activities**, whether alone or in combination with any other claims.  If **Harassment or Bullying Activities** are alleged at any stage during a **Claim**, all allegations in that **Claim** and any **Related Claims** will be subject to the Limit of Liability as set forth in this Endorsement.  If the **Company** has paid the Limit of Liability set forth herein, it will no longer be obligated to make any payment in connection with any **Claims** involving **Harassment or Bullying Activities**.

IV.    Each **Claim** arising out of **Harassment or Bullying Activities** that is covered by this Endorsement shall be subject to a Retention in the amount of  $10,000  .

V.    The term **Harassment or Bullying Activities** as used in this Endorsement means:

    Any gesture, or any written, verbal or physical act, or any electronic communication that is directed at a student or group of students, and takes place on school property, at any school-sponsored function or on a school bus, which a reasonable person should know, under the circumstances, will have the effect of:

    a.    Harming a student, damaging the student's property, damaging a student's education or future educational opportunities, or placing a student in reasonable fear of harm to his or her person, damage to his or her property, or damage to his or her education or future educational opportunities; or

    b.    Insulting or demeaning any student or group of students in such a way as to cause substantial disruption in, or substantial interference with, the orderly operation of the school or that student's or students' education or future educational opportunities.

VI.   The coverage under this Endorsement shall be the sole and exclusive coverage under this Policy for **Claims** based upon, arising out of, resulting from, or in any way involving or related to **Harassment or Bullying Activities**, whether alone or in connection with any other claims. Except as set forth in this Endorsement, there shall be no coverage under this Policy for any **Claim** based upon, arising out of, resulting from, or in any way involving or related to **Harassment or Bullying Activities**.

VII.  The term **Related Claims** as used in this Endorsement means:

**Related Claims** means all **Claims** for **Harassment or Bullying Activities** or **Wrongful Acts** based upon, arising out of, resulting from, or in any way involving, the same or related facts, circumstances, situations, transactions or events, or the same or related series of facts, circumstances situations, transactions or events, whether related logically, causally or in any other way, or the same persons.


All other terms, conditions and limitations of this Policy shall remain unchanged.


_____
(Authorized Representative)

DOCUMENT 4

**ENDORSEMENT #**

This endorsement, effective 12:01 a.m. 01/01/2021 , forms a part of Policy No. ELL0951876-03

issued to  Judson College

by   Indian Harbor Insurance Company

**SERVICE OF PROCESS**

The Commissioner of Insurance of the State of Alabama is hereby designated the true and lawful attorney of the Company upon whom may be served all lawful process in any action, suit or proceeding arising out of this policy. The Company further designates:

> Sarah Mims
> Assistant Secretary
> 505 Eagleview Boulevard, Suite 100
> Exton, Pennsylvania 19341-0636

as its agent in Alabama to whom such process shall be forwarded by the Commissioner of Insurance.

For Illinois exposures, the Insurer further designates the Director of the Illinois Division of Insurance and his successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the insured or any beneficiary hereunder arising out of an Illinois exposure and this contract of insurance.

All other terms and conditions of this policy remain unchanged.

_(Authorized Representative)_

XL-ALSOP 11 10

© 2010 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

DOCUMENT 4

# NOTICE TO POLICYHOLDERS

**FRAUD NOTICE**

| Arkansas | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
|---|---|
| **Colorado** | **It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable for insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.** |
| **District of Columbia** | **WARNING:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant. |
| **Florida** | Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree. |
| **Kansas** | A "fraudulent insurance act" means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto. |
| **Kentucky** | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. |
| **Louisiana** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Maine** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines, or denial of insurance benefits. |
| **Maryland** | Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **New Jersey** | Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties. |
| **New Mexico** | ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES. |

© 2015 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

| New York | **General: All applications for commercial insurance, other than automobile insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.<br><br>**All applications for automobile insurance and all claim forms:** Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation.<br><br>**Fire:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.<br><br>The proposed insured affirms that the foregoing information is true and agrees that these applications shall constitute a part of any policy issued whether attached or not and that any willful concealment or misrepresentation of a material fact or circumstances shall be grounds to rescind the insurance policy. |
|---|---|
| Ohio | Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud. |
| Oklahoma | **WARNING**: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony. |
| Pennsylvania | **All Commercial Insurance, Except As Provided for Automobile Insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.<br><br>**Automobile Insurance:** Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and the payment of a fine of up to $15,000. |
| Puerto Rico | **Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances [be] present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.** |

© 2015 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

| Rhode Island | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
|---|---|
| Tennessee | **All Commercial Insurance, Except As Provided for Workers' Compensation** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.<br><br>**Workers' Compensation:**  It is a crime to knowingly provide false, incomplete or misleading information to any party to a workers' compensation transaction for the purpose of committing fraud. Penalties include imprisonment, fines and denial of insurance benefits. |
| Utah | **Workers' Compensation:**  Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report or billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state prison. |
| Virginia | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| Washington | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| West Virginia | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| All Other States | Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in prison.  (In Oregon, the aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). |

© 2015 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

### PRIVACY POLICY

The XL Catlin insurance group (the "Companies"), believes personal information that we collect about our customers, potential customers, and proposed insureds (referred to collectively in this Privacy Policy as "customers") must be treated with the highest degree of confidentiality. For this reason and in compliance with the Title V of the Gramm-Leach-Bliley Act ("GLBA"), we have developed a Privacy Policy that applies to all of our companies. For purposes of our Privacy Policy, the term "personal information" includes all information we obtain about a customer and maintain in a personally identifiable way. In order to assure the confidentiality of the personal information we collect and in order to comply with applicable laws, all individuals with access to personal information about our customers are required to follow this policy.

### Our Privacy Promise

Your privacy and the confidentiality of your business records are important to us. Information and the analysis of information is essential to the business of insurance and critical to our ability to provide to you excellent, cost-effective service and products. We understand that gaining and keeping your trust depends upon the security and integrity of our records concerning you. Accordingly, we promise that:

1. We will follow strict standards of security and confidentiality to protect any information you share with us or information that we receive about you;
2. We will verify and exchange information regarding your credit and financial status only for the purposes of underwriting, policy administration, or risk management and only with reputable references and clearinghouse services;
3. We will not collect and use information about you and your business other than the minimum amount of information necessary to advise you about and deliver to you excellent service and products and to administer our business;
4. We will train our employees to handle information about you or your business in a secure and confidential manner and only permit employees authorized to use such information to have access to such information;
5. We will not disclose information about you or your business to any organization outside the XL Catlin insurance group of Companies or to third party service providers unless we disclose to you our intent to do so or we are required to do so by law;
6. We will not disclose medical information about you, your employees, or any claimants under any policy of insurance, unless you provide us with written authorization to do so, or unless the disclosure is for any specific business exception provided in the law;
7. We will attempt, with your help, to keep our records regarding you and your business complete and accurate, and will advise you how and where to access your account information (unless prohibited by law), and will advise you how to correct errors or make changes to that information; and
8. We will audit and assess our operations, personnel and third party service providers to assure that your privacy is respected.

### Collection and Sources of Information

We collect from a customer or potential customer only the personal information that is necessary for (a) determining eligibility for the product or service sought by the customer, (b) administering the product or service obtained, and (c) advising the customer about our products and services. The information we collect generally comes from the following sources:

- Submission – During the submission process, you provide us with information about you and your business, such as your name, address, phone number, e-mail address, and other types of personal identification information;
- Quotes – We collect information to enable us to determine your eligibility for the particular insurance product and to determine the cost of such insurance to you. The information we collect will vary with the type of insurance you seek;

PN CW 02 1015

© 2015 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

- Transactions – We will maintain records of all transactions with us, our affiliates, and our third party service providers, including your insurance coverage selections, premiums, billing and payment information, claims history, and other information related to your account;
- Claims – If you obtain insurance from us, we will maintain records related to any claims that may be made under your policies. The investigation of a claim necessarily involves collection of a broad range of information about many issues, some of which does not directly involve you. We will share with you any facts that we collect about your claim unless we are prohibited by law from doing so. The process of claim investigation, evaluation, and settlement also involves, however, the collection of advice, opinions, and comments from many people, including attorneys and experts, to aid the claim specialist in determining how best to handle your claim. In order to protect the legal and transactional confidentiality and privileges associated with such opinions, comments and advice, we will not disclose this information to you; and
- Credit and Financial Reports – We may receive information about you and your business regarding your credit. We use this information to verify information you provide during the submission and quote processes and to help underwrite and provide to you the most accurate and cost-effective insurance quote we can provide.

Retention and Correction of Personal Information

We retain personal information only as long as required by our business practices and applicable law. If we become aware that an item of personal information may be materially inaccurate, we will make reasonable effort to re-verify its accuracy and correct any error as appropriate.

Storage of Personal Information

We have in place safeguards to protect data and paper files containing personal information.

Sharing/Disclosing of Personal Information

We maintain procedures to assure that we do not share personal information with an unaffiliated third party for marketing purposes unless such sharing is permitted by law. Personal information may be disclosed to an unaffiliated third party for necessary servicing of the product or service or for other normal business transactions as permitted by law.

We do not disclose personal information to an unaffiliated third party for servicing purposes or joint marketing purposes unless a contract containing a confidentiality/non-disclosure provision has been signed by us and the third party. Unless a consumer consents, we do not disclose "consumer credit report" type information obtained from an application or a credit report regarding a customer who applies for a financial product to any unaffiliated third party for the purpose of serving as a factor in establishing a consumer's eligibility for credit, insurance or employment. "Consumer credit report type information" means such things as net worth, credit worthiness, lifestyle information (piloting, skydiving, etc.) solvency, etc. We also do not disclose to any unaffiliated third party a policy or account number for use in marketing. We may share with our affiliated companies information that relates to our experience and transactions with the customer.

Policy for Personal Information Relating to Nonpublic Personal Health Information

We do not disclose nonpublic personal health information about a customer unless an authorization is obtained from the customer whose nonpublic personal information is sought to be disclosed. However, an authorization shall not be prohibited, restricted or required for the disclosure of certain insurance functions, including, but not limited to, claims administration, claims adjustment and management, detection, investigation or reporting of actual or potential fraud, misrepresentation or criminal activity, underwriting, policy placement or issuance, loss control and/or auditing.

PN CW 02 1015

© 2015 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

Access to Your Information

Our employees, employees of our affiliated companies, and third party service providers will have access to information we collect about you and your business as is necessary to effect transactions with you.  We may also disclose information about you to the following categories of person or entities:

- Your independent insurance agent or broker;
- An independent claim adjuster or investigator, or an attorney or expert involved in the claim;
- Persons or organizations that conduct scientific studies, including actuaries and accountants;
- An insurance support organization;
- Another insurer if to prevent fraud or to properly underwrite a risk;
- A state insurance department or other governmental agency, if required by federal, state or local laws; or
- Any persons entitled to receive information as ordered by a summons, court order, search warrant, or subpoena.

Violation of the Privacy Policy

Any person violating the Privacy Policy will be subject to discipline, up to and including termination.

For more information or to address questions regarding this privacy statement, please contact your broker.

© 2015 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC and possibly the U.S. Department of State. **Please read this Policyholder Notice carefully.**

OFAC administers and enforces sanctions policy based on Presidential declarations of "national emergency". OFAC has identified and listed numerous

- Foreign agents
- Front organizations
- Terrorists
- Terrorist organizations
- Narcotics traffickers

as *Specially Designated Nationals and Blocked Persons*. This list can be found on the U.S. Department of the Treasury's web site - http//www.treas.gov/ofac.

The Secretary of the Treasury also has identified a number of entities in the insurance, petroleum, and petrochemicals industries determined to be owned or controlled by the Iranian government. Business transactions with any of these entities are expressly prohibited. These entities have been added to OFAC's list of *Financial Institutions Determined To Be Owned or Controlled by the Government of Iran.* This list can be found on the U.S. Department of the Treasury's web site - http://www.treasury.gov/resource-center/sanctions/Programs/Pages/iran.aspx, see List of CISADA and NDAA Prohibitions or Conditions

In accordance with OFAC regulations, or any applicable regulation promulgated by the U.S. Department of State, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance will be immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

PN CW 05 0914

©2014 X.L. America, Inc. All rights reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

DOCUMENT 5

ELECTRONICALLY FILED
7/17/2023 12:12 PM
53-CV-2023-900035.00
CIRCUIT COURT OF
PERRY COUNTY, ALABAMA
MIA JACOBS-TURNER, CLERK

# EXHIBIT C

DOCUMENT 5





Matthew Liebnick, Esq.
AXA XL
14643 Dallas Parkway
Suite 770
Dallas, TX 75254

Phone 972-663-3278
Matthew.Liebnick@axaxl.com

May 5, 2022

VIA EMAIL:  drobinson@judson.edu

Daphne R. Robinson
President
Judson College
302 Bibb Street
Marion, Alabama 36756

## COVERAGE DISCLAIMER

Re:  **Insured:**           **Judson College**
     **Claimant:**          **Bondholders**
     **Policy No.:**        **ELL0951876-03**
     **Policy Period:**     **01/01/2021 01/01/2022**
     **Reference:**         **0006917170**

Dear Ms. Robinson:

Indian Harbor Insurance Company ("Indian Harbor") previously acknowledged notice of the above-referenced matter by certain Bondholders (the "Bondholders" or the "Claimants") against Judson College ("Judson," the "Insured," or "You"). The purpose of this letter, therefore, is to advise the Insured of Indian Harbor's position regarding coverage for the claims made by Claimants against the Insured. **Based on our review of the materials currently available, Indian Harbor respectfully denies your request for coverage and will not be providing a defense or indemnification of this matter, as explained in detail below.**

This Coverage Disclaimer is based upon the factual allegations, as known, asserted against You. You may wish to consult with a personal attorney regarding the contents of this letter; however, such consult shall be at your own expense.

## I.      THE CLAIM

Our understanding of the facts include that the Insured entered into a contract or agreement where certain bonds were created for the benefit of the Insured. On or about October 25, 2021, Claimant's counsel sent a letter to the Insured advising that an ad hoc committee of bondholders had been established to represent their interests in relation to outstanding obligations of the Insured. The letter noted that the Insured is in default of its obligations to the Bondholders and that there is uncertainty regarding future payments. On or about November 17, 2021, Claimants requested that the Insured enter into a tolling agreement as a means to avoid litigation and allow for work out efforts of the outstanding obligations of the Insured in regard to the liability under the agreement with the Bondholders. The letter appears to lay out the specifics of the bond(s) created and certain payments made through those bonds, for the benefit of the Insured, which appears to form the basis of the Claim.

DOCUMENT 2

Daphne R. Robinson
President
Judson College
May 5, 2022
Page 2 of 7

## II.   THE INDIAN HARBOR POLICY

We are evaluating a tender for insurance coverage to Indian Harbor on behalf of the individual and/or entity to whom this letter is addressed. Unless we hear from you to the contrary, we will assume that coverage is being tendered to Indian Harbor only under the below referenced Policy and is being tendered on behalf of only those to whom our coverage letter is addressed.

Indian Harbor issued Educators Legal Liability and Employment Practices Liability Policy No. ELL0951876-03 (the "Policy"), which is effective from January 1, 2021, to January 1, 2022 (the "Policy Period"). Pursuant to Insuring Agreement A.1.a., entitled "Educators Legal Liability," the Policy has a maximum limit of liability of $5,000,000 each Claim and a $5,000,000 Policy Period Aggregate. *The Policy carries a $10,000 retention for each such claim.*

The Policy contains the following relevant provisions:

<div align="center">

**EDUCATORS LEGAL LIABILITY AND
EMPLOYMENT PRACTICES LIABILITY
INSURANCE COVERAGE FORM
(CLAIMS-MADE)**

</div>

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and what is not covered. Throughout the Policy the words **"You"** and **"Your"** refer to the **Named Insured**. The words '**We**", "**Us**", "**Our**" and the "**Company**" refer to the Company providing this insurance.

This Policy is incomplete unless the Declarations and all applicable forms and endorsements are attached. Words and phrases that appear in bold have special meaning and are defined in Section **E. DEFINITIONS**. Singular words shall include the plural, and plural words shall include the singular.

**A.    INSURING AGREEMENTS**

Subject to the Limits of Liability set forth in the Declarations, and all other terms and conditions of this Policy, we agree as follows:

1.    Educators Legal Liability

   a.    **We** will pay on behalf of an **Insured Loss** that the **Insured** becomes legally obligated to pay as a result of a **Claim** first made against an **Insured** during the **Policy Period** or applicable Extended Reporting Period for an **Educators Wrongful Act** occurring on or after the **Retroactive Date** and before the end of the **Policy Period**.

**D.    EXCLUSIONS**

This Policy shall not apply to any **Claim** arising from or relating to:

   11.    An **Insured's** liability under a contract or agreement, other than a manual of employment policies or procedures issued by **You**, unless such liability would have attached in the absence of such express contract or agreement. This exclusion shall not apply to the payment of **Defense Expenses** in connection with a

DOCUMENT 2

Daphne R. Robinson
President
Judson College
May 5, 2022
Page 3 of 7

**Collective Bargaining Act** or to the payment of **Defense Expenses** incurred in connection with a **Claim** for an **Employment Practices Wrongful Act** in the form of an actual or alleged breach of a contract to commence or continue employment with **You**.

**E.     DEFINITIONS**

Whenever used in this Policy, the term:

5.     **Claim** means:

a.     A written demand for monetary damages or **Non-Monetary Relief**;

b.     A written request to toll or waive any statute of limitations, or to waive any contractual time bar, relating to a potential suit against an **Insured** for a **Wrongful Act**;

c.     A civil proceeding in a court of law or equity, including any appeal therefrom, which is commenced by the filing of a complaint, motion for judgment, or similar proceeding;

d.     A criminal proceeding that is commenced by the return of an indictment or similar document;

e.     An administrative or regulatory proceeding or investigation, including a proceeding brought by or before the Equal Employment Opportunity Commission or similar state or local agency, commenced by the filing of a notice of charges, formal order of investigation or similar document; or

f.     An arbitration proceeding or other alternative dispute resolution proceeding, to which the **Insured** must submit or does submit with **Our** consent.

8.     **Educators Wrongful Act** means:

a.     Any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty, including any **Personal Injury**, by an **Insured**, committed in the performance of his or her duties for **You**;

b.     Any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by any natural person **Insured** while serving at the direction or request of the **Named Insured** in the natural person **Insured's** capacity as a board member or committee member of an organization, other than the **Named Insured**, that is exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. The coverage provided by this Subsection b. is excess of, and shall not contribute with, any other insurance plan or program of self-insurance carried by such not-for-profit corporation, and any contribution or indemnification to which a natural person **Insured** is entitled to from such not-for-profit organization;

c.     Any matter claimed against an **Insured** solely by reason of his or her status as an **Insured** during the **Policy Period** and committed solely in the performance of duties for **You**.

Daphne R. Robinson
President
Judson College
May 5, 2022
Page 4 of 7

An Educators Wrongful Act shall not include an **Employment Practices Wrongful Act** or a **Third Party Wrongful Act**.

12.    **Insured** means:

    a.    **You**;

    b.    **Your** past, present or future duly elected, appointed or employed officials, directors, officers, regents, trustees or school board members, or their functional equivalents;

    c.    **Employees**;

    d.    In the event of the death, incapacity or bankruptcy of a natural person Insured, such Insured's estate, heirs, legal representatives or assigns, but only in connection with a **Claim** for an alleged **Wrongful Act** against the Insured Individual; and

    e.    The lawful spouse or domestic partner of any individual Insured identified in the paragraphs above, but only with respect to liability arising out of **Wrongful Acts** committed by such individual, and provided that such spouse or domestic partner is represented by the same counsel as such individual with respect to any **Claim**.

13.    **Loss** means damages, pre-judgment interest, post-judgment interest, front pay and back pay, judgments, settlements, punitive or exemplary damages where insurable under applicable law, or other amounts that an **Insured** is legally obligated to pay as a result of a **Claim**.

Loss will not include:

    a.    **Defense Expenses**;

    b.    **Non-Monetary Relief**;

    c.    Any amount representing the value of diminished or lost retirement, health care or other benefits;

    d.    Fines, taxes, penalties;

    e.    The cost of disaster response activities conducted by the **Insured** as required by the Federal Emergency Management Agency (FEMA);

    f.    Amounts due under any contract to commence, continue or separate from employment with **You**, including but not limited to the value of any compensation or employment benefits lost, or the cost of specific performance in connection with any such contract; or

    g.    The multiplied portion of multiplied damages; provided that Loss will include any multiplied damages awarded pursuant to the Age Discrimination in Employment Act or the Equal Pay Act ("Specified Multiplied Damages") that an **Insured** is obligated to pay as a result of a **Claim**, but only if such Specified Multiplied Damages are insurable

DOCUMENT 1

Daphne R. Robinson
President
Judson College
May 5, 2022
Page 5 of 7

under applicable law.

For the purpose of determining the insurability of punitive damages, exemplary damages or Specified Multiplied Damages under this Policy, the laws of the jurisdiction most favorable to the insurability of such damages shall control, provided that such jurisdiction:

(1)   is the location of the court which awarded or imposed such punitive, exemplary damages or Specified Multiplied Damages;

(2)   is where **You** are incorporated or otherwise organized or have a place of business; or

(3)   is where **We** are incorporated or has **Our** principal place of business.

### III.   EXPLANATION OF COVERAGE DISCLAIMER

As indicated above, Indian Harbor "will pay on behalf of an **Insured Loss** that the **Insured** becomes legally obligated to pay as a result of a **Claim** first made against an **Insured** during the **Policy Period** or applicable Extended Reporting Period for an **Educators Wrongful Act** occurring on or after the **Retroactive Date** and before the end of the **Policy Period**." The Policy defines a "Claim" to mean in part a "written demand for monetary damages or Non-Monetary Relief" or a "written request to toll or waive any statute of limitations, or to waive any contractual time bar, relating to a potential suit against an Insured for a Wrongful Act." An "Educators Wrongful Act" is defined by the Policy in relevant part to include "any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty, including any **Personal Injury**, by an **Insured**, committed in the performance of his or her duties for **You**." The Policy Period is January 1, 2021, to January 1, 2022.

As discussed above, the Insured entered into a contract or agreement where certain bonds were created for the benefit of the Insured. Claimant's counsel notified the Insured that an ad hoc committee of bondholders had been established to represent their interests in relation to collection of outstanding contractual obligations related to those bonds from the Insured. Thus, this matter is a "Claim" "first made" against an "Insured" during the "Policy Period" for an "Educators Wrongful Act," as these terms are defined. However, Exclusion 11 precludes coverage for "any **Claim** arising from or relating to…"an **Insured's** liability under a contract or agreement, other than a manual of employment policies or procedures issued by **You**, unless such liability would have attached in the absence of such express contract or agreement." Given this matter arises from and is related to the Insured's liability under a contract or agreement, Indian Harbor respectfully denies defense and indemnity coverage for this matter based on Exclusion 11.

### IV.   CONCLUSION

Indian Harbor's coverage position is based on the terms and provisions of the Policy and the facts currently known to Indian Harbor. If you have any additional information that you believe may change Indian Harbor's coverage position, please provide that information to us as soon as possible.

This letter should not be construed to limit any other defenses potentially available under the Policy. No action taken by Indian Harbor in investigating the facts of the action shall be construed in any way as waiving any right or defense or operating as an estoppel to assert any right or defense that Indian Harbor has under the law or the Policy. Likewise, nothing in this letter is intended to or should be construed to

Daphne R. Robinson
President
Judson College
May 5, 2022
Page 6 of 7

deprive the Insured of any rights that it may have under the law or the Policy.  Indian Harbor further reserves
the right to supplement and/or amend its coverage position at any time as circumstances may warrant.

If you have any other insurance policies which may respond to this claim, you should notify those carriers.

Should you have any questions concerning the foregoing, or wish to discuss this matter further, please feel
free to call me at any time.


Sincerely,


Matthew Liebnick, Esq.
Senior Claims Counsel

Cc:     Roberta Clanton, rclanton@pgui.com
        marjorie.siciliano@USI.com

DOCUMENT 6

ELECTRONICALLY FILED
7/17/2023 12:12 PM
53-CV-2023-900035.00
CIRCUIT COURT OF
PERRY COUNTY, ALABAMA
MIA JACOBS-TURNER, CLERK

## IN THE CIRCUIT COURT OF PERRY COUNTY, ALABAMA

|  |  |  |
|---|---|---|
| JUDSON COLLEGE; JOAN VIGNES NEWMAN; JUDITH KAREN FAVOR; DAPHNE RUDICELL ROBINSON; JOSEPH WILLIAM "BILL" MATHEWS, JR., | ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| v. | ) ) | **CIVIL ACTION NO.:** _____ |
| INDIAN HARBOR INSURANCE CO.; KEN GOFORTH; USI INSURANCE SERVICES, | ) ) ) ) | **JURY TRIAL REQUESTED** |
| **Defendants.** | ) | |

## PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS

COMES NOW Plaintiffs and hereby serve the following requests for production to be answered in accordance with Rule 34 of the Alabama Rules of Civil Procedure:

## DEFINITIONS

The following words, when used in these Requests for Production, unless otherwise indicated, shall mean:

A        The terms "You" and "Your" refer to the Defendant, **Indian Harbor**, and to his/her present or former agents, attorneys, representatives and other persons who have acted or purported to act on his/her/their behalf pursuant to contract or otherwise in any of the matters covered by these interrogatories and request for production, whether or not it is contended that such entity or person had authority to act on behalf thereof.

B.        "Communication" means any oral or written exchange of words, thoughts or ideas with another person(s), whether person-to-person, in a group, in a meeting, by telephone, letter, telefax, electronic mail, or otherwise, and including without limitation any printed, typed, handwritten or other readable document and any tape recording, correspondence, memorandum, report, contract, diary, log book, minutes, notes, study, survey and/or forecast.

C.    The "Document" or "Documents" shall have their customary broad meanings and shall include, without limitation, all originals, copies and drafts of all written, typewritten, recorded, transcribed, printed, taped, photographic or graphic material, however produced or reproduced, whether sent or received, or neither, including but not limited to, all books, pamphlets, articles, newspapers, press releases, magazines, booklets, circulars, handbooks, manuals, periodicals, letters, memoranda, files, envelopes, notices, instructions, reports, financial reports, records, studies, transcripts, diaries (formal or informal), audited and un-audited financial statements, working papers, questionnaires, notes, notations, charts, lists, comparisons, telegrams, cables, telex messages, communications (including intra-corporate communications, and reports, notes, notations and memoranda of, or relating to, telephone conversations and conferences), minutes, transcriptions, correspondence, agreements, graphs, tabulations, analyses, evaluations, tests, projections, opinions or reports, statements, summaries, desk calendars, appointment books, telephone logs, telephone bills, surveys, indices, tapes, computer inputs or outputs, computer memory, computer disks, electronic mail, microfilm, magnetic tapes, photographs, installation guides and instruction material within your possession, custody or control. Different versions of the same documents, including but not limited to, drafts or documents with handwritten notations or marks not found in the original or other copies or different documents.

D.    "Person" means any natural person as well as any firm, partnership, proprietorship, association, institution, joint venture, corporation, government entity, administrative agency, professional association and any other organization.

E.    "Identify," when used in reference to a natural person, means to provide that person's name, last known home and business addresses, last known home and business telephone numbers, present employer and job title.

F.    "Identify," when used in reference to a person that is a corporation, partnership, proprietorship, association, business, or other such group, means to provide the person's full name, address, telephone number, form of organization and a description of its business activities.

G.    "Identify," when used in reference to a document, means to provide a brief description of the document including its date, author, addressee, number of recipients, forum (that is, letter, invoice, blueprint, etc.), subject matter, length, and the present custody of each copy of the document having notations unique to such copy.

H.    "Identify," when used in reference to an oral communication, means to state the date of the communication and the place or places where the

2

communication occurred, and to identify each person who took part or heard the communication, to provide a description of the subject matter of the communication, and to identify each document that refers or relates to or evidences the communication.

I.  "Date" refers to the exact day, month, and year, if known, or, if not known, best approximation including, as appropriate to the situation, relationship to the offense.

J.  "Plaintiff" shall refer to, **Judson College,** and any present or former agents, attorneys, representatives and all other persons who have acted or purported to act on his/their behalf pursuant to contract or otherwise in any of the materials covered by these interrogatories and requests for production, whether or not it is contended that such entity or person had authority to act on behalf thereof.

K.  For each and every requested document that is claimed to be privileged: (i) identify the document by date, author, addressor and addressee; (ii) identify the person who presently has custody, control or possession of the original and all copies thereof; (iii) state specifically each and every ground on which the claim of privilege is based; (iv) identify each person (by name, address, employer, job description or position at present) who received, or had access in the ordinary course of business to, the original and/or any copy of the document from the time the document was originated until the present.

## REQUESTS FOR PRODUCTION

**Please produce:**

1.  Any and all communications (email, text, etc.) between Judson College and Indian Harbor.

2.  Any and all communications between Indian Harbor and Goforth (and/or his agency).

3.  Any and all communications between Goforth (and/or his agency) and Judson College.

4.  Copies of any documents generated as a result of any investigation conducted on behalf of the Defendant as a result of the underlying lawsuit, and Plaintiff's claim for defense and

indemnity in connection therewith, including but not limited to any evaluation of the facts giving rise to the underlying lawsuit, and any evaluation of coverage under the subject insurance policy.

5.      Please produce a certified copy of any relevant insurance policy, including all endorsements or riders.

6.      Any marketing materials produced between Goforth, his agency, and Indian Harbor.

7.      Copies of any and all reports from any experts, adjusters, or other individuals concerning an evaluation of the losses giving rise to the subject claim.

8.      Copies of any and all internal e-mail correspondence which in any way relates or pertains to the subject claim and/or the evaluation thereof.

9.      Copies of any and all documents or correspondence submitted during the claims process, to any file, including any underwriting, adjuster or claims files.

10.     Copies of any and all claims manuals regarding the handling of claims by this Defendant and/or its employees, agents, adjusters or claims personnel, and which were in effect as of the date that the subject claim was submitted.

11.     Copies of any and all guidelines, booklets, or other manuals concerning the proper procedures to be followed by Defendant's employees, agents, directors, adjusters, claims personnel or independent contractors, who are charged with handling claims on behalf of the Defendant.

12.     Copies of any and all communications between Defendant and its insureds under the subject insurance policy, which relate in any way to the underlying lawsuit, including but not limited to the facts giving rise to the same.

13.     Copies of any and all documents in your possession (whether or not created by you, or on your behalf) which relate in any way to Defendant's determination of coverage (or non-coverage, as the case may be) for the underlying claim.

Respectfully submitted,

*/s/ Richard E. Smith*
Richard E. Smith (SMI105)
Robert Andrew Yarbro (YAR017)
*Attorneys for Plaintiffs*

**OF COUNSEL:**
**CHRISTIAN & SMALL, LLP**
505 20th Street North, Suite 1800
Birmingham, Alabama  35203
Telephone:  205-795-6588
Fax:  205-328-7234
resmith@csattorneys.com
rayarbro@csattorneys.com

W. Ivey Gilmore, Jr. (GIL049)
*Attorney for Plaintiffs*

**OF COUNSEL:**
**GILMORE, ROWLEY, CRISSEY & WILSON, ATTORNEYS AT LAW, LLC**
1905 7th St,
Tuscaloosa, AL, 35401
Telephone: 205-752-8338
Fax: 205-686-1516
gilmore@gilmorerowley.com

<u>**PLEASE SERVE DEFENDANTS BY CERTIFIED MAIL**
**WITH THE SUMMONS AND COMPLAINT AND SIMULTANEOUSLY FILED**
**DISCOVERY REQUESTS**</u>

**INDIAN HARBOR INSURANCE CO.**
c/o Sarah Mims
505 Eagleview Boulevard, Suite 100
Exton, Pennsylvania 19341-0636

**KEN GOFORTH**
3761 Kinross Dr

5

**INDIAN HARBOR INSURANCE CO.**
c/o Sarah Mims
505 Eagleview Boulevard, Suite 100
Exton, Pennsylvania 19341-0636

**KEN GOFORTH**
3761 Kinross Dr
Birmingham, AL 35242-5805

**USI INSURANCE SERVICES**
2 North Jackson St., Suite 605
Montgomery, AL 36104

6

3827955.2



CERTIFIED MAIL

P.O. BOX 505
MARION, AL, 36756

UNITED STATES POSTAL SERVICE

DOCUMENT 7

USPS CERTIFIED MAIL

9236 0901 7301 4153 2300 0009 88

Restricted Delivery

To: INDIAN HARBOR INSURANCE COMPANY C/O SARAH
505 EAGLEVIEW BLVD
SUITE 100
EXTON, PA 19341



quadient

IMI

CORRECTION

$029.45 ℠
Y71172023  ZIP 367756
043M30234105B

US POSTAGE